## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

In re:

LINCOLN PAPER AND TISSUE, LLC

Debtor.

Chapter 11

Case No. 15-10715

**MOTION FOR ORDER (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING ON AN INTERIM BASIS AND (B) UTILIZE CASH COLLATERAL OF PRE-PETITION SECURED PARTIES ON AN INTERIM BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY, (IV) GRANTING RELATED RELIEF, PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363(C), (D) & (E), 364(C), 364(D)(1), 364(E) AND 507(B), AND (V) SCHEDULING A FINAL HEARING AUTHORIZING FINANCING ON A FINAL BASIS PURSUANT TO BANKRUPTCY RULE 4001**

Lincoln Paper and Tissue, LLC, the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor"), by and through its attorneys, hereby moves this Court to enter interim (the "Interim Order") and final orders (the "Final Order" and together with the Interim Order, the "DIP Orders") pursuant to sections 105(a), 361, 362, 363 and 364 of title 11 of the United States Code, Rule 4001(c) and (d) of the Federal Rules of Bankruptcy Procedure and Rules 4001-2 and 4001-4 of the Local Rules for the Bankruptcy Court for the District of Maine: (A) authorizing the Debtor to obtain postpetition financing (the "DIP Loan") from Siena Lending Group LLC ("Siena") substantially in accordance with the revolving credit facility the terms of which are set forth in that certain Debtor-in-Possession Revolving Loan and Security Agreement (the "DIP Credit Agreement"), a true and correct copy of which is attached hereto as **Exhibit A** (and which is incorporated herein by reference), which DIP Credit Agreement arises out of that certain commitment letter and related term sheet (collectively, the "DIP Term Sheet") attached hereto as **Exhibit B** (and which DIP Term Sheet is also incorporated herein by reference);

(B) authorizing the grant to Siena of a superpriority claim and a senior security interest in substantially all the Debtor's assets; (C) scheduling a final hearing on the Motion (the "Final Hearing") and (D) granting related relief.  In support of the Motion, the Debtor states as follows:

## CONCISE STATEMENT OF RELIEF REQUESTED[1]

Pursuant to Rules 4001(c)(1)(B) and (d)(1)(B) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Debtor provides the following concise statement of the relief requested summarizing the material provisions of the DIP Loan and the proposed Interim and Final Orders:[2]

(a)     The Debtor is seeking authorization to obtain postpetition financing up to $6,600,000.00 (the "Loan Amount") consisting of senior revolving loans, which shall be advanced as follows (on the filing date, the Debtor owed Siena approximately $4,300,000.00 and the Prepetition Indebtedness (as defined below) is included within the Loan Amount):

(i)     an initial allowance of up to $4,500,000.00 of the DIP Credit Facility upon entry of the Interim Order to fund the Debtor's day-to-day operations, working capital needs and restructuring costs in accordance with the Budget;

(ii)    the balance of the DIP Credit Facility will be made available to the Debtor upon entry of the Final Order.  [DIP Term Sheet, p. 7; DIP Credit Agreement, § 1.1].

(b)     All cash receipts received will be applied to the Prepetition Indebtedness (as defined below) and thereafter to the obligations under the DIP Credit Facility in a manner consistent with the DIP Credit Agreement.  [DIP Term Sheet, p. 7; DIP Credit Agreement, § 4.2].

(c)     The DIP Credit Facility will be made available only if the Interim Order or Final Order, as applicable, is in full force and effect.  [DIP Term Sheet, p. 7; DIP Credit Agreement, § 1.6].

---

[1] Capitalized terms used but not defined in this Concise Statement of Relief Requested shall have the meanings ascribed to such terms in the DIP Term Sheet.

[2] The description of the terms and conditions of the DIP Loan, the DIP Credit Agreement, the DIP Term Sheet and the DIP Orders set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and should only be relied upon as such.  The summaries are qualified in their entirety by the relevant documents.  In the event there is a conflict between this Motion and the relevant documents, the relevant documents, as applicable, shall control in all respects.

(d)     The DIP Credit Facility may only be used for specific purposes, including but not limited to, repayment of the Obligations under the Pre-Petition Credit Agreement, providing the Debtor with working capital, and, through use of a revolving line of credit created by the DIP Loan, payment of allowed administrative costs and expenses of the Case, in accordance with the Budget and the DIP Orders.  [DIP Term Sheet, p. 7; DIP Credit Agreement, § 5.13].

(e)     The DIP Credit Facility shall end on the earliest of (i) sixty (60) days from the Petition Date, (ii) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and becomes effective prior thereto, (iii) the date of acceleration by Siena upon the occurrence of an Event of Default under the DIP Credit Facility, (iv) conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, unless otherwise consented to by Siena, (v) dismissal of the Case, unless otherwise consented to by Siena, (vi) the date of consummation of a sale approved by Siena and (vii) the effective date of a plan of reorganization confirmed in the Case.  [DIP Term Sheet, p. 7; DIP Credit Agreement, § 1.1 and 1.7(b)].

(f)     All obligations of the Debtor under the DIP Credit Facility shall be:

(i)      Entitled to superpriority claim status, subject to the Carve-Out Expenses (defined below), under section 364(c)(1) of the Bankruptcy Code; and

(ii)     Secured, pursuant to sections 364(c)(2), (3) and (d)(1) of the Bankruptcy Code, by valid, enforceable first priority, fully perfected security interests, excepting the proceeds of chapter 5 causes of action.  [DIP Term Sheet, p. 8; DIP Credit Agreement, § 3.5].

(g)     The Revolving Loans shall not exceed at any time the lesser of (i) the Total DIP Credit Facility Amount ($6,600,000.00) and (ii) the sum of

(i)      85% of Eligible Accounts (as defined in the DIP Credit Agreement) of the Debtor, plus

(ii)     60% of the value of Eligible Inventory (as defined in the DIP Credit Agreement) of the Debtor valued at the lower of cost or market, plus

(iii)    Liquidation value of the Eligible Equipment (as defined in the DIP Credit Agreement) up to the maximum amount of $2,500,000.00, less

(iv)    Reserves from time to time established by Siena in its commercially reasonable discretion to address facts and circumstances not known to Siena at the time of the execution of

the Commitment Letter. [<u>DIP Term Sheet</u>, p. 9; <u>DIP Credit Agreement</u>, § 1.1 and 1.2]

(h)   The Revolving Loans shall, in part, be subject to an interest rate equivalent to Prime Rate (as defined in the DIP Credit Agreement) plus 6.0%, but not less than 9.25% (with respect to Revolving Loans against accounts receivable and inventory), and, in part, be subject to an interest rate equivalent to Prime Rate plus 7.5%, but not less than 10.75% (with respect to Revolving Loans against machinery and equipment). [<u>DIP Term Sheet</u>, p. 9; <u>DIP Credit Agreement</u>, § 2.1].

(i)   The DIP Credit Facility provides for customary events of default. [<u>DIP Term Sheet</u>, p. 12-13; <u>DIP Credit Agreement, §</u> 7.1]. Upon the occurrence of an event of default, Siena is permitted to take certain actions against the Debtor, subject to certain limitations, without further order of or application to the Court. [<u>DIP Term Sheet</u>, p. 13-14; <u>DIP Credit Agreement</u>, §§ 7.2 and 7.3].

(j)   The Final Order shall provide that no expenses of the Case, excluding the Carve-Out Expenses, shall be charged against or recovered from any collateral under section 506(c) of the Bankruptcy Code. [<u>DIP Term Sheet</u>, p. 15; <u>DIP Credit Agreement</u>, Schedule B (definition of "Final Order")].

(k)   The Debtor shall stipulate and acknowledge the validity, amount, perfection, priority and enforceability of the Prepetition Indebtedness and the obligations under the Prepetition Loan Documents (as defined below). [<u>DIP Term Sheet</u>, p. 15; <u>DIP Credit Agreement</u>, § 1.11].

(l)   The Debtor agrees to indemnify the Siena for certain losses related to, among other things, the Commitment Letter. [<u>DIP Term Sheet</u>, p. 2; <u>DIP Credit Agreement</u>, § 6.3].

(m)   The DIP Credit Facility includes releases of Siena [<u>DIP Term Sheet, p. 2; </u>; <u>DIP Credit Agreement</u>, § 1.12 and 6.1<u>]</u>

(n)   Authorizing the Debtor to enter into the DIP Documents (as defined below) and approving the DIP Documents. [<u>Interim Order</u>, ¶ 1.3.1].

(o)   Pursuant to Bankruptcy Rule 4001(c)(2), scheduling a preliminary hearing on this Motion and authorizing the Debtor to borrow the Interim Advance pending entry of the Final Order. [<u>Interim Order</u>, ¶ 1.1].

(p)   Pursuant to Bankruptcy Code section 362, modifying the automatic stay. [<u>Interim Order</u>, ¶ 6.6].

(q)   Pursuant to Bankruptcy Rule 4001(c)(2), scheduling the Final Hearing and granting related relief. [<u>Interim Order</u>, ¶ 7].

## JURISDICTION, VENUE AND PREDICATES FOR RELIEF

1.      The United States District Court for the District of Maine (the "<u>District Court</u>") has original, but not exclusive, jurisdiction over the Debtor's Chapter 11 case pursuant to 28 U.S.C. § 1334(b).  Pursuant to 28 U.S.C. § 157 and Rule 83.6 of the District Court's local rules, the District Court has authority to refer and has referred this proceeding to this Court.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and this Court has constitutional authority to enter final judgment in this proceeding.

3.      Venue over this Chapter 11 case is proper in this district pursuant to 28 U.S.C. § 1408, and venue over this proceeding is proper in this district pursuant to 28 U.S.C. § 1409.

4.      The predicates for relief sought herein are Bankruptcy Code sections 105(a), 361, 362, 363 and 364, Bankruptcy Rule 4001(c) and (d) and Local Rules 4001-2 and 4001-4.

## BACKGROUND

### A.      The Chapter 11 Case

5.      On September 28, 2015 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business as a debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108.  As of the date hereof, no trustee or examiner has been sought or appointed in the case, and no official committee has been appointed.

6.      Additional background information regarding the Debtor and the relief sought by this Motion and relating to the marketing, reasonableness and necessity of the DIP Loan is set forth in the <u>Declaration of Keith Van Scotter in Support of Chapter 11 Petition and Various First Day Motions</u> (the "<u>Van Scotter Declaration</u>"), which was filed on the Petition Date and which is incorporated by reference herein.

**B.**     **The Debtor's Prepetition Assets and Secured Debt**

7.     Prior to the Petition Date, on December 11, 2014, the Debtor and Siena entered into certain loan agreements (all loan documents giving rise to the prepetition obligations owed to Siena collectively, the "Prepetition Loan Documents") pursuant to which Siena provided to the Debtor revolving loans and letters of credit (together with all Obligations under and as defined in the Prepetition Loan Documents, the "Prepetition Indebtedness") with an aggregate credit limit of $6,000,000.00, minus any Availability Block and Reserves (each as defined in the Prepetition Loan Documents).

8.     The Prepetition Indebtedness is secured by first priority liens (the "Prepetition Lender Liens") on substantially all of the Debtor's assets, including (a) cash, accounts receivable, work in progress and inventory (collectively, the "Cash Collateral") and (b) the Debtor's principal asset—a tissue mill located in Lincoln, Maine, comprised of certain of the Debtor's real property (the "Real Property") and the equipment and other "hard" assets (the "PP&E"), subject only to certain Permitted Liens (as defined in the Prepetition Loan Documents and as set forth below).  Siena is the only entity with an interest in the Cash Collateral.  As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Loan Documents was approximately $4,300,000.00.  Van Scotter Declaration, ¶ 11.

9.     In addition to the Prepetition Indebtedness, the Debtor is obligated to the Finance Authority of Maine ("FAME") under the Economic Recovery Loan Program Loan Agreement dated as of December 9, 2014 (any and all loan documents related thereto collectively, the "FAME Loan Documents") in the amount of approximately $950,000.00, as of the Petition Date. Van Scotter Declaration, ¶ 12.  The obligations arising under the FAME Loan Documents (the "FAME Obligations") are secured by liens on the PP&E (the "FAME Liens"), which are Permitted Liens under (and as defined in) the Prepetition Loan Documents.  Under the

Intercreditor Agreement,[3] the FAME Liens are subordinate to the Prepetition Lender Liens on the

PP&E.  The Intercreditor Agreement also provides that the subordination and lien provisions of

the Intercreditor Agreement shall apply to all advances of Prepetition Indebtedness up to

$8,000,000.  See Intercreditor Agreement, ¶ 2 (defining "[Revolver] Indebtedness" and capping

such indebtedness at $8,000,000); see also Intercreditor Agreement, ¶ 10(b) (. . . "[Siena] may . .

. without the consent of or notice to [FAME] . . . [take certain actions], provided the principal

amount of the [Revolver] Indebtedness shall not exceed $8,000,000. . . .").  The Intercreditor

Agreement further provides that FAME shall not object to any such financing afforded by Siena

during a bankruptcy proceeding (provided that the terms of such financing are not materially

more adverse to FAME than under the Prepetition Loan Documents):

> The subordination and lien priority provisions of this Intercreditor Agreement
> shall continue to apply to all advances that do not cause the total amount of
> [Revolver] Indebtedness to exceed $8,000,000 in the aggregate made during the
> pendency of such [bankruptcy] court proceedings. . . .  [FAME] shall not object to
> financing by [the Prepetition Revolving Lender] during the pendency of such
> [bankruptcy] court proceeding provided that the terms and conditions of such
> financing are not materially more adverse to [FAME] than those under the
> [Prepetition Loan Documents].

Intercreditor Agreement, ¶ 21.

10.    Finally, two contractors, Fastco Corporation ("Fastco") and Sullivan and Merritt

Constructors, Inc. ("Sullivan," and together with Fastco, the "Mechanics" and together with

FAME, the "Other Secured Creditors") have asserted liens (collectively, the "Mechanics' Liens")

arising under applicable non-bankruptcy law in connection with various services provided to the

Debtor prior to the Petition Date.  In particular, Fastco asserts that it is owed approximately

$336,999.13 as of the Petition Date, and that its claim may be secured by liens on certain of the

Debtor's PP&E and Real Property that are subordinate to Siena's and FAME's liens.  Sullivan

---

[3] The "Intercreditor Agreement" means the Intercreditor Agreement between Siena and FAME dated as of
December 11, 2014.  A copy of the Intercreditor Agreement is attached hereto as **Exhibit E**.

asserts that it is owed approximately $1,120,318.47 as of the Petition Date (together with the amount asserted to be owed to Fastco, the "Mechanics' Obligations," and together with the FAME Obligations, the "Other Secured Obligations"), and that its claim may be secured by liens on certain of the Debtor's PP&E and Real Property.  The Prepetition Lender Liens and the FAME Liens may be subject to Sullivan's priming mechanic's lien on certain of the PP&E and Real Property pursuant to applicable law.  See 10 M.R.S.A. Pt. 7, Ch. 603.

11.    Accordingly, as of the Petition Date, Sullivan's mechanic's lien may have a first priority lien on certain of the PP&E and Real Property (which Siena disputes), Siena has a first priority lien on the Cash Collateral and has a first priority lien on certain of the PP&E and Real Property and may have a second priority lien on certain other PP&E and Real Property, and FAME may have a third priority lien on the PP&E.  Fastco may hold a fourth priority lien on the PP&E and a third on the Real Property.[4]  As set forth more fully below, by agreement of the Debtor, Siena and the Mechanics, the respective priorities of these parties has been agreed to as a condition of the DIP Loan such that Siena shall have a first priority lien on and security interest in the Cash Collateral, PP&E and Real Property upon entry of the Interim Order and the making of the DIP Loan securing any amounts owed to Siena in respect of the Prepetition Indebtedness and the DIP Credit Facility.

---

[4] Certain of the Debtor's equipment lessors have filed financing statements in regard to their respective equipment leases.  The Debtor reserves all rights to argue that such leases are actually disguised financings and that the allegedly leased equipment is property of the Debtor's estate.  Additionally, except to the extent prohibited by the terms hereof, the Debtor reserves the right to contest the validity and priority of any and all liens, claims and encumbrances against the Debtor's assets.

C.    **The DIP Loan Marketing Process**

12.    During the months preceding the Petition Date, the Debtor and its advisors examined the Debtor's options for resolving its liquidity issues and labor obligations without resorting to a chapter 11 filing, but there was simply no feasible out-of-court restructuring alternative to chapter 11. <u>See Van Scotter Declaration</u>, ¶ 17. During these months, the Debtor and its advisors began to engage in discussions with certain potential postpetition lenders regarding the contours of a postpetition financing facility (certain of these discussions also involved the possibility of prepetition financing). <u>See Van Scotter Declaration</u>, ¶ 17. Although the Debtor provided information to and engaged in discussions with at least three potential lenders with adequate financial resources, no lender agreed to provide financing. <u>See Van Scotter Declaration</u>, ¶ 18. Thus, the Debtor was unable to obtain alternative debtor-in-possession financing through credit allowable as an administrative expense or secured by junior liens on the Debtor's encumbered assets or on any others terms, including the granting of priming liens on the Debtor's assets.

D.    **Key Provisions of the DIP Term Sheet and Commitment Letter and DIP Credit Agreement**

13.    The DIP Credit Facility is up to $6,600,000.00 (the "<u>Total DIP Credit Facility Amount</u>") consisting of senior secured revolving loans (the "<u>Revolving Loans</u>"), based on a cash forecast delivered to Siena, which sets forth projected cash flows for a period of sixty (60) days from the Petition Date (the "<u>Budget</u>"). A copy of the initial Budget is attached hereto as **<u>Exhibit C</u>**. As set forth in greater detail in the DIP Term Sheet and the DIP Credit Agreement, the Debtor will not deviate from certain markers in the Budget by more than 10% on an aggregate cumulative basis. An amount of up to approximately $4,500,000.00 (the "<u>Interim Advance</u>") of the DIP Loan will be made available to the Debtor during the period from the entry of the Interim Order through entry of the Final Order (the "<u>Interim Period</u>").

14.    The Revolving Loans against accounts receivable and inventory will bear interest at a rate equivalent to Prime Rate (as defined in the DIP Credit Agreement) plus 6.0% per annum, but not less than 9.25% when the DIP Loan is made against certain assets of the Debtor. DIP Term Sheet, p. 9; DIP Credit Agreement, § 2.1.  The Revolving Loans against machinery and equipment will bear interest at a rate equivalent to Prime Rate plus 7.5% per annum, but not less than 10.75%.  DIP Term Sheet, p. 9; DIP Credit Agreement, § 2.1.  As noted above, the Debtor's obligations under the DIP Credit Facility will be:

    a.  Entitled to superpriority claim status, subject to the Carve-Out Expenses, under section 364(c)(1) of the Bankruptcy Code (the "DIP Superpriority Claim");

    b.  Secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by valid, enforceable first priority, fully perfected security interests in and liens upon all of the Debtor's rights in property as of the Petition Date and all of the Debtor's rights in property acquired post-Petition Date, excepting the proceeds of chapter 5 causes of action (Siena held a blanket first position on substantially all of the assets of the Debtor in relation to the Prepetition Indebtedness); and

    c.  Secured, pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code, by first priority (subject only to Permitted Priority Liens that were perfected prior to the Petition Date), perfected liens in and upon property of the Debtor as of the Petition Date.

(collectively, the "DIP Liens").  DIP Term Sheet, p. 8; DIP Credit Agreement, § 3.5.

15.    As set forth in greater detail in the DIP Term Sheet and the DIP Credit Agreement, "DIP Collateral" includes property of the Debtor as of the Petition Date and all of the Debtor's rights in property acquired post-Petition Date, but does not include any causes of action arising under chapter 5 of the Bankruptcy Code or the proceeds thereof.  See DIP Term Sheet, p. 8; DIP Credit Agreement, § 3.1; see also Local Rule 4001-2(c)(4).

16.    The DIP Liens will prime the liens currently securing all valid, enforceable and perfected liens of record, including the liens securing the Other Secured Obligations, but will be

subject to the Carve-Out Expenses.[5]  See DIP Term Sheet, p. 8; DIP Credit Agreement, § 3.5; see also Interim Order, ¶ 2.1.1(C).  The DIP Liens are, however, subject and subordinate only to those liens approved by Siena that are senior to, and have not been subordinated to, the liens arising under the Prepetition Loan Documents to the extent such liens are valid, enforceable and non-avoidable as of the Petition Date.  See DIP Term Sheet, p. 8; DIP Credit Agreement, § 3.5(a)(3).  The DIP Liens will be automatically perfected without further action by Siena.

17.    The DIP Term Sheet, DIP Credit Agreement and the DIP Loan also contemplates the Debtor timely achieving the following milestones in the case:

   a.  Identify a stalking horse bidder reasonably acceptable to Siena on or before the Petition Date;

   b.  File a motion under section 363 of the Bankruptcy Code for approval of a bidding procedures order by October 13, 2015;

   c.  Obtain Court approval of proposed bidding procedures, and entry of an order granting such procedures by October 28, 2015;

   d.  Obtain Court approval of a sale order by November 12, 2015; and

   e.  Close the proposed sale by November 27, 2015.

(collectively, the "Milestones").  See DIP Term Sheet, p. 10; DIP Credit Agreement, §§ 7.1(ii)-(mm).

18.    The DIP Term Sheet, DIP Credit Agreement and the DIP Loan require the Debtor to stipulate and acknowledge the validity, amount, perfection, priority and enforceability of the Prepetition Indebtedness and the obligations under the Prepetition Loan Documents.  See DIP Term Sheet, p. 15; DIP Credit Agreement, § 1.11; see also Local Rule 4001-2(c)(1); Interim

---

[5] The "Carve-Out Expenses" means an amount sufficient to satisfy, collectively:  (i) the statutory fees payable to the Office of the United States Trustee (the "U.S. Trustee") pursuant to 28 U.S.C. § 1930(a)(6), plus accrued interest thereon (if any); (ii) fees payable to the Clerk of this Court; and (iii) the unpaid and outstanding reasonable fees and expenses actually incurred on or after the Petition Date, and approved by a final order of the Court pursuant to the Bankruptcy Code by Bernstein Shur, as Debtor's bankruptcy counsel, Spinglass Management Group, as Debtor's financial advisor, SSG Capital Advisors as Debtor's investment banker and the professional firms retained by the official committee of creditors appoint in the Case, in a cumulative, aggregate sum not to exceed the amount set forth in the Budget.  See Interim Order, ¶ 2.3.

Order, ¶¶ D(2), 5.1.  The DIP Term Sheet, DIP Credit Agreement and the DIP Loan also contemplate that the amount of the Prepetition Indebtedness is included within the Loan Amount and all cash receipts received will be applied to the Prepetition Indebtedness and thereafter to the obligations under the DIP Credit Facility in a manner consistent with the DIP Credit Agreement. See DIP Term Sheet, p. 7; DIP Credit Agreement, §§ 3.5 and 4.2; see also Local Rule 4001-2(c)(3); Interim Order, ¶ 1.5.  Additionally, the DIP Term Sheet and DIP Credit Agreement require that the Final Order include a ruling that, subject to the Carve-Out Expenses, no expenses incurred in administrating this case shall be charged against, or recovered from, the DIP Collateral under section 506(c) of the Bankruptcy Code.  See DIP Term Sheet, p. 15; DIP Credit Agreement, Schedule B (definition of "Final Order"); see also Local Rule 4001-2(c)(2).  The DIP Term Sheet and DIP Credit Agreement further permit Siena to take certain actions against the Debtor upon the occurrence of an event of default without further order or hearing from the Court.  See DIP Term Sheet, p. 13-14; DIP Credit Agreement, §§ 7.2. and 7.3; see also Local rule 4001-2(c)(5); Interim Order, ¶ 4.2.3.  The DIP Term Sheet and DIP Credit Agreement do not, however, grant Siena, or any other party, a security interest in avoidance actions under chapter 5 of the Bankruptcy Code or the proceeds thereof.  See DIP Term Sheet, p. 8; DIP Credit Agreement, § 3.1; see also Local Rule 4001-2(c)(4).

19.    Lastly, as set forth above, the Mechanics have filed suit in state court against the Debtor in relation to work performed on the mill facility of the Debtor.  In the state court action, Sullivan is asserting the Mechanic Lien and seeking to prime the interests of Siena on certain assets pledged to Siena.  Fastco is not seeking to prime Siena, however, it is seeking to lien property of the Debtor.  Premised on these issues with the Mechanics, Siena conditioned the DIP Loan on reaching consensual resolutions of the claims of the Mechanics.  Premised on this condition, the Debtor reached agreements with the Mechanics that provide for certain payments

to the Mechanics upon the closing of the DIP Loan and provide for the granting of the Mechanic

Liens, provided the liens and interests are subordinated to Siena and the Mechanics have each

entered into subordination agreements with Siena evidencing the such subordination.  True and

correct copies of the settlement agreements are attached hereto as **Exhibit D**.

## **RELIEF REQUESTED**

20.     By this Motion, the Debtor (i) seeks authority (a) to enter into the DIP Credit

Agreement, (b) to grant Siena the DIP Superpriority Claim and the DIP Liens in the DIP

Collateral, and (c) for Siena and the Debtor to take such steps as may be necessary or appropriate

to implement the foregoing; and (ii) requests that this Court schedule the Final Hearing and grant

related relief.

21.     The Debtor requests that the Court first conduct an emergency preliminary

hearing (the "Interim Hearing") authorizing the Debtor to borrow the Interim Advance

immediately for use during the Interim Period, in accordance with the terms of a proposed

Interim Order.  The Debtor further requests that the Court schedule the Final Hearing to occur no

later than 21 days after the Petition Date to consider entry of the Final Order, authorizing the

Debtor to borrow the Loan Amount on a permanent basis on terms substantially similar to those

set forth in the Interim Order (as amended by the terms of a Final Order).[6]

## **BASIS FOR RELIEF**

A.     **The Legal Standard**

22.     Bankruptcy Code section 364(c) provides that:

If the [debtor] is unable to obtain unsecured credit allowable under section
503(b)(1) of this title as an administrative expense, the court, after notice and a
hearing, may authorize the obtaining of credit or the incurring of debt–

---

[6] The Debtor will file a form of Final Order approving this Motion in advance of the Final Hearing.

(1)     with priority over any or all administrative expenses of the kind
specified in section 503(b) or 507(b) of this title;

11 U.S.C. § 364(c).  Pursuant to Bankruptcy Code section 364(d)(1), a debtor may incur a debt

secured by a senior lien on property of the estate that is subject to a lien if (a) more favorable

financing is not available and (b) the holder of the existing lien on the property on which the

senior lien is to be granted is adequately protected.  See 11 U.S.C. § 364(d)(1).  A creditor's

consent to the priming of its lien satisfies the requirement that such lender be adequately

protected.  See Anchor Savs. Bank v. Sky Valley, Inc., 99 B.R. 117, 122 (N.D. Ga. 1989) (even

tacit consent to imposition of a priming lien via withdrawal of objection "relieved the debtor of

having to demonstrate that [lienholders] were adequately protected").

23.     With respect to section 364(c) and the first requirement of section 364(d), courts

require that a debtor have made a reasonable effort to seek credit from other sources available

under section 364(a) and (b), but section 364 does not require an exhaustive search.  Bray v.

Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986);

see also In re 495 Central Park Ave. Corp., 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992)

("Section 364(d)(1) does not require the debtor to seek alternate financing from every possible

lender.  However, the debtor must make an effort to obtain credit without priming a senior

lien."); In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Courts have found

. . . 2 attempts [to secure funding] to be sufficient under the particular circumstances of each case

but . . . one attempt is not sufficient.").

24.     With respect to the second requirement of section 364(d), Bankruptcy Code

section 361 sets forth certain types of adequate protection, but adequate protection is not limited

to those methods and "must be determined based upon equitable considerations arising from the

particular facts of each proceeding."  In re Dynaco Corp., 162 B.R. 389, 394 (Bankr. D.N.H.

1993).  The point of adequate protection is to "provide the pre-petition secured creditor with the

*same level of protection* it would have had if there had not been postpetition superpriority financing." Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994) (emphasis added) (finding that a promise of increase to collateral value based on speculative projections does not constitute adequate protection); see also In re Jug End in the Berkshires, Inc., 46 B.R. 892, 900 (Bankr. D. Mass. 1985) (holding that protection is adequate when the creditor "receives the same *measure* of protection in bankruptcy [though] the *type* of protection may differ," but ultimately finding than an 8.3% equity cushion would be inadequate) (emphasis in original). Whether protection is "adequate" depends "on how effectively it compensates the secured creditor for *the loss of its collateral's value caused by the superpriority* given to the postpetition loan." Swedeland, 16 F.3d at 564 (quotations omitted and emphasis added).

25.     One form of adequate protection is the availability of an equity cushion. See In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("The exist[ence] of an equity cushion seems to be the preferred test in determining whether priming of a senior lien is appropriate under section 364.") (internal quotations omitted); Wilmington Trust Co. v. AMR Corp. (In re AMR Corp.), 490 B.R. 470, 478 (S.D.N.Y. 2013) ("[T]he existence of an equity cushion can be sufficient, in and of itself, to constitute adequate protection.") (internal citations omitted). While there is no bright-line test for the size of the equity cushion required to adequately protect a secured creditor whose liens are being primed, courts have generally held a roughly 20-percent cushion (after giving effect to the incurrence of the priming loan) to be sufficient. See In re James River Assocs., 148 B.R. 790, 796 (E.D. Va. 1992) ("Case law has almost uniformly held that an equity cushion of 20% or more constitutes adequate protection. . . ."); In re McKillips, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987) (same); see also In re Mellor, 734 F.2d 1396, 1401 (9th Cir. 1984) (overturning bankruptcy court's decision to grant

secured creditor's request to lift stay due to lack of adequate protection, and finding 20% equity

cushion—using market value of collateral—sufficient to adequately protect secured creditor); <u>In

re Snead</u>, No. 08-00070-8-JRL, 2008 WL 934389, at *1 (Bankr. E.D.N.C. Apr. 1, 2008) (27%

equity cushion sufficient); <u>In re Kost</u>, 102 B.R. 829, 831–32 (Bankr. D. Wy. 1989) (collecting

cases finding that, in various scenarios, 20-65% equity cushion was adequate, but 7-18% was

inadequate).

      26.     To determine the extent of a prepetition secured creditor's equity cushion, the

debtor's assets securing the creditor's lien must be valued.  When a prepetition secured creditor

has a blanket lien on the debtor's assets, the valuation of the creditor's collateral will require a

valuation of the debtor's entire business.  The valuation of a debtor whose assets are

contemplated to be sold as a going concern should be on a going-concern basis.  <u>See In re

Residential Capital LLC</u>, 501 B.R. 549, 591-95 (Bankr. S.D.N.Y. 2013) (finding that going-

concern valuation of debtor was proper for adequate protection purposes when debtor's stated

purpose in the case was to sell its assets as a going concern and parties-in-interest never

contemplated foreclosure sale); <u>see also In re Winthrop Old Farm Nurseries, Inc.</u>, 50 F.3d 72, 74

(1st Cir. 1995) (holding that fair market value was appropriate valuation method for property that

Chapter 11 debtor proposed to continue to use to operate business).  The use of a going-concern

valuation in the context of an operating debtor is consistent with Bankruptcy Code section

506(a), which provides that when valuing collateral, the appropriate valuation method turns on

"the purpose of the valuation and of the proposed disposition or use" of the collateral.  Applying

the going concern approach for an operating business is also consistent with U.S. Supreme Court

precedent holding that "the 'proposed disposition or use' of the collateral is of paramount

importance to the valuation question."  <u>See In re Rash</u>, 520 U.S. 953, 962 (1997) (overturning

decision capping creditor's secured claim at the foreclosure value of its collateral when Chapter

13 debtor proposed to retain collateral for use in its business under its plan).

27.     Pursuant to Bankruptcy Code section 364(e), any reversal or modification on

appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under

Bankruptcy Code section 364 shall not affect the validity of that debt incurred or priority or lien

granted as long as the entity that extended credit "extended such credit in good faith."  See

11 U.S.C. § 364(e).   Courts generally hold that "good faith" in the context of postpetition

financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct

or transaction concerned.  See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In

re Ellingsen MacLean Oil Co.), 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)).

28.     Additionally, section 105(a) authorizes the Court to issue any order that is

necessary or appropriate to carry out the provisions of Title 11.  See 11 U.S.C. § 105(a).  Finally,

Bankruptcy Rule 4001(c)(2) permits courts to authorize a debtor to obtain credit on shorter than

15 days' notice "to the extent necessary to avoid immediate and irreparable harm to the estate

pending a final hearing."  Fed. R. Bankr. P. 4001(c)(2); see also Local Rule 4001-2(e).

**B.     The Debtor has Satisfied the Requirements for Sections 364(c) and (d) of the Bankruptcy Code**

29.     By this Motion, the Debtor seeks authority to enter into the DIP Credit Agreement

and the DIP Credit Facility so that it can, initially, access the Interim Advance, pursuant to the

Interim Order, and, upon entry of the Final Order, the balance of the DIP Credit Facility in

exchange for providing Siena with the DIP Superpriority Claim on account of, and the DIP Liens

to secure, the obligations arising under the DIP Loan.  The Debtor submits that it has satisfied the

requirements of Bankruptcy Code sections 364(c) and (d) and that the DIP Loan, on the terms set

forth herein, is in the best interests of the Debtor's estate.

i.    **The Debtor Needs the DIP Loan to Continue to Operate as a Going Concern and to Conduct a Sale of its Assets**

30.    In order to operate during this case, the Debtor needs to obtain debtor-in-possession financing.  Without the DIP Loan, and the inability to use cash collateral, the Debtor would likely become unable to pay general operating expenses immediately, including, without limitation, employee payroll and other benefits, rent, utilities and the various other items reflected in the Budget.  See Van Scotter Declaration, ¶ 19.  Upon the Debtor's inability to pay its general operating expenses, the Debtor would have to immediately liquidate, resulting in the destruction of substantial value that would otherwise inure to the benefit of the Debtor's stakeholders.  See Van Scotter Declaration, ¶ 19.  The credit provided under the DIP Loan will enable the Debtor to pay its employees and otherwise operate its business during the pendency of this case, thereby preserving and enhancing the value of its estate for the benefit of all parties in interest.  See Van Scotter Declaration, ¶ 19.

31.    In addition, the Debtor needs the DIP Loan to enable it to have adequate time and resources to conduct a robust sale process for its assets.[7]  See Van Scotter Declaration, ¶ 20.  The Debtor currently believes, in consultation with its advisors, that a sale process is the best way to maximize value for its constituents, and obtaining the DIP Loan to enable an orderly sale process is thus in the best interests of the Debtor's estate.  See Van Scotter Declaration, ¶ 20. Accordingly, the Debtor respectfully submits that timely approval of the relief requested herein is imperative.

ii.    **The Debtor Has No Alternative Source of Funding**

32.    Bankruptcy Code section 364 requires that a debtor have made a reasonable effort to seek credit from other sources available, but an exhaustive search is not required.  See

---

[7] The Debtor plans to seek approval of bidding procedures and authorization to sell substantial assets in separate motions to be filed in the near term.

11 U.S.C. §§ 364(c), (d); see also Snowshoe, 789 F.2d at 1088; 495 Central Park Ave., 136 B.R. at 630-31; Reading Tube, 72 B.R. at 332.

33.      Here, the Debtor does not have an alternative source of financing, and has been unable to obtain one on equal or better terms than the DIP Loan.  The Debtor contacted at least three financial institutions in addition to Siena in an effort to obtain postpetition financing on terms most favorable to the Debtor's estate.  See Van Scotter Declaration, ¶ 18.  Two of those institutions were unwilling to lend to the Debtor on a priming basis, let alone on an unsecured or junior secured basis, and the other institution was unable to provide sufficient funds.  See Van Scotter Declaration, ¶ 18.  Like the other financing institutions contacted, Siena was not willing to lend on an unsecured or junior basis, but was willing to lend on terms that were fair and reasonable, as described above.  See Van Scotter Declaration, ¶ 18.

34.      Bankruptcy Code section 364 does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without granting a senior lien.  Snowshoe, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); 495 Central Park Ave., 136 B.R. at 631 (debtor testified to failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position").  Here, none of the three institutions contacted was willing to lend on terms more favorable than Siena. See Van Scotter Declaration, ¶ 18.  Accordingly, the Debtor has satisfied its burden of taking reasonable efforts to seek financing on more favorable terms from other financial institutions.

    **iii.**    **The Other Secured Creditors Have Consented to or Are Adequately Protected for the Priming of Their Interests in the Real Estate and/or PP&E**

35.      Bankruptcy Code section 364(d) requires that adequate protection be provided to account for the priming of a prepetition secured creditor's lien unless the creditor consents to the

priming.  See 11 U.S.C. § 364(d); see also Anchor, 99 B.R. at 122 (consenting to imposition of a priming lien "relieved the debtor of having to demonstrate that [lienholders] were adequately protected").

36.     As an initial matter, Siena requires no adequate protection as Siena has consented to the relief requested by this Motion.  See Anchor, 99 B.R. at 122.

37.     As to FAME, FAME is a sophisticated investor that, in connection with execution of the FAME Loan Documents, assessed the risks and agreed that the FAME Obligations could be subordinated to up to $8,000,000 of Prepetition Indebtedness, even in the context of a bankruptcy proceeding.  See Intercreditor Agreement, ¶¶2, 10(b), 21.  FAME further agreed not to object to any postpetition financing extended by Siena that was not materially more adverse to FAME than under the Prepetition Loan Documents.  See Intercreditor Agreement, ¶21.  In connection with execution of the Prepetition Loan Documents and the FAME Loan Documents, FAME thus contemplated and prospectively agreed to a situation more risky to it than the one presented here, in which it would be subordinate to only $6.6 million of indebtedness under the DIP Loan (which is not materially more adverse to it than under the Prepetition Loan Documents).  Accordingly, the Debtor respectfully submits that FAME has already consented to the relief sought herein, and no adequate protection is thus required.  See Anchor, 99 B.R. at 122.

38.     Additionally, premised on the terms of the settlements agreements with the Mechanics discussed above and the subordination agreements entered into in connection therewith, the Mechanics have consented to the relief requested herein.

39.     For these reasons, and because the Other Secured Creditors have either consented to the priming of their liens or are adequately protected by their respective equity cushions, the Debtor has satisfied Bankruptcy Code section 364(d) and the DIP Loan should be approved (adequate protection will be demonstrated by the Debtor if needed).

C.      **The DIP Term Sheet and the DIP Credit Agreement were Negotiated in Good Faith and Siena Should Thus be Afforded the Protection of Section 364(e) of the Bankruptcy Code**

40.      In determining to enter into the DIP Credit Agreement and the DIP Loan, the Debtor conducted arm's-length, good-faith negotiations with Siena, during which (a) Siena forbore from taking action with respect to remedies it may have had under the Prepetition Loan Documents, (b) Siena agreed to various accommodations and changes to its postpetition financing proposal at the Debtor's request, and (c) the Debtor and Siena agreed upon the Milestones.  The Debtor ultimately decided, together with its advisors, that the proposal for postpetition financing advanced by Siena was the most favorable under the circumstances, could be documented and accessed quickly and would enable the Debtor to meet ongoing operational and restructuring expenses.  Further, the various fees and charges required by Siena under the DIP Credit Agreement and all loan documents giving rise to the DIP Credit Facility (collectively, the "DIP Documents") are on reasonable, market terms, and the Milestones agreed to in connection with the DIP Documents and are achievable and appropriate in light of the facts of the case.  See Van Scotter Declaration, ¶ 21.

41.      The Debtor, therefore, respectfully submits that in negotiating and extending the DIP Credit Agreement and the DIP Loan, Siena's conduct was characterized by "honesty in fact." See Ellingsen MacLean Oil, 834 F.2d at 605 (finding "honesty in fact" in the conduct constituted good faith).  Accordingly, Siena is a "good faith" lender and thus should be afforded the protections of Bankruptcy Code section 364(e).

D.      **Modification of the Automatic Stay**

42.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The DIP Term Sheet and DIP Credit Agreement contemplate a limited modification of the automatic stay to the extent necessary to permit Siena to perform any act authorized or permitted under, or by virtue of, the DIP Orders or the DIP Documents.  Limited stay modification provisions of this type are standard features of debtor-in-possession financing facilities and, in the Debtor's business judgment, such a provision is reasonable under the present circumstances.  Accordingly, the Debtor respectfully requests that the Court authorize the limited modification of the automatic stay in accordance with the terms set forth in the DIP Orders.

E.      **The Interim Advance of the DIP Loan Should be Approved on an Interim Basis**

43.     As set forth above, Bankruptcy Rule 4001 and Local Rule 4001-2 provide that a final hearing on a motion obtain credit may not be commenced earlier than 14 days after the service of such motion.  See Fed. R. Bankr. P. 4001(c)(2); see also Local Rule 4001-2(e).  Upon request, however, this Court is empowered to conduct a preliminary, emergency hearing on the motion and to authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.  See Id.

44.     Authorization to enter into the DIP Documents as requested herein is necessary on an interim basis in order to avoid immediate and irreparable harm to the Debtor.  Absent immediate access to additional funds, the Debtor would become unable to pay its employees, insurance providers, vendors, utility providers, and providers of other essential operational services within a very short time.  See Van Scotter Declaration, ¶ 21.  As set forth above, the failure of the Debtor to make any of these payments would result in an inability to continue operations as a going concern and would result in an immediate need to liquidate the Debtor's

assets.  See Van Scotter Declaration, ¶ 21.  The interim borrowing proposed in this Motion will, on the other hand, permit the Debtor to operate as a going concern in order to preserve the value of its assets to maximize value for constituents and meet its obligations as a debtor in possession. See Van Scotter Declaration, ¶ 21.

45.    The Debtor respectfully requests that this Court schedule and conduct a preliminary hearing on the Motion and authorize the Debtor to obtain credit in the Interim Advance during the Interim Period under the terms that will be contained in the DIP Documents, as set forth in the DIP Term Sheet and DIP Credit Agreement.  In addition, the Debtor further respectfully requests that this Court schedule the Final Hearing to consider entry of the Final Order.

## NOTICE

46.    Notice of this Motion and the Interim Hearing was served on the following parties on the date on which the Motion was filed by CM/ECF, e-mail, facsimile, or overnight mail: (i) Siena and the Pre-Petition Secured Parties (as defined in the Interim Order); (ii) the United States Trustee for the District of Maine; (iii) the holders of the twenty (20) largest unsecured claims against the Debtor's estate; (iv) FAME; (v) all parties known to the Debtor who hold any liens or security interest in the Debtor's assets who have filed UCC-1 financing statements against the Debtor, or who, to the Debtor's knowledge, have asserted any liens on any of the Debtor's assets, including the Mechanics; (vi) all landlords and warehouseman of the Debtor; (vii) LPT Holdings LLC; (viii) the Internal Revenue Service and all relevant taxing authorities of Maine; (ix) the Pension Benefit Guaranty Company; (x) the United Steelworkers Union; (xi) the Environmental Protection Agency; (xii) all creditors known to the Debtor to be holding a judgment and (xiii) certain other parties identified in the certificates of service filed with the Court.

## CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that this Court enter an order: (a) authorizing the Debtor to borrow under the DIP Credit Agreement from Siena; (b) authorizing the Debtor, pursuant to 11 U.S.C. §§ 105(a), 361, 362 and 364(c) and (d), to grant Siena the DIP Superpriority Claim and the DIP Liens in the DIP Collateral; (c) authorizing the Debtor and Siena to execute the DIP Documents and take such other steps as may be necessary or appropriate to implement the foregoing; (d) scheduling a Final Hearing on the Motion; and (e) providing such other and further relief as is just and appropriate.

Dated: September 28, 2015

**LINCOLN PAPER AND TISSUE, LLC**

By its proposed attorneys:

*/s/ Timothy J. McKeon*
Robert J. Keach, Esq.
Sam Anderson, Esq.
Roma Desai, Esq.
Timothy J. McKeon, Esq.
Lindsay K. Zahradka, Esq. (*pro hac vice* admission pending)
BERNSTEIN, SHUR, SAWYER & NELSON
100 Middle St., PO Box 9729
Portland, Maine 04104-5029
Tel: (207) 774-1200