

**EXHIBIT B**

**CONFIDENTIAL**

September 23, 2015

Lincoln Paper and Tissue, LLC
50 Katahdin Avenue
Lincoln, ME   04457

Attention:  Keith Van Scotter,
              President and CEO

**Up to $6,600,000**
**Debtor-in-Possession Revolving Credit Facility**
**Commitment Letter**

Dear Keith:

On behalf of Siena Lending Group LLC ("<u>Siena</u>" or "<u>DIP Lender</u>"), I am pleased to confirm to Lincoln Paper and Tissue, LLC, a Delaware limited liability company ("<u>LPT</u>" or the "<u>Borrower</u>") and LPT Holdings, LLC, a Delaware limited liability company ("<u>Parent</u>" or "<u>Guarantor</u>"; Borrower and Guarantor are collectively, the "<u>Debtors</u>"), as a guarantor, the fully-underwritten commitment of Siena to provide, upon the filing of Debtors' proposed bankruptcy cases, a superpriority debtor-in-possession revolving credit facility to Debtors of up to $6,600,000 (the "<u>DIP Credit Facility</u>") based upon and subject to the terms and conditions set forth in this letter and the term sheet attached as Exhibit A hereto (the "<u>Term Sheet</u>" and together with this letter, collectively, the "<u>Commitment Letter</u>").

The Debtors agree that, so long as this Commitment Letter remains in effect, the arrangements with Siena will be on an exclusive basis and that the Debtors and their affiliates will not engage, solicit or otherwise consult with any other financial institution or entity regarding the DIP Credit Facility or any other proposed credit facility for the Debtors or any of their subsidiaries.

Each Debtor hereby represents, warrants and covenants that (i) all information, other than Projections (as defined below), which has been or is hereafter made available to Siena by or on behalf of the Debtors, any of their affiliates or any of their representatives, including any financial advisors and investment bankers, in connection with the business of the Debtors and their affiliates ("<u>Information</u>") is and will be complete and correct as to the subject matter thereof (taken as a whole) in all material respects as of the date made available to Siena and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading and (ii) the 9 week short-term cash flow analysis attached hereto as  <u>Exhibit B</u> (the "<u>Initial Budget</u>") and all financial projections (including any additional Budgets (as defined in the Term Sheet) relating to the period after the Filing Date (as defined in the Term Sheet) concerning the Debtors and their affiliates that have been or are hereafter made available to Siena by or on behalf of the Debtors, any of their affiliates or any of their representatives (the "<u>Projections</u>") have been or will be prepared in good faith based upon reasonable assumptions in light of the past operations of the businesses of the Debtors and their subsidiaries and based upon estimates and assumptions which the Debtors have determined to be reasonable and fair in light of the then current conditions and facts.  The Debtors agree to furnish to Siena such Information and Projections as Siena may reasonably request and to supplement the Information and the Projections from time to time until the closing date of the DIP Credit Facility so that the representation, warranty and covenant in the preceding sentence is correct on the closing date of the DIP Credit Facility.  In issuing this Commitment Letter, Siena is using and relying on the Information without independent verification thereof.

The Debtors will promptly reimburse Siena, on a joint and several basis, upon demand, for all reasonable out-of-pocket fees and expenses incurred by Siena in connection with its due diligence, approval, documentation, syndication and closing of the DIP Credit Facility, including without limitation with respect to the preparation and negotiation of this Commitment Letter (including any amendment or modification to this Commitment Letter), and the loan documentation

pertaining to the DIP Credit Facility, including without limitation reasonable attorneys' fees and legal expenses (including fees and expenses incurred in connection with review and preparation of pleadings and filings in the Cases (as defined in the Term Sheet), attendance at all hearings relevant to Siena, and defending or prosecuting any actions or proceedings therein), appraisal fees, expenses of consultants and experts, expenses related to Patriot Act compliance, recording taxes, environmental assessment fees (if applicable), filing and search charges and field examination expenses, per diem field examination and underwriting charges, whether or not the DIP Credit Facility is approved or closes. All such fees and expenses are to be paid by the Debtors to Siena upon demand by Siena. Siena may require that the Debtors pay any such fees and expenses owing to third parties directly to such third parties, including without limitation as to appraisals. Siena has the right to apply to such fees and expenses any sums received from or on behalf of the Debtors or any of its affiliates. The anticipated fees and expenses provided for pursuant to the terms hereof shall be set forth in the Initial Budget and the amounts paid on demand shall be limited to the amount set forth in the Initial Budget (or any subsequent agreed upon Budget) and, in the event the fees and expenses exceed the budgeted amounts, such additional amounts shall be payable upon the Termination Date and not on demand.

Notwithstanding the above-paragraph, Debtors, jointly and severally, agree to pay to Siena a deposit (the "Deposit") in the amount of $50,000 to cover fees and expenses described above through the date of the closing of the DIP Credit Facility. Debtors hereby authorize Siena to charge Debtors' account with the amount of the Deposit at any time after the date of this Commitment Letter in satisfaction thereof, and requests that Siena make one or more Revolving Loan(s) after the date hereof in an aggregate amount equal to the total amount of the Deposit, and that Siena disburse the proceeds of such Revolving Loan(s) in satisfaction thereof. If the DIP Credit Facility closes, any remaining balance of the Deposit together with any remaining balance of other deposits received by Siena from the Debtors with respect to the DIP Credit Facility (net of fees and expenses) would be applied toward any fees due at closing by the Debtors, including the Closing Fee (as defined in the Term Sheet). If the DIP Credit Facility does not close in part because of (i) the Debtors' acceptance of financing from another lender, (ii) the Debtors' termination of Siena's efforts hereunder, (iii) any breach of this Commitment Letter by any Debtor, (iv) any failure by any Debtor to satisfy all of the closing conditions required by this Commitment Letter prior the expiration or termination of this Commitment Letter or (v) the DIP Credit Facility is not approved in the Cases, then any remaining balance of the Deposit, together with any remaining balance of other deposits at any time received by Siena from the Debtors with respect to the DIP Credit Facility shall be retained by Siena and applied against the Obligations. Otherwise if the DIP Credit Facility does not close, any remaining balance of Deposit, together any remaining balance of any other deposits at any time received by Siena from the Debtors with respect to the DIP Credit Facility (net of fees and expenses) shall be returned.

In the event the DIP Credit Facility closes, the arrangements with respect to such fees and expenses after the closing of the DIP Credit Facility will be governed by the terms and conditions of the loan documentation pertaining to the DIP Credit Facility and the Financing Orders (as defined in the Term Sheet).

Each Debtor, on behalf of itself, and its affiliates, agrees to jointly and severally indemnify and hold harmless Siena and each director, officer, employee, attorney, advisor, agent and affiliate of Siena (each such person or entity referred to hereafter in this paragraph as an "Indemnified Person") from any losses, claims, costs, damages, expenses or liabilities (or actions, suits or proceedings, including any inquiry or investigation, with respect thereto) to which any Indemnified Person may become subject, insofar as such losses, claims, costs, damages, expenses or liabilities (or actions, suits, or proceedings, including any inquiry or investigation, with respect thereto) arise out of, in any way relate to, or result from, this Commitment Letter, the Cases, reports or other information provided to any Indemnified Person or contemplated by or referred to herein or therein or the other transactions contemplated hereby and thereby and to reimburse upon demand each Indemnified Person for any and all legal and other fees and expenses incurred in connection with investigating, preparing to defend or defending any such loss, claim, cost, damage, expense or inquiry or investigation, with respect thereto; provided, that the Debtors shall have no obligation to any Indemnified Person under this indemnity provision for liabilities to the extent that such liabilities are determined by a final, nonappealable judgment of a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of such Indemnified Person. The foregoing provisions of this paragraph shall be in addition to any right that an Indemnified Person shall have at common law or otherwise.

In consideration of the commitments of Siena set forth in this Commitment Letter and the mutual promises contained herein and for and in other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties hereto, intending to be legally bound, effective immediately upon execution of this Commitment Letter,

2

Borrower and Guarantor each hereby release and discharge Siena, in its capacity as Lender (the "Pre-Petition Lender") under the Pre-Petition Loan Documents (as defined in the Term Sheet) and its agents, officers, directors, employees, attorneys, professionals, successors, and assigns of and from any and all claims and causes of action of any nature or kind whatsoever arising out of, related to, or in connection with the Pre-Petition Loan Documents, the pre-petition lending relationship, and any action or inaction by the Pre-Petition Lender (the "Release").  The Interim Order, the Final Order and the DIP Loan Documents (each as defined in the Term Sheet) shall contain additional releases of Pre-Petition Lender by each Debtor and each of their respective estates in form and substance satisfactory to DIP Lender (the "Post-Petition Release").

This Commitment Letter is addressed solely to the Debtors and is not intended to confer any obligations to or on, or benefits to or on, any other person or entity (other than Siena, its affiliates and the Indemnified Persons as provided above) and may not be relied on by any such other person or entity.  No Indemnified Person shall be liable for any damages arising from the use by others of Information or other materials obtained through the internet, Passport 6.0, or other similar transmission systems in connection with the DIP Credit Facility.  In addition, no Indemnified Person shall be responsible or liable for special, indirect, consequential, exemplary, incidental or punitive damages which may be alleged as a result of this Commitment Letter or the Case and each Debtor, on behalf of itself and each of its affiliates, irrevocably and unconditionally waives any right to seek any equitable remedies (including, without limitation, specific performance) for any damages that may be alleged as a result of any breach or as a result of this Commitment Letter, the Case or any element of the transactions contemplated hereby.

Except as required by applicable law, this Commitment Letter and the contents of this Commitment Letter shall not be disclosed by the Debtors or any of its affiliates or by Siena to any third party without the prior consent of the other party or parties, other than to their attorneys, financial advisors and accountants, in each case, who need to know the terms hereof, provided that (i) each of such persons and entities shall be informed of, and directed to comply with, the confidentiality provisions hereof, and (ii) the Debtors or Siena (as applicable) shall be liable for any breach of such confidentiality provisions by any such persons and entities, regardless of any releases provided by the terms hereof or loan documents relating hereto.  Debtors or Siena shall not issue any press release as to or make any public announcement of the transactions contemplated hereby which refers to the other party or parties  or mentions any such entity without the other party or parties' prior written consent (except to the extent required by law).

Each Debtor acknowledges and agrees to the disclosure by Siena and its affiliates of information relating to the DIP Credit Facility to Gold Sheets and other publications or for Siena's marketing materials, with such information to consist of deal terms and other information customarily found in such publications or marketing materials and that Siena and its affiliates may otherwise use the corporate name and logo of the Debtors and their subsidiaries in "tombstones" or other advertisements, marketing materials or public statements.  The disclosures provided for by the terms of this paragraph are excepted from the restrictions on disclosure imposed by the previous paragraph.

Nothing contained herein shall limit or preclude Siena or any of its affiliates from carrying on any business with, providing banking or other financial services to, or from participating in any capacity, including as an equity investor, in any party whatsoever, including, without limitation, any competitor, supplier or customer of the Debtors or their subsidiaries or any of their affiliates, or any other party that may have interests different than or adverse to such parties.  Each Debtor acknowledges that Siena and its affiliates (the term "Siena" as used in this paragraph being understood to include such affiliates) may be providing debt financing, equity capital or other services (including financial advisory services) to other companies with which the Debtors or their subsidiaries or affiliates may have interests that conflict, that Siena may act, without violating its contractual obligations to the Debtors, as it deems appropriate with respect to such other companies (provided, that, except as required by applicable law, Siena will not provide any material non-public confidential information as to the Debtors to any such competitor, supplier or customer of the Debtors or their subsidiaries), and that Siena has no obligation in connection with the DIP Credit Facility to use, or to furnish to the Debtors or their subsidiaries or affiliates, confidential information obtained from other companies or entities.  Each Debtor, its subsidiaries and its affiliates acknowledge and agree that in connection with all aspects of the transactions, it and its affiliates on the one hand, and Siena, on the other hand, have an arm's length business relationship that creates no fiduciary duty on the part of Siena and each expressly disclaims any fiduciary relationship.

This Commitment Letter will be of no force and effect unless a counterpart hereof is accepted and agreed to by the Debtors and, as so accepted and agreed to, received by Siena by 5:00 p.m. (Eastern time) on September 24, 2015.  The

commitment of Siena under this Commitment Letter, if timely accepted and agreed to by the Debtors, will terminate upon the close of business on September 30, 2015 or such later date as may be agreed upon in writing by Siena and the Debtors, if the DIP Credit Facility has not closed, or the initial borrowings under the DIP Credit Facility have not occurred, on or prior to such date.  All indemnities and reimbursement obligations hereunder shall survive the termination of this Commitment Letter.  Following any termination hereof, the DIP Credit Facility will require reapproval by Siena even if Siena and its counsel and other advisors continue to work on the DIP Credit Facility.  Such reapproval, if obtained, may result in different terms or conditions, or the determination not to consummate the DIP Credit Facility.

The commitments of Siena under this Commitment Letter are conditioned upon:  (a) the filing of the Cases by Debtors, (b) entry of the Interim Order authorizing the DIP Credit Facility by the Bankruptcy Court in the Cases, on the terms and conditions set forth herein and in the definitive loan documentation and granting a first priority valid and perfected security interest in all pre-petition and post-petition property and assets of the Debtors (subject only to an agreed upon carve-out and other excluded assets as provided for herein), (c) on or before the petition date, the Debtors shall use best efforts to obtain a commitment from a "stalking horse" buyer reasonably acceptable to Siena to purchase the assets of Debtors in a sale in the Cases on terms and conditions and for a purchase price reasonably acceptable to Siena, (d) the absence of any event, development or circumstance from the date hereof that has or could reasonably be expected to have a material adverse effect on the business, operations, property, condition (financial or otherwise) or prospects of the Debtors and their subsidiaries, taken as a whole (provided that the filing of the Cases shall not constitute a material adverse effect), (e) the absence of any information or other matter affecting the Debtors or any of their subsidiaries or the transactions contemplated hereby which in Siena's reasonable judgment is inconsistent in a material and adverse manner with any information or other matter, taken as a whole, disclosed to Siena prior to the date hereof or that could reasonably be expected to materially impair the DIP Credit Facility, (f) there being no competing offering of debt or equity financing in lieu of all or any portion of the DIP Credit Facility in any transaction other than a transaction led or arranged by Siena or any of its affiliates, (g) the accuracy, in all material respects (or in all respects where already qualified by materiality), of the representations and warranties of the Debtors contained herein and the compliance by the Debtors with the terms and conditions herein and (h) the satisfaction of the other terms and conditions referred to in the Term Sheet.

This Commitment Letter contains the entire commitment of Siena for this transaction and, upon acceptance by the Debtors, supersedes all prior proposals, commitment letter, negotiations, discussions and correspondence. This Commitment Letter may not be contradicted by evidence of any alleged oral agreement.  No party has been authorized by Siena to make any oral or written statements inconsistent with this Commitment Letter.

This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  Delivery of an executed signature page of this Commitment Letter by facsimile transmission or other electronic means shall be effective as delivery of a manually executed counterpart hereof.

This Commitment Letter may not be assigned by the Debtors without the prior written consent of Siena and may not be amended, waived or modified, except in writing signed by Siena and the Debtors.  This Commitment Letter is not intended to create a fiduciary relationship among the parties hereto. Siena may terminate this Commitment Letter if, in Siena's good faith judgment, any condition to the obligations of Siena set forth in this Commitment Letter or in the proposed definitive documentation is or becomes incapable of satisfaction or the failure of the Debtors, their subsidiaries or their affiliates to comply with the terms and conditions of this Commitment Letter.  This Commitment Letter is governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of law.

SIENA AND EACH DEBTOR EACH WAIVES ITS RIGHT TO A JURY TRIAL IN ANY ACTION OR PROCEEDING ARISING OUT OF OR IN ANY WAY RELATING TO THIS COMMITMENT LETTER OR THE TRANSACTIONS REFERRED TO IN THIS COMMITMENT LETTER.

If the Debtors accept and agree to the foregoing, please so indicate by executing and returning the enclosed copy of this letter to Siena.

4

We look forward to continuing to work with you to complete this transaction.

Very truly yours,

**SIENA LENDING GROUP LLC**

By: _____

Name: STEVEN SANICOLA

Title: Director

By: _____

Name: MICHAEL DECROW

Title: VP   Account Manager

ACCEPTED on this ____ day
of September, 2015:

**LINCOLN PAPER AND TISSUE, LLC**

By: _____

Name:

Title:

5

We look forward to continuing to work with you to complete this transaction.

Very truly yours,

**SIENA LENDING GROUP LLC**

By. _____
Name:
Title:

By: _____
Name:
Title:

ACCEPTED on this 23rd day
of September, 2015:

**LINCOLN PAPER AND TISSUE, LLC**

By: _____
Name: KEITH VAN SCOTTER
Title: PRESIDENT

**LPT HOLDINGS, LLC**

By: _____
Name: KEITH VAN SCOTTER
Title: MANAGER

5

**EXHIBIT A**



September 23, 2015

Lincoln Paper and Tissue, LLC
50 Katahdin Avenue
Lincoln, ME   04457

Attention:  Keith Van Scotter,
            President and CEO

Dear Keith:

On behalf of Siena Lending Group LLC ("Siena" or "DIP Lender"), I am pleased to provide Lincoln Paper and Tissue, LLC, a Delaware limited liability company ("LPT" or the "Borrower") and LPT Holdings, LLC, a Delaware limited liability company ("Parent" or "Guarantor"; Borrower and Guarantor are collectively, the "Debtors"), as a guarantor, with our proposed terms for a senior secured debtor-in-possession revolving credit facility of up to $6,600,000 (the "DIP Credit Facility").  Capitalized terms used in this term sheet and not otherwise defined shall have the meanings given to such terms in (i) the Commitment Letter dated as of the date hereof among Siena and Debtors (the "Commitment Letter") to which this term sheet ("DIP Term Sheet") is attached or (ii) the Loan and Security Agreement, dated as of December 11, 2014 (as amended, supplemented, and otherwise modified from time to time, the "Pre-Petition Credit Agreement"), among the Debtors and the Pre-Petition Lender (as defined below), as applicable.   The following proposed terms are offered for your consideration:

### CREDIT FACILITY / PARTIES

| | |
|---|---|
| **Borrower:** | LPT, as a debtor in possession in a case (the "Case" and, in the event Guarantor files, the "Cases") [1] pending as of the filing date (the "Filing Date") administered under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Maine (the "Bankruptcy Court"). |
| **Guarantor:** | Guarantor shall jointly and severally guarantee all of the Loans made under the DIP Credit Facility and all obligations of the Borrower.  Guarantor may also file for chapter 11 bankruptcy protection. |
| **Pre-Petition Lender:** | Siena Lending Group, LLC, in its capacity as Lender under the Pre-Petition Credit Agreement and related pre-petition loan documents (the "Pre-Petition Loan Documents").  LPT and Parent hereby acknowledge that the Obligations (as defined in the Pre-Petition Credit Agreement) are |

---

[1] References to the "Debtors" in the DIP Term Sheet or the Commitment Letter shall be deemed to apply only to the one Debtor in the event Guarantor does not file for chapter 11 protection and to the extent the DIP Lender has confirmation that its liens and claims will have senior priority at the Guarantor either by operation of law or by further subordination agreements of any third parties.

owing without defense, setoff, claim, counterclaim or deduction of any kind, nature or description whatsoever.

| | |
|---|---|
| **DIP Lender:** | Siena Lending Group LLC |
| **DIP Credit Facility:** | Up to $6,600,000 (the "Total DIP Credit Facility Amount") consisting of senior secured revolving loans ("Revolving Loans"), which may be adjusted based on the Budget (as defined below). |

The DIP Lender will provide to the Debtors a senior secured, superpriority revolving loan facility in the aggregate commitment amount of up to the Total DIP Credit Facility Amount, subject to a borrowing base substantially consistent with the borrowing base set forth in the Pre-Petition Credit Agreement (as modified by the terms hereof) less any additional reserves for the Carve-Out (as defined below).

An amount of up to approximately $4,500,000 (the "Interim Advance") of the DIP Credit Facility, approved by the Bankruptcy Court pursuant to the Interim Order (as defined below), structured as a creeping roll-up, shall be made available during the period from the date of entry by the Bankruptcy Court of the Interim Order through the date of entry by the Bankruptcy Court of the Final Order (as defined below), which shall be structured as a full roll-up and the balance of which commitments shall be available only upon and after entry of the Final Order. Pending entry of the Final Order, the DIP Lender shall be afforded all of the protections contained in the Interim Order.

The DIP Credit Facility will be made available if (and only if) the Interim Order or Final Order, as applicable, is in full force and effect. Subject to the terms and conditions of the DIP Loan Documents (as defined below), the loans under the DIP Credit Facility will be made available following delivery by the Debtors of a loan request which shall include a certification in the form set forth in the DIP Credit Agreement (as defined below) that (i) no default or Event of Default has occurred and is continuing under the DIP Credit Agreement, (ii) all representations and warranties shall be true and correct as of the date of the loan request and (iii) the loans being requested shall be used in accordance with the Budget, subject to the variances permitted under this term sheet, and within 5 business days of the funding of such request.

| | |
|---|---|
| **Use of Proceeds:** | The DIP Credit Facility may be used only to repay the Obligations (including, but not limited to, the Annual Fee, the Collateral Monitoring Fee, and the Early Termination Fee (in the amount of 3% of the Maximum Facility Amount) existing under the Pre-Petition Credit Agreement; it being agreed and acknowledged by the parties that the Early Termination Fee shall be deemed fully earned and non-refundable prior to the Filing Date and shall be indefeasibly paid in full in cash on the Termination Date) under the Pre-Petition Credit Agreement, for working capital purposes of the Debtors, to pay current interest and fees under the DIP Credit Facility, and the allowed administrative costs and expenses of the Cases, in each case, solely in accordance with, and up to the amounts provided in, the Budget and the Financing Orders (each as defined below) incorporating the terms hereof, as may be agreed to by DIP Lender and approved by the Bankruptcy Court, for a period not to exceed the Term (as defined below), which may be extended in the DIP Lender's sole discretion. |
| **Term:** | The term of the DIP Credit Facility shall end on the earliest of: (i) 60 days from the Filing Date, (ii) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto; (iii) the date of acceleration by the DIP Lender upon the occurrence of an Event of Default under the DIP Credit Facility; (iv) conversion of one or both of the Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the DIP Lender; (v) dismissal of either of the Cases, unless otherwise consented to in writing by the DIP Lender; (vi) the date of consummation of a sale approved by the DIP Lender; and (vii) the effective date of a plan of reorganization for |

140690.01019/101434630v.5

either Debtor confirmed in the Cases (the "Termination Date"), unless extended, as to the DIP Credit Facility, with the prior written consent of the DIP Lender.  Upon the Termination Date, all DIP Obligations (as defined below) and all Obligations (as defined in the Pre-Petition Credit Agreement) shall be due and payable in full.

**Priority and Security:**

All obligations of the Debtors under the DIP Credit Facility (the "DIP Obligations") shall be:

(i)  entitled to superpriority claim status under Section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims and unsecured claims now existing or hereafter arising under the Bankruptcy Code, subject to the Carve-Out.  The superpriority claims of the DIP Lender may be repaid from any cash of the Debtors;

(ii)  secured, pursuant to Section 364(d)(1) of the Bankruptcy Code, by valid, enforceable first priority, fully perfected security interests in and liens upon all of the Debtors' rights in property of the Debtors' estates as of the Filing Date (including such property securing the Debtors' obligations under the Pre-Petition Loan Documents) and all of the Debtors' rights in property acquired post-petition, excepting the proceeds of chapter 5 causes of action  (the "Avoidance Actions")), whether now existing or hereafter acquired or arising (collectively, the "DIP Collateral"), subject and subordinate only to those liens approved by the DIP Lender that, under applicable law, are senior to, and have not been subordinated to, the liens of the Pre-Petition Lender under the Pre-Petition Loan Documents, but only to the extent that such liens are valid, enforceable and nonavoidable liens as of the Filing Date (collectively, "Permitted Priority Liens") (for the avoidance of doubt, Permitted Priority Liens do not include any mechanics liens, which mechanics lien holders shall enter into subordination agreements and consents to the terms of the DIP Credit Facility acceptable to DIP Lender);

(iii)  secured, pursuant to Section 364(c)(2) of the Bankruptcy Code, by a first priority, perfected lien on all of the Debtors' rights in property of the Debtors' estates as of the Filing Date that, as of the Filing Date, were unencumbered; and

(iv)  secured, pursuant to Section 364(c)(3) of the Bankruptcy Code, by a junior priority, perfected lien on all of the Debtors' rights in property of the Debtors' estates as of the Filing Date that, as of the Filing Date, were subject to a Permitted Priority Lien that was perfected prior to the Filing Date.

The DIP Collateral shall also include without limitation all real and personal property including any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Lender in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits;

*provided*, *however*, that the liens described above shall not attach to any Avoidance Actions.

As long as the Obligations are outstanding, the Pre-Petition Lender shall receive as adequate protection a lien on the DIP Collateral subject only to the Carve-Out and the liens in favor of the DIP Lender. As further adequate protection, the Pre-Petition Lender shall be entitled to a superpriority administrative claim of the kind and nature provided to the DIP Lender, subject only to the Carve-Out and the superpriority administrative claim provided to the DIP Lender.

**Borrowing Base Availability:**

Revolving Loans shall not exceed at any time the lesser of (i) the Total DIP Credit Facility Amount and (ii) the sum of:

140690.01019/101434630v.5

a) 85% of eligible accounts receivable of LPT <u>plus</u>

b)  60% of the value of Eligible Inventory of Borrower valued at the lower of cost or market, <u>plus</u>

c) Liquidation value of the Eligible Equipment up to the maximum amount of $2,500,000 (the "<u>Revolving Machinery and Equipment Availability</u>"); <u>less</u>

d) Reserves from time to time established by Siena in its commercially reasonable discretion to address facts and circumstances not known to Siena at the time of the execution of the Commitment Letter.

Eligible accounts receivable shall exclude, without limitation, poor credits, accounts that remain unpaid 90 days or more after the invoice date or 60 days or more after the due date; cross-age will be 25%; concentration will be 25%; intercompany, contra, or affiliated receivables; foreign receivables billed and collected in foreign currency, excluding Canada; progress billings; and excessive concentration accounts in amounts to be determined.

Eligible inventory shall exclude, without limitation, inventory that is obsolete or slow moving; inventory that is not raw materials comprised of bailed, virgin hardwood pulp that has been opened or unpacked; finished goods that are not comprised of tissue products that have been manufactured pursuant to a firm purchase order, WIP, damaged, contaminated, discontinued or rejected inventory; in-transit; fabricated parts; consigned; supplies and packaging; inventory located outside the United States; and inventory purchased or manufactured pursuant to a license agreement.

## INTEREST AND FEES

**Interest Rate:** Revolving Loans at a rate equivalent to Prime Rate plus 6.0% per annum, but not less than 9.25%; Revolving Loans against the Revolving Machinery and Equipment Availability at a rate equivalent to Prime Rate plus 7.5% per annum, but not less than 10.75%.

Default rate of interest for all outstanding Revolving Loans and Term Loan will be 3% higher than the rate otherwise payable.

**DIP Closing Fee:** $125,000.  The DIP Closing Fee will be fully earned and non-refundable upon entry of the Interim Order and paid by the Debtors to DIP Lender upon the Termination Date.

**Collateral Monitoring Fee:** $4,000 per month, which monthly fees shall be deemed fully earned and non-refundable at the beginning of each month following entry of the Interim Order and paid by the Debtors to DIP Lender upon the Termination Date.

**Collateral Examination Expense:** $1,100 per man day plus all out-of-pocket expenses, provided, however, that such expenses shall not be duplicative of or in addition to the Collateral Examination Expenses in the Pre-Petition Credit Agreement.

**Unused Line Fee:** A fee of .75% per annum, payable at the end of each month, computed on the difference between (A) the Total DIP Credit Facility Amount and (B) the average daily Revolving Loan balance during such month, provided, however, that such fees shall not be duplicative of or in addition to the Unused Line Fee in the Pre-Petition Credit Agreement.

## CERTAIN OTHER TERMS

140690.01019/101434630v.5

| | |
|---|---|
| **Loan Documentation:** | The definitive loan documentation for the DIP Credit Facility shall include, all in form and substance acceptable to DIP Lender and its counsel: |

1. an interim debtor-in-possession financing order entered on or before September 29, 2015, in form and substance acceptable to the DIP Lender and its counsel, incorporating the terms hereof and containing such other provisions as the DIP Lender may reasonably require, including without limitation a prohibition on the right to use cash collateral, shall be entered by the Bankruptcy Court and shall not have been stayed, modified or appealed (the "<u>Interim Order</u>").  Notwithstanding anything to the contrary contained herein, funding of any Interim Advance shall be subject to entry of the Interim Order and funding of the balance of the commitments under the DIP Credit Facility shall be subject to entry of a final debtor-in-possession financing order, in form and substance reasonably acceptable to the DIP Lender and its counsel, incorporating the terms hereof and containing such other provisions as the DIP Lender may reasonably require, including without limitation a prohibition on the right to use cash collateral, which has not been stayed, modified or appealed and for which the appeal period has expired (the "<u>Final Order</u>" and, together with the Interim Order, collectively, the "<u>Financing Orders</u>"); and

2. such other loan documents, collateral documents, cash dominion agreements, intercreditor agreements, certificates, legal opinions from Debtors' counsel, and other support documents incorporating the terms and conditions contemplated hereby and other terms and conditions required by the DIP Lender and such other provisions as DIP Lender may require, all in form and substance reasonably acceptable to DIP Lender and its counsel.

| | |
|---|---|
| **Sale Process Covenants:** | The Debtors shall take the following actions (or obtain the following approvals, as applicable) as soon as possible, but not later than the following (collectively, the "<u>Sale Process Covenants</u>"): |

(i)     stalking horse bidder reasonably acceptable to DIP Lender to be identified on or before the Filing Date;

(ii)    Within fifteen (15) days of the Filing Date, file a motion under Section 363 of the Bankruptcy Code for approval of a bidding procedures order (the "<u>Bidding Procedures</u>"), in form and substance reasonably acceptable to DIP Lender, which shall include the right of DIP Lender to credit bid in connection with any such sale and all proceeds of any such sale(s) shall be applied directly and indefeasibly to the obligations owing to DIP Lender until such obligations are indefeasibly paid in full, subject to the Carve-Out;

(iii)   obtain Bankruptcy Court approval of the Bidding Procedures and a bid procedures order in form and substance reasonably satisfactory to DIP Lender no later than thirty (30) days after the Filing Date;

(iv)   obtain Bankruptcy Court approval of a sale order in form and substance reasonably satisfactory to DIP Lender within forty-five (45) days of the Filing Date; and

(v)    sale(s) closing to occur within sixty (60) days of the Filing Date.

Neither the Bidding Procedures nor any of the approvals described above shall be amended or otherwise modified without the consent of DIP Lender, which consent shall not be unreasonably withheld.

140690.01019/101434630v.5

**Expenses:** The Borrower hereby agrees to pay (i) all reasonable costs and expenses of DIP Lender (including all reasonable fees and expenses of attorneys and other professionals engaged by DIP Lender relating to the DIP Credit Facility and the administration of the DIP Credit Facility, duplication, consultation, travel, appraisal, audit, underwriting, collection, search, filing, title insurance, and recording fees, whether or not the DIP Credit Facility is consummated and (ii) all disbursements of the DIP Lender in connection with the collection of the facility obligations or the enforcement of its rights thereunder (collectively, the "Expenses"), which Expenses shall be first paid from the Deposit and otherwise shall be paid in accordance with the terms of the Commitment Letter.

LPT's obligations under this Section shall survive termination and/or expiration of this Term Sheet.

**Good Faith Deposit:** Upon execution of this Term Sheet, LPT will provide Siena with an initial good faith deposit in accordance with the terms of the Commitment Letter.

**Collateral Account and Lockbox:** All Borrower receipts shall be directly deposited to a separate collateral account (via the use of a lockbox) at a financial institution acceptable to Siena. Deposited amounts shall be applied to the Revolving Loans on the business day of receipt by Siena in its general account, but for interest calculation purposes credited to the outstanding Revolving Loan balance on the second business day after receipt. Standard money transfer and/or wire fees would apply.

**Budget / Financial Covenants:** Debtors shall deliver to DIP Lender a cash forecast, setting forth projected cash flows, together with detailed information as to projected weekly cash receipts and expenditures (as well as projected availability) for the period beginning on the Filing Date and ending on the last day of the Term, including all updates and supplements thereto (the "Budget"), which Budget shall be in form and substance satisfactory to DIP Lender and shall be updated weekly. Each weekly update of the Budget shall be in form and substance satisfactory to DIP Lender. See annexed Exhibit A for a copy of the initial Budget.

With the subsequent weekly delivery of an updated Budget, the Debtors shall also deliver weekly a reconciliation of actual cash receipts, disbursements and sales for the week compared to the Budget previously delivered to DIP Lender for such week.

Among others covenants consistent with the Pre-Petition Loan Documents, the Debtors shall, for each calendar week, comply with the Budget for such week as follows: (i) aggregate cumulative receipts, as compared to aggregate receipts set forth in the Budget for such period, shall have a negative variance not to exceed 10%, (ii) aggregate cumulative disbursements shall not exceed 10% of the amount set forth in the Budget for such period, and (iii) aggregate cumulative sales, as compared to aggregate cumulative sales set forth in the Budget for such period, shall have a negative variance not to exceed 10%. For the avoidance of doubt, if a budgeted item is not paid during the week in which it is budgeted but is subsequently paid, such deviation from the weekly budgets will be acceptable so long as the delayed payment is consistent with the Budget on a cumulative basis.

**Reporting:** Financial and collateral reporting requirements would include, without limitation:

1. Weekly (or more frequent) reporting of sales, credit memos, collections, accounts receivable aging, and inventory levels and Budget updates and variance reports.
2. Monthly accounts receivable aging, monthly inventory listing and monthly accounts payable aging together with reconciliations to be submitted electronically to Siena.
3. Monthly, internally-prepared, financial statements along with officer's certification of compliance.
4. Annual audited consolidating and consolidated fiscal year-end financial statements prepared by an independent auditor acceptable to Siena, along with management discussion and

11

analysis of results.

5. Other reporting and information covenants made by the Borrower under the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents.

6. Contemporaneously with each advance in respect of the DIP Credit Facility, reports reasonably requested by DIP Lender, including, sales journal, credit memos, and collections, cash disbursements, accounts receivable and accounts payable reports.

7. Any other information Siena may reasonably request.

| | |
|---|---|
| **Affirmative and Negative Covenants:** | The DIP Loan Documents will contain the affirmative and negative covenants made by the Debtor under the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents (other than the fixed charge coverage ratio set forth on Schedule E to the Pre-Petition Credit Agreement), and such other affirmative and negative covenants as DIP Lender shall reasonably require, including certain additional covenants and requirements consistent with this Term Sheet acceptable to DIP Lender. Exceptions and carve-outs to the negative covenants that were available under the Pre-Petition Credit Agreement and the other Pre-Petition Loan Documents that were subject to the absence of any default or event of default under the Pre-Petition Loan Documents shall no longer be available. |

In addition, except in connection with a sale under the Bidding Procedures order, absent the advance consent of DIP Lender, which consent shall not be unreasonably withheld, so long as all DIP Obligations are paid in full with the proceeds of such sale, lease, transfer or disposition at the time of consummation thereof, the Debtors shall not sell, lease, transfer or otherwise dispose of any collateral out of the ordinary course of business. In the event of any sale of the assets of the Debtors consented to by DIP Lender, the Bankruptcy Court order authorizing any sale (including a sale under the Bidding Procedures) shall provide that any and all proceeds of such sale shall be paid, upon consummation of such sale, to the DIP Lender to be applied against the DIP Obligations (which shall include a roll up of the Obligations under the Pre-Petition Loan Documents) subject to and in accordance with the DIP Credit Agreement.

| | |
|---|---|
| **Events of Default:** | "Events of Default" shall include the occurrence of any of the following: |

(i)     The Interim Order is not entered promptly upon conclusion of the first day hearing, or at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, or modified or amended without the prior written consent of DIP Lender;

(ii)     The Final Order shall not have been entered within twenty one (21) days after the entry of the Interim Order or at any time ceases to be in full force and effect, or shall be vacated, reversed or stayed, or modified or amended without the prior written consent of DIP Lender;

(iii)     Breach by the Debtors of (a) any Sale Process Covenant, (c) compliance with the Budget after accounting for the variance covenants set forth in this Term Sheet with respect to the Budget or (c) any other covenant or agreement contained in the DIP Loan Documents or in the Financing Orders;

(iv)     Either of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; a Chapter 11 Trustee or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those expressly set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in either of the Cases; or any other superpriority claim (other than the Carve-Out (as defined below)) or grant of any other lien (including any adequate protection lien) which is pari passu with or senior to the claims and liens of DIP Lender shall be granted in either of the Cases;

(v)     Other than payments authorized by the Bankruptcy Court and which are set forth in the Budget (A) in respect of tax, accrued payroll and related expenses as of the

12

Filing Date and (B) in respect of certain critical vendors and other creditors, in each case to the extent authorized by one or more "first day" or other orders reasonably satisfactory to DIP Lender, the Debtors shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or payables (including, without limitation, reclamation claims);

(vi) The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any lien (including, without limitation, any mechanics lien) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Debtors;

(vii) The Termination Date shall have occurred;

(viii) An "Event of Default" under the DIP Loan Documents shall have occurred;

(ix) The filing by the Debtors of any plan of reorganization without the prior written consent of DIP Lender or the termination of the Debtors' "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization, unless such plan provides for full and indefeasible payment of the DIP Obligations on the effective date of such plan;

(x) The Debtors petition the Bankruptcy Court to obtain additional financing *pari passu* or senior to the DIP Credit Facility;

(xi) (A) The Debtors engage in or support any challenge to the validity, perfection, priority, extent or enforceability of the DIP Credit Facility or the Pre-Petition Loan Documents or the liens on or security interest in the assets of the Debtors securing the DIP Obligations or (B) the Debtors engage in or support any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against the DIP Lender or the Pre-Petition Lender; provided, however, that it shall not constitute an Event of Default if the Debtors provide information with respect to the Pre-Petition Loan Documents to a party in interest or is compelled to provide information by an order of the Bankruptcy Court and provides prior written notice to DIP Lender of any intention or requirement to do so; or

(xii) Any person shall obtain a Section 506(a) judgment or similar determination with respect to the DIP Collateral without DIP Lender's or Pre-Petition Lender's prior written consent;

(xiii) The allowance of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the DIP Collateral; or

(xiv) The consummation of a sale of any material portion of the Debtors' assets other than pursuant to a sale approved by DIP Lender, unless such sale results in full and indefeasible payment, in cash at closing, of the DIP Obligations prior to the Termination Date.

Upon the occurrence and during the continuance of any Event of Default beyond any applicable grace period, DIP Lender shall accelerate the DIP Obligations and, thereafter, may take all or any of the following actions without further order of or application to the Bankruptcy Court (including, without limitation, to (i) cease providing advances to Debtors in respect of the DIP Credit Facility and (ii) apply proceeds of all collections received by DIP Lender to the DIP Obligations), provided that, following the entry of the Final Order, in the case of the enforcement of liens or other remedies with respect to collateral (other than to the extent set forth above in this paragraph), including pursuant to clause (2) below, DIP Lender shall provide the Debtors (with a copy to any counsel for the Creditors' Committee (as defined below) appointed in the Case and to the United States Trustee) with five (5) business days' prior written notice during which time any such party

must file a pleading seeking an emergency hearing in opposition to DIP Lender's exercise of its rights and remedies and provided further, that in any hearing following such notice, the only issue that may be raised by any party in opposition to the actions proposed or available to be taken by DIP Lender shall be whether, in fact, an Event of Default has occurred and is continuing::

    (1) declare the principal of and accrued interest on the outstanding borrowings to be immediately due and payable and terminate, as applicable, any further commitments under the DIP Credit Facility; and

    (2) charge the default rate of interest under the DIP Credit Facility.

**Syndication:** Syndication and/or participation of all or part of the DIP Credit Facility may be done at DIP Lender's sole discretion.  Borrower and Guarantor hereby consent and agree that financial, credit, background and reference information obtained may be shared with other lending institutions who desire to participate in the DIP Credit Facility.

**Carve-Out:** "Carve-Out" means the following expenses:  (i) to the extent allowed at any time, but limited in all respects to the amounts disclosed in the Budget described above, all accrued and unpaid fees, disbursements, costs and expenses incurred by Bernstein Shur, Debtors bankruptcy counsel, Spinglass, financial consultant to the Debtors and the monthly payments to SSG, investment advisor to the Debtors, and the professional firms retained by the official committee of creditors appointed in the Cases (the "Creditors' Committee") before or on the first business day following delivery by DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (ii) after the first business day following delivery by DIP Lender of the Carve Out Trigger Notice, to the extent allowed at any time, all unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors in an aggregate amount not to exceed $40,000 (the amount set forth in this clause (ii) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by DIP Lender to the Debtors and their counsel, the United States Trustee, and lead counsel to any official committee, which notice may only be delivered following the occurrence and continuance of an Event of Default, and stating that the Post-Carve Out Trigger Notice Cap has been invoked.

DIP Lender shall be reimbursed for any monies paid toward the Carve-Out from the proceeds of unencumbered or recovered assets to the extent such monies later become available.  All amounts funded into a Carve-Out reserve account for the benefit of professionals or otherwise paid on account of allowed professional fees shall reduce the Carve Out on a dollar-for-dollar basis.  The Carve-Out and amounts funded pursuant to the Carve-Out shall not in any way be considered a reduction of the DIP Obligations.

The foregoing Post-Carve Out Trigger Notice Cap shall not be reduced by the amount of any compensation and reimbursement of expenses paid or incurred (to the extent ultimately allowed by the Bankruptcy Court) prior to the delivery of the Carve-Out Trigger Notice; provided, however, that following the delivery of the Carve-Out Trigger Notice, any amounts paid to professionals in respect of fees accruing following delivery of the Carve-Out Trigger Notice by any means will reduce the Post-Carve Out Trigger Notice Cap on a dollar-for-dollar basis; and provided, further, that nothing herein shall be construed to impair the ability of any party in interest object to any of the fees, expenses, reimbursement or compensation sought by the professionals retained by the Debtors or any statutory committee appointed in the Cases.

Neither the Carve-Out nor the DIP Credit Facility may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to the DIP Credit Facility or the security interests and liens securing the DIP Obligations with respect thereto, or to fund prosecution or assertion of any claims, or to otherwise litigate against DIP Lender, provided that up to $25,000 shall be made available to any Creditors' Committee for investigation

140690.01019/101434630v.5

costs in respect of the stipulations contemplated below.

At DIP Lender's request, Debtors shall maintain a segregated Carve-Out reserve account in accordance with and pursuant to terms set forth in the Interim Order.

| | |
|---|---|
| **Section 506(c) Waiver:** | The Final Order shall include a ruling that, except to the extent of the Carve-Out, no expenses of administration of the Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any collateral pursuant to Section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of DIP Lender and no such consent shall be implied from any other action, inaction, or acquiescence by DIP Lender. |
| **Marshalling:** | DIP Lender shall not be required to marshal assets. |
| **Section 552(b):** | DIP Lender shall be entitled to all of the rights and benefits of Section 552(b) of the Bankruptcy Code and no expenses of administration of the Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the collateral under Section 552(b) of the Bankruptcy Code. |
| **No Priming or Pari Passu Liens:** | No order shall be entered authorizing or approving any liens or encumbrances on collateral senior to or pari passu with the liens of DIP Lender. |
| **Acknowledgment / Stipulations:** | Debtors shall stipulate to and acknowledge (i) the amount, validity, priority and enforceability of the Obligations under the Pre-Petition Loan Documents, without setoff, defense or counterclaims and (ii) that the Pre-Petition Lender has a valid, enforceable and fully perfected first priority lien in all of the prepetition Collateral.  The Interim Order, the Final Order and the DIP Credit Agreement shall provide that each Debtor and their respective estates release the Pre-Petition Lender consistent with the Post-Petition Release (as defined in the Commitment Letter), which would not bind the Creditors' Committee or other party in interest until the expiration of a challenge period acceptable to DIP Lender (the "Challenge Period"). |
| **Conditions of Approval and Funding:** | Siena's approval of the DIP Credit Facility and initial funding thereof, shall include, without limitation, the following conditions, all of which would need to be satisfied in a manner acceptable to Siena in its sole discretion: |

1.  Satisfactory review and execution and delivery of all legal documentation pertaining to the DIP Credit Facility in form and substance acceptable to DIP Lender, including, without limitation, a definitive credit agreement, related security agreement(s) (the "DIP Credit Agreement"), guarantees, pledge agreements, mortgages, and other agreements, opinions, instruments and documents required by DIP Lender (collectively, the "DIP Loan Documents");

2.  DIP Lender shall have received the Budget, including all updates and supplements thereto, which Budget shall be in form and substance acceptable to DIP Lender;

3.  The Release and the Post-Petition Release (each as defined in the Commitment Letter) being effective and in full force, it being understood that the Post-Petition Release is subject to the Challenge Period;

4.  Entry of the applicable Financing Order and any other required court approval by the Bankruptcy Court and such Financing Order(s) and approval(s) have not been stayed, modified or appealed and for which the appeal period has expired;

5.  As a condition to the entry of the Final Order, (i) payment in full in cash (except as expressly set forth in this clause (i)) of all Obligations (including, but not limited to, the Annual Fee, the Collateral Monitoring Fee, and the Early Termination Fee (in the amount

140690.01019/101434630v.5

of 3% of the Maximum Facility Amount) existing under the Pre-Petition Credit Agreement; it being agreed and acknowledged by the parties that the Early Termination Fee shall be deemed fully earned and non-refundable prior to the Filing Date and shall be indefeasibly paid in full in cash on the Termination Date)) existing under the Pre-Petition Loan Documents, and (ii) reimbursement in full in cash of all professional fees, costs and expenses of the Pre-Petition Lender;

6.  Approval in advance by DIP Lender of all "first day" motions and orders and approval of those motions and orders seeking approval of Bidding Procedures under Section 363 of the Bankruptcy Code;

7.  Minimum opening excess availability in an amount to be determined after repaying existing secured debt, closing costs and any book overdraft;

8.  The closing date of the DIP Credit Facility (the "Closing Date") would need to occur on or before September 30, 2015;

9.  Compliance with the Sale Process Covenants;

10. Financial advisor of Borrower to report directly to DIP Lender on terms and conditions acceptable to DIP Lender;

11. Satisfaction of DIP Lender that SSG Capital Advisors is continuing to serve as investment banker to the Debtors on terms and conditions acceptable to DIP Lender; and

12. Subordination Agreement to be executed by and between existing Mechanics Lien Holders and DIP Lender in form and substance satisfactory to DIP Lender, including, without limitation, consent of the existing Mechanics Lien Holders to be primed pursuant to the terms of this DIP Term Sheet immediately upon entry of the Interim Order (which DIP Lender acknowledges may include funding up to 30% of the claims of such mechanics lien holders in accordance with the Budget and which DIP Lender acknowledges will require settlement agreements providing for the payment of the balance of the mechanics lien holders' claims from the sale proceeds on or before December 31, 2015, provided, however, that DIP Lender must be indefeasibly paid in full prior to any such remaining balance payment to any mechanics lien holder)

This DIP Term Sheet does not define all of the terms and conditions of the proposed DIP Credit Facility.

This DIP Term Sheet is delivered to the Debtors on the condition that the contents of this Term Sheet will not be disclosed by the Debtors without the prior written approval of Siena, except (i) as may be required by law and (ii) on a confidential and "need to know" basis, to the Debtors' directors, officers, employees, and advisors.

THIS DIP TERM SHEET SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICT OF LAW PRINCIPLES THEREOF. THE DEBTORS CONSENT TO THE NONEXCLUSIVE JURISDICTION AND VENUE OF THE STATE OR FEDERAL COURTS LOCATED IN NEW YORK COUNTY, NEW YORK. EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, (A) ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS TERM SHEET OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) AND (B) ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LEGAL PROCEEDING IN THE STATE OR FEDERAL COURTS LOCATED IN NEW YORK COUNTY, NEW YORK.

This DIP Term Sheet may be executed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures hereto were upon the same instrument.  Signatures by facsimile or e-mail shall bind the parties

140690.01019/101434630v.5

hereto.  Once executed, this DIP Term Sheet may not be amended or modified other than pursuant to a written agreement signed by each of the parties hereto.

This DIP Term Sheet will expire on September 24, 2015 if by such date you do not deliver such signature of the Debtors.

*[Signature Page Follows]*

140690.01019/101434630v.5

Thank you again for your consideration and we appreciate the opportunity to make this proposal. We look forward to continuing to work with you and your associates towards establishing a mutually beneficial relationship.

Very truly yours,

Siena Lending Group LLC

By: _____
Title: _____

By: _____
Title: _____

ACCEPTED on this _____ day
of September, 2015:

Lincoln Paper and Tissue, LLC

By: _____
Title: _____

LPT Holdings, LLC

By: _____
Title: _____

18

140690.01019/101434630v.5

Thank you again for your consideration and we appreciate the opportunity to make this proposal.  We look forward to continuing to work with you and your associates towards establishing a mutually beneficial relationship.


Very truly yours,

Siena Lending Group LLC


By: _____          By: _____
Title: _____          Title: __Authorized Signatory_____


ACCEPTED on this 23rd day
of September, 2015:

Lincoln Paper and Tissue, LLC


By: _____
Title: _____

LPT Holdings, LLC


By: _____
Title: _____

140690.01019/101434630v.5

Thank you again for your consideration and we appreciate the opportunity to make this proposal. We look forward to continuing to work with you and your associates towards establishing a mutually beneficial relationship.

Very truly yours,

Siena Lending Group LLC

By: _____    By: _____
Title: _____    Title: _____

ACCEPTED on this 23rd day
of September, 2015:

Lincoln Paper and Tissue, LLC

By: _____
Title: _____

LPT Holdings, LLC

By: _____
Title: _____

18

140690.01019/101434630v.5

**EXHIBIT B**

Budget

See attached.

**Lincoln Paper and Tissue**
**Post Filing Weekly Cash Analysis** 2
**From Week Starting  9/28/2015 through 11/29/2015**

| Week========>>>> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 9/28/2015 | 10/5/2015 | 10/12/2015 | 10/19/2015 | 10/26/2015 | 11/2/2015 | 11/9/2015 | 11/16/2015 | 11/23/2015 | Total |
| **Receipts** | | | | | | | | | | |
| Pre Petition Collections | 800,000 | 1,000,000 | 1,000,000 | 1,000,000 | 200,000 | - | - | - | - | 4,000,000 |
| Discounts | (15,000) | (15,000) | (15,000) | (15,000) | - | - | - | - | - | (60,000) |
| Post Petition Collections | - | - | - | 814,807 | 1,273,467 | 1,341,990 | 1,462,202 | 1,499,837 | 1,386,546 | 7,778,848 |
| Discounts | - | - | - | (4,844) | (22,792) | (20,543) | (20,512) | (20,482) | (20,451) | (109,624) |
| **Net Receipts** | 785,000 | 985,000 | 985,000 | 1,794,963 | 1,450,675 | 1,321,447 | 1,441,689 | 1,479,356 | 1,366,095 | 11,609,224 |
| **Disbursements** | | | | | | | | | | |
| **Payroll & Related** | | | | | | | | | | |
| ADP w/fees | - | 367,200 | - | 367,200 | - | 367,200 | - | 367,200 | - | 1,468,800 |
| Concessions | - | - | - | - | - | - | - | - | - | - |
| Fidelity | - | 31,600 | - | 31,600 | - | 31,600 | - | 31,600 | - | 126,400 |
| Weekly Medical, etc. | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 405,000 |
| **Total PR and Related** | 45,000 | 443,800 | 45,000 | 443,800 | 45,000 | 443,800 | 45,000 | 443,800 | 45,000 | 2,000,000 |
| **Raw Material, Energy, Freight** | | | | | | | | | | |
| Bleached Hardwood Kraft | 443,771 | 554,714 | 554,714 | 554,714 | 554,714 | 554,714 | 554,714 | 554,714 | 554,714 | 4,881,485 |
| Bleached Softwood Kraft | 70,375 | 87,969 | 87,969 | 87,969 | 87,969 | 87,969 | 87,969 | 87,969 | 87,969 | 774,127 |
| Chemicals & Packaging | 112,784 | 140,744 | 140,509 | 140,273 | 140,038 | 139,802 | 139,567 | 139,331 | 139,096 | 1,232,145 |
| Electricity - distribution & transmission | 29,925 | 37,407 | 37,407 | 37,407 | 37,407 | 37,407 | 37,407 | 37,407 | 37,407 | 329,178 |
| Electricity - supply | 36,109 | 45,136 | 45,136 | 45,136 | 45,136 | 45,136 | 45,136 | 45,136 | 45,136 | 397,197 |
| Natural Gas (supply & distribution) | 28,706 | 35,883 | 35,883 | 35,883 | 35,883 | 35,883 | 35,883 | 35,883 | 35,883 | 315,768 |
| Waste Oil or #6 Oil | 55,546 | 69,432 | 69,432 | 69,432 | 69,432 | 69,432 | 69,432 | 69,432 | 69,432 | 611,005 |
| Mill Paid Freight & Distribution | 33,533 | 41,916 | 41,916 | 41,916 | 41,916 | 41,916 | 41,916 | 41,916 | 41,916 | 368,861 |
| **Total Raw Material, Energy, Freight** | 810,749 | 1,013,201 | 1,012,966 | 1,012,730 | 1,012,495 | 1,012,259 | 1,012,024 | 1,011,788 | 1,011,553 | 8,909,766 |
| **Operating Expenditures** | | | | | | | | | | |
| Parts, Supplies, & Contractors | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 720,000 |
| Insurance (pay per schedule - assume 10% | 92,095 | - | - | - | 92,095 | - | - | - | 92,095 | 276,285 |
| Property Taxes | - | - | 50,355 | - | - | - | - | 50,355 | - | 100,709 |
| Property Taxes - refund/TIF | - | - | - | (28,978) | - | - | - | - | (28,978) | (57,956) |
| Other | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 270,000 |
| **Total Operating Expenditures** | 202,095 | 110,000 | 160,355 | 81,022 | 202,095 | 110,000 | 110,000 | 160,355 | 173,117 | 1,309,038 |
| **Total Operating Disbursements** | 1,057,844 | 1,567,001 | 1,218,320 | 1,537,552 | 1,259,590 | 1,566,059 | 1,167,024 | 1,615,943 | 1,229,670 | 12,219,004 |
| Net Operating CF | (272,844) | (582,001) | (233,320) | 257,410 | 191,085 | (244,612) | 274,666 | (136,587) | 136,425 | (609,779) |
| **Professional and Related Fees** | | | | | | | | | | |
| BSSN - Counsel | 25,000 | 25,000 | 25,000 | 25,000 | - | - | 120,000 | - | - | 220,000 |
| Spinglass | - | - | - | 35,000 | - | - | 40,000 | - | - | 75,000 |
| SSG | - | - | - | 25,000 | - | 25,000 | 25,000 | - | - | 75,000 |
| Mechanic Lien Subordination | 372,000 | | | | | | | | | 372,000 |
| Utilities Adequate Assurance Deposit | - | - | - | 222,310 | - | - | - | - | - | 222,310 |
| DIP Fees | - | - | - | - | - | - | - | 125,000 | - | 125,000 |
| DIP Interest Payments | - | - | - | - | 38,120 | - | - | - | 42,342 | 80,461 |
| Siena Counsel | 25,000 | 25,000 | 25,000 | 50,000 | - | - | 125,000 | - | - | 250,000 |
| US Trustee | - | - | - | - | - | 13,000 | - | - | - | 13,000 |
| Committee Fees & Expenses | - | - | - | - | - | - | 75,000 | - | - | 75,000 |
| **Total Professional and BK Related** | 422,000 | 50,000 | 50,000 | 357,310 | 38,120 | 38,000 | 385,000 | - | 167,342 | 1,507,771 |
| **Miscellaneous Expenses** | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 90,000 |
| **Total Disbursements** | 1,489,844 | 1,627,001 | 1,278,320 | 1,904,862 | 1,307,709 | 1,614,059 | 1,562,024 | 1,625,943 | 1,407,011 | 13,816,775 |
| **Change In Cash** | (704,844) | (642,001) | (293,320) | (109,899) | 142,966 | (292,612) | (120,334) | (146,587) | (40,917) | **(2,207,550)** |
| Cummulative Change in Cash | (704,844) | (1,346,845) | (1,640,166) | (1,750,065) | (1,607,100) | (1,899,712) | (2,020,046) | (2,166,634) | (2,207,550) | |
| Cash Beginning | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Receipts - Total | 785,000 | 985,000 | 985,000 | 1,794,963 | 1,450,675 | 1,321,447 | 1,441,689 | 1,479,356 | 1,366,095 | 11,609,224 |
| Receipts Applied to PP Loan | (785,000) | (985,000) | (985,000) | (1,645,000) | - | - | - | - | - | (4,400,000) |
| Receipts Applied to DIP Loan | - | - | - | (149,963) | (1,450,675) | (1,321,447) | (1,441,689) | (1,479,356) | (1,366,095) | (7,209,224) |
| Advances of DIP Loan | 1,489,844 | 1,627,001 | 1,278,320 | 1,904,862 | 1,307,709 | 1,614,059 | 1,562,024 | 1,625,943 | 1,407,011 | 13,816,775 |
| Disbursements | (1,489,844) | (1,627,001) | (1,278,320) | (1,904,862) | (1,307,709) | (1,614,059) | (1,562,024) | (1,625,943) | (1,407,011) | (13,816,775) |
| Cash At End | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |

(1)  Eliminated if filed in Maine

**Lincoln Paper and Tissue**
**DIP Loan and Collateral**
**From Week Starting  9/28/2015 through 11/29/2015**

| Week=======>>>> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 9/28/2015 | 10/5/2015 | 10/12/2015 | 10/19/2015 | 10/26/2015 | 11/2/2015 | 11/9/2015 | 11/16/2015 | 11/23/2015 | Total |
| PRE PETITION SIENA BALANCE | 4,400,000 | 3,615,000 | 2,630,000 | 1,645,000 | - | - | - | - | - | - |
| Collections applied to balance | (785,000) | (985,000) | (985,000) | (1,645,000) | - | - | - | - | - | |
| Ending PP Loan Balance | 3,615,000 | 2,630,000 | 1,645,000 | - | - | - | - | - | - | |
| **ANALYSIS OF DIP LOAN** | | | | | | | | | | |
| Beginning Balance | - | 1,489,844 | 3,116,845 | 4,395,166 | 6,150,065 | 6,007,100 | 6,299,712 | 6,420,046 | 6,566,634 | 6,607,550 |
| Advances/Disbursements | 1,489,844 | 1,627,001 | 1,278,320 | 1,904,862 | 1,307,709 | 1,614,059 | 1,562,024 | 1,625,943 | 1,407,011 | 13,816,775 |
| Repayments/Collections | - | - | - | (149,963) | (1,450,675) | (1,321,447) | (1,441,689) | (1,479,356) | (1,366,095) | (7,209,224) |
| Ending Balance | 1,489,844 | 3,116,845 | 4,395,166 | 6,150,065 | 6,007,100 | 6,299,712 | 6,420,046 | 6,566,634 | 6,607,550 | 6,607,550 |
| **TOTAL SIENA EXPOSURE** | 5,104,844 | 5,746,845 | 6,040,166 | 6,150,065 | 6,007,100 | 6,299,712 | 6,420,046 | 6,566,634 | 6,607,550 | 6,607,550 |
| **ANALYSIS OF ACCOUNTS RECEIVABLE** | | | | | | | | | | |
| Beginning Balance | 4,000,000 | 4,277,868 | 4,626,923 | 4,973,948 | 4,662,241 | 4,685,427 | 4,692,409 | 4,577,180 | 4,422,316 | 4,000,000 |
| Invoiced | 1,092,868 | 1,364,055 | 1,362,025 | 1,522,944 | 1,519,444 | 1,367,485 | 1,367,485 | 1,365,455 | 1,363,425 | 12,327,216 |
| Discounts | (15,000) | (15,000) | (15,000) | (19,844) | (22,792) | (20,543) | (20,512) | (20,482) | (20,451) | (169,624) |
| Less Collections | (800,000) | (1,000,000) | (1,000,000) | (1,814,807) | (1,473,467) | (1,341,990) | (1,462,202) | (1,499,837) | (1,386,546) | (11,778,848) |
| Ending AR | 4,277,868 | 4,626,923 | 4,973,948 | 4,662,241 | 4,685,427 | 4,692,409 | 4,577,180 | 4,422,316 | 4,378,744 | 4,378,744 |
| **ANALYSIS OF INVENTORY** | | | | | | | | | | |
| Estimated Ending Inventory | 1,369,500 | 1,369,500 | 1,369,500 | 1,237,550 | 1,118,795 | 1,118,795 | 1,118,795 | 1,118,795 | 1,118,795 | 1,118,795 |
| **REFUNDABLE DEPOSITS** | - | - | - | 222,310 | 222,310 | 222,310 | 222,310 | 222,310 | 222,310 | 222,310 |
| **ENDING CASH** | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| **TOTAL AR, INV, CASH, DEPOSIT COLLATERAL** | 5,652,368 | 6,001,423 | 6,348,448 | 6,127,101 | 6,031,532 | 6,038,514 | 5,923,285 | 5,768,421 | 5,724,849 | 5,724,849 |
| **NET SIENA POSITION V. CASH COLLATERAL** | 547,524 | 254,578 | 308,282 | (22,965) | 24,432 | (261,198) | (496,761) | (798,213) | (882,702) | (882,702) |
| **PPE COLLATERAL (LPT Estimate)** | 9,800,000 | 9,800,000 | 9,800,000 | 9,800,000 | 9,800,000 | 9,800,000 | 9,800,000 | 9,800,000 | 9,800,000 | 9,800,000 |
| **NET SIENA POSITION AGAINST TTL COLLATERAL** | 10,347,524 | 10,054,578 | 10,108,282 | 9,777,035 | 9,824,432 | 9,538,802 | 9,303,239 | 9,001,787 | 8,917,298 | 8,917,298 |
| Borrowing Base (start of period) | | | | | | | | | | |
| AR | 4,000,000 | 4,277,868 | 4,626,923 | 4,973,948 | 4,662,241 | 4,685,427 | 4,692,409 | 4,577,180 | 4,422,316 | |
| Availability (@85%) | 3,400,000 | 3,636,188 | 3,932,885 | 4,227,856 | 3,962,905 | 3,982,613 | 3,988,548 | 3,890,603 | 3,758,969 | |
| Inventory | 1,369,500 | 1,369,500 | 1,369,500 | 1,237,550 | 1,118,795 | 1,118,795 | 1,118,795 | 1,118,795 | 1,118,795 | |
| Availability (@60%) | 821,700 | 821,700 | 821,700 | 742,530 | 671,277 | 671,277 | 671,277 | 671,277 | 671,277 | |
| Equipment (Availability) | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | |
| Total Availability | 6,721,700 | 6,957,888 | 7,254,585 | 7,470,386 | 7,134,182 | 7,153,890 | 7,159,825 | 7,061,880 | 6,930,246 | |