**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| In re:<br><br>LINCOLN PAPER AND TISSUE, LLC<br><br>Debtor. | Chapter 11<br>Case No. 15-10715 |

**DECLARATION OF KEITH VAN SCOTTER IN SUPPORT OF**
**CHAPTER 11 PETITION AND VARIOUS FIRST DAY MOTIONS**

I, KEITH VAN SCOTTER, declare, pursuant to section 1746 of title 28 of the United States Code, that:

1. I am the President and Chief Executive Officer ("CEO") of Lincoln Paper and Tissue, LLC ("Lincoln"). I have been Lincoln's President and CEO since its assets were acquired in 2004. I am familiar with Lincoln's day-to-day operations, business and financial affairs. I am authorized to submit this Declaration in support of Lincoln's chapter 11 petition and the first day pleadings described herein.

2. On September 28, 2015 (the "Petition Date"), Lincoln filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Maine (the "Bankruptcy Court"). The same day, the following pleadings were filed on behalf of Lincoln (collectively, the "First Day Motions"):

    (a) Motion for Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing on an Interim Basis and (B) Utilize Cash Collateral of Pre-Petition Secured Parties on an Interim Basis, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV) Granting Related Relief, Pursuant to 11 U.S.C. Sections 105, 361, 362, 363(c), (d) & (e), 364(c), 364(d)(1), 364(e) and 507(b), and (V) Scheduling a Final Hearing

1

      Authorizing Financing on an Final Basis Pursuant to Bankruptcy Rule 4001 ("the "DIP Motion");

  (b) Motion for Authority to (A) Pay Pre-Petition Employee Wages, Salaries and Related Payroll Obligations; (B) Make Payments for Which Payroll Deductions are Made; (C) Continue Employee Benefits Programs and Related Administrative Obligations in the Ordinary Course; (D) Maintain Insurance Policies and Pay Policy Premiums Arising Thereunder; and (E) Direct All Financial Institutions to Honor All Related Payment Requests (the "Payroll Motion");

  (c) Motion for Entry of an Order Authorizing (A) the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks; and (B) Continued Use of the Existing Cash Management System (the "Cash Management Motion"); and

  (d) Motion for Emergency Hearing and Approval of Shortened Objection Period with Respect to Certain First Day Motions (the "Lincoln Motion for Emergency Hearing").

3. This Declaration is submitted in support of these First Day Motions, which are described in greater detail below.

4. All facts set forth herein are based on my personal knowledge, on information supplied to me by others within Lincoln's organization, upon my review of relevant documents, or on my opinion based upon my experience and knowledge of Lincoln's operations, financial condition and present liquidity needs.  If I were called to testify, I could and would testify competently to the facts set forth herein.

5. Part I of this Declaration describes the business operations and background of Lincoln and Part II sets forth facts relevant to each of the First Day Motions.

## I.  Description of Lincoln's Business and Background

###   A. *Lincoln's Business*

6. Lincoln is a leading manufacturer of specialty and high-quality white tissue located on approximately 350 acres of land along the Penobscot River in Lincoln, Maine.

Lincoln is also the largest domestic producer of deep-dyed/colored tissue products and a market leader in print-to-edge tissue.

7. Lincoln is a wholly owned subsidiary of LPT Holding, LLC ("Holding"). Holding has three classes of equity interests: Class A, Class B and Class C.

8. Several years after the initial purchase, in 2006, Lincoln invested approximately $40 million in a 37,000 STPY Metso Advantage machine ("TM8") and introduced new operational techniques to drive process improvement. In 2007, Lincoln installed a new 13.5-MW steam turbine generator ("TG3") and completed a High Volume Low Concentration (HVLC) collection system as the final investment for compliance with the Environmental Protection Agency's "Pulp and Paper Cluster Rule." In 2008, Lincoln began TG3 and began working towards replacing fossil fuels with biofuels. More recently, Lincoln completed nearly $10 million in additional improvements, including a new $6 million condensing turbine upgrade (making Lincoln a nearly self-sufficient electricity generator) and $3 million in a new pulper and bale handling systems.

9. Until November 2013, Lincoln operated a pulp-integrated parent roll mill consisting of three tissue and two uncoated free-sheet paper production lines. Lincoln produced 100% of its own bleached kraft pulp (approximately 140,000 tons per year) and enjoyed a significant cost advantage over competitors that purchase pulp in the open market. Lincoln was able to produce 70,000 tons of tissue and 75,000 tons of specialized, high-bulk uncoated free-sheet paper.

10. In November 2013, the Lincoln pulp mill's recovery boiler sustained significant damage due to an explosion (the "Explosion"). Lincoln did not believe that insurance proceeds were sufficient to rebuild the boiler and maintain its customer base and consequently idled the

pulp mill along with the associated electricity generation equipment and the two uncoated free-sheet machines. The closure of the pulp mill forced Lincoln to reconfigure several processes and layoff 185 mill-workers. Lincoln now purchases all of its pulp from third parties, largely virgin hardwood from nearby sources.

### B.    The Debtors' Prepetition Secured Debt Structure

11.    Prior to the Petition Date, on December 11, 2014, Lincoln and Siena Lending Group LLC ("Siena") entered into certain loan agreements (all loan documents giving rise to the prepetition obligations owed to Siena collectively, the "Prepetition Loan Documents") pursuant to which Siena provided to Lincoln revolving loans and letters of credit (together, the "Revolver Indebtedness") with an aggregate credit limit of $6,000,000.00, minus any Availability Block and Reserves (each as defined in the Prepetition Loan Documents). The Revolver Indebtedness is secured by first priority liens (the "Revolver Liens") on substantially all of Lincoln's assets, including (a) cash, accounts receivable, work in progress and inventory (collectively, the "Cash Collateral") and (b) Lincoln's principal asset - the tissue mill located in Lincoln, Maine, comprising Lincoln's real property (the "Real Property") and the equipment and other "hard" assets (the "PP&E"), subject only to certain Permitted Liens (as defined in the Siena Loan Documents and as set forth below). Siena is the only entity with an interest in the Cash Collateral. As of the Petition Date, the aggregate principal amount outstanding under the Prepetition Loan Documents was approximately $4,300,000.00. Holding is a guarantor of the debt owed to Siena.

12.    In addition to the Revolver Indebtedness, Lincoln is obligated to the Finance Authority of Maine ("FAME") under the Economic Recovery Loan Program Loan Agreement dated as of December 9, 2014 (any and all loan documents related thereto collectively, the

"FAME Loan Documents") in the amount of approximately $950,000.00, as of the Petition Date. The obligations arising under the FAME Loan Documents (the "FAME Obligations") are secured by liens on the PP&E (the "FAME Liens"), which are Permitted Liens under (and as defined in) the Prepetition Loan Documents.

13. Finally, two contractors, Fastco Corporation ("Fastco") and Sullivan and Merritt Constructors, Inc. ("Sullivan," and together with Fastco, the "Mechanics Lien Holders," and together with FAME, the "Other Secured Creditors") have asserted liens (collectively, the "Mechanics' Liens") arising under applicable non-bankruptcy law in connection with various services provided to Lincoln prior to the Petition Date. In particular, Fastco asserts that it is owed approximately $337,000.00 as of the Petition Date, and that its claim may be secured by liens on certain of Lincoln's PP&E and Real Property that are subordinate to Siena's and FAME's liens. Sullivan asserts that it is owed approximately $1,120,000.00 as of the Petition Date (together with the amount asserted to be owed to Fastco, the "Mechanics' Obligations," and together with the FAME Obligations, the "Other Secured Obligations"), and that its claim may be secured by liens on certain of the PP&E and Real Property.[1]

### C. *Events Leading Up to the Chapter 11 Filing*

14. As a result of the 2013 Explosion, Lincoln began to sustain cash losses. Around that time, Lincoln's board of managers determined to pursue a strategy to capture a meaningful tissue market share, which in turn placed great pricing pressure on Lincoln. Amid that pricing pressure, in 2014, the global tissue paper market began to experience contraction. Coupled with increasing energy costs (despite running its own turbine, which turbine had a substantially

---

[1] Certain of Lincoln's equipment lessors filed financing statements in regard to their respective equipment leases. Lincoln reserves all rights to argue that such leases are actually disguised financings and that the allegedly leased equipment is property of Lincoln's estate. Lincoln reserves the right to contest the validity and priority of any and all liens asserted against any assets of Lincoln, subject to the terms of the DIP Term Sheet (defined below).

delayed start in operations and the installation of which suffered from substantial cost overruns), Lincoln's cash flow situation worsened. In addition, Lincoln is obligated under a collective bargaining agreement with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (the "Union") to fund significant labor obligations. Moreover, on August 28, 2015, Siena sent Lincoln a letter of default alleging Lincoln's default of the terms of the Prepetition Loan Documents. All told, the combination of these issues caused cash flow problems that have greatly hindered Lincoln's ability to operate as a going concern.

15. After consultation with Lincoln's other officers, member of the board and Lincoln's advisors, Lincoln determined that a standalone reorganization outside of the protections afforded by chapter 11 would be difficult to achieve. Accordingly, Lincoln filed its chapter 11 case to facilitate the orderly sale of its assets in a fashion that will maximize the value thereof, thus creating the largest possible return to creditors. As soon as possible after the Petition Date, Lincoln intends to sell substantially all of Lincoln's assets. Lincoln's primary assets include its real estate, machinery, equipment, inventory and accounts receivable.

## II.     The First Day Motions[2]

16. I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is necessary if Lincoln is to successfully exit from chapter 11 protection. Ultimately, the First Day Motions will be critical to Lincoln's ability to maximizing the return on its assets.

---

[2] Capitalized terms used but not defined in this First Day Motions section shall have the meanings ascribed to such terms in their respective First Day Motions.

### A. DIP Motion

17. During the months preceding the Petition Date, Lincoln and its advisors examined Lincoln's options for resolving its liquidity issues and labor obligations without resorting to a chapter 11 filing, but there was simply no feasible out-of-court restructuring alternative to chapter 11. During these months, Lincoln and its advisors began to engage in discussions with certain potential postpetition lenders regarding the contours of a postpetition financing facility (certain of these discussions also involved the possibility of prepetition financing).

18. In total, Lincoln contacted at least three financial institutions in addition to Siena in an effort to obtain postpetition financing on terms most favorable to Lincoln. Two of those institutions were unwilling to lend to Lincoln on a priming basis, let alone on an unsecured or junior secured basis, and the other institution was unable to provide sufficient funds. Like the other financing institutions contacted, Siena was not willing to lend on an unsecured or junior basis, but was willing to lend on terms that were fair and reasonable, as described above. In addition to the contacting financial institutions, Lincoln entered into negotiations with a number of potential strategic buyers, which negotiations included the possibility of these buyers providing the needed financing. Lincoln was unable to reach an agreement with any of these potential strategic buyers.

19. Without the DIP Loan, and the inability to use cash collateral, Lincoln would likely become unable to pay general operating expenses immediately, including, without limitation, employee payroll and other benefits, rent, utilities and the various other items reflected in the Budget. Upon Lincoln's inability to pay its general operating expenses, Lincoln would have to immediately liquidate, resulting in the destruction of substantial value that would otherwise inure to the benefit of Lincoln's creditors. The credit provided under the DIP Loan will

enable Lincoln to pay its employees and otherwise operate its business during the pendency of this case, thereby preserving and enhancing the value of its estate for the benefit of all parties in interest.

20. In addition, Lincoln needs the DIP Loan to enable it to have adequate time and resources to conduct a robust sale process for its assets. Lincoln currently believes, in consultation with its advisors, that a sale process is the best way to maximize value for its constituents, and obtaining the DIP Loan to enable an orderly sale process is thus in Lincoln's best interests.

21. Absent immediate access to additional funds, Lincoln would become unable to pay its employees, insurance providers, vendors, utility providers, and providers of other essential operational services within a very short time. Lincoln's failure to make any of these payments would result in an inability to continue operations as a going concern and would result in an immediate need to liquidate Lincoln's assets. The interim borrowing proposed for Siena, on the other hand, will permit Lincoln to operate as a going concern in order to preserve the value of its assets to maximize value for constituents and meet its obligations as a debtor in possession. Moreover, the various fees and charges required by Siena under the DIP Documents are on reasonable, market terms, and the Milestones agreed to in connection with the DIP Documents and are achievable and appropriate in light of the facts of the case.

### B. *Payroll Motion*

22. Lincoln has accrued payroll expenses as a result of regular business activity prior to the Petition Date. I understand that by the Payroll Motion, Lincoln seeks authorization to pay certain accrued wages, salaries and specified payroll-related expenses, to make payments to certain insurance companies, and to direct all applicable banks or financial institutions to receive,

process, honor and pay any and all checks drawn on Lincoln's accounts in relation to the amounts authorized to be paid under the Payroll Motion.

23. Based on the immediately prior period's payroll, the Prepetition Compensation attributable to the period from September 21, 2015 at 6:00 am through the Petition Date for the Employees will be approximately $234,861.00, and the service fee payable to ADP for such pay period is approximately $517.00.

24. In addition, Lincoln withholds Union Dues from the Hourly Employees' paychecks and remits those amounts to the Union. With certain exceptions, the Union Deductions are remitted to the Union at the end of each month on account of the prior month's membership, which can allow for the buildup of up to three paychecks' worth of withheld but unremitted Union Deductions in a month with three pay cycles. Approximately $4,134.00 (based on the immediately prior pay period numbers) in Union Dues is withheld from paychecks bi-weekly.

25. For the benefit of eligible Employees, Lincoln maintains two 401(k) plans through Fidelity Investments (FMR LLC). Lincoln maintains the Non-Union 401(k) Plan for the benefit of the Salaried Employees and the Union 401(k) Plan for the benefit of the Hourly Employees; however, Lincoln only provides contributions to the Union 401(k) Plan.

26. Aside from temporary and summer employees, Employees are eligible to participate in the 401(k) Plans on the first day of employment. Lincoln withholds, at any eligible Employee's request, up to 100% of such Employee's annual, pre-tax pay, subject to the Internal Revenue Service's annual maximums, for such Employee's Employee 401(k) Contribution, which contributions total approximately $20,000.00 (premised on the immediately prior pay

period) bi-weekly, remitted one day prior to the pay date with respect to which the contributions are made.

27.  For the Union 401(k) Plan, Lincoln matches fifty percent (50%) up to the first three percent (3%) of Employee 401(k) Contributions, which total approximately $2,300.00 bi-weekly. Lincoln also contributes $1.40 toward the Union Pension Fund for every hour up to two thousand two hundred (2,200) hours an Hourly Employee works in a year, totaling approximately $33,000.00 per month.

28.  Lincoln maintains a self-funded, shared cost group insurance program for health care coverage for its eligible Employees. The health plans are administered through a third party administrator named North America Administrators ("NAA"). Lincoln offers Employees the following coverage options: a preferred provider organization plan (the "PPO"), a consumer driven health plan (the "CDHP"), and the option to receive coverage under another health insurance plan (the "Health Sell"). To determine the premiums for the PPO and the CDHP (which are self-funded plans until such time as stop loss coverage is triggered), a joint committee consisting of certain Hourly Employees and members of Lincoln's upper management team meet on an annual basis and review Lincoln's prior year health spending and actuarial tables in an effort to project health related expenses for the upcoming year. The committee then reaches a determination regarding the forthcoming year's estimated annual health claims expenditures under both the PPO and CDHP. Those totals are divided by twenty-six (26) pay periods to determine the total premium per pay period for the PPO and the CDHP. For Employees electing coverage under the PPO and CDHP, the Employee is responsible for twenty-percent (20%) of the per-pay period premium and Lincoln funds the remaining eighty-percent (80%). Lincoln also

funds certain stop-loss coverage that is triggered when an employee's covered medical expenses exceed $50,000.00 per coverage year.

29. Lincoln also offers dental insurance. The premium is determined in a similar fashion as the health insurance premium. Electing Employees are responsible for forty-percent (40%) of the dental insurance premium and Lincoln funds the remaining sixty-percent (60%).

30. Premised on the health plans and the dental plans being self-funded to a point, these Employee health and dental insurance premium payments are deposited into Lincoln's medical disbursement account. Lincoln contributes approximately $50,000.00 per week as its portion of the health and dental insurance premium and deposits such money into the medical disbursement account. Friday or Monday of each week, NAA sends Lincoln an invoice for the healthcare claims that were paid by NAA the prior week. Lincoln then pays the invoice from the medical disbursement account and covers any short-fall between the amount in the medical disbursement account and the amount of the weekly invoice.

31. For Employees electing the Health Sell option, Lincoln pays such Employees approximately $15,000.00 per pay period in the aggregate.

32. Lincoln also provides life insurance, accidental death and dismemberment, and short-term disability coverage through Standard Insurance Company to all Hourly Employees, and life insurance, accidental death and dismemberment, and long-term disability coverage through Standard Insurance Company to all Salaried Employees. The premiums for these insurance policies are determined bi-annually and are paid monthly for the preceding month. For the last six months, the aggregate average premiums for the Life Insurance Premiums totaled approximately $8,500.00. Lincoln paid its September payment on September 18, 2015, and will

need to make the next payment on or about October 16, 2015 to cover the October payment (a portion of which relates to prepetition amounts due).

33. The Union also offers an additional short term disability plan to the Hourly Employees which goes beyond the coverage provided by Lincoln. Lincoln does not contribute to this plan, but deducts these union related charges from paychecks of Employees participating in this plan and remits the deduction to the Union on a monthly basis.

34. All Employees have the option of contributing to a health savings account (the "HSA"); however, Lincoln only contributes to HSA accounts of Employees electing the CDHP health coverage. For these Employees, Lincoln contributes $32.66 per pay period for CDHP single coverage and $93.17 for CDHP family coverage, which totals approximately $1,300.00 per pay period.

35. Lincoln also provides other Employee Benefits such as vacation time, increased pay for shift differentials, funeral leave, an annual safety shoe allowance, a tool allowance, and reimbursement for any expenditures incurred by Employees in connection with their employment and requests the authority to continue providing these Employee Obligations postpetition and to fund any of these obligations relating to the prepetition period.

36. In the ordinary course of its business operations, Lincoln maintains various Insurance Policies which provide coverage for, among other things, property, general liability, worker's compensation, automobile liability, directors' and officers' liability, and fiduciary liability (and a certain umbrella policy). The Insurance Policies were obtained through third-party insurance carriers (the "Insurance Carriers") and, over the course of last year, the total annual premiums under the Insurance Policies equaled approximately $850,000.00.

37. On or about May 27, 2015, the Debtor entered in a Premium Financing Agreement (the "Financing Agreement") with AFCO Insurance Premium Finance ("AFCO") because it became economically advantageous for Lincoln to finance the premiums of the Insurance Policies. Under the Financing Agreement, Lincoln made a down payment of $31,749.00 and financed the premiums for the Insurance Policies in the amount of $850,930.00, which AFCO paid to the various Insurance Carriers. Lincoln, in turn, is obligated to AFCO to repay the premiums in nine (9) equal monthly installments of $92,094.85, in accordance with a pre-set payment schedule that began on June 27, 2015, and to pay any and all other costs associated with the financing (the "Premium Financing Obligations"). The next monthly installment payment for the premiums under the Financing Agreement is due on or about October 16, 2015.

38. I believe any delay in paying the Prepetition Compensation or the Premium Financing Obligations will damage Lincoln's relations with the Employees, irreparably harm morale, and harm the value of Lincoln's business, property, and assets. To maintain and preserve the morale of any continuing labor force while a sale or restructuring occurs, I believe that it is essential that Lincoln be permitted to pay the Employees the compensation and deductions accrued prior to the filing. Moreover, payment of the Premium Financing Obligations is necessary to preserve the value of Lincoln as a going concern and to comply with the Bankruptcy Code. Absent the relief requested by the Payroll Motion, I believe that Lincoln's Employees will suffer undue hardship and, in many instances, suffer financial difficulties because these sums are needed to enable them to meet their own personal obligations. I believe that many Employees would seek other employment if not paid, and Lincoln could lose critical Employees. Moreover, I understand that applicable state law may require payment of wage-

related claims upon the termination of such Employees. No Employee will receive, in the aggregate, more than the $12,475.00 priority amounts allowed under 11 U.S.C. § 507(a)(4) and (5).

### C. *Cash Management Motion*

39. I understand that by the Cash Management Motion, Lincoln seeks authority to continue its prepetition cash management system (the "Cash Management System") and to use prepetition bank accounts and business forms. I believe this relief is critical to avoid disruption to Lincoln's operations. The Cash Management System consists of six (6) Accounts located at JPMorgan Chase Bank, N.A. ("Chase") which is listed on the United States Trustee's list of authorized depositories  The Accounts facilitate the timely and efficient collection, concentration, management and disbursement of funds by Lincoln.

40. One of the Accounts is a Lockbox for direct receipt of payments from all customers of Lincoln. The Lockbox is swept daily and the collected funds held in the Lockbox are transferred to an account in the name of Siena to pay the revolving loan (the "Line of Credit") and other fees and amounts owed to Siena as provided under that certain Loan and Security Agreement (among other related loan documents) dated December 11, 2014 between Lincoln and Siena. The second Account is the Operating Account, which is funded by draws on the Line of Credit and is used as the primary operating account of Lincoln. The Operating Account funds three other Accounts: the Medical Claims Account, the Payroll Account and the Medical Flex Spending Account. The Medical Claims Account is a segregated account used by Lincoln to pay NAA for employee medical claims. Lincoln funds the Medical Claims Account from the Operating Account. As noted above, each week, on Friday or Monday, NAA submits an invoice to Lincoln for employee medical claims paid the prior week. Lincoln then pays NAA

from the Medical Claims Account. The Payroll Account is a segregated account funded by Lincoln for payroll services provided by ADP. The Medical Flex Spending Account is a segregated account funded, in part, by the Operating Account for Lincoln's contributions to the HSA. The Medical Flex Spending Account is also used to hold employee contributions to their own HSA. The sixth Account is the Block Account, which is used to backstop Lincoln's existing letters of credit.

41. In addition to the Accounts, in the ordinary course of business, Lincoln uses a variety of Business Forms. System-generated sequenced check numbers are printed on stock as checks are printed. To minimize administrative expense and delay, Lincoln is requesting authority to continue to use its Business Forms substantially in the forms existing immediately prior to the Petition Date, without reference to Lincoln's "Debtor-in-Possession" status.

42. I believe that changing the Cash Management System would result in needless disruption of Lincoln's business and impede Lincoln's ability to seamlessly transition into chapter 11. Any new remittance procedure may lead to confusion and delay in receiving payments, a result that would be particularly disastrous. Additionally, transitioning to a new cash management system would cause Lincoln to incur additional costs and deplete assets of the estate without providing any benefit to Lincoln's creditors.

43. Lincoln is also requesting that it be authorized to continue to use all Business Forms existing immediately before the Petition Date without reference to Lincoln's status in bankruptcy. I believe that that it would be costly and disruptive to cease using all existing forms and to purchase and begin using new stationary, business forms, and checks.

### D. *Motions for Emergency Hearing*

44. Due to the nature of the relief sought by certain of the First Day Motions, Lincoln seeks emergency hearings on the First Day Motions as soon as possible after the Petition Date.

45. Lincoln seeks immediate relief with respect to the DIP Motion. As set forth in the DIP Motion, without immediate authority to continue its borrowing relationship with Siena, Lincoln will be unable to operate its business going forward. The ability to operate the paper mill is essential to Lincoln's ability to preserve its value as a going concern. Without the ability to fund its obligations as a debtor in possession, purchase the materials and equipment necessary to its operations, and pay other postpetition amounts owed in the ordinary course, Lincoln will simply be unable to operate.

46. Lincoln's ability to continue its operations depends, to a significant extent, on its ability to retain its Employees. If the Payroll Motion is not heard on an emergency basis, Lincoln will not be able to pay its Employees the Prepetition Compensation in a timely manner. That inability could lead to loss of employees at the very time when Lincoln most needs a dedicated, motivated work force.

47. Lincoln also seeks immediate authorization to maintain its existing Cash Management System, bank accounts and business forms to make a seamless transition into chapter 11 and, in turn, to best preserve its estate for the benefit of its creditors.

*[Remainder of page left intentionally blank. Signature page follows.]*

*[SIGNATURE PAGE FOR DECLARATION OF KEITH VAN SCOTTER IN SUPPORT OF CHAPTER 11 PETITION AND VARIOUS FIRST DAY MOTIONS]*

I certify under penalty of perjury that the foregoing is true and correct.

Dated: September 28, 2015

_____
Keith Van Scotter