# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

In re:

LINCOLN PAPER AND TISSUE, LLC

Debtor.

Chapter 11

Case No. 15-10715

## MOTION FOR ORDER: (A) APPROVING BID PROCEDURES FOR SALE OF SOME OR ALL OF THE DEBTOR'S ASSETS; (B) APPROVING ASSUMPTION PROCEDURES FOR CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (C) APPROVING A BREAK-UP FEE, EXPENSE REIMBURSEMENT AND OVERBID PROTECTIONS; AND (D) APPROVING A FORM OF NOTICE OF SALE

Lincoln Paper and Tissue, LLC, the debtor and debtor in possession in the above-captioned Chapter 11 case (the "Debtor"), requests that this Court enter an order pursuant to sections 105, 363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), substantially in the form attached hereto as **Exhibit A** (the "Bid Procedures Order"): (i) approving bidding procedures substantially in the form attached as **Exhibit 1** to the Bid Procedures Order (the "Bid Procedures"); (ii) approving procedures pursuant to which the Debtor may assume and assign certain executory contracts and unexpired leases; (iii) approving the Break-Up Fee, Expense Reimbursement and Overbid Protections (each as defined below); and (iv) approving the form of notice of sale (collectively, the "Motion").[1]  In support of the Motion, the Debtor respectfully states the following:

---

[1] In the near term, the Debtor plans to file its Motion for Order Authorizing (A) Sale of Certain Assets of the Debtor to LP Acquisitions, LLC Free and Clear of Liens, Claims and Encumbrances and (B) Assumption and Assignment of Certain Leases and Executory Contracts (the "Sale Motion").  Pursuant to the Sale Motion, the Debtor is requesting that this Court enter an order authorizing the Debtor to consummate a sale of the Stalking Horse Assets to LP Acquisitions, LLC or its designee (the "Stalking Horse") pursuant to the Stalking Horse Agreement, or to such other party who has submitted a higher or better offer in the Auction (each as defined below).

## JURISDICTION, VENUE AND PREDICATES FOR RELIEF

1.      The United States District Court for the District of Maine (the "District Court")
has original, but not exclusive, jurisdiction over the Debtor's chapter 11 case pursuant to 28
U.S.C. § 1334(b).  Pursuant to 28 U.S.C. § 157 and Rule 83.6 of the District Court's local rules,
the District Court has authority to refer and has referred this proceeding to this Court.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court has
constitutional authority to enter final judgment in this proceeding.

3.      Venue over this chapter 11 case is proper in this district pursuant to 28 U.S.C.
§ 1408, and venue over this proceeding is proper in this district pursuant to 28 U.S.C. § 1409.

4.      The statutory predicates and applicable rules for the relief sought herein are
11 U.S.C. §§ 105, 363, 365, 503(b) and 507(a)(2), Rules 2002, 6004, and 6006 of the Federal
Rules of Bankruptcy Procedure (hereinafter "Fed. R. Bankr. P.") and Rule 6006-1 of this Court's
local rules (the "Local Rules").

## BACKGROUND

### A.      General Background

5.      On September 28, 2015 (the "Petition Date"), the Debtor filed a voluntary petition
for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business
as a debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  On October 7,
2015, the Office of the United States Trustee filed a notice of appointment [D.E. 65] of an
official committee of unsecured creditors (the "Committee") in the Debtor's chapter 11 case.

6.      Additional background information regarding the Debtor and reasons for the
chapter 11 filing are set forth in the Declaration of Keith Van Scotter in Support of Chapter 11
Petition and Various First Day Motions [D.E. 7] (the "Van Scotter Declaration").

7.    Based upon various circumstances, the Debtor has determined that a sale of substantially all or a significant portion of its assets (the "Assets") is likely to maximize the return to the Debtor's creditors.

### B.    Pre-Petition Marketing Activities

8.    In the months leading up to the Petition Date, the Debtor, together with its advisors and, in particular, its investment banker, SSG Capital Advisors, LLC ("SSG"), expended significant efforts marketing the Debtor's assets in an effort to maximize value for the Debtor's stakeholders.  This marketing process included significant mailing and calls to targeted, industry specific, potential buyers that the Debtor and its advisors believed might be interested in discussing a potential purchase of the Assets.  In particular, before the Petition Date, the Debtor or its advisors: (a) contacted 169 potential bidders; (b) sent form non-disclosure agreements ("NDAs") to 47 parties; and (c) entered into 36 NDAs.  The culmination of this marketing process is the Stalking Horse Agreement (as defined below), although the Debtor and SSG believe there to be several additional entities interested in participating in an auction with respect to the Assets.

### C.    Negotiation of the Stalking Horse Agreement

9.    In the weeks prior to the Petition Date, the Debtor negotiated with the Stalking Horse the terms of an asset purchase agreement (the "Stalking Horse Agreement") memorializing the purchase of the Assets identified in the Stalking Horse Agreement (the "Stalking Horse Assets").  As part of those negotiations, the Debtor agreed to seek approval from this Court to enter into the Stalking Horse Agreement,[2] subject to higher or better offers at an

---

[2] As noted above, the Debtor will separately file the Sale Motion seeking approval of the sale of the Stalking Horse Assets to the Stalking Horse, subject to higher or better bids.  A copy of the Stalking Horse Agreement is attached hereto as **Exhibit B**.

auction, as well as of the Bid Procedures governing the sale process and certain bid protections for the Stalking Horse.

10.     The bid protections (the "Overbid Protection") include: (a) a break-up fee of $175,000 (the "Break-Up Fee"), payable at the closing of a competing transaction for the acquisition of the Stalking Horse Assets for a higher or better value than that contemplated by the Stalking Horse Agreement; and (b) postpetition fees and expenses of the Stalking Horse up to a maximum of $200,000 (the "Expense Reimbursement"), paid upon the closing of a Sale Transaction (as defined below), approved by the Bankruptcy Court with a Successful Bidder (as defined below) other than the Stalking Horse.  The Debtor may solicit and obtain bids during an auction for the Assets; provided, however, that no offer for any of the Stalking Horse Assets shall be accepted by the Debtor unless the proposed purchase price equals or exceeds the Purchase Price for the Stalking Horse Assets by the sum of (the "Minimum Overbid"): (i) the Break-Up Fee; plus (ii) Expense Reimbursement; plus (iii) $200,000.  In addition, the Stalking Horse Agreement contemplates that the Break-Up Fee may be credited as consideration in the Auction in the event of an overbid.

**RELIEF REQUESTED**

11.     By this Motion, the Debtor respectfully requests entry of the Bid Procedures Order, by which the Debtor seeks: (i) approval of the Bid Procedures; (ii) approval of the procedures for the assumption and assignment of certain executory contracts and unexpired leases designated in connection with the highest or otherwise best offer for the Assets (the bidder submitting such offer, the "Successful Bidder"), the resolution of any objections to such assumption and assignment, and the service of related notices (attached as **Exhibit 2** to the Bid Procedures Order, the "Assumption Procedures"); (iii) approval of the Break-Up Fee, Expense Reimbursement and Overbid Protection; and (iv) approval of the form and manner of notice (the

"Sale Notice") with respect to an auction (the "Auction") for the proposed sale of the Assets and related transactions (collectively, the "Sale Transaction") and a hearing (the "Sale Hearing") to approve the Sale Transaction.

### A.  Proposed Bid Procedures

#### i.  Pre-Auction Bidding

12.     To ensure that the estate receives the highest or best offer for the Assets, the Debtor will solicit competing bids for the Assets pursuant to the Bid Procedures.  Bid procedures will be approved if they do not provide an undue advantage to the stalking horse bid, provide the same access to information to all potential bidders, provide the option to contain the same contingencies as any stalking horse bid, and promote overall fairness.  See, e.g., In re Jon J. Peterson, Inc., 411 B.R. 131, 137 (Bankr. W.D.N.Y. 2009).  Of course, the primary goal of any sale process is to maximize the proceeds received by the estate, and clear bid procedures promote that goal.  In re Food Barn Stores, Inc., 107 F.3d 558, 564-68 (8th Cir. 1997).  The Debtor submits that the Bid Procedures promote overall fairness and will provide for a streamlined sale process to best ensure the values of its Assets are maximized for its estate.

13.     As set forth in the Bid Procedures attached to the Bid Procedures Order as **Exhibit 1**, the Bid Procedures provide for the following process in connection with the sale of the Assets:

#### i.  Qualified Bids

(a)     **Assets to Be Sold**.  The Debtor is offering the Assets for sale.  Bidders may submit a bid for less than all of the Stalking Horse Assets or a bid that includes more than the Stalking Horse Assets (the "Other Assets").  As to

each Proposed Agreement (as defined below), the Assets designated for purchase shall be the "Purchased Assets."[3]

(b)    **The Bidding Process**.  The Debtor, in conjunction with its advisors and using reasonable discretion taking into account its fiduciary duties, shall: (i) determine whether any person is a Potential Bidder (as defined below); (ii) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Assets; (iii) receive offers from Qualified Bidders (as defined below); and (iv) negotiate any offer made to purchase any of the Assets, together or separately (collectively, the "Bidding Process").

(c)    **Potential Bidders**.  To be a "Potential Bidder," each bidder must have delivered the following:

(i)    An executed confidentiality agreement in a form satisfactory to the Debtor in its reasonable discretion taking into account its fiduciary duties, provided that no Potential Bidder will be required to execute a confidentiality agreement more onerous in any material respect to the confidentiality agreements executed by other Potential Bidders; and

(ii)    Current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited and unaudited financial statements or other financial information of the Potential Bidder's equity holder or other financial backer, or such other form of financial disclosure and evidence acceptable to the Debtor and its advisors in their reasonable discretion taking into account the Debtor's fiduciary duties, demonstrating such Potential Bidder's ability to close the proposed transaction, to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder.

(d)    **Due Diligence**.  The Debtor shall afford each Potential Bidder due diligence access to the Assets.  Neither the Debtor, nor its representatives, shall be obligated to furnish information of any kind whatsoever relating to the Assets to any person who is not a Potential Bidder.

---

[3] The sale of the Assets will be conducted in a manner consistent with the rights and obligations of the Debtor and Siena Lending Group LLC (the "DIP Lender") under the Debtor-In-Possession Loan and Security Agreement Dated as of September 30, 2015 and any and all documents executed in relation thereto (the "DIP Credit Agreement") and the terms of any orders issued by this Court authorizing the Debtor to borrow post-petition funds under the same (the "DIP Orders").  Nothing herein shall be construed to limit, alter, modify or amend, in any way, the rights and obligations of the Debtor and the DIP Lender under the DIP Credit Agreement and/or the DIP Orders.

(i)      Due diligence access may include management presentations as may be scheduled by the Debtor, access to data rooms, onsite inspections and such other matters which a Potential Bidder may request and as to which the Debtor may agree in its reasonable discretion taking into account its fiduciary duties, provided that all such information shall be made available to each Potential Bidder on an equal basis.

(ii)      Potential Bidders are advised to exercise their own discretion before relying on any information regarding the Assets provided by anyone other than the Debtor or its representatives.

(iii)      Each Potential Bidder shall be deemed to acknowledge and represent that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or Assets in making its bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection with the Assets, the Bidding Process or the Auction, except as expressly stated in these Bid Procedures or, as to the Successful Bidder, in the applicable Proposed Agreement.

(e)      **Participation Requirements**.  Unless otherwise ordered by the Bankruptcy Court for cause shown or as otherwise determined by the Debtor in its reasonable discretion, taking into account its fiduciary duties, in order to participate in the Bidding Process, each Potential Bidder must submit a bid that adheres to the following requirements (such a qualifying bid, a "<u>Qualified Bid</u>," and any person submitting such a bid, a "<u>Qualified Bidder</u>"):[4]

(i)      The Stalking Horse will be deemed to be a Qualified Bidder and the Stalking Horse Agreement will be deemed to be a Qualified Bid (the "<u>Stalking Horse Bid</u>"), without the need to comply with any of the requirements set forth below.

(ii)      All Qualified Bids must be submitted to counsel for the Debtor: Robert J. Keach, Esq. and D. Sam Anderson, Esq., Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, P.O. Box 9729, Portland, ME, 04104-5029 (Fax: (207) 774-1127; email: rkeach@bernsteinshur.com,  sanderson@bernsteinshur.com)  not later than 11:00 a.m. (prevailing Eastern Time) on **November 9,**

---

[4] Any Potential Bidder submitting a Bid that otherwise constitutes a Qualified Bid is deemed, by the submission of such Qualified Bid, to consent to such Qualified Bid being treated by the Debtor as Back-up Bidder as that term is defined below.

**2015** (the "<u>Bid Deadline</u>").  Upon determination that any Bid is not a Qualified Bid, the Debtor shall notify such bidder of such determination forthwith, but in any event not later than the commencement of the Auction, and shall provide such bidder with the basis for such determination.

(iii)   Immediately upon receipt of any Bid(s), Debtor's counsel shall provide DIP Lender with a copy of such Bid(s) for DIP Lender's review.   After reviewing any such Bid(s), but prior to the commencement of the Auction, DIP Lender shall notify the Debtor whether DIP Lender will participate in the Auction as a Potential Bidder.   Should DIP Lender so participate, DIP Lender will be deemed to be a Qualified Bidder and any asset purchase agreement submitted by the DIP Lender will be deemed a Qualified Bid (the "<u>DIP Lender Bid</u>") without the need to comply with any of the requirements set forth below.   In accordance with the DIP Credit Agreement and DIP Orders, the DIP Lender is authorized to credit bid in connection with any Sale Transaction; provided, however, that notwithstanding any other provision in these Bid Procedures, the Debtor shall not consult with DIP Lender regarding any bid by a Qualified Bidder in relation to the Auction in which the DIP Lender has submitted a DIP Lender Bid.

(iv)   All Qualified Bids shall be in the form of an offer letter from a person or persons that the Debtor, in its reasonable discretion taking into account its fiduciary duties, deems financially able to consummate the purchase of the Assets, which letter states:

(A)   that such Qualified Bidder offers to purchase some or all of the Assets upon the terms and conditions set forth in an executed asset purchase agreement (an electronic version in Word format and blacklined against the Stalking Horse Agreement), together with its exhibits and schedules, including terms relating to price and the time of closing (the "<u>Proposed Agreement</u>");

(B)   that such Qualified Bidder is prepared to consummate the transaction, following entry of an order of this Court approving the Sale to the Successful Bidder (the "<u>Sale Order</u>");

(C)   that in the event such Qualified Bidder becomes the Successful Bidder or the Back-up Bidder (as defined below), such Qualified Bidder's offer is irrevocable until two (2) business days after the closing of the sale of the Assets;

(D)  the actual value of such Qualified Bidder's bid to the Debtor's estate; and

(E)  which (if any) of the Debtor's leases and executory contracts are to be assumed in connection with the consummation of the Qualified Bidder's bid.

(v)  All Qualified Bids must exceed the Stalking Horse Bid in relation to the Stalking Horse Assets by the Minimum Overbid.

(vi)  All Qualified Bids shall be accompanied by a deposit into escrow with the Debtor of an amount equal to 3.0% of the proposed purchase price for such bid (the "Good Faith Deposit").

(vii)  All Qualified Bids shall be accompanied by satisfactory evidence, in the reasonable opinion of the Debtor and its advisors, taking into account the Debtor's fiduciary duties, of committed financing or other ability to perform all transactions contemplated by the Proposed Agreement.

(viii)  Qualified Bids should not contain any financing conditions or contingencies (other than those set forth in the Stalking Horse Agreement).

(ix)  All Qualified Bids must provide for adequate working capital financing to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder.

(f)  "**As Is, Where Is**."  The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtor, its agents or estate, except to the extent set forth in the Proposed Agreement of the Successful Bidder.

(g)  **Free and Clear**.  Except as otherwise provided in the Proposed Agreement, all of the Debtor's right, title and interest in and to the Assets to be acquired shall be sold free and clear of all liens, claims, charges, security interests, restrictions and other encumbrances of any kind or nature thereon and there against (collectively, the "Transferred Liens"), with such Transferred Liens to attach to the proceeds of the sale.

ii.  *The Auction*

(a)  **Cancellation of Auction**.  If the Debtor does not receive any Qualified Bids other than the Stalking Horse Bid, the Debtor, in consultation with the DIP Lender and the Committee, will report the same to this Court,

cancel the Auction and proceed to seek authorization to enter into the Stalking Horse Agreement.

(b)    **Auction.**  If the Debtor receives more than one Qualified Bid prior to the Bid Deadline, the Debtor shall, in consultation with the DIP Lender and the Committee, conduct the Auction at the offices of Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, Portland, ME 04104 on **November 10, 2015, beginning at 9:00 a.m. (prevailing Eastern Time)** or such later time or other place as the Debtor shall notify all Qualified Bidders who have submitted Qualified Bids.

(i)    Only representatives of the Stalking Horse, the Debtor, the DIP Lender, the United States Trustee, the Committee, and any Qualified Bidders who have timely submitted Qualified Bids shall be entitled to attend the Auction.

(ii)    The Debtor, in its reasonable discretion taking into account its fiduciary duties, and in consultation with the DIP Lender and the Committee, may announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make subsequent overbids) for conducting the Auction, so long as such rules are not inconsistent with these Bid Procedures. The Debtor may, in consultation with the DIP Lender and the Committee, and based upon the terms of the Qualified Bids received, the number of Qualified Bidders participating in the Auction, and such other information as the Debtor, in its reasonable discretion taking into account its fiduciary duties, determines is relevant, conduct the Auction in the manner it determines will achieve the maximum value for the Assets. At the Auction, the minimum initial bid against the Stalking Horse bid must exceed the value of the Stalking Horse Bid by the Minimum Overbid in relation to the Stalking Horse Assets. Subsequent bids in relation to the Stalking Horse Assets shall be made in minimum increments of not less than $50,000 (subject to the discretion of the Debtor and in consultation with the DIP Lender and the Committee) (the "Subsequent Overbid").

(iii)    At the commencement of the Auction and at the conclusion of each round of bidding at the Auction, the Debtor, in its reasonable discretion taking into account its fiduciary duties, and in consultation with the DIP Lender and the Committee, shall announce the then highest or otherwise best offer or combination of offers for the Assets and the basis for such determination, including identifying any non-economic terms that form the basis for such determination.

(iv) Prior to concluding the Auction, the Debtor shall, in consultation with the DIP Lender and the Committee: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale; and (ii) using its reasonable discretion taking into account its fiduciary duties, identify and announce to all attending the Auction the highest or otherwise best offer or combination of offers for the Assets (the "Successful Bid") and any second-highest offer (the "Back-up Bid" and the Qualified Bidder submitting such Back-up Bid, the "Back-up Bidder") and the basis for such determination.

(v) The Successful Bidder shall execute an asset purchase agreement for the Successful Bid at the conclusion of the Auction. The Debtor shall present the Successful Bid to the Bankruptcy Court for approval at the Sale Hearing. The Back-up Bidder shall also execute an asset purchase agreement for the Back-up Bid, contingent on the failure to close of the Successful Bid.

(c) **Acceptance of Qualified Bids.** Subject to the terms of the DIP Credit Agreement and the DIP Orders, the Debtor shall sell the Stalking Horse Assets to the Stalking Horse or the Purchased Assets to the Successful Bidder, as the case may be, submitting the highest or otherwise best Qualified Bid at the Auction, after approval of such Qualified Bid by the Bankruptcy Court at the Sale Hearing. The Debtor's presentation to the Bankruptcy Court for approval of a particular Qualified Bid does not constitute the Debtor's acceptance of such Qualified Bid. The Debtor shall have accepted a Qualified Bid only when that Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing.

(d) **The Sale Hearing.** After the conclusion of the Auction, the Bankruptcy Court shall conduct the Sale Hearing to approve the Sale Transaction by no later than November 12, 2015. At the Sale Hearing, the Debtor will seek entry of an order (the "Sale Order"), in form and substance acceptable to the DIP Lender, among other things, authorizing and approving the Sale to the Successful Bidder(s), as determined by the Debtor in accordance with the Bid Procedures, pursuant to the terms and conditions set forth in the Proposed Agreement(s) submitted by the Successful Bidder(s) (as such agreement may be modified prior to, during or after the Auction with the agreement of the Debtor). The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date in open court. Following the entry of the Sale Order approving the Sale, if the Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-up Bid, as disclosed at the Sale Hearing, shall be deemed to be the Successful Bid(s) and the Debtor

shall be authorized to effectuate such sale without further order of the Bankruptcy Court.

(e)  **Return of Good Faith Deposit**.

(i)  The Good Faith Deposits of the Qualified Bidders other than the Successful Bidder(s) and the Back-up Bidder shall be returned to the applicable Qualified Bidder within two (2) business days after entry of the Sale Order.

(ii)  The Good Faith Deposits of the Successful Bidder(s) and the Back-up Bidder (to the extent applicable) shall be retained by the Debtor and such Successful Bid and Back-up Bid will remain open and irrevocable, notwithstanding Bankruptcy Court approval of a sale to a Successful Bidder, until two (2) business days after the closing of the Sale Transaction.

(A)  The Debtor shall credit the Successful Bidder's Good Faith Deposit (if any) against the Purchase Price, and upon the closing of the Sale Transaction, shall return to the Back-up Bidder its Good Faith Deposit.

(B)  If a Successful Bidder fails to consummate a Sale Transaction because of such Successful Bidder's breach or failure to perform, the Debtor will have no obligation to return such Successful Bidder's Good Faith Deposit (if any), which shall be retained by the Debtor as liquidated damages to the extent the Debtor is entitled to such damages under the Proposed Agreement.  In such an event, the Debtor shall proceed with closing of the Sale Transaction to the Back-up Bidder, and shall credit the Back-up Bidder's Good Faith Deposit (if any) against the Purchase Price.  In the event the Back-up Bidder fails to close, the DIP Lender reserves the right to credit bid with respect to any Assets.

(f)  **Assessment of Qualified Bids.**  The Debtor, in consultation with the DIP Lender and the Committee, may: (i) determine, in its reasonable business judgment taking into account its fiduciary duties, which Qualified Bid, if any, is the highest or otherwise best offer; (ii) consult with any significant constituent in connection with the bidding process and Bid Procedures (other than with a Qualified Bidder about the Qualified Bid of a different Qualified Bidder); and (iii) reject at any time before announcing the Successful Bid at the Auction, any bid that, in the Debtor's reasonable discretion taking into account its fiduciary duties, is: (x) inadequate or insufficient; or (y) not in conformity with the Bankruptcy Code or the Bid Procedures.

(g)   **Reservation of Rights**: In addition to its rights set forth in section (b) above, the Debtor, in consultation with the DIP Lender and the Committee, may modify these Bid Procedures or impose, at or prior to the Auction, additional terms and conditions on the proposed Sale of the Assets if, in its reasonable judgment, taking into account its fiduciary duties, such modifications would be in the best interests of the Debtor's estate and promote an open and fair sale process.  Without limitation, at any point during the Auction, the Debtor, in consultation with the DIP Lender and the Committee, shall have the absolute right to convert the bidding process from an open auction to a "sealed bid auction," in which case all Qualified Bidders shall have one opportunity to make a final, sealed bid.  If the Debtor exercises this option, the Debtor shall collect all sealed bids, analyze them, and, in consultation with the DIP Lender and the Committee, determine the Successful Bid and any Back-up Bid.

14.     As a sale of the Assets is in the best interests of the Debtor's estate and the Bid Procedures are intended to foster bidding to maximize a return on the Assets, the Bid Procedures should be approved by this Court.

**B.**     **Proposed Procedures Relating to Executory Contracts and Unexpired Leases**

15.     The Stalking Horse Agreement does not designate any executory contracts or unexpired leases for the Debtor to assume and assign to the Stalking Horse.  The Debtor expects, however, that additional Qualified Bidders may designate executory contracts or unexpired leases (collectively as to each Qualified Bidder, the "Selected Contracts") for the Debtor to assume and assign to them in the event their Qualified Bid is selected as the Successful Bid.  To facilitate any such assumption and assignment of the Selected Contracts, the Debtor requests that the Court find all anti-assignment provisions of the Selected Contracts to be unenforceable under

section 365(f) of the Bankruptcy Code.[5]  Absent such a finding, the Debtor's ability to attract the highest or otherwise best offer to maximize value for the estate may be imperiled.

16.     Section 365 of the Bankruptcy Code authorizes a debtor to assume and assign its executory contracts and unexpired leases, subject to approval of the Bankruptcy Court, and provided that certain defaults under such contracts or leases are cured and adequate assurance of future performance is provided.   11 U.S.C. § 365(a).   In the case of an assumption and assignment, the purchaser or assignee must provide the non-debtor contract counterparty the adequate assurance of future performance.  See 11 U.S.C. § 365(f)(2).  Adequate assurance of future performance depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  See In re Carlisle Homes, Inc., 103 B.R. 524, 538 (Bankr. D.N.J. 1989).

17.     As the Stalking Horse Agreement does not designate any Selected Contracts, no cure schedule will be filed unless and until a Successful Bidder other than the Stalking Horse is designated.  To avoid the time and expense of addressing assumption and assignment issues on a piecemeal basis with respect to any Selected Contracts designated by a Successful Bidder other than the Stalking Horse, the Debtor requests approval of the "**Assumption Procedures**" set forth below.

(a)     **Successful Bidder May Designate Selected Contracts**.  In the event a Successful Bidder other than the Stalking Horse is chosen, the Successful Bidder (and any Back-up Bidder) may, at any time through Closing, designate Selected Contracts for the Debtor to assume and assign to the

---

[5] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease...."  11 U.S.C.  § 365(f)(1).   Section 365(f)(3) further provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

Successful Bidder (or the Back-up Bidder, as applicable) in connection with consummation of the Sale Transaction.

(b) **Selected Contracts Schedule**.  In the event of such Successful Bidder's (or Back-up Bidder's) designation of Selected Contracts, the Debtor will (i) file a list (the "<u>Selected Contracts Schedule</u>") of such Selected Contracts together with the amounts the Debtor believes are required to cure any defaults under such Selected Contracts (the "<u>Cure Amounts</u>") and (ii) serve each counterparty to a Selected Contract (each, a "<u>Counterparty</u>") by electronic or overnight mail with notice that their contract or lease has been selected for assumption and assignment to the Successful Bidder, including the applicable Cure Amount (in substantially the form attached as <u>Exhibit 4</u> to the Bid Procedures Order, the "<u>Cure Notice</u>").

(c) **Objections to Assumption and Assignment**.  Any Counterparty that objects to (i) the ability of the Successful Bidder(s) (or the Back-up Bidder) to provide adequate assurance of future performance with respect to their Selected Contract(s) or (ii) the Cure Amount for their Selected Contract(s) must file an objection (a "<u>Cure Objection</u>") on the Court's docket in accordance with the following within five (5) days of the date of the Cure Notice:

   (i) If the Counterparty objects to the Cure Amount, the objection must include the Cure Amount such Counterparty believes is owing.

   (ii) If the Counterparty objects to the ability of the Successful Bidder(s) (or the Back-up Bidder) to provide adequate assurance of future performance with respect to their Selected Contract(s), the objection must explain why such Counterparty believes the Successful Bidder (or the Back-up Bidder) cannot provide adequate assurance of future performance.

   (iii) The failure of a Counterparty to submit an objection will forever bar such Counterparty from (A) asserting any other Cure Amount or otherwise disputing such amounts with respect to any Selected Contract(s) and (B) objecting to the assumption and assignment of its Selected Contract(s) to the Successful Bidder or Back-up Bidder.

   (iv) In the event a Cure Objection cannot be resolved, the Bankruptcy Court will adjudicate same on an expedited basis.

(d) **Payment of Cure Amounts**.  Upon resolution of any issues relating to the assumption and assignment of executory contracts or unexpired leases, the Successful Bidder shall pay or cause to be paid any and all Cure Amounts with respect to its Selected Contracts.  In the event of any dispute relating

to any Cure Amount, the Successful Bidder may elect not to assume the Selected Contract if it is unsatisfied with the resolution of such dispute.

### C.    The Break-Up Fee, Expense Reimbursement and Overbid Protection

18.    The Stalking Horse Agreement provides for the Overbid Protections, as well as payment of the Break-Up Fee and Expense Reimbursement in the event that (a) the Debtor determines that a Qualified Bid other than the Stalking Horse Bid constitutes a higher or better offer for the Stalking Horse Assets and (b) the Bankruptcy Court authorizes the Debtor to enter into a purchase agreement documenting same. Indeed, the Stalking Horse requires approval of the Break-Up Fee, Expense Reimbursement and Overbid Protections on an advance basis in order to proceed with the Stalking Horse Bid. Such provisions protect and compensate the Stalking Horse for the time and expense incurred to enter into the Stalking Horse Agreement notwithstanding the uncertainties presented by a sale of this nature, which Stalking Horse Agreement offers the Debtor a backstop for the Sale Transaction and a price floor for the Auction. In light of these considerations and those set forth below, the Debtor believes that the Break-Up Fee, Expense Reimbursement and the Overbid Protections are reasonable, and thus requests that the Court approve such provisions as administrative expenses under Bankruptcy Code sections 503(b) and 507(a)(2).

19.    Break-up fees serve a number of useful functions: (a) they attract bidders; (b) they help to insure that a bidder does not withdraw its bid; and (c) they help to establish a bid standard for other bidders. In re Great Northern Paper, Inc., 299 B.R. 1 (D. Me. 2003); see also In re Integrated Resources, Inc., 147 B.R. 650, 661-62 (S.D.N.Y. 1992); In re Hupp Industries, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1991) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's … due diligence. . . ."); In re 995

Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) ("break up fees and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter the bid by providing some form of compensation for the risks it is undertaking").

20.    Courts consider three questions in assessing the appropriateness of break-up fees: (a) whether the relationship between the parties who negotiated the break-up fee is tainted by self-dealing or manipulation; (b) whether the fee hampers, rather than encourages, bidding; and (c) whether the amount of the break-up fee is reasonable relative to the proposed purchase price. See Integrated Res., 147 B.R. at 657.

21.    With respect to the first factor of this test, the Break-Up Fee is the product of arm's length negotiations between unrelated parties.  With respect to the second, the Break-Up Fee and other bid protections encourage meaningful bidding by (a) attracting and retaining the Stalking Horse Bid when no other party was willing to make a better firm offer to acquire the Stalking Horse Assets and (b) establishing a benchmark against which the Debtor can evaluate overbids for the Stalking Horse Assets.  With respect to the third factor, the Debtor believes, in its business judgment and based on discussions with its advisors, that the Break-Up Fee, which is approximately 3.5% of the value of the Stalking Horse Bid, is fair and reasonable relative to the amount to be paid to the Debtor if the Sale Motion is approved.

22.    Likewise, the Stalking Horse Bidder should be entitled to the Expense Reimbursement.  Approval of the Expense Reimbursement as a form of bidder protection in connection with a sale of assets pursuant to Bankruptcy Code section 363 is appropriate and has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.  See, e.g.,

Integrated Res., 147 B.R. 650 (approving break-up fee and expense reimbursement as necessary

incentives for stalking horse bidder).

23.     Finally, the Stalking Horse Agreement requires that any initial competing offer

for the Stalking Horse Assets must exceed the value of the Stalking Horse Bid by the Minimum

Overbid, which is the sum of the Overbid Protections and $200,000.  The Minimum Overbid is

inclusive of the maximum Break-Up Fee and Expense Reimbursement.  Subsequent bidding

increments must be no less than the Subsequent Overbid.  Given the size of this transaction,

subsequent bidding increments of $50,000 will not discourage competing bids at an auction, and

in fact the Debtor believes will facilitate productive bidding at the Auction.

24.     Approval of the Break-Up Fee, the Overbid Protections and the Minimum

Overbid are conditions precedent to the consummation of the sale of the Stalking Horse Assets to

the Stalking Horse.  Based upon the timing considerations and the requirements of the Stalking

Horse, the Debtor requests that the terms of such provisions be approved by this Court.

**D.**     **Proposed Form and Manner of Notice**

25.     A proposed form of notice with respect to the sale of the Stalking Horse Assets

and the objection deadline and hearing dates is attached to the Proposed Order as **Exhibit 3** (the

"Sale Notice").  In accordance with Rules 2002, 6004, and 6006 of the Bankruptcy Rules, the

Debtor intends, upon approval of this Motion, to:

(a)     serve copies of the Sale Motion and Sale Notice upon (collectively, the
        "Sale Notice Parties"):

    (i)     Stephen Morrell, Esq. and Jennifer Pincus, Esq., U.S. Trustee, 537
            Congress Street, Room 303, Portland, ME 04101 (Fax: 207-780-
            3564;        email:        Stephen.G.Morrell@usdoj.gov,
            Jennifer.H.Pincus@usdoj.gov);

    (ii)    counsel to the official committee of unsecured creditors, Jeremy
            Fischer and Jeffrey T. Piampiano, Drummond Woodsum, 84
            Marginal Way, Suite 600, Portland, ME 04101-2480 (Fax: 207-

772-3627;          email:          jfischer@dwmlaw.com,
jpiampiano@dwmlaw.com);

(iii)   counsel to Siena Lending Group LLC, c/o Regina Stango Kelbon,
Esq., Blank Rome LLP, 1201 Market Street, Suite 800,
Wilmington, DE 19801 (Fax: (302) 428-5133;
Kelbon@BlankRome.com);

(iv)   counsel to Finance Authority of Maine, c/o Christopher Roney,
Esq., P.O. Box 949, 5 Community Drive, Augusta, ME 04332
(Fax: (207) 213-2620; croney@famemaine.com);

(v)    counsel to Fastco Corporation, c/o Curtis E. Kimball, Esq. Rudman
Winchell, 84 Harlow Street, P.O. Box 1401, Bangor, ME 04402
(fax: (207) 941-9715; ckimball@rudmanwinchell.com);

(vi)   counsel to Sullivan and Merritt Constructors, Inc., c/o Michael D.
Traister, Esq., Murray, Plumb & Murray, 75 Pearl Street, P.O. Box
9785, Portland, ME 04104 (Fax: (207) 773-8023;
mtraister@mpmlaw.com); and

(vii)  local, state and federal taxing authorities for each jurisdiction in
which the Stalking Horse Assets are located;

(viii) counsel to the Stalking Horse;

(ix)   prospective bidders (or their counsel) that are known to the Debtor
and its advisors;

(x)    any parties known to the Debtor to have or assert any liens, claims
and encumbrances or other interests against the Stalking Horse
Assets (in addition to those listed in this subparagraph (a)); and

(xi)   all parties having filed requests for notices in the Debtor's case;
and

(b)    serve a copy of the Sale Notice by first class mail upon all creditors and
the Counterparties to the Debtor's executory contracts and unexpired
leases (collectively, the "Sale Notice Parties").

26.    The proposed Sale Notice is adequately detailed, and its service upon the Sale

Notice Parties will ensure that the appropriate parties in interest receive reasonable notice.  In

addition, service of the Sale Notice on the Sale Notice Parties complies with applicable

Bankruptcy Rules.  Finally, before the Bid Deadline, the Debtor's financial advisor and/or

investment banker will continue to contact various parties who have previously expressed or who might express an interest in acquiring the Assets to determine whether such parties are interested in submitting a bid. The Debtor believes that this process provides more than sufficient notice and a reasonable period in which to attract bids, particularly in view of the marketing activities engaged in by the Debtor and its financial advisor and investment banker prior to the Petition Date with respect to any potential Sale Transaction.

27. The Debtor submits that such notice constitutes good and sufficient notice of the Motion and all proceedings to be held thereon and that no other further notice need be given.

## **CONCLUSION**

**WHEREFORE**, the Debtor respectfully requests this Court to enter an order:

(a) Approving the Bid Procedures, including, without limitation, the initial overbid amount and the subsequent bidding intervals;

(b) Approving the Assumption Procedures;

(c) Approving the Break-Up Fee and Expense Reimbursement and authorizing the Debtor to pay the Break-Up Fee and Expense Reimbursement in accordance with the terms of this Motion;

(d) Establishing a date and time for the Sale Hearing and setting the deadline for objections or overbids;

(e) Approving the form and content of the Sale Notice attached to the Bid Procedures Order as **Exhibit 3**; and

(f) Granting such other and further relief as seen just and equitable.

Dated:  October 8, 2015

**LINCOLN PAPER AND TISSUE, LLC**

By its proposed attorneys:

/s/ Sam Anderson, Esq.
Robert J. Keach, Esq.
Sam Anderson, Esq.
Lindsay K. Zahradka, Esq. (admitted *pro hac vice*)
BERNSTEIN, SHUR, SAWYER & NELSON
100 Middle St., PO Box 9729
Portland, Maine 04104-5029
(207) 774-1200