Final

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT dated as of October 6, 2015, between LINCOLN PAPER AND TISSUE, LLC, a Delaware limited liability company (the "Seller") and LP Acquisitions, LLC, a Delaware limited liability company, or its assignees (the "Purchaser").

## RECITALS

A.   WHEREAS, Seller owns various real estate, assets and rights used to operate a tissue manufacturing business located in Lincoln, Maine; and

B.   WHEREAS, on September 28, 2015, Seller filed a voluntary petition for relief commencing a case (the "Chapter 11 Case") under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), filed as Case No. 15-10715 in the United States Bankruptcy Court for the District of Maine (the "Bankruptcy Court"); and

C. WHEREAS, Seller desires to sell to the Purchaser, and the Purchaser desires to purchase from the Seller, certain tangible personal property consisting generally of machinery and equipment located at the Seller's mill in Lincoln, Maine as described hereinafter and in the Schedules to this Agreement, all in the manner and subject to the terms and conditions set forth herein and in the Bid Procedures Orders (defined below) and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code.

NOW THEREFORE, in consideration of the mutual benefits to be derived from this Agreement and of the representations, warranties, conditions, agreements and promises contained herein and other good and valuable consideration, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1   Definitions.   As used in this Agreement, the following terms have the following meanings:

"Agreement" shall mean this Asset Purchase Agreement, including the Exhibits and Schedules attached hereto.

"Assets" shall have the meaning set forth in Section 2.1.

"Bankruptcy Code" shall have the meaning set forth in Recital B, above.

"Bankruptcy Court" shall have the meaning set forth in Recital B, above.

"Bid Deadline" shall have the meaning set forth in Section 6.1(a).

"Bid Procedures" shall have the meaning set forth in Section 6.1(a).

"Bid Procedures Motion" shall have the meaning set forth in Section 6.1(a).

"Bid Procedures Order" shall have the meaning set forth in Section 6.1(a).

"Borrowing Orders" shall have the meaning set forth in Section 6.1(a).

"Break-Up Fee" shall have the meaning set forth in Section 5.4.

"Business Day" means any day of the year, other than any Saturday, Sunday or any day on which banks located in Portland, Maine generally are closed for business.

"Chapter 11 Case" shall have the meaning set forth in Recital B, above.

"Claims" shall have the meaning set forth in the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code and shall include, among other things, any and all claims or orders arising under Environmental Laws and any and all claims or rights based on successor, tort and products liability.

"Closing" shall have the meaning set forth in Section 2.6.

"Closing Date" shall have the meaning set forth in Section 2.6.

"Deposit" shall have the meaning set forth in Section 2.4(a).

"Environmental Laws" shall mean all applicable laws, regulation or rule relating to pollution or protection of human health or the environment (including without limitation ambient air, water, surface water, groundwater, land surface, soil or subsurface) or natural resources (including without limitation applicable laws relating to the storage, transfer, transportation, investigation, cleanup, treatment, or use of, or release or threatened release into the environment of, any Hazardous Substances).

"Environmental Liabilities" shall mean and include any claims, judgments, damages (including punitive damages), losses, penalties, fines, liabilities, encumbrances, violations, responsibilities, costs and expenses (including attorneys' fees) of investigation, remediation, cleanup, corrective action, monitoring, or defense of any matter arising (whether at law or in equity) under any Environmental Laws or in any way relating to (i) the environment (including any surface or subsurface physical medium or natural resource such as air, land, soil, surface waters, ground waters, stream and river and biota), (ii) the use, generation, storage, treatment, disposal, processing, transportation, handling, release, emission or remediation of Hazardous Substances, or (iii) impacts on human health and safety resulting from the foregoing, of whatever kind or nature, by any party, Government Authority or other entity, whether or not resulting from the violation of, or noncompliance with, Environmental Laws.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Filing Date" shall mean September 28, 2015, the date on which Seller commenced the Chapter 11 Case.

"Final Order" shall mean an order of the Bankruptcy Court that has not been reversed, vacated or stayed and (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the order has been affirmed by the highest court to which such order was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such order and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"Governmental Authorities" shall mean and include any agency, board, bureau, executive, court, commission, department, tribunal, instrumentality or administration of the United States or any State, and any local or other governmental body in a State.

"Governmental Permits" shall mean and include all licenses, permits, approvals, consents, certificates, waivers, exemptions, orders and other authorizations from any and all Governmental Authorities.

"Hazardous Substance" means any substance or material defined in or governed by any Environmental Law as a dangerous, toxic or hazardous pollutant, contaminant, chemical, waste, material or substance, and also expressly includes ureaformaldehyde, polychlorinated biphenyls, dioxin, radon, asbestos, asbestos containing materials, nuclear fuel or waste, radioactive materials, explosives, carcinogens and petroleum products, including but not limited to crude oil or any fraction thereof, natural gas, natural gas liquids, gasoline and synthetic gas, or any other waste, material, substance, pollutant or contaminant which would subject the owner or operator of the Property to any damages, penalties or liabilities under any applicable Environmental Regulation.

"Initial Minimum Overbid" shall have the meaning set forth in Section 6.1(a).

"Intellectual Property" shall mean all (i) trademarks, service marks, trade names, logos and corporate names and registrations and applications for registration and thereof, together with all of the goodwill associated therewith; (ii) registered copyrights; (iii) computer software (other than general commercial software), data, databases and documentation thereof; and (v) domain names and URLs used by Seller in the course of their businesses.

"Letter of Intent" means the letter of intent dated September 25, 2015 by and between Seller and Purchaser.

"License" or "License Period" shall have the meaning set forth below in Section 8.1(b).

"Liens" shall mean any lien, charge, pledge, deed of trust, right of first refusal, right of first offer, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, option, proxy, hypothecation, voting trust agreement, transfer restriction, easement, servitude, encroachment or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code).

"Premises" means the mill property owned by Seller and described in Schedule 1.1 attached hereto and made a part hereof.

"Purchase Price" shall have the meaning set forth in Section 2.5.

"Sale Order" shall mean a Final Order issued by the Bankruptcy Court approving the sale of the Assets pursuant to this Agreement and under the applicable provisions of the Bankruptcy Code.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1    Purchase and Sale.  Upon the terms and subject to the conditions set forth herein, on the Closing Date, the Seller shall sell and deliver to the Purchaser, and the Purchaser shall purchase from Seller, all of Seller's right, title and interest in and to the assets specified below (the "Assets"), in each

case free and clear of any Liens, Claims, encumbrances, rights, remedies or interests, except as specifically permitted herein, as approved for sale, transfer and assignment pursuant to the Sale Order.

All personal property of Seller located on the Premises, on a floor to ceiling, wall to wall basis including, without limitation:

(i)      All tissue and paper processing machinery, and equipment including transformers, boilers, electrical conduit, copper and other wiring and interconnected piping;

(ii)      All rolling stock, fork lifts, manlifts, cranes, trucks, trailers;

(iii)      All inspection tools, gauges, jibs, tools, vidmar cabinets with contents, stores and spare parts; and

(iv)      All scrap and recoverable metals, and other related fixtures and personal property.

The Assets shall not include the Excluded Assets.

2.2      Excluded Assets.   Notwithstanding anything else to the contrary set forth in this Agreement, the Assets to be conveyed to Purchaser shall not include, and Purchaser shall not buy or have any liability or obligation with respect to, any of the following (collectively, the "Excluded Assets"):

(a)      Cash, cash equivalents, accounts, accounts receivable, credits, rights of reimbursement, set off rights, and rights of recoupment, including, without limitation, any reimbursement rights or other rights arising out of governmental programs; any amounts due for the sale of tax credits; and other work in progress;

(b)      Any and all causes of action;

(c)      Except as set forth in Section 9.1(b)(v) solely with respect to damage or destruction of Assets occurring after the entry of the Sale Order, the Seller' rights and interests under any insurance policies;

(d)      Any and all (i) employment, consulting, advisory or service agreements, plans, commitments, arrangements or understandings, (ii) leases or consignment agreements and arrangements; (iii) employee benefit, deferred compensation and/or severance agreements, plans, commitments, arrangements or understandings including, without limitation, all stock option, stock purchase, bonus, incentive and similar agreements, plans, commitments, arrangements or understandings; (iv) collective bargaining agreements, commitments, arrangements or understandings with employees, and (v) agreements, obligations and liabilities with respect to or relating to any "pension plan" or "welfare plan" (as such terms are defined in ERISA);

(e)      Deposits, including all utility deposits;

(f)      All contracts and leases;

(g)      All real estate and any rights and any rights in connection therewith; except in relation to the license granted by Seller for Purchaser to access the Premised as provided for by the terms hereof;

(h)      Inventory, any work in process and any equipment subject to a purchase money security interest, lease, or finance lease, including, but not limited to, the leased equipment listed on Schedule 2.2;

(i)      Intellectual Property; and

(j)      Books and records, customer lists, corporate records and minutes, and the name of Seller and all assumed names; provided, however, notwithstanding the foregoing, to the extent available and allowable by law, Seller will transfer any and all warranties and maintenance manuals to the Purchaser; and

(k)      Hazardous Substances.

2.3      <u>Assumption and Assignment of Liabilities</u>.  Purchaser shall not assume any liabilities or obligations of Seller.

2.4      <u>Deposit</u>.

(a)      Within five (5) days following the full execution and delivery of this Agreement, Purchaser shall deliver to Bernstein, Shur, Sawyer & Nelson, P.A., as escrow agent, the sum of One Hundred Fifty Thousand Dollars ($150,000.00) (the "<u>Deposit</u>").  The Deposit (and any interest accrued thereon) shall be credited as a partial payment of the Purchase Price payable at the Closing.  The Deposit shall, at all times prior to its release or return in accordance with the terms of this Agreement, be held by Bernstein, Shur, Sawyer & Nelson, P.A. in escrow in a segregated interest bearing account and in accordance with the terms of this Agreement, and, except for interest collected on the Deposit, no other money or funds shall be commingled in such account.

(b)      In the event that (i) the parties terminate this Agreement pursuant to Section 9.1(a), (ii) Purchaser terminates this Agreement pursuant to Section 9.1(b), or (iii) Seller terminates this Agreement pursuant to Section 9.1(c)(i) or (iii), then the Deposit (and any interest accrued thereon) shall be returned immediately and in full to Purchaser.  If this Agreement is terminated by Seller pursuant to Section 9.1(c)(ii), then the Deposit (and any interest accrued thereon) shall be delivered immediately to Seller.  Delivery of the Deposit to Seller in accordance with the foregoing shall not constitute full compensation of any and all losses and expenses incurred by Seller, shall not constitute liquidated damages, and Seller reserves the right to pursue any and all other remedies available at law or equity.

2.5      <u>Purchase Price</u>.  The purchase price for the Assets (the "<u>Purchase Price</u>") shall consist of Five Million Dollars ($5,000,000.00), in cash or by means of a completed federal funds wire transfer to an account or accounts designated by Seller in writing not later than three (3) Business Days prior to the Closing Date.  Except as otherwise specified herein, the term "Dollars" or "$" as used in this Agreement refers to United States Dollars.

2.6      <u>Closing</u>.  The closing (the "<u>Closing</u>") shall occur on or within two (2) Business Days following the date upon which the Sale Order approving the sale of the Assets to Purchaser in

accordance with this Agreement shall have become a Final Order or such earlier date as may be agreed to by the parties. The Closing shall take place at the offices of Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle Street, Portland, Maine, or such other place as Seller and Purchaser shall agree, and shall be effective as of 11:59 p.m. Portland, Maine time on the date of Closing (the "Closing Date).

2.7    Guaranteed Sale Program.   In the event that Seller shall elect to pursue the Guaranteed Sale Program described in the Letter of Intent, Seller shall provide notice to Purchaser within fifteen (15) days after the date of this Agreement, and the parties shall enter into an Amendment to this Agreement setting forth the respective rights and obligations of the parties to effect a sale of the Assets using the Guaranteed Sale Program.

2.8    Option to Purchase the Premises.   Provided that Purchaser is not in breach of any of its obligations to Seller under this Agreement, for a period equal to the earlier of (i) one (1) year after the Closing Date or (ii) the date upon which all Assets have been removed from the Premises ("Option Term"), Purchaser shall have an option to purchase the Premises for a purchase price in an amount equal to the greater of (i) purchase price of One Hundred Fifty Thousand US Dollars ($150,000.00) or (ii) the amount of any bona fide offer to purchase the Premises that is received by the Seller prior to the expiration of the Option Term. In the event such bona fide offer to purchase the Premises is received, Seller shall provide a copy of the offer to Purchaser and Purchaser shall have thirty (30) days to exercise its option. In order to exercise Purchaser's purchase option, Purchaser must deliver to Seller written notice of exercise at least sixty (60) days before the end of the Option Term, time being of the essence. The closing on such sale shall be thirty (30) days after Purchaser shall given notice of its exercise of the option and, at closing, in return for the payment of the purchase price by Purchaser in immediately-available funds, Seller shall convey the Premises to Purchaser by statutory quitclaim deed, such conveyance to be subject to all easements, covenants, restrictions and agreements of record, but free and clear of liens except for liens for real estate taxes not yet due and payable and liens caused by the acts or omissions of Purchaser (e.g., mechanics' lien claims by Purchaser's contractors). Purchaser shall pay the Maine real estate transfer taxes. In the event that Purchaser does not exercise the foregoing purchase option in a timely manner or in the event that Purchaser is in breach or default of its obligations under this Agreement at the time of an attempted exercise, the foregoing purchase option shall be deemed waived and forever released by Purchaser. A memorandum of this option may be recorded in the Penobscot County Registry of Deeds at the request of either party.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, Seller hereby represents and warrants to Purchaser as follows, conditioned upon and subject to the entry of the Sale Order:

3.1    Organization and Authority.   Seller is duly organized and validly existing under the laws of the jurisdiction of its organization and, subject to any required approval of the Bankruptcy Court, and any required approval of applicable regulatory and Governmental Authorities, has the power and authority to enter into the transactions contemplated by this Agreement.

3.2    Authority and Binding Agreement.   This Agreement has been duly authorized, executed and delivered by Seller and, subject to the approval of the Bankruptcy Court, is the valid and binding obligation of Seller.

3.3     <u>Consents and Approvals</u>.  No consent, approval or authorization of, or declaration, filing, or registration with, any Governmental Authorities is required to be made or obtained by Seller in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, except for: (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; (b) the filing of such deeds, assignments or other conveyance documents as may be required to transfer Seller's interest in any Assets, the title to which is governed by filing in the public records; (c) the filing of such documents as may be necessary to reflect the release of any security interests, Liens, pledges, charges, escrows, options, rights of first refusal, mortgages, indentures, security interests or other encumbrances as a matter of public record; and (d) any consents, approvals, or authorizations of any Governmental Authority.

3.4     <u>Title to and Condition of Assets</u>.  Seller has good title to all of the Assets and may transfer each of the Assets free and clear of all liabilities, security interests, Liens (including tax liens), mortgages, Claims, encumbrances, rights, remedies and interests of any kind whatsoever, all to the extent provided for by the terms of the Sale Order.

3.5     <u>As Is/Where Is</u>.  Purchaser will acquire the Assets on an "AS IS," "WHERE IS" and "WITH ALL DEFECTS" basis free and clear of any Liens, Claims, encumbrances, rights, remedies or interests, except as specifically permitted herein, as approved for sale, transfer and assignment pursuant to the Sale Order.

**ARTICLE IV**
**<u>REPRESENTATIONS AND WARRANTIES OF PURCHASER</u>**

Purchaser hereby represents and warrants to Seller as follows:

4.1     <u>Organization and Authority</u>.  Purchaser is duly organized and validly existing under the laws of the jurisdiction of its organization and has the power and authority and all necessary governmental approvals to enter into the transactions contemplated by this Agreement.  Purchaser is duly qualified to do business in each jurisdiction where Purchaser does business.

4.2     <u>Authority and Binding Agreement</u>.  This Agreement has been duly authorized, executed and delivered by Purchaser and, subject to the approval of the Bankruptcy Court, is the valid and binding obligation of Purchaser.

4.3     <u>Consents and Approvals</u>.  No consent, approval or authorization of, or declaration, filing, or registration with, any Governmental Authority is required to be made or obtained by Purchaser in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, except for (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; (b) the filing of such deeds, assignments or other conveyance documents as may be required to transfer Seller's interest in any Assets, the title to which is governed by filing in the public records; (c) consents and approvals necessary to transfer the permits and licenses being purchased by Purchaser hereunder; (d) any necessary approval, authorization or exemption by any Governmental Authorities with jurisdiction over and the right to approve the sale; and (e) consents, approvals, authorizations, declarations, filings or registrations which, if not obtained, individually or in the aggregate, would not have a material adverse effect on the transactions contemplated in this Agreement.

4.4     <u>Litigation</u>.  There is no action, suit, inquiry, proceeding or investigation by or before any court or Governmental Authority or other regulatory or administrative agency or commission pending,

or, to the knowledge of Purchaser, threatened against Purchaser that questions or challenges the validity of this Agreement or in connection with the transactions contemplated thereby.  As of the date hereof, to Purchaser's knowledge, there are no circumstances or facts that would prevent Purchaser from engaging in the transactions contemplated in this Agreement.

4.5     WHERE-IS/AS-IS.  Except as otherwise expressly stated in this Agreement, Purchaser and any designee agree to accept the Assets in a "WHERE-IS, AS-IS" condition as of the Closing Date free and clear of any Liens, Claims, encumbrances, rights, remedies or interests, except as specifically permitted in this Agreement and all to the extent provided by the terms of the Sale Order.  Without limitation of the foregoing, Purchaser acknowledges, represents and warrants to Seller that Purchaser has not been induced to execute this Agreement by any act, statement or representation of Seller or its agents, employees or other representatives not expressly set forth in this Agreement.

4.6     Financing.  At the Closing, Purchaser will have sufficient immediately available funds to pay the Purchase Price and all other amounts payable pursuant to this Agreement, the other agreements contemplated herein, and the transactions contemplated herein and thereby.  Upon the consummation of the transactions contemplated herein, Purchaser will not be insolvent, be left with unreasonably small capital, or have incurred debts beyond its ability to pay such debts as they mature.

**ARTICLE V**
**COVENANTS PRIOR TO AND IN FURTHERANCE OF CLOSING**

5.1     Affirmative and Negative Covenants Pending Closing.  Except as expressly set forth below, during the period from the date hereof to the Closing Date:

(a)     Seller's Covenants.

(i)     Affirmative Covenants Pending Closing.  Seller covenants and agrees that it shall, unless otherwise agreed to in writing by Purchaser:

(1)     Maintenance.  Maintain the Assets owned or operated by it consistent with its standard practice, subject only to ordinary wear and tear.

(2)     Court Orders.  Use its good faith diligent efforts to secure all required approvals by the Bankruptcy Court, without modification, of the Break-Up Fee provisions set forth in Section 5.4 of this Agreement, the Bid Procedures set forth in Article VI of this Agreement, and the sale of the Assets pursuant to the terms hereof, and shall otherwise use its best efforts to cause the consummation of the transactions contemplated by this Agreement in accordance with the terms and conditions hereof.

(3)     Notification of Certain Matters.  To the extent not prohibited by law, Seller shall notify Purchaser of (i) any material adverse change relating to the Assets; (ii) any governmental or third party complaint, investigation or hearing (or communications indicating that any are contemplated); and (iii) any environmental enforcement actions, rulings or orders under any applicable Environmental Laws, including, without limitation, any remediation or clean-up orders, issued with respect to Seller or the Assets.

(ii)        Negative Covenants Pending Closing.  Except as expressly permitted herein, Seller shall not, without the prior written consent of Purchaser (which shall not, be unreasonably withheld), enter into any new leases and/or other agreements that Seller reasonably could anticipate would negatively impact the value of the Assets.

(b)        Purchaser's Covenants.  Purchaser agrees that it shall use its good faith efforts to take, or cause to be taken, all actions reasonably requested by Seller to assist in obtaining entry of the Bidding Procedures Orders and Sale Order, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court.

5.2        Consents and Further Actions.  Subject to the terms and conditions herein provided, Seller and Purchaser covenant and agree to use their good faith efforts to take, or cause to be taken, all actions, or do, or cause to be done, all things, necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated in this Agreement, including all closing conditions to be satisfied.  This Section 5.2 shall survive the closing of the transactions contemplated in this Agreement.

5.3        Tax Cooperation and Exchange of Information.  Each party hereto will provide the other party with such cooperation and information as may be reasonably requested in filing any tax return, amended tax return, or claim for refund, determining any liabilities for taxes or a right to refund of taxes, or participating in or conducting any audit or other proceeding with respect to taxes relating to the Assets.  Such cooperation and information shall include providing copies of relevant tax returns or portions thereof, together with accompanying schedules and related work papers and documents relating to rulings or other determinations by taxing authorities.

5.4        Break-Up Fee; Deposit.  This Agreement is subject to other offers presented to Seller solely in accordance with the Bid Procedures Order (as defined in Section 6.1 hereof).  In the event that the Bankruptcy Court, in accordance with the Bid Procedures Order, determines that an offer submitted pursuant to the Bid Procedures Order is higher or better than the terms set forth in this Agreement, or is superior to this Agreement and approves such offer ("Topping Bid") in lieu of this Agreement, then Seller shall return the Deposit (and any interest accrued thereon) to Purchaser in accordance with Section 2.4(b) of this Agreement and pay to Purchaser, by wire transfer of immediately available funds, contemporaneously with the closing on the sale of the Assets pursuant to the Topping Bid, a break-up fee in the amount of $175,000 (the "Break-Up Fee").  The Break-Up Fee shall constitute an administrative priority expense under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code and shall be Purchaser's sole remedy as a result of a sale of the Assets pursuant to a Topping Bid in accordance with the Bid Procedures Order.  Purchaser may credit bid the Break-Up Fee at any auction to sell the Assets.

5.5        Public Announcement.  The parties shall consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or other public statements with respect to this Agreement or the transactions contemplated hereby.  Except as may be required by applicable law or the Bankruptcy Court, the parties will not cause or permit the issuance of any such release or any such public statement without the consent of all of the parties hereto, which consent shall not be unreasonably withheld or delayed.

**ARTICLE VI**
**BID AND AUCTION PROCESS**

6.1        Court Actions.

(a)    In accordance with the terms of any orders entered by the Bankruptcy Court in relation to debtor in possession financing (the "Borrowing Orders") and no later than October 13, 2015, Seller shall file a motion with the Bankruptcy Court (a "Bid Procedures Motion") seeking entry of an order (the "Bid Procedures Order"), among other things, (i) approving the Break-Up Fee, (ii) approving an initial minimum bid increment equal to the sum of (A) the Purchase Price, (B) the amount of the Break-Up Fee ($175,000), (C) an estimate of Purchaser's out of pocket post-petition fees and costs prior to the date of the auction relating to the transactions at issue in this Agreement, and (D) $200,000 (the "Initial Minimum Overbid"), (iii) directing each competing bidder to submit a redline of this Agreement reflecting any modifications relating to the bid of the competing bidder submitted for the Assets by no later than November 9, 2015 (the "Bid Deadline"), (iv) directing each competing bidder to provide, by no later than the Bid Deadline, Seller with a deposit in the amount of $150,000.00 to be held by Bernstein, Shur, Sawyer & Nelson, P.A. in escrow in a segregated interest bearing account and in accordance with the terms of the bid of the competing bidder, (v) directing each competing bidder to provide adequate assurance to Seller and the Bankruptcy Court of such competing bidder's financial capacity to perform its obligations under its competing bid-, (vi) authorizing Purchaser to serve as a back-up bidder in the event the Bankruptcy Court approves a Topping Bid, (vii) scheduling an auction in the event one (or more) Qualified Bid (as defined in the Bid Procedures) is received by the Bid Deadline, and (viii) scheduling a hearing on or before November 12, 2015 on entry of the Sale Order (collectively, the "Bid Procedures").  The Bid Procedures Order shall be entered by the Bankruptcy Court no later than October 28, 2015.

(b)    Seller shall file with the Bankruptcy Court and prosecute in good faith, all such necessary motions or applications seeking approval of this Agreement, subject to higher and better offers, in accordance with the Bid Procedures.  Seller shall use its good faith diligent efforts to effectuate the entry of the Sale Order as soon thereafter as possible and upon the timeframes set forth in the Borrowing Orders.

(c)    Seller shall comply (or obtain an order from a competent court waiving compliance) with all applicable laws, rules and regulations, including, without limitation, requirements under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the local rules of procedure of the Bankruptcy Court.

6.2    Compliance with Bid Procedures; Maintenance of Confidentiality.

(a)    Seller shall comply with the Bid Procedures established or approved by the Bankruptcy Court.

(b)    Seller shall not release any person or entity from, or waive any provisions of, any confidentiality agreement entered into in accordance with the Bid Procedures, without Purchaser's prior written consent.

**ARTICLE VII**
**CONDITIONS PRECEDENT TO CLOSING**

7.1    Conditions to Seller' Obligation to Close.  Seller's obligation to consummate the transactions contemplated in this Agreement is subject, at the option of Seller, to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)    Representations and Warranties; Covenants.

(i)         All representations and warranties of Purchaser contained in this Agreement and any related transaction documents shall have been true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties that, by their terms, apply only as of an earlier date, which shall have been true and correct as of such date), and Seller shall have received a certificate, dated as of the Closing Date and signed by an authorized representative of Purchaser, to that effect.

(ii)        Purchaser shall have performed in all material respects all agreements and covenants required by this Agreement to be performed by it prior to or at the Closing Date, and Seller shall have received a certificate, dated as of the Closing Date and signed by an authorized representative of Purchaser, to that effect.

(b)        <u>No Injunction</u>.   No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in this Agreement.

(c)        <u>Sale Order</u>.  The Bankruptcy Court shall have entered the Sale Order and such order shall have become a Final Order.

(d)        <u>Purchaser's Deliveries</u>.  Purchaser shall have paid the Purchase Price and shall have duly executed and delivered to Seller each of the documents, instruments and agreements required to be delivered pursuant to Section 7.3(b) of this Agreement.

(e)        <u>Governmental Permits</u>.   All Governmental Permits, authorizations and/or exemptions required to be obtained in connection with the consummation of the transactions contemplated by this Agreement shall have been obtained and be in full force and effect.

7.2     <u>Conditions to Purchaser's Obligation to Close</u>.  Purchaser's obligation to consummate the transactions contemplated in this Agreement is subject, at the option of Purchaser, to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)        <u>Representations and Warranties; Covenants</u>.

(i)         All representations and warranties of Seller contained in this Agreement and any related transaction documents shall have been true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date, as if such representations and warranties were made at and as of the Closing Date (except for those representations and warranties that, by their terms, apply only as of an earlier date, which will be true and correct as of such date), and Seller shall have delivered to Purchaser a certificate, dated as of the Closing Date and signed by an authorized representative of Seller, to that effect.

(ii)        Seller shall have performed in all material respects all agreements and covenants required by this Agreement to be performed by it prior to or at the Closing Date, and Seller shall have delivered to Purchaser a certificate, dated as of the Closing Date and signed by an authorized representative of Seller, to that effect.

11

(b)      Seller's Deliveries.  Seller shall have duly executed and delivered to Purchaser each of the documents, instruments and agreements required to be delivered by it pursuant to Section 7.3(a) of this Agreement.

(c)      Bid Procedures Order.  In accordance with the terms of the Borrowing Orders, the Bankruptcy Court shall have entered the Bid Procedures Order in form and substance reasonably satisfactory to Purchaser expressly approving the Break-Up Fee and the Bid Procedures set forth in the Seller's Bid Procedures Motion, and such order shall have become a Final Order.

(d)      Sale Order.  In accordance with the terms of the Borrowing Orders, the Bankruptcy Court shall have entered the Sale Order (with respect to the Assets) in form and substance reasonably satisfactory to Purchaser, and such order shall have become a Final Order.

(e)      No Injunction or Challenge.  No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in this Agreement.  No law, ordinance or regulation shall have been enacted, and no order, judgment, or decree shall have been enacted or rendered by a Governmental Authority or any other person (and not subsequently dismissed, settled, withdrawn or terminated, nor shall any petition, complaint, or action have been filed or be pending that seeks such order, judgment or decree) which would prevent the consummation at the Closing of , or restrain or invalidate , the transactions contemplated by this Agreement.

7.3      Deliveries at Closing.

(a)      Deliveries by Seller.  At the Closing, Seller shall deliver or cause the delivery of the following to Purchaser:

(i)      a certified copy of the Sale Order;

(ii)      Bills of Sale and Assignment without warranty or other covenants, duly executed by Seller, in a form reasonably satisfactory to Purchaser;

(iii)      any applicable local, state or federal transfer tax forms;

(iv)      all other documents, closing statements, affidavits, instruments and writings reasonably required to be delivered by Seller at or prior to the Closing Date pursuant to this Agreement or otherwise reasonably requested by Purchaser to deliver the Assets free and clear of any Liens, Claims, encumbrances, rights, remedies or interests, each in form and substance reasonably satisfactory to Purchaser and Seller;

(v)      certificates of Seller, executed by a duly authorized officer of each Seller, in a form reasonably satisfactory to Purchaser.

(b)      Deliveries by Purchaser.  At the Closing, Purchaser shall deliver or cause the delivery of the following to Seller:

(i)      the Purchase Price, in cash or by means of a completed federal funds wire transfer to an account or accounts designated by Seller in writing not later than three (3) Business Days prior to the Closing Date;

(ii)        all other documents, closing statements, affidavits, instruments and writings reasonably required to be delivered by Purchaser or its designee at or prior to the Closing Date pursuant to this Agreement, each in form and substance reasonably satisfactory to Purchaser and Seller.

7.4    <u>Possession</u>.  On the Closing Date, possession of the Assets shall be delivered to Purchaser with possession meaning providing access to Purchaser to the Premises.

7.5    <u>Closing Costs</u>.  Purchaser shall pay any applicable recording fees and transfer taxes (both Seller' and Purchaser's portions thereof) unless otherwise provided by the Sale Order.  Other costs associated with the Closing and transactions contemplated under the Agreement shall be allocated as provided elsewhere in the Agreement.  Seller understands that Purchaser will provide a Resale Certificate at Closing to obviate the payment of any sales tax. Seller shall request that the Court waive all transfer, stamp and other transfer taxes due and owing as result of transfer of Assets from Seller to Purchaser. Purchaser agrees to be bound by the Court's ruling on this request.

## ARTICLE VIII
## POST-CLOSING OBLIGATIONS

8.1    <u>Post-Closing Access; License to Use Mill Property</u>.  From and after the Closing, Seller grants to Purchaser a right, in its sole and absolute discretion, to conduct a private and/or public asset recovery sale program (including, but not limited to, by way of a sealed bid offering, orderly liquidation sale program and global webcase auction sale (the "<u>Auction</u>") of the Assets at the Premises for a period of time equal to twelve (12) months from the date the Sale Order becomes a Final Order, subject to the following:

(a)    <u>Insurance</u>.  Purchaser shall secure adequate casualty and liability insurance naming and insuring Seller and the Premises and related property against liability or damage, including arising from Auction activities, whether by Purchaser or its invitees, such insurance to be in an amount, provide such coverages and be in a form and substance reasonably satisfactory to Seller.

(b)    <u>Access, Right and License; Right of Abandonment</u>.  Subject to the terms and conditions of this Section 8.1, Seller hereby grants to Purchaser access, right and license to enter onto the Premises at all times for a period of one (1) year following the transfer of the Assets to Seller for the purpose of using the Premises in order to take possession of and otherwise take steps necessary and appropriate to effect an asset recovery program and sale of the Assets located on the Premises (the "<u>License</u>" or "<u>License Period</u>").  Purchaser's access to and presence on the Premises shall be subject to Seller's reasonable rules and limitations imposed to permit Seller to adequately keep secure the Premises, and to allow other uses of the Premises that are not inconsistent with Purchaser's rights under this Agreement.  Seller may provide Purchaser with notice of such rules and limitations in writing from time to time, provided, that Seller shall not unreasonably interfere with Purchaser's use of the Premises or its removal of the Assets. Purchaser shall be liable for and shall timely pay all of the costs and expenses of securing the Premises and the Assets during the term of the license, including real estate taxes (up to $100,000), personal property taxes on the Assets as may be assessed from time to time after the Closing, utilities, trash removal and costs of security for the Premises.   Upon sale of any of the Assets by Purchaser to a third party, Purchaser shall remove, or cause to be removed, the Asset(s) from the Premises at its sole cost and expense, in a commercially reasonable manner. At the conclusion of the License Period, any Assets not removed from the location shall be

13

deemed abandoned by Purchaser, or any purchaser of Assets from Purchaser, and all right, title and Purchaser transfers to Seller any and all right title and interest in any such Assets not removed from the Premises at expiration of the License Period.

(c)     Indemnity and Release.   In connection with the entry of Purchaser onto the Premises, Purchaser, for itself and all of its employees, agents, subcontractors and invitees hereby (i) agrees that it enters onto the Premises at its own risk and (ii) agrees to defend, indemnify and hold harmless Seller and its affiliates, employees, officers, managers and agents from and against any and all loss, costs, damages, mechanic's liens, claims or expenses, including without limitation attorney's fees, Purchaser may incur in exercising its rights under this Section 8.1.  Purchaser hereby acknowledges and agrees that Seller shall not be liable for, and Purchaser hereby releases Seller from, all claims for any injury or death to any person or damage to property of Purchaser or any person or entity accessing the Premises or the Assets in connection with Purchaser, including without limitation all of Purchaser's agents, employees, subcontractors and invitees relating in any way to the Premises or the Assets or any accident on or about the Premises or the Assets or due to any act or omission of Purchaser.  The provisions of this Section 3(c) shall expressly survive the termination of the term of this license to enter the Premises, regardless of the reason for such termination.

(d)     Environmental.   Purchaser shall keep the Premises free from all Hazardous Substances which are not located in or on the Premises as of the Closing Date provided that Purchaser shall not have any obligation with respect to Hazardous Substances placed on the Premises by persons other than Purchaser and its affiliates, agents or invitees.  Purchaser also shall (i) handle and remove from the Premises any Hazardous Substances which are a part of, or stored or contained in or connected to the Assets acquired by Purchaser, at all times in compliance with all Environmental Laws and other applicable laws, regulations and ordinances and (ii) not disturb Hazardous Substances, if any, located in or on the Premises as of the date hereof and not removed in conjunction with Purchaser's removal of the Assets.  Purchaser hereby agrees to defend, indemnify and hold harmless Seller and its affiliates, employees, officers, directors, managers and agents from and against any and all claims for loss or damage arising out of the presence of any Hazardous Substances on the Premises not in compliance with applicable law, to the extent that such presence is caused by or otherwise results from Purchaser's actions at and/or presence on the Premises.  The provisions of this Section 3(d) shall expressly survive the termination of this Agreement, regardless of the reason for such termination.   For avoidance of doubt, Purchaser is not purchasing, selling or removing any Hazardous Substances located in, on or at the Premises, unless and only to the extent such Hazardous Substances are a part of, or stored or contained in or connected to the Assets acquired by Purchaser, and only shall have responsibility and liability for removal of such Hazardous Substances and any other Hazardous Substances that Purchaser or its affiliates, agents or invitees shall bring on to the Premises or which are created as a result of Purchaser's conduct of its or its affiliates, agents or invitees actions on the Premises.

(e)     Liability for Removal of Property.   Purchaser shall act in good faith to minimize any damage to the Premises when removing or permitting purchasers to remove Assets from the Premises.   In the event that Purchaser shall need to make any structural alterations to the Premises to move or otherwise deal with the Assets, prior to making such alterations, Purchaser shall consult with Seller.  In its consultation, Purchaser shall work in good faith to accommodate the concerns of Seller with respect to the Premises.  No alteration of the structure of the Premises shall be effected in a manner that such alteration shall leave the Premises in an unsafe condition

(excepting, however, any present unsafe condition at the Premises). Seller agrees that Purchaser may have to remove walls or other structural portions of the Premises to remove the Assets and, in such event, (i) Purchaser agrees to cover any holes in external walls of the Premises with temporary coverings (such as plywood or metal siding) in a manner reasonably acceptable to Seller to leave the Premises in a reasonably weather-tight and secure condition and (ii) upon completion of removal of the Assets, Purchaser shall repair such walls, floors, systems that may have been disrupted, and/or other structural portions of the Premises to as good or better condition as existed prior to such removal or alteration.

## ARTICLE IX
## TERMINATION

9.1     Termination.   This Agreement may be terminated and the transactions contemplated hereby may be abandoned, and there shall thereafter be no liability of any party to the other party hereunder, as follows:

(a)     Mutual Consent.  Upon the mutual written consent of Seller and Purchaser.

(b)     By Purchaser.

(i)      By Purchaser, in the event of a material violation or material breach by Seller of its agreements, covenants, representations or warranties contained in this Agreement; provided that such violation or breach shall not have been waived or cured within ten (10) days following receipt by Seller of written notice of such breach from Purchaser, and provided further that the Seller is not then in material breach of the Agreement; or

(ii)     By Purchaser, at any time after the Bid Procedures Order is entered, if such order is vacated, reversed or stayed, or is modified or amended in a manner materially adverse to Purchaser; or

(iii)    By Purchaser, if the Sale Order is not entered by the Bankruptcy Court in accordance with the timeframes provided by the Borrowing Orders; or

(iv)    By Purchaser, if the Closing does not occur on or before the timeframes provided by the terms of the Borrowing Orders (or on such other extended date upon which the parties mutually agree in writing); or

(v)     By Purchaser if, prior to the Closing, a material amount of the Assets are destroyed or substantially damaged by fire, explosion, act of God, collapse or other casualty; provided, however, that Purchaser may elect to close and accept the Assets with no reduction in the Purchase Price and, in that event, any insurance proceeds (or proceeds of such condemnation proceeding) subsequently recovered by Seller on account of such loss shall be transferred to Purchaser; or

(c)     By Seller.

(i)      By Seller, in the event that a higher or better offer, from a Qualified Bidder (as defined in the Bid Procedures) other than Purchaser is (i) accepted by Seller in

accordance with the Bid Procedures, (ii) approved by the Bankruptcy Court, and (iii) results in the closing of such sale, in which event this Agreement shall be deemed, without further action, to have been automatically terminated by Seller on the date of the approval of such sale by the Bankruptcy Court.  In such event, the Deposit (and any interest accrued thereon) shall be returned to Purchaser in accordance with Section 2.4(b) hereof, and the Break-Up Fee shall be paid in accordance with Section 5.4 hereof; or

    (ii)  By Seller, in the event of a material violation or material breach by Purchaser of its agreements, covenants, representations or warranties contained in this Agreement; <u>provided</u> that such violation or breach shall not have been waived or cured within ten (10) days following receipt by Purchaser of written notice of such breach from Seller, and <u>provided</u> <u>further</u> that Purchaser is not then in material breach of the Agreement; or

    (iii)  By Seller, if the Closing does not occur on or before the timeframes provided by the terms of the Borrowing Orders (or on such other extended date upon which the parties mutually agree).

    (d)  <u>Effect of Termination</u>.  In the event of termination of this Agreement pursuant to this Section 9.1, written notice thereof shall forthwith be given to the other party, and all further obligations of the parties hereunder shall immediately and without further action terminate, except that the obligations set forth in Sections 5.4 and the last sentence of this Section 9.1(d) shall survive in full force and effect, as shall any other provisions of this Agreement which are specifically designated to survive termination; provided, however, that if this Agreement is terminated by a party because of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies for breach of contract or otherwise, including, without limitation, specific performance and damages relating thereto, shall also survive such termination unimpaired.  Subject to Section 5.4 hereof, but notwithstanding anything herein otherwise to the contrary, to the extent the Agreement is terminated by Purchaser for any reason, other than a knowing and willful breach by Seller, Purchaser's remedies shall be limited solely to the return of the Deposit (and any interest accrued thereon) and, if due under Section 5.4 hereof, the payment of the Break-Up Fee and Expense Reimbursement.  If this Agreement is terminated as provided herein each party will redeliver all documents, work papers and other material of the other party relating to the transactions contemplated hereby, whether obtained before or after the execution hereof to the party furnishing the same and shall abide by the terms of any confidentiality agreement relating thereto.

**ARTICLE XI**
**<u>MISCELLANEOUS</u>**

   10.1 <u>Entire Agreement</u>.  This Agreement and the Schedules and Exhibits, together with the confidentiality agreement previously executed and delivered by Purchaser, contain the entire agreement among the parties with respect to the transactions contemplated by this Agreement and supersede all prior agreements or understandings among the parties.

   10.2 <u>Other Governmental Authorities</u>.  In the event any party receives notice from any Governmental Authority that other notices, applications, filings or Governmental Permits are required with respect to this Agreement or the transactions contemplated hereby, Purchaser and Seller (as

applicable) shall make such notices, applications or filings and seek such Governmental Permits, unless they decide, in good faith, that such compliance is not necessary.

10.3    Additional Actions and Documents.    At and after the Closing, and without further consideration, Purchaser and/or Seller (as applicable) will promptly execute and deliver such further instruments of conveyance, assignment and transfer, and take such other actions as any party may reasonably request in order to convey, assign and transfer to Purchaser all of Seller' rights, title and interest in and to the Assets, or to clarify, identify or more precisely describe the Assets intended to be conveyed.

10.4    Entire Agreement.    This Agreement and the Schedules and Exhibits, together with the confidentiality agreement previously executed and delivered by an affiliate of Purchaser, contain the entire agreement among the parties with respect to the transactions contemplated by this Agreement and supersede all prior discussions, agreements or understandings among the parties with respect to the subject matter hereof and this Agreement.

10.5    Descriptive Headings; Certain Interpretations.

(a)    Section headings are descriptive and for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

(b)    Except as otherwise expressly provided in this Agreement, the following rules of interpretation apply to this Agreement:  (i) the singular includes the plural and the plural includes the singular; (ii) "or" and "either" are not exclusive and "include" and "including" is not limiting; (iii) a reference to any agreement or other contract includes any schedules and exhibits thereto and permitted supplements and amendments thereof; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder; (v) a reference to a person includes a natural person or entity and its permitted successors and assigns; and (vi) a reference in this Agreement to an Article, Section, Exhibit or Schedule is to the Article, Section, Exhibit or Schedule of this Agreement.

10.6    Successors and Assigns.    This Agreement is made solely and specifically by and for the benefit of the parties hereto, and their respective successors and assigns.  Purchaser shall be entitled to assign its rights hereunder to an affiliate or an entity related to Purchaser; provided, however, that such assignment shall not relieve Purchaser of its obligations hereunder.

10.7    Notices.  All notices, requests, and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally against written receipt or mailed (postage prepaid by certified or registered U.S. mail, return receipt requested) or by overnight courier to the parties at the following addresses, e-mail addresses, or facsimile numbers:

If to Seller, addressed to:

Keith Van Scotter
Lincoln Paper and Tissue, LLC
50 Katahdin Avenue
PO Box 490
Lincoln, ME  04457
Email:  kvanscotter@lpt.com

With copies (which shall not constitute notice hereunder) to:

John L. Carpenter, Esq.
Bernstein, Shur, Sawyer & Nelson, P.A.
100 Middle Street
Portland, ME 04104-5029
(207) 774-1127
Email:  jcarpenter@bernsteinshur.com

If to Purchaser, addressed to:

Adam Reich
Reich Brothers
10618 Pico Blvd.
Los Angeles, CA 90064
Email:  areich@reichbros.com

All such Notices will (a) if delivered personally to the address as provided in this Section 10.7, be deemed given upon delivery; (b) if delivered by mail in the manner described above to the address as provided in this Section 10.7, be deemed given three Business Days after mailing; (c) if delivered by overnight courier service to the address as provided in this Section 10.7 to the addresses as provided in this Section 10.7, be deemed given one Business Days after deposit with the courier (in each case regardless of whether such notice, request, or other communication is received by any other Person to whom a copy of such notice, request, or other communication is to be delivered pursuant to this Section). Any party from time to time may change its address or other information for the purpose of notices to that party by giving notice specifying the change to the other parties.

10.8    Expenses.  Except as otherwise expressly provided herein (including Section 5.4), each party shall bear its own costs with respect to the drafting and negotiation of this Agreement, any court or regulatory proceedings related thereto, the consummation of the transactions contemplated hereby, and such party's compliance with all its agreements and conditions contained herein, including without limitation all legal and accounting fees and disbursements and all costs of obtaining necessary consents. The provisions of this Section 10.8 shall survive the Closing or earlier termination of this Agreement.

10.9    Brokerage Commissions and Fees.  Purchaser warrants and represents that no brokerage commissions or fees are due any broker as a result of Purchaser's actions in connection with the transactions contemplated in this Agreement; and Purchaser agrees that should any claim be made for commissions or fees by any broker against Seller, Purchaser will indemnify and hold Seller harmless from and against any and all such claims in connection therewith.  Seller warrants and represents that no brokerage commissions or fees are due to any brokers other than amounts due to SSG Capital Advisors, LLC, Seller' investment banker; and Seller agrees that Seller shall indemnify and hold Purchaser harmless from and against any and all such claims in connection therewith (including without limitation any claim for compensation due to SSG Capital Advisors, LLC).  Notwithstanding anything contained herein to the contrary, the provisions of this Section 10.9 shall survive the Closing or any earlier termination of this Agreement.

10.10    Waiver.  Any term, provision or condition of this Agreement may be waived, or the time for its performance may be extended, at any time by the party which is entitled to the benefit thereof.  To be effective, each such waiver shall be in writing, shall specifically refer to this Agreement and the term, provision or condition being waived, and shall be executed by an authorized officer of the party granting

such waiver.  The failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor to affect in any way the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.  Notwithstanding the foregoing, a waiver hereunder by the Seller of any material term or condition shall not be effective without an order of the Bankruptcy Court in relation to such waiver.

10.11   <u>Amendment</u>.   This Agreement may be modified or amended only in a writing duly executed by or on behalf of all parties hereto.

10.12   <u>Counterparts; Facsimile Signatures</u>.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered by facsimile.

10.13   <u>Continuing Jurisdiction</u>.   The parties agree that the Bankruptcy Court shall retain jurisdiction over the enforcement of this Agreement, including the performance of the obligations and transactions contemplated hereunder.

10.14   <u>Choice of Law</u>.   This Agreement shall be construed, interpreted and the rights of the parties determined in accordance with the laws of the State of Maine  without regard to conflicts of laws principles thereof, except with respect to matters of law concerning the internal corporate affairs of any corporation, company or limited liability company that is a party to or the subject of this Agreement, and as to those matters the law of the jurisdiction of incorporation or organization of such entity shall govern.

10.15   <u>No Partnership or Joint Venture</u>.   Nothing contained in this Agreement shall be deemed to create a partnership, joint venture, or any other relationship other than that of seller and purchaser between the parties hereto.

10.16   <u>No Third-Party Beneficiaries</u>.   Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person, firm or corporation, other than the parties hereto and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement. It is the explicit intention of the parties hereto that no person or entity other than the parties hereto and their successors and permitted assigns is or shall be entitled to bring any action to enforce any provision of this Agreement against any party hereto, and the assumptions, indemnities, covenants, undertakings and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by, the parties hereto or their respective successors and permitted assigns.

10.17   <u>Prevailing Agreement Between the Parties</u>.   In the event of any conflict between the provisions of this Agreement and the provisions of any other transaction document, other than the Sale Order, the provisions of this Agreement shall prevail in the determination of the respective rights and obligations of the parties as between themselves.  In the event of any conflict between any provision of this Agreement and the Sale Order, the terms of the Sale Order shall govern.

[Signature page follows.]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly authorized, executed and delivered.

Lincoln Paper and Tissue, LLC.

By:

Name:     Keith Van Scotter

Title:     Chief Executive Officer

LP Acquisitions, LLC

By:_____

Name:

Title:

21

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly authorized, executed and delivered.

Lincoln Paper and Tissue, LLC.

By:_____

Name:   Keith Van Scotter
Title:   Chief Executive Officer

LP Acquisitions, LLC

By:_____

Name:  Adam Reich
Title:  Member

**Schedules and Exhibits**

Schedule 1.1

**Legal Description of Mill Premises**

<u>**THE CORE MILL PARCEL**</u>

A certain lot or parcel of land with buildings and improvements thereon situated in the Town of Lincoln, County of Penobscot, State of Maine and being more particularly described as follows:

Beginning at a concrete monument found on the southerly bank of the Penobscot River, so called, said point is further described as being on the southwesterly line of land now or formerly of land of the Lincoln Sanitary District as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 2840, Page 162;

Thence S 59º 06' 29" E by and along the southwesterly line of land of the said Lincoln Sanitary District, a distance of 758.52 feet to an iron rod found at the corner of said lot;

Thence S 59º 06' 29" E by and along the southwesterly line of land of others, a distance of 262.25 feet to a #6 rebar with an aluminum cap stamped "PLS 1030" set at the most westerly corner of land now or formerly of Beverly Nash, said point is further described as being the most northerly corner of a parcel of land conveyed by the Lincoln Pulp & Paper Co. to Beverly Nash, said deed is dated August 17, 1992 and recorded at the Penobscot County Registry of Deeds in Volume 5154, Page 77;

Thence S 30º 53' 31" W by and along the northwesterly line of land of said Nash as described in said deed recorded in Volume 5154, Page 77, a distance of 20.00 feet to #6 rebar with an aluminum cap stamped "PLS 1030" set at the most westerly corner of said parcel;

Thence S 59º 06' 29" E by and along the southwesterly line of land of said Nash as described in said deed recorded in Volume 5154, Page 77, a distance of 100.00 feet to #6 rebar with an aluminum cap stamped "PLS 1030" set at the most southerly corner of said parcel;

Thence N 30º 53' 31" E by and along the southeasterly line of land of said Nash as described in said deed recorded in Volume 5154, Page 77, a distance of 20.00 feet to rebar found at the most easterly corner of said parcel;

Thence S 59º 06' 29" E by and along the southwesterly line of land of others, a distance of 326.03 feet to a concrete monument found on said line;

Thence continuing on the same course S 59º 06' 29" E by and along the southwesterly line of land of others, a distance of 1.44 feet to a point on the westerly sideline of the Maine Central Railroad right of way;

Thence running in a southwesterly direction by and along the westerly sideline of the Maine Central Railroad right of way line following a 5779.15 foot radius curve to the left, an arc distance of 144.74 feet to a point of tangency in said westerly sideline;

Thence S 7º 05' 15" W by and along the westerly sideline of the Maine Central Railroad right of way line, a distance of 1171.14 feet to an angle point in said westerly right of way line;

Thence N 82º 54' 45" W by and along the westerly sideline of the Maine Central Railroad right of way line, a distance of 50.00 feet to an angle point in said westerly right of way line;

Thence S 7º 05' 15" W by and along the westerly sideline of the Maine Central Railroad right of way line, a distance of 600.00 feet to an angle point in said westerly right of way line;

Thence S 82º 54' 45" E by and along the westerly sideline of the Maine Central Railroad right of way line, a distance of 50.00 feet to an angle point in said westerly right of way line;

Thence S 7º 05' 15" W  by and along the westerly sideline of the Maine Central Railroad right of way line, a distance of 253.61 feet to an angle point in said westerly right of way line;

Thence S 87º 02' 30" E  by and along the westerly sideline of the Maine Central Railroad right of way line, a distance of 23.63 feet to an angle point in said westerly right of way line;

Thence S 12º 47' 13" W by and along the westerly sideline of the Maine Central Railroad right of way line, a distance of 606.49 feet to an angle point in said westerly right of way line;

Thence N 72º 25' 30" W by and along the westerly sideline of the Maine Central Railroad right of way line, a distance of 10.54 feet to an angle point in said westerly right of way line;

Thence running southwesterly by and along the westerly sideline of the Maine Central Railroad right of way line following a 1860.58 foot radius curve to the right, said curve has a radial bearing to the center point of the curve of N 70º 00' 16" W, an arc distance of 305 feet, more or less, to a point defined by the intersection of said westerly right of way line with the southwesterly shore of Mattanawcook Stream (aka the Mill Pond);

Thence running in a northwesterly direction by and along the southwesterly shore of the said Mill Pond, a distance of 93 feet, more or less, to a point defined by the intersection of the said southwesterly shore of the Mill Pond with a line that bears N 88º 09' 47" E from an 1 inch iron pin found on the northerly line of land now or formerly of Crocker & Murchison as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 1920, Page 142;

Thence S 88º 09' 47" W by and along the northerly line of land of said Crocker & Murchison, a distance of 6 feet, more or less, to said 1 inch iron pin;

Thence S 88º 09' 47" W by and along the northerly line of land of said Crocker & Murchison and the northerly line of land now or formerly of the Lincoln Sanitary District as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 3058, Page 258, a distance of 364.65 feet to a #5 rebar found at the northwesterly corner of said land of the Lincoln Sanitary District, said point is further described as being the northeasterly corner of land now or formerly of VanAlstyne as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 5041, Page 348;

Thence S 88º 09' 47" W by and along the northerly line of land of said VanAlstyne, the northerly terminus of Spring Street, so called, the northerly line of land now or formerly of Pete as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 5457, Page 187, a distance of 189.51 feet to a #7 rebar found at the northeasterly corner of land now or formerly of Antone as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 2306, Page 83;

Thence S 88º 09' 47" W by and along the northerly line of land of said Antone, a distance of 100.17 feet to an #7 rebar found on the easterly sideline of Katahdin Avenue, so called;

Thence N 4º 23' 45" W by and along the easterly sideline of said Katahdin Avenue, a distance of 386.57 feet to the northerly terminus of said Katahdin Avenue;

Thence S 83º 12' 54" W by and along the northerly terminus of said Katahdin Avenue, a distance of 44.06 feet to the westerly sideline of said Katahdin Avenue;

Thence S 4º 10' 47" E by and along the westerly sideline of said Katahdin Avenue, a distance of 319.73 feet to a #6 rebar with an aluminum cap stamped "PLS 1030" set on the westerly sideline of said Katahdin Avenue, said point is further described as being the northeasterly corner of land now or formerly of Thompson as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 3605, Page 131;

Thence N 88º 58' 47" W by and along the northerly line of land of said Thompson, a distance of 247.82 feet to a #6 rebar with an aluminum cap stamped "PLS 1030" set at the northwesterly corner of land of said Thompson and on the easterly line of land now or formerly of Rich as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 3542, Page 102;

Thence N 2º 47' 29" W by and along the easterly line of land of said Rich, a distance of 80.00 feet to #6 rebar with an aluminum cap stamped "PLS 1030" set at the northeasterly corner of land of said Rich;

Thence N 86º 38' 01" W by and along the northerly line of land of said Rich, a distance of 172.19 feet to #6 rebar with an aluminum cap stamped "PLS 1030" set at the northwesterly corner of land of said Rich, said point is further described as being the northeasterly corner of land now or formerly of Lincoln Land & Timber Co. as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 2631, Page 230;

Thence S 78º 29' 56" W by and along the northerly line of Lincoln Land & Timber Co., a distance of 226.80 feet to a corner of said lot;

Thence N 11º 30' 04" W by and along the easterly line of Lincoln Land & Timber Co., a distance of 204.00 feet to a corner of said lot;

Thence S 78º 29' 56" W by and along the northerly line of Lincoln Land & Timber Co., a distance of 153.23 feet to a corner of said lot;

Thence S 15º 44' 26" W by and along the westerly line of Lincoln Land & Timber Co., a distance of 398.28 feet to an angle point in said westerly line;

Thence S 8º 04' 00" E by and along the westerly line of Lincoln Land & Timber Co., a distance of 484.80 feet to an angle point in said westerly line;

Thence S 14º 14' 00" E by and along the westerly line of Lincoln Land & Timber Co., a distance of 153.78 feet to a rebar found on the northerly sideline of West Broadway, so called;

Thence S 74º 19' 46" W by and along the northerly sideline of said West Broadway, a distance of 40.53 feet to a concrete monument found on said sideline, said point is further described as being the southeasterly corner of land now or formerly of David Merkel et al   as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 7030, Page 57;

Thence N 14º 02' 19" W by and along the easterly line of land of said Merkel, a distance of 153.81 feet to a concrete monument found at the northeasterly corner of said lot;

Thence N 74º 15' 34" W by and along the northerly line of land of said Merkel and land now or formerly of Gloria A. Edwards as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 3016, Page 350, a distance of 161.54 feet to a concrete monument found at the northwesterly corner of land of said Edwards, said point is further described as being on the easterly line of land now or formerly of the Town of Lincoln as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 2135, Page 626;

Thence N 15º 44' 26" E by and along the easterly line of land of the said Town of Lincoln, a distance of 370.16 feet to the northeasterly corner of said lot;

Thence N 75º 56' 03" W by and along the northerly line of land of the said Town of Lincoln, a distance of 579.68 feet to a #7 rebar found at the northwesterly corner of said lot;

Thence S 14º 03' 57" W by and along the westerly line of land of the said Town of Lincoln, a distance of 601.28 feet to the southwesterly corner of said lot, said point is further described as being on the northerly sideline of Park Street, so called;

Thence N 75º 56' 03" W by and along the northerly sideline of said Park Street, a distance of 49.93 feet to the southeasterly corner of land of the Inhabitants of the Town of Lincoln (Cemetery Lot) as described in a deed recorded at the Penobscot Registry of Deeds in Volume 2135, Page 628;

Thence N 14º 03' 57" E by and along the easterly line of said Cemetery Lot, a distance of 623.83 feet to a concrete monument found at the northeasterly corner of said Cemetery Lot, said point is further described as being the northeasterly corner of a strip of land described in a deed from Lincoln Pulp & Paper Company, Inc. to the Town of Lincoln, dated February 7, 1975 and recorded at the Penobscot Registry of Deeds in Volume 2561, Page 300;

Thence N 75º 56' 03" W by and along the northerly line of said Cemetery Lot as described said Volume 2561, Page 300, a distance of 1385.45 feet to rebar found at the northwesterly corner of said Cemetery Lot;

Thence S 13º 50' 57" W by and along the westerly line of said Cemetery Lot, a distance of 522.60 feet to #6 rebar with an aluminum cap stamped "PLS 1030" set on said line, said point is further described as being the northeasterly corner of land now or formerly of Ivan Smith as described in deed recorded at the Penobscot Registry of Deeds in Volume 1741, Page 50;

Thence N 58º 44' 11" W by and along the northerly line of land of said Smith, a distance of 526.66 feet to rebar found within the limits of a Bangor Hydro-Electric Co. transmission line right of way and at the northwesterly corner of land of said Smith, said point is further described as being on the easterly line of land now or formerly of Lincoln Land & Timber Co. as described in a deed recorded at the Penobscot Registry of Deeds in Volume 4374, Page 49;

Thence N 23º 25' 59" E by and along the easterly line of land of said Lincoln Land & Timber Co., a distance of 184.99 feet to a concrete monument found at the northeasterly corner of said lot;

Thence N 56º 33' 35" W by and along the northeasterly line of land of said Lincoln Land & Timber Co., a distance of 1440.44 feet to concrete monument found at the northwesterly corner of said lot, said point is further described as being on the southeasterly line land now or formerly of Ireland as described in a deed recorded at the Penobscot Registry of Deeds in Volume 4642, Page 180;

Thence N 33º 28' 27" E by and along the southeasterly line of land of said Ireland, a distance of 180.33 feet to a concrete monument found at the most northerly corner of said lot, said point is further described as being on the southeasterly line land now or formerly of Ireland as described in a deed recorded at the Penobscot Registry of Deeds in Volume 4628, Page 194;

Thence N 67º 33' 33" E by and along the southeasterly line of land of said Ireland, a distance of 569.71 feet to a concrete monument found at the most easterly corner of said lot;

Thence N 39º 42' 25" W by and along the northeasterly line of land of said Ireland, a distance of 328.04 feet to a rebar found at the most northerly corner of land of said Ireland, said point is further described as being the most easterly corner of land now or formerly of Edwards et al as described in a deed recorded at the Penobscot Registry of Deeds in Volume 2440, Page 12;

Thence N 39º 42' 25" W by and along the northeasterly line of land of said Edwards, a distance of 529.50 feet to a rebar found at an angle point in the northeasterly line of land of said Edwards;

Thence N 34º 38' 18" W by and along the northeasterly line of land of said Edwards, a distance of 467.64 feet to a concrete monument found on the northeasterly line of land of said Edwards and on the bank of the Penobscot River, so called;

Thence continuing on the same course N 34º 38' 18" W by and along the northeasterly line of land of said Edwards, a distance of 23 feet, more or less, to the normal water line of the said Penobscot River;

Thence running in a easterly or northeasterly direction by and along the normal water line of the said Penobscot River, a distance of 5780 feet, more or less, to a point defined by the intersection of said normal water line with a line that bears N 59° 06' 29" W from the concrete monument identified as the point of beginning herein;

Thence S 59° 06' 29" E by and along the southwesterly line of land of the said Lincoln Sanitary District as described in a deed recorded at the Penobscot Registry of Deeds in Volume 2840, Page 162, a distance of 34 feet, more or less, to the point of beginning, said point of beginning is further described as being N 75° 10' 49" E, a distance of 5050.48 feet from the previously described concrete monument found on the bank of the said Penobscot River.

Bearings referenced herein are oriented to Grid North of the Maine State Coordinate System, East Zone, NAD 83.

Excepting from the above-described Mill Parcel that portion of Depot Street (a public way) that extends into the land described above.

Excepting from the above described Mill Parcel that portion of the bed of the Penobscot River which abuts the Mill Parcel (for its entire length along the river) and lies between the normal water line at the Mill Parcel and the thread of the river.

Also excepting a certain parcel of land identified as "TOTAL EXCLUSION AREA 112.2 Acres" on the Plan which area is also more particularly bounded and described as follows:

Beginning at a point near the southerly bank of the Penobscot River, said point being located S 75º 53' 09" W a tie distance of 2511.44 feet from a concrete monument found at the northeasterly corner of Lincoln Pulp & Paper Company Core Mill Parcel and on the southwesterly line of lands now or formerly of the Lincoln Sanitary District as described in volume 2840, page 162 of the Penobscot County Registry of Deeds;

Thence S 67º 44' 44" E, a distance of 1020.61 feet to a point;

Thence N 60º 30' 35" E, a distance of 379.42 feet to a point;

Thence S 60º 37' 35" E, a distance of 492.96 feet to a point;

Thence S 88º 03' 03" E, a distance of 228.82 feet to a point;

Thence S 29º 00' 15" E, a distance of 224.43 feet to a point;

Thence S 17º 03' 46" E, a distance of 276.39 feet to a point;

Thence S 19º 50' 19" E, a distance of 331.43 feet to a point;

Thence S 34º 35' 55" W, a distance of 136.11 feet to a point;

Thence S 37º 49' 30" E, a distance of 124.04 feet to a point;

Thence N 89º 07' 45" E, a distance of 113.90 feet to a point;

Thence S 3º 34' 39" E, a distance of 221.88 feet to a point;

Thence S 51º 33' 21" W, a distance of 67.69 feet to a point;

Thence N 42º 37' 54" W, a distance of 94.46 feet to a point;

Thence S 62º 47' 37" W, a distance of 102.35 feet to a point;

Thence S 22º 03' 44" W, a distance of 52.73 feet to a point;

Thence N 78º 08' 47" W, a distance of 352.78 feet to a point;

Thence S 56º 39' 17" W, a distance of 120.06 feet to a point;

Thence N 74º 28' 01" W, a distance of 91.32 feet to a point;

Thence S 34º 52' 41" W, a distance of 541.94 feet to a point;

Thence S 73º 57' 58" W, a distance of 498.94 feet to a point;

Thence S 52º 30' 47" W, a distance of 111.48 feet to a point;

Thence S 13º 46' 33" W, a distance of 110.28 feet to a point;

Thence S 9º 39' 24" E a distance of 243.22 feet to a point;

Thence S 70º 48' 29" W, a distance of 481.57 feet to a point;

Thence S 89º 29' 11" W, a distance of 318.00 feet to a point;

Thence N 6º 02' 30" W, a distance of 840.09 feet to a point;

Thence N 17º 38' 14" W, a distance of 960.85 feet to a point;

Thence N 6º 00' 38" E, a distance of 949.75 feet to a point;

Thence N 54º 35' 42 E, a distance of 246.00 feet to a point;

Thence N 85º 37' 31" E, a distance of 115.43 feet to the point of beginning;

Bearings referenced herein are oriented to Grid North of the Maine State Coordinate System, East Zone, NAD 83.


Also included as part of the Exclusion Area, and therefore not included in this conveyance, is that portion of the bed of the Penobscot River which abuts the Mill Parcel (for its entire length along the river) and lies between the normal water line at the Mill Parcel and the thread of the river.

Together with the following appurtenant easements that benefit the Mill Parcel:

1.      Rights and easements described in deed from Maine Central Railroad Company to Lincoln Pulp & Paper Co., Inc. dated January 12, 1983 and recorded in said Registry of Deeds in Book 3371, Page 239 subject to the terms, provisions, conditions and agreements set forth therein.

2.      The following rights and easements described in the Trustee's Deed to Lincoln Paper and Tissue, LLC dated May 26, 2004 recorded in the Penobscot County Registry of Deeds in Book 9354, Page 165:

   a.      An easement for the passage of pedestrians, workers and equipment of the owner of the Core Mill Parcel, its agents, employees, contractors and invitees, in, on and over existing roadways, traveled ways, driveways, as they are now located ("Existing Roadways") or may be relocated from time to time by the owner of the Exclusion Area or the owner of the Core Mill Parcel.

   b.      The right to clear, pave, lay, install, maintain, repair, and replace existing, or build future, roadways and bridges in, on, through, or under the Exclusion Area for all purposes including the right to cross the Exclusion Area for purposes of ingress and egress to all parts of the Core Mill Parcel, to the Penobscot River, to adjacent streets, roads and ways.

   c.      An easement for purposes of the maintenance, operation, installation, replacement and repair of existing utility lines which may cross the Exclusion Area and the right, to clear, pave, lay, install, maintain, repair, and replace existing, or build future, utility and communication conduits and lines, including without limitation, gas, electricity, sewer, water, storm, drainage and cable TV, including without limitation, such other utilities in the future that become available or may be used, or would be useful, in connection with the operation of the Core Mill Parcel and other activities on the Core Mill Parcel.

   d.      An easement for the operation, maintenance, replacement, relocation and repair of the "Outfall Discharge Pipe" in the general location shown on the Plan for any portion of the pipe and supporting structures that are or may be located below the normal water line of the Penobscot River.

**Peripheral Parcels:**

**Tax Map 64, Lot 5 (formerly Tax Map 14, Lot 14):**

A certain lot or parcel of land with buildings thereon situated on the northeasterly side of Park Street, in the Town of Lincoln, State of Maine and being more particularly described as follows:

Beginning at a point on the northeasterly sideline of said Park Street, which point is further described as being the most southerly corner of land formally of Rosella Moody, now Ireland as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 4628, Page 194;

Thence N 28° 00' 50" E by and along land of said Ireland as described in the aforementioned deed, a distance of 520.67 feet to a concrete monument found on the southeasterly line of land of said Ireland;

Thence S 56° 33' 35" E by and along the southwesterly line of land of Lincoln Paper and Tissue, LLC as described in a deed recorded that the Penobscot County Registry of Deeds in Volume 9354, Page 165, a distance of 1440.44 feet to a concrete monument found at a corner of land of said Lincoln Paper and Tissue, LLC;

Thence S 23° 25' 59" W by and along the northwesterly line of Land of said Lincoln Paper and Tissue, LLC, a distance of 184.99 feet to an iron rod found at the most northerly corner of land now or formerly of Ivan Smith as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 1741, Page 50;

Thence S 23° 21' 06" W by and along the northwesterly line of land of said Smith as described in the aforementioned deed, a distance to 299.98 feet to an iron rod found on the northeasterly sideline of said Park Street;

Thence running in a northwesterly direction by and along the northeasterly sideline of said Park Street, a distance of 1487 feet, more or less, to the point of beginning. The last mentioned iron rod found at the most westerly corner of land of said Smith and on the northeasterly sideline of said Park Street and the point of beginning are connected by a tie line that has a bearing of N 58° 08' 39" W and a distance of 1476.47 feet.

Bearings referenced herein are oriented to Grid North of the Maine State Coordinate System, East Zone, NAD 83.

**Tax Map 136, Lot 18 (formerly Tax Map 6, Lot 101-11):**

A certain lot of land situated on the northerly side of West Broadway in the Town of Lincoln, State of Maine and being more particularly described as follows:

Beginning at a concrete monument found on the northerly sideline said West Broadway, which point is further described as being the southwesterly corner of land now or formally of Ellis & Guerrette, LLC has described in a deed recorded at the Penobscot County Registry of Deeds in Volume 8140, Page 220;

Thence S 73° 34' 50" W by and along the northerly sideline of said West Broadway, a distance of 108.57 feet to an iron rod found at the southeasterly corner of land now of  Lincoln Paper and Tissue, LLC as described in a deed recorded that the Penobscot County Registry of Deeds in Volume 9354, Page 165;

Thence N 14° 14' 00" W by and along land of said Lincoln Paper and Tissue, LLC, a distance of 153.78 feet to an angle point in said line;

Thence N 8° 04' 00" W continuing along land of said Lincoln Paper and Tissue, LLC, a distance of 484.80 feet to an angle point in said line;

Thence N 15° 44' 26" E continuing along land of said Lincoln Paper and Tissue, LLC, a distance of 398.28 feet to an angle point in said line;

Thence N 78° 29' 56" E continuing along land of said Lincoln Paper and Tissue, LLC, a distance of 153.23 feet to an angle point in said line;

Thence S 11° 30' 04" E continuing along land of said Lincoln Paper and Tissue, LLC, a distance of 204.00 feet to a corner of said parcel;

Thence N 78° 29' 56" E continuing along land of said Lincoln Paper and Tissue, LLC, a distance of 226.80 feet to a #6 rebar with an aluminum stamped "PLS 1030" set the northwesterly corner of land now or formerly of Rich as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 3542 Page 102;

Thence S 3° 49' 38" E by and along the westerly line of land of said Rich as described in the aforementioned deed, a distance of 437.07 feet to an iron rod found at the northeasterly corner of land now formally of Potts as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 3450, Page 199;

Thence S 80° 28' 14" W by and along the northerly line of land of said Potts and the northerly line of land now or formerly of Briola as described in a deed recorded at the Penobscot County Registry of Deeds in Volume 5716, Page 191, a distance of 244.12 feet to a concrete monument found at the northwesterly corner of land of said Briola;

Thence S 79° 57' 55" W by and along the northerly line of land now or formerly of  Ellis & Guerrette, LLC has described in a deed recorded at the Penobscot County Registry of Deeds in Volume 8140, Page 220, a distance of 40.23 feet to an iron rod found on the northerly line of land of said Ellis & Guerrette, LLC;

Thence S 79° 45' 22" W by and along the northerly line of land of said Ellis & Guerrette, LLC, a distance of 181.33 feet to an iron rod found at the northwesterly corner of land of Ellis & Guerrette, LLC;

Thence S 19° 07' 04" E by and along the westerly line of land of said Ellis & Guerrette, LLC, a distance of 361.77 feet to the point of beginning.

**Schedule 2.2**

**Excluded Assets (Leases)**

1. One (1) Caterpillar 966H Wheel Loader S/N:  A6D02609

2. Three (3) Xerox 5325 S/N:  AE7148757, AE7148761, AE7148231

3. One (1) Xerox 7120 S/N:  XDC386288

4. One (1) Xerox 7120PT S/N:  XDC386233

5. Two (2) Xerox 7535 S/N:  XKK390858, XKK390598

6. One (1) Xerox 7545 S/N:  XKP532682

7. One (1) Caterpillar 938H Wheel Loader S/N:  MJC01572

8. One (1) Copier  7845 PT S/N:  MX4313641

9. One (1) Caterpillar 966M Wheel Loader S/N:  KJP00778