## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MAINE

|  |  |
|---|---|
| In re: | ) CHAPTER 11 |
|  | ) |
| Lincoln Paper and Tissue, LLC, | ) Case No. 15-10715 |
|  | ) |
| Debtor. | ) |
|  | ) |
|  | ) |
|  | ) |

**SECOND ORDER (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING ON AN INTERIM BASIS AND (B) UTILIZE CASH COLLATERAL OF PRE-PETITION SECURED PARTIES ON AN INTERIM BASIS, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY, (IV) GRANTING RELATED RELIEF, PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363(C), (D) &(E), 364(C), 364(D)(1), 364(E) AND 507(B), AND (V) SCHEDULING A FINAL HEARING AUTHORIZING FINANCING ON A FINAL BASIS PURSUANT TO BANKRUPTCY RULE 4001**

Upon the motion (the "**Motion**"), dated September 28, 2015, of Lincoln Paper and Tissue, LLC ("**LPT**" also referred to as "**Borrower**" or "**Debtor**") as a Debtor and Debtor-in-Possession in the above-captioned Chapter 11 case (collectively, the "**Case**"), pursuant to Sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 507(b) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**") and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking, among other things:

(1)     authorization and approval for the Borrower to obtain post-petition loans, advances and other financial accommodations (the "**Post-Petition Financing**") on an interim basis for a period through and including the date of the Final Hearing (as defined below) from Siena Lending Group LLC (the "**DIP Lender**") in connection with the DIP Credit Agreement (as defined below), under or in connection with the debtor-in-possession revolving credit facility (the "**DIP Facility**") in an interim aggregate amount up to $4,500,000 and on a final basis in an aggregate amount up to $6,600,000 and otherwise in accordance with this Second Interim Order (defined below) and the Final Order (defined below); and for the Debtor to enter into that certain the Debtor-In-Possession Loan and Security Agreement with the DIP Lenders, substantially in the form attached hereto as **Exhibit 2** (the "**DIP Credit Agreement**"), which shall reflect in all material respects the terms and conditions set forth in this Order (the

DIP Credit Agreement, this Second Interim Order and the Final Order (as defined below) together with all other agreements, documents and instruments to be executed or delivered in connection therewith, collectively, the "**DIP Financing Documents**"). The DIP Facility shall be used in part for working capital and upon entry of the Final Order to refinance, at the DIP Lender's option, the outstanding principal balance of the revolving loans and obligations under the Loan and Security Agreement dated as of December 11, 2014 (as amended, supplemented, extended or otherwise modified from time to time, the "**Pre-Petition Credit Agreement**"), by and among Lincoln Paper and Tissue, LLC (the "**Pre-Petition Borrower**") and Siena Lending Group LLC, as lender (the "**Pre-Petition Lender**"), and which shall indefeasibly satisfy in full the outstanding obligations under the Pre-Petition Financing Documents (as defined below). The Pre-Petition Credit Agreement and all other agreements, documents and instruments executed or delivered with, to, or in favor of the Pre-Petition Lender, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection with the Pre-Petition Credit Agreement or related thereto, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated or replaced at any time prior to the Petition Date (as defined below), are collectively referred to herein as the "**Pre-Petition Financing Documents**";

        (2)    the grant to the DIP Lender, of superpriority administrative claim status pursuant to Sections 364(c)(1) and 507(b) of the Bankruptcy Code in accordance with the terms of this Order;

        (3)    granting adequate protection to the Pre-Petition Lender and Pre-Petition Lender as the issuer of any Letter of Credit (as defined in the Pre-Petition Credit Agreement) (collectively, the "**Pre-Petition Secured Parties**," together with the DIP Lender, the "**Secured Parties**") under and in connection with the Pre-Petition Financing Documents in accordance with the terms set forth herein;

        (4)    authorizing the Debtor's use of "cash collateral" (the "**Cash Collateral**") which term shall include, without limitation, all cash and cash equivalents of the Debtor, whenever or wherever acquired, and the proceeds of all collateral pledged to the Secured Parties (defined below), as contemplated by section 363 of the Bankruptcy Code in accordance with the terms set forth herein;

        (5)    granting adequate protection in favor of Sullivan and Merritt Constructors, Inc. ("**Sullivan**"), and Fastco Corporation ("**Fastco**"), the alleged Mechanic's Lienors (as defined below) in the form of cash payment at closing of the DIP Facility and further in accordance with the terms and provisions of the First Interim Order (defined below) and this Second Interim Order which shall be incorporated into the Final Order and in accordance with certain agreements entered into with Sullivan and Fastco attached hereto;

        (6)    modification of the automatic stay to the extent hereinafter set forth and waiving the fourteen (14) day stay provisions of Federal Rule of Bankruptcy Procedure 4001(a)(3) and 6004(h); and

140690.01019/101527344v.3

(7)    the setting of a final hearing on the Motion (the "**Final Hearing**") for entry of an order authorizing the financing and use of cash collateral on a final basis (the "**Final Order**").

Notice of the Motion, the relief requested therein, and the First Interim Hearing (as defined below) and notice of entry of the First Interim Order (as defined below) and, if applicable, the Second Interim Hearing (as defined below) (collectively, the "**Notice**") having been served by the Debtor in accordance with Rule 4001(c) on: (i) the DIP Lender and the Pre-Petition Secured Parties; (ii) the United States Trustee for the District of Maine (the "**U.S. Trustee**"); (iii) the holders of the twenty (20) largest unsecured claims against the Debtor's estate; (iv) FAME; (v) all parties known to the Debtor who hold any liens or security interest in the Debtor's assets who have filed UCC-1 financing statements against the Debtor, or who, to the Debtor's knowledge, have asserted any liens on any of the Debtor's assets, including the Mechanics Lienors (defined below); (vi) all landlords and warehouseman of the Debtor; (vii) LPT Holdings LLC; (viii) the Internal Revenue Service and all relevant taxing authorities of Maine; (ix) the Pension Benefit Guaranty Company; (x) the United Steelworkers Union; (xi) the Environmental Protection Agency; (xii) all creditors known to the Debtor to be holding a judgment and (xiii) certain other parties identified in the certificates of service filed with the Court (collectively, the "**Noticed Parties**").

The initial hearing on the Motion having been held by this Court on September 29, 2015 (the "**First Interim Hearing**") and the second interim hearing on the Motion having been scheduled for October 9, 2015 (the "**Second Interim Hearing**").

The Court having entered the *Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing on an Interim Basis and (B) Utilize Cash Collateral of Pre-Petition Secured Parties on an Interim Basis, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay, (IV)*

3

*Granting Related Relief, Pursuant to 11 U.S.C. Sections 105, 361, 362, 363(c), (d) & (e), 364(c), 364(d)(1), 364(e) and 507(b), and (V) Scheduling a Final Hearing Authorizing Financing on a Final Basis Pursuant to Bankruptcy Rule 4001* [Dkt. No. 42] (the "**First Interim Order**").

Upon the record made by the Debtor at the First Interim Hearing and, if applicable, the Second Interim Hearing, including the Motion, and the filings and pleadings in the Case, and good and sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]:

A.  Petition.  On September 28, 2015 (the "**Petition Date**"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its property as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

B.  Jurisdiction and Venue.  The Court has jurisdiction of this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  The Motion is a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M).  Venue of the Case and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.  Notice.  Under the circumstances, the Notice given by the Debtor of the Motion, the First Interim Hearing, the entry of the First Interim Order, the Second Interim Hearing and the relief sought herein has been given to the Noticed Parties pursuant to Fed. R. Bankr. P. 4001(c)(2).

---

[1] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact pursuant to Fed. R. Bankr. P. 7052.  Any statements of the Court from the bench at the Second Interim Hearing (if applicable) shall constitute additional findings of fact and conclusions of law as appropriate and are expressly incorporated by reference into this Interim order to the extent non inconsistent herewith.

140690.01019/101527344v.3

D.     **Debtor's Acknowledgments and Agreements**.[2]  **Without prejudice to the rights of any other party (but subject to the limitations contained in paragraph 5.1 below), the Debtor admits, stipulates, acknowledges and agrees that:**

(i)     **Pre-Petition Financing Documents.     Prior to the commencement of the Case, the Pre-Petition Secured Parties made loans, advances and provided other financial accommodations pursuant to the Pre-Petition Financing Documents to the Pre-Petition Borrower.   LPT Holdings, LLC (the "Pre-Petition Guarantor") guaranteed the obligations of the Pre-Petition Borrower under the Pre-Petition Credit Agreement, which was executed by the Pre-Petition Guarantor.**

(ii)     **Pre-Petition Obligations Amount.   As of September 28, 2015, the aggregate principal amount of all Obligations (as defined in the Pre-Petition Credit Agreement) owing by the Pre-Petition Borrower to the Pre-Petition Secured Parties under and in connection with the Pre-Petition Financing Documents was approximately $4,300,000, consisting of Revolving Loans outstanding under (and as defined in) the Pre-Petition Credit Agreement, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses), Early Termination Fee, Annual Fee, Collateral Management Fee,  and other charges accrued, accruing or chargeable with respect thereto under the Pre-Petition Credit Agreement (collectively, the "Pre-Petition Obligations").  The Pre-Petition Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the Pre-Petition Borrower and the Pre-Petition Guarantor, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other**

---

[2] **In accordance with Local Rule 4001-2(d), bolded provisions of this Order may deviate from Local Rule 4001-2(c).**

applicable law, and the Debtor does not possess and shall not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and nonavoidability of any of the Pre-Petition Obligations.

(iii)    **Pre-Petition Collateral.**    As of the Petition Date, the Pre-Petition Obligations were secured pursuant to the Pre-Petition Financing Documents by valid, perfected, enforceable and non-avoidable first priority security interests and liens granted by (a) the Pre-Petition Borrower and Pre-Petition Guarantor to the Pre-Petition Lender, for the benefit of itself and the other Pre-Petition Secured Parties, upon the Collateral (as defined in the Pre-Petition Credit Agreement, hereafter the "Pre-Petition Non-Real Property Collateral"), subject to the lien in favor of (i) Caterpillar Financial Services Corporation on specific equipment evidenced by the UCC filings against LPT filed on 11/8/2010, 5/22/2012 and 4/16/15 with the Secretary of State for Delaware (the "Caterpillar Lien"), (ii) NMHG Financial Services, Inc. on specific equipment evidenced by the UCC filings against LPT filed on 1/31/2012 and 1/21/2014 with the Secretary of State for Delaware (the "NMHG Lien"), (iii) CIT Finance LLC on specific equipment evidenced by the UCC filings against LPT filed on 3/13/2012 with the Secretary of State for Delaware (the "CIT Lien") and (iv) U.S. Bank Equipment Finance on specific equipment evidenced by the UCC filings against LPT filed 2/18/2015 with the Secretary of State for Delaware (the "US Bank Lien"), in each case, to the extent constituting valid, perfected, enforceable and non-avoidable security interests and liens (collectively, the "Permitted Liens" and each a "Permitted Lien"); and (b) the Pre-Petition Borrower to the Pre-Petition Lender, for the benefit of itself and the other Pre-Petition Secured Parties, upon the Property (as defined in

6

that certain Open-End Mortgage, Assignment of Rents, Security Agreement and Fixture Filing executed by the Pre-Petition Borrower in favor of the Pre-Petition Lender, for the benefit of the Pre-Petition Secured Parties dated December 11, 2014 relating to the premises located at 50 Katahdin Avenue, Lincoln, Maine (as amended, restated, supplemented and modified from time to time, the "**Mortgage**") (hereafter, the "**Pre-Petition Real Property Collateral**," together with the Pre-Petition Non-Real Property Collateral, the "**Pre-Petition Collateral**").  The Debtor does not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Secured Parties' liens, claims or security interests in the Pre-Petition Collateral.

(iv)    Subordinated Obligations.  Prior to the commencement of the Case, in connection with that certain Economic Recovery Loan Program Loan Agreement dated December 9, 2014 (as amended, supplemented, extended or otherwise modified from time to time, the "**FAME Loan Agreement**") and related Economic Recovery Program Loan Promissory Note dated December 9, 2014 (the "**FAME Promissory Note**" and together with the FAME Loan Agreement, the "**Pre-Petition Subordinated Loan Agreement**") and that certain Economic Recovery Program Security Agreement dated December 9, 2014, (the "**Pre-Petition Subordinated Security Agreement**" and together with the Pre-Petition Subordinated Loan Agreement, the "**Pre-Petition Subordination Loan Documents**") pursuant to which Borrower obtained a subordinated loan from FAME (hereafter "**FAME**" or "**Subordinated Creditor**") in the original principal amount of $970,000.00 (the "**Subordinated Loan**") secured by a lien on certain of the Debtor's non-real property assets (the "**Pre-Petition Subordinated Collateral**") which are subordinated

7

pursuant to and in accordance with the Intercreditor Agreement (defined herein). The obligations owing under the Pre-Petition Subordinated Loan Agreement are guaranteed (subject to certain limitations) by LPT Holdings, LLC. As of the Petition Date, the obligations owing by Debtor under the Pre-petition Subordinated Loan Agreement was approximately $950,000.

(v)     Intercreditor Agreement.   The Pre-Petition Lender and Subordinated Creditor are parties to that certain Intercreditor Agreement, dated as of December 11, 2014 (as has been amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), which governs the respective rights, obligations and priorities of the Secured Parties and the Subordinated Creditor with respect to the matters referred to therein, including, without limitation, the use of Cash Collateral and the DIP Facility. The liens and security interests granted to Subordinated Creditor in the Pre-Petition Subordinated Collateral are governed by and subject to the Intercreditor Agreement and are junior in all respects to the liens and security interests granted to the Pre-Petition Secured Parties in the Pre-Petition Collateral and Secured Parties in the DIP Collateral. See Paragraphs 1, 2, 3, 4, 7, 8, 15 and 21 of the Intercreditor Agreement.

(vi)     FAME Subordination.  In addition, FAME has consented that its liens on the Pre-Petition Subordinated Collateral are subordinate to the liens and claims of the DIP Lender and the Pre-Petition Lender and the Subordinated Creditor's claims against the Debtor are subordinated to the Pre-Petition Obligations and the Post-Petition Obligations under the terms and conditions of the Intercreditor Agreement and this Order.

140690.01019/101527344v.3

(vii)    **Fastco and Sullivan (collectively, the "Mechanics Lienors")**
**have asserted that they are holders of mechanics liens against the real property located at**
**50 Katahdin Avenue, Lincoln, ME 04457 and certain machinery and equipment**
**constituting fixtures at such property (the "Mechanics Lienors Asserted Lien Collateral").**
**The Debtor has agreed to provide adequate protection to the Mechanics Lienors in**
**accordance with the terms of the First Interim Order, this Second Interim Order and**
**certain agreements attached hereto (the "Mechanics Lienor Agreements") and**
**subordination agreements entered into in connection herewith (the "Mechanics Lienors**
**Subordination Agreements") to secure their consensual subordination of any prepetition**
**liens and claims they hold against the Mechanics Lienors Asserted Lien Collateral and the**
**Debtor to the DIP Lender's liens and claims granted hereunder on the DIP Collateral and**
**against the Debtor's estate and the Pre-Petition Lender's liens on the Pre-Petition**
**Collateral and further any claims by the DIP Lender and the Prepetition Lender against**
**the Debtor.  In accordance with the Mechanics Lienor Agreements, the initial advance**
**under the DIP Facility shall include a payment to Sullivan in the amount of $345,950 (the**
**"Sullivan Payment") and a payment to Fastco in the amount of $25,000.00 (the "Fastco**
**Payment"), half of which was made on or about September 30, 2015 and half of which shall**
**not be made until entry of this Second Interim Order.  Sullivan acknowledges that its liens**
**and claims are subordinated to the liens and claims of the Pre-Petition Lender on the Pre-**
**Petition Collateral and the DIP Lender on the DIP Collateral and as granted hereunder;**
***provided, however,* the aggregate principal amount of all advances constituting Senior Debt**
**(as defined in the Mechanics Lienors Subordination Agreements) shall not at any time**
**exceed $7,100,000 (exclusive of all fees, costs and expenses and Protective Advances (as**

**defined in the DIP Financing Documents)) without Sullivan's prior written consent. Fastco acknowledges that its liens and claims are subordinated to the liens and claims of the Pre-Petition Lender on the Pre-Petition Collateral and the DIP Lender on the DIP Collateral and as granted hereunder,** *provided, however,* **the aggregate principal amount of all advances constituting Senior Debt (as defined in the Mechanics Lienors Subordination Agreements) shall not at any time exceed $7,100,000 (exclusive of all fees, costs and expenses and Protective Advances (as defined in the DIP Financing Documents)) without Fastco's prior written consent. Sullivan and Fastco shall not seek or assert any further adequate protection in this Case that would impact or be adverse to the Pre-Petition Lender or the DIP Lender.**

E. <u>Adequate Protection</u>.

(i)     Adequate Protection Obligations.  The Debtor acknowledges and agrees that the Pre-Petition Secured Parties are entitled to adequate protection resulting from the (1) provisions of this Second Interim Order granting first priority and/or priming liens on the Pre-Petition Collateral to the DIP Lender, for the benefit of the DIP Lender, with respect to the DIP Facility, (2) use, sale, lease, or depreciation or other diminution in value of the Pre-Petition Collateral, and/or (3) the imposition of the automatic stay under section 362(a) of the Bankruptcy Code or otherwise pursuant to sections 361(a), 363(c), 364(c) and 364(d)(1) of the Bankruptcy Code (which amount of any such use and diminution being referred to hereafter as the "**<u>Adequate Protection Obligations</u>**").

(ii)     Adequate Protection Liens.  Pursuant to sections 361, 363 and 507(b) of the Bankruptcy Code, as adequate protection for the Adequate Protection Obligations, (a) the Debtor has agreed to provide the Pre-Petition Secured Parties with the First Lien

Adequate Protection (as defined below), (b) the Debtor has agreed to provide the Subordinated Creditor with the Subordinated Adequate Protection Liens (as defined below) and (c) the Mechanics Lienors have consented to the DIP Facility and subordination of their liens to the First Lien Adequate Protection and the DIP Lender Liens.

(iii)   Necessity for Adequate Protection.   The adequate protection and other treatment proposed to be provided by the Debtor pursuant to this Second Interim Order are consistent with, inter alia, the Intercreditor Agreement as to FAME, the Mechanics Lienor Agreements, and authorized by the Bankruptcy Code, will minimize disputes and litigation over subordination of liens, the use of Cash Collateral and the DIP Facility, and facilitate the Debtor's ability to continue to operate until a sale of assets to maximize value in this Case.

F.   Adequate Protection for Financing/Cash Collateral/Non-Impairment.   The security interests and liens granted hereunder to (a) the DIP Lender, under section 364(c) and (d) of the Bankruptcy Code, and (b) to the Pre-Petition Lender, for the benefit of the Pre-Petition Secured Parties, under sections 105, 361 and 363 of the Bankruptcy Code, are appropriate because, among other things:  (w) the Pre-Petition Secured Parties will only consent to the entry of this Second Interim Order on the terms set forth herein; (x) Subordinated Creditor has consented to the security interests and priming liens granted to the DIP Lender for the use of Cash Collateral and the First Lien Adequate Protection pursuant to the terms and conditions of the Intercreditor Agreement and this Second Interim Order; (y) the Mechanics Lienors have entered into the Mechanics Lienor Agreements and consent to the terms of the First Interim Order, this Second Interim Order, and the Final Order and Mechanics Lienors are receiving cash payments at closing of the DIP Facility as adequate protection; and (z) the holders of Permitted

Liens, to the extent they are legal, valid, binding, continuing, enforceable and fully perfected, are not being impaired by this Second Interim Order.

        G.   <u>Preliminary Findings Regarding the Postpetition Financing</u>.  Solely for the purposes of the Interim Orders (defined below):

        (i)   Postpetition Financing.  The Debtor has requested from the DIP Lender, and the DIP Lender is willing to extend, certain loans, advances and other financial accommodations, as more particularly described, and on the terms and conditions set forth, in this Second Interim Order and the DIP Financing Documents.  Notwithstanding the Secured Parties' willingness to extend such financial accommodations, the Pre-Petition Obligations shall be deemed to have been automatically accelerated on the Petition Date as a result of the commencement of the Case in accordance with the terms of the Pre-Petition Financing Documents.

        (ii)   Fair and Reasonable.  Based on the record presented to the Court by the Debtor, it appears that the terms of the DIP Credit Agreement, the DIP Financing Documents and the DIP Facility are fair and reasonable and reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration.

        (iii)   Need for Post-Petition Financing.  The Debtor does not have sufficient available sources of working capital to operate the Debtor's businesses in the ordinary course without the Post-Petition Financing and the ability to use Cash Collateral as described in this Second Interim Order.  The Debtor's ability to maintain and maximize the value of the operations until a sale, to pay its employees, and to otherwise fund its operations is essential to the Debtor's continued viability.  The ability of the Debtor to obtain sufficient working capital

12

and liquidity through the proposed Post-Petition Financing and the use of Cash Collateral on the terms set forth in the DIP Financing Documents and this Second Interim Order is vital to the preservation and maximization of the going concern value of the Debtor's currently operating businesses pending a sale of the assets of the Debtor.  Accordingly, the Debtor has an immediate need to obtain authorization use Cash Collateral for the limited purpose set forth herein and to obtain the Post-Petition Financing in order to, among other things, permit the orderly continuation of the operation of its operating businesses, preserve jobs for its employees, maintain vendor support, minimize the disruption of its business operations, and manage and preserve the assets of the Debtor's bankruptcy estate (as defined under Section 541 of the Bankruptcy Code, the "**Estate**") in order to maximize the recoveries to creditors of the Estate.

(iv)     No Credit Available on More Favorable Terms.  The Debtor is unable to procure financing in the form of unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code, as an administrative expense under Section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to Section 364(c)(1) of the Bankruptcy Code, without the grant of liens on all or substantially all of Debtor's assets, pursuant to Section 364(c) and Section 364(d) of the Bankruptcy Code.  The Debtor has been unable to procure the necessary financing on terms more favorable than the financing offered by the DIP Lender pursuant to the DIP Financing Documents and this Second Interim Order and the DIP Lender and Pre-Petition Secured Parties do not consent to any financing that subordinates their liens on the Pre-Petition Collateral or the DIP Collateral or their claims against the Debtor and the Debtor's Estate.

(v)     Budget.  Based on the record presented to the Court by the Debtor, it appears that the Debtor has prepared and delivered to the DIP Lender the Budget (as defined in

140690.01019/101527344v.3

the DIP Credit Agreement).  A copy of the Budget is annexed hereto as Exhibit 1.  The Budget

has been thoroughly reviewed by the Debtor and its management and sets forth, among other

things, the projected cash receipts and disbursements for the periods covered thereby.    The

Debtor believes in good faith that the Budget is achievable and will allow the Debtor to operate

in Chapter 11 without the accrual of unpaid administrative expenses during the term of the

Budget.    The DIP Lender is relying upon the Debtor's compliance with the Budget in

determining to consent to the use of Cash Collateral for the limited purposes expressly set forth

herein and to enter into the Post-Petition Financing provided for herein.

       (vi)    Business Judgment and Good Faith Pursuant to Section 364(e) and

Section 363(m).  Based on the record presented to the Court by the Debtor, it appears that the

terms of the DIP Financing Documents and this Second Interim Order are fair, just, reasonable

and appropriate under the circumstances, reflect the Debtor's exercise of its prudent business

judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value

and fair consideration.  Based on the record before this Court, it appears (and the Debtor has

stipulated) that the Debtor and each of the Secured Parties have negotiated at arms' length and in

good faith regarding the terms of the DIP Financing Documents, the DIP Facility, the use of

Cash Collateral and the Debtor's use of the prepetition lenders collateral, respectively, all subject

to the terms of this Second Interim Order.  Any credit extended under the terms of this Second

Interim Order shall be deemed to have been extended in "good faith" by the Secured Parties as

that term is used in Section 364(e) and 363(m) of the Bankruptcy Code.

       (vii)    No Objection/Subordinated Creditor and Mechanics Lienors

Consent.  The Pre-Petition Secured Parties have no objection to the DIP Facility and the use of

Cash Collateral solely on the terms and conditions set forth in this Second Interim Order.

Subordinated Creditor consented to the terms of financing and the use of Cash Collateral. Moreover, the Mechanics Lienors have consented to the terms of the First Interim Order and the Second Interim Order pursuant to the Mechanics Lienor Agreements.

(viii)    Nothing in this Second Interim Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the Pre-Petition Secured Parties are or will be adequately protected with respect to any additional financing, or any non-consensual use of Cash Collateral. The DIP Lender has indicated a willingness to provide the DIP Facility, but solely on the terms and conditions set forth in this Second Interim Order and in the DIP Financing Documents.

(ix)    Good Cause.    The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtor and its Estate, as its implementation will, among other things, provide the Debtor with the necessary liquidity to (a) minimize disruption to the Debtor's on-going businesses and on-going operations and to permit the Debtor to sell its assets, (b) preserve and maximize the value of the Debtor's Estate, and (c) avoid immediate and irreparable harm to the Debtor, its business, its employees and its assets.

(x)    Immediate Entry.    Sufficient cause exists for immediate entry of this Second Interim Order pursuant to Bankruptcy Rules 4001(c)(2). No party appearing in the Case has filed or made an objection to the relief sought in the Motion or the entry of this Second Interim Order, or any objections that were made (to the extent such objections have not been withdrawn) are hereby overruled.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that:

Section 1.      Authorization and Conditions to Financing.

1.1      Motion Granted.    The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Order.  This Order shall be referred to herein as the "**Second Interim Order**" (together with the First Interim Order, the "**Interim Orders**").

1.2      Authorization to Borrow and Use of Loan Proceeds.  In order to avoid immediate and irreparable harm to the Debtor's estate pending the Final Hearing, the Debtor is hereby authorized and empowered to immediately borrow and obtain Revolving Loans and the Debtor is hereby authorized and empowered to incur indebtedness and obligations owing to the DIP Lender on the terms and subject to the conditions set forth in the DIP Financing Documents and this Second Interim Order, during the period commencing on the date of this Second Interim Order through and including the date of the Final Hearing as set forth in Section 7 of this Second Interim Order (the "**Interim Financing Period**") as set forth in the Total Operating Disbursements and Mechanics Lien Subordination line items of the Budget during such period and up to the maximum amount of $6,600,000 upon entry of the Final Order; in such amounts as may be made available to the Debtor by the DIP Lender in accordance with all of the lending formulae, sublimits, terms and conditions set forth in the DIP Financing Documents.  The Debtor may only use the proceeds of the Revolving Loans and any other credit accommodations provided to the Debtor pursuant to the terms and conditions of the DIP Financing Documents and this Second Interim Order; *provided however*, that upon entry of this Second Interim Order, the Mechanics Lienors shall be paid in accordance with the Mechanics Lienor Agreements, the First Interim Order, and this Second Interim Order to agree to fully subordinate their liens on the Mechanics Lienors Asserted Lien Collateral to the Pre-Petition Lenders liens on the Pre-Petition

16

Collateral and the DIP Lender's liens on the DIP Collateral, *provided, however,* the aggregate

principal amount of all advances constituting Senior Debt (as defined in the Mechanics Lienors

Subordination Agreements) shall not at any time exceed $7,100,000 (exclusive of all fees, costs

and expenses and Protective Advances (as defined in the DIP Financing Documents)) without

the Mechanics Lienors' prior written consent; and provided further that upon entry of the Final

Order, Revolving Loans may be used to refinance, in whole or in part, at the DIP Lender's

option, the outstanding principal balance of amounts owing under the Pre-Petition Financing

Documents.

    1.3    <u>Financing Documents</u>.

        1.3.1    <u>Authorization</u>.  The Debtor is hereby authorized to enter into,

execute, deliver, perform, and comply with all of the terms, conditions and covenants of the

DIP Financing Documents and other related agreements, including without limitation, the DIP

Credit Agreement and the Mechanics Lienor Agreements referred to herein.

        1.3.2    <u>Approval</u>.  The DIP Financing Documents and each term set forth

therein are approved to the extent necessary to implement the terms and provisions of this

Second Interim Order.

        1.3.3    <u>Amendment of DIP Financing Documents</u>.  The Debtor and the

DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP

Financing Documents, any non-material modification, including, without limitation, up to a three

percent (3%) increase in the Maximum Facility Amount (as defined to the DIP Credit

Agreement), of the DIP Financing Documents without further order of this Court or any other

modification to the DIP Financing Documents; provided however, that notice of any material

modification or amendment to the DIP Financing Documents shall be provided to counsel to any

140690.01019/101527344v.3

official committee (the "**Committee**") and U.S. Trustee, each of whom shall have five (5) business days from the date of such notice within which to object in writing to such modification or amendment unless the Committee agrees to a shorter period if the Committee consents in writing.  If any Committee or the U.S. Trustee timely objects to any material modification or amendment to the DIP Financing Documents, such modification or amendment shall only be permitted pursuant to an order of this Court.

1.4     Payment of Prepetition Debt.  The Debtor is authorized to pay the Pre-Petition Obligations to the Pre-Petition Secured Parties in accordance with Sections 1.5 and 1.6 of this Second Interim Order.

1.5     Payments and Application of Payments.  The Debtor is authorized and directed to make all payments and transfers of Debtor's Estate property to the DIP Lender as provided, permitted and/or required under the DIP Financing Documents, which payments and transfers, subject to Section 5.1 herein, shall not be avoidable or recoverable from the DIP Lender under Section 547, 548, 550, 553 or any other section of the Bankruptcy Code, or subject to any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law or otherwise.  The DIP Lender shall apply the proceeds of the DIP Collateral (as defined below), and any other amounts or payments received by the DIP Lender in respect of the Pre-Petition Obligations and the Post-Petition Obligations (as defined in the DIP Financing Documents) (collectively, the "**Obligations**") in accordance with the DIP Financing Documents and this Second Interim Order, in such order and manner determined by the DIP Lender, including, without limitation, applying all payments, proceeds and other amounts either to the Pre-Petition Obligations or to the Post-Petition Obligations in the DIP Lender's and Pre-Petition Lender's sole and absolute discretion.  Without limiting the generality of the foregoing, the

18

Debtor is authorized and directed, without further order of this Court, to pay or reimburse the

DIP Lender, in accordance with the DIP Financing Documents, for all present and future costs

and expenses, including, without limitation, all professional fees, consultant fees and legal fees

and expenses paid or incurred by the DIP Lender in connection with the financing transactions as

provided in the DIP Financing Documents and this Second Interim Order, all of which shall be

and are included as part of the principal amount of the Obligations and secured by the DIP

Collateral (as defined below); provided however, the fees and costs of the DIP Lender shall be

funded up to the amounts set forth in the Budget during the term of the Budget with any

remaining amounts owed, if any, to be paid upon the Termination Date.

   1.6 <u>Interest and Fees</u>.  The rate of interest to be charged for the Revolving Loans

under the Post-Petition Obligations pursuant to the DIP Credit Agreement shall be the rates set

forth in the DIP Credit Agreement and shall be payable at the times set forth in the DIP Credit

Agreement.  The fees charged under the DIP Facility shall be those set forth in the DIP Credit

Agreement and shall be payable at the times set forth in the DIP Credit Agreement, including

without limitation the $125,000 Closing Fee, which is fully earned and non-refundable upon

execution of the DIP Credit Agreement and payable upon the earlier of the Maturity Date and the

Termination Date (each as defined in the DIP Credit Agreement).  Each of the Annual Fee,

Collateral Management Fee and Early Termination Fee (in the amount of 3% of the Maximum

Facility Amount) each, existing under, and as defined in, the Pre-Petition Loan Agreement, is

deemed fully earned and non-refundable prior to the Petition Date and is payable as part of the

DIP Facility upon the earlier of the Maturity Date and the Termination Date (each as defined in

the DIP Credit Agreement).  The rate of interest to be charged on the Pre-Petition Obligations

shall be the rates set forth in the Pre-Petition Financing Documents and shall accrue and be

payable at the times and in the manner set forth in the Pre-Petition Financing Documents. Other than as expressly set forth in this Section 1.6, any and all fees charged under the Pre-Petition Financing Documents shall be as set forth in the Pre-Petition Financings Documents and shall accrue and be payable at the times and in the manner set forth in the Pre-Petition Financing Documents.

1.7    <u>Continuation of Prepetition Procedures</u>. All pre-petition practices and procedures for the payment and collection of proceeds of the Collateral, the turnover of cash, the delivery of property to the DIP Lender and the funding pursuant to the Pre-Petition Credit Agreement, including any lockbox and/or blocked depository bank account arrangements, will be the same under the DIP Financing Documents and are hereby approved and shall continue without interruption after the commencement of the Case, provided that the practices and procedures are otherwise consistent with the terms of the Order approving the Motion of the Debtor for Entry of an Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks; and (B) Continued Use of the Existing Cash Management System.

Section 2.    <u>Cross-Collateralization, Adequate Protection and Superpriority Administrative Claim Status</u>.

2.1    <u>Cross-Collateralization</u>.

2.1.1    <u>DIP Lien Grant</u>. To secure the prompt payment and performance of any and all Post-Petition Obligations **(and upon entry of the Final Order, any and all Obligations, including without limitation, all Pre-Petition Obligations and Post-Petition Obligations)** of the Debtor to the DIP Lender of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, the DIP Lender shall have and is hereby granted, effective as of the Petition Date, valid and perfected first priority (subject only to the Permitted

140690.01019/101527344v.3

Liens and the Carve-Out (as defined herein)), security interests and liens in and upon (such

security interests and liens collectively, the "**DIP Liens**") all present and after acquired property

of the Debtor of any nature whatsoever, including without limitation, all accounts receivable,

inventory, general intangibles, chattel paper, real property, leaseholds, fixtures, machinery,

equipment, deposit accounts, cash and cash equivalents, investments, patents, trademarks, trade

names, copyrights, rights under license agreements and other intellectual property, inter-

company notes or receivables due to the Debtor, all of the Collateral (as defined in the Pre-

Petition Credit Agreement and in the DIP Credit Agreement), all of the Mortgaged Property (as

defined in the Mortgage), and all causes of action whether pursuant to federal or state law and all

proceeds thereof and property received thereby whether by judgment, settlement or otherwise, of

the Debtor or its estate, and as to all of the foregoing, all rents issues, products, proceeds and

profits generated by any of the foregoing (being sometimes collectively referred to in this Second

Interim Order as the "**DIP Collateral**"); provided however, that the DIP Collateral shall not

include claims and causes of action under Chapter 5 of the Bankruptcy Code (collectively,

"**Avoidance Actions**").  **The Obligations shall also include all indemnification obligations of**

**the Debtor to the Pre-Petition Secured Parties arising under the Pre-Petition Financing**

**Documents, including, without limitation, the obligations arising under Sections 6.3 of the**

**Pre-Petition Credit Agreement which survive payment in full of the Pre-Petition**

**Obligations.**  Further, as consideration to Pre-Petition Secured Parties for their agreement to the

terms hereof and as replacement collateral for the Pre-Petition Collateral used, consumed or sold

by the Debtor in the Case, to the extent of any diminution in value of the Pre-Petition Collateral,

the DIP Collateral shall also secure the Pre-Petition Obligations.  Subject to the provisions of

Section 2.3.1, the DIP Liens shall be:

21

(A)    <u>Liens on Unencumbered Assets</u>.  Pursuant to Section 364(c)(2) of the Bankruptcy Code, continuing valid, perfected, enforceable, first priority, and fully perfected liens on and security interests in all of the Debtor's right, title, and interest in and to and under all DIP Collateral that is not otherwise encumbered by a validly perfected security interest on or lien on the Petition Date (the "**Unencumbered Property**").

(B)    <u>Liens on Encumbered Assets</u>.  Pursuant to Section 364(c)(3) of the Bankruptcy Code, a continuing valid, enforceable, second priority, and fully perfected lien on and security interest (other than as set forth in clause (C) below) in all of the Debtor's right, title, and interest, in and to and under all DIP Collateral which is subject to, as of the Petition Date, a Permitted Lien that was perfected prior to the Petition Date or that is perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

(C)    <u>Priming Liens on Encumbered Assets</u>.  Subject to Permitted Liens, pursuant to section 364(d) of the Bankruptcy Code, valid, enforceable, fully perfected, and first priority senior priming security interests in and senior priming liens upon all of the Debtor's right, title and interest in, to and under all DIP Collateral, including, without limitation, priming security interests and priming liens which are senior to (i) the security interests and liens held by the Pre-Petition Secured Parties, (ii) the security interests and liens held by Subordinated Creditor, (iii) the liens held by the Mechanics Lienors, which have been consensually subordinated to both the Pre-Petition Lender and the DIP Lender and (iv) the Adequate Protection Liens (as defined below).

(D)    <u>Liens Senior to Certain Other Liens</u>.  Notwithstanding anything to the contrary contained in this Second Interim Order, the DIP Liens and the Adequate Protection Liens provided to the DIP Lender and the Pre-Petition Secured Parties shall not be subject or

22

subordinate to (i) any lien or security interest that is avoided or preserved for the benefit of the Debtor or its Estate under section 551 of the Bankruptcy Code or (ii) any intercompany or affiliate liens of the Debtor.

            2.1.2         <u>Post-Petition Lien Perfection</u>.  This Second Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the DIP Collateral, or other act to validate or perfect such security interest or lien, including without limitation, control agreements with any financial institution(s) holding any deposit account of the Debtor (a "**Perfection Act**").  Notwithstanding the foregoing, if the DIP Lender and/or the Pre-Petition Lender shall, in its/their sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, each of the DIP Lender and the Pre-Petition Lender is authorized to perform such act, and then the Debtor is authorized to perform such act to the extent necessary or required by the DIP Lender and/or the Pre-Petition Lender, which act or acts shall be deemed to have been accomplished as of the Petition Date notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law.  The DIP Lender and/or the Pre-Petition Lender may choose to file, record or present a certified copy of this Second Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Second Interim Order in accordance with applicable law.  Should the DIP Lender and/or the Pre-

Petition Lender so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Second Interim Order.

2.1.3    <u>Subordinated Creditor Agreement</u>.    Notwithstanding anything to the contrary contained herein, the liens and security interests granted to the Secured Parties to secure the Obligations shall have priority over any and all liens and security interests granted to Subordinated Creditor to secure obligations of the Debtor owing to Subordinated Creditor and the rights of the parties with respect to such liens and security interests shall be governed by the Intercreditor Agreement.  So long as any Obligations are outstanding under the Pre-Petition Financing Documents or the DIP Financing Documents or the DIP Lender's commitment to make Revolving Loans under the DIP Credit Agreement has not been terminated, Subordinated Creditor shall (i) take no action to foreclose upon or otherwise exercise remedies against any DIP Collateral, (ii) be deemed to have consented to any release of DIP Collateral in connection with any disposition of any DIP Collateral authorized under the Pre-Petition Financing Documents or the DIP Financing Documents and, effective upon such release, be deemed to release its liens therein, and (iii) not file any financing statement, trademark filings, copyright filings, patent filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect its security interests in the DIP Collateral.

2.1.4    <u>Mechanics Lienors' Agreements</u>.    Pursuant to the terms contained herein, the First Interim Order, and in the Mechanics Lienors' Agreements, the liens and security interests granted to the Secured Parties to secure the Obligations shall have priority over any and all liens and security interests granted to or otherwise held by the Mechanics

140690.01019/101527344v.3

Lienors to secure obligations of the Debtor owing to the Mechanics Lienors and the rights and respective priorities of the parties with respect to such liens and security interests shall be governed by the terms of this Second Interim Order, the Mechanics Lienor Agreements and the Mechanics Lienors Subordination Agreements.  So long as any Obligations are outstanding under the Pre-Petition Financing Documents or the DIP Financing Documents or the DIP Lender's commitment to make Revolving Loans under the DIP Credit Agreement has not been terminated, the Mechanics Lienors shall (i) take no action to foreclose upon or otherwise exercise remedies against any Pre-Petition Collateral or DIP Collateral, (ii) be deemed to have consented to any release of Pre-Petition Collateral or DIP Collateral in connection with any disposition of any Pre-Petition Collateral DIP Collateral authorized under the Pre-Petition Financing Documents or the DIP Financing Documents and, effective upon such release, be deemed to release its liens therein, (iii) shall agree that each respective liens on the Mechanics Lienors Asserted Lien Collateral constituting Pre-Petition Collateral or the DIP Collateral is subordinated to the Pre-Petition Lender's liens and the DIP Lender's liens, respectively, *provided, however,* the aggregate principal amount of all advances constituting Senior Debt (as defined in the Mechanics Lienors Subordination Agreements) shall not at any time exceed $7,100,000 (exclusive of all fees, costs and expenses and Protective Advances (as defined in the DIP Financing Documents)) without the Mechanics Lienors' prior written consent, and (iv) not file any financing statement, trademark filings, copyright filings, patent filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect its security interests in the DIP Collateral; *provided*, *however*, that the Mechanics Lienors may take any action permitted under the Mechanics Lienor Agreements; *provided*

25

*further* that any consent judgment contemplated thereby has to be in form and substance acceptable to the Secured Parties.

2.2    <u>Superpriority Administrative Expense</u>.    For all Post-Petition Obligations (and upon entry of the Final Order, for all Obligations, including without limitation, all Pre-Petition Obligations and the Post-Petition Obligations) now existing or hereafter arising and for diminution in value of any Pre-Petition Collateral used by the Debtor pursuant to this Second Interim Order, the DIP Financing Documents or otherwise, the DIP Lender is granted an allowed superpriority administrative claim in the Debtor's Estate pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtor, whether now in existence or hereafter incurred by the Debtor, and over any and all administrative expenses, adequate protection claims or priority claims of the kind specified in, or ordered pursuant to the Bankruptcy Code, including without limitation, inter alia, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (upon entry of the Final Order), 507, 364(c)(1), 546(c), 726 or 1114 of the Bankruptcy Code (the "**DIP Superpriority Claim**"), subject only to the Carve Out.  The DIP Superpriority Claim shall not attach to the proceeds of Avoidance Actions.

2.3    <u>Carve Out</u>.

2.3.1    <u>Carve-Out</u>.  The DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Adequate Protection Claims shall be subject only to the right of payment of the following expenses (collectively, the "**Carve-Out**"):

a.    statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) with respect to the Debtor (the "**Statutory Fees**"); and

26

b.      to the extent allowed at any time by final order of the Court under Sections 328, 330, 331 of the Bankruptcy Code, including pursuant to any interim compensation procedures order, as applicable (the "**Allowed Professional Fees**"), but limited in all respects to the weekly amounts budgeted to be funded for each such Professional for such week in accordance with the Budget, all accrued and unpaid fees, disbursements, costs and expenses incurred by Bernstein Shur, counsel for the Debtor, Spinglass Management Group, LLC, financial consultant to the Debtor, SSG Capital Advisors, investment banker for the Debtor (solely for their monthly budgeted amount and not the amounts at closing), and any professionals for the Official Committee of Unsecured Creditors (the "**Creditors Committee**"), all appointed under Section 327 or 1103(a) of the Bankruptcy Code (collectively, the "**Professionals**") before or on the first business day following delivery by the DIP Lender of a Carve-Out Trigger Notice (as defined below) (the "**Pre-Default Carve-Out Amount**") and (ii) after the first business day for the time period following the delivery by the DIP Lender of a Carve-Out Trigger Notice, for Professionals to the Debtor, in an amount equal to but not to exceed $40,000 (hereafter, the "**Post-Default Carve-Out Amount**", and together with the Pre-Default Carve-Out Amount, the "**Carve-Out Cap**").  For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by DIP Lender to the Debtor and its counsel, the U.S. Trustee, and lead counsel to any Creditors Committee, which notice may only be delivered following the occurrence and continuance of an Event of Default, and stating that the Post-Default Carve-Out Amount cap has been invoked.

c.      Subject to the terms of this Second Interim Order, the Carve-Out Cap shall be allocated on a Professional by Professional basis based on the amounts budgeted to be funded for each Professional pursuant to the Budget.

2.4    Excluded Professional Fees.  Notwithstanding anything to the contrary in this

Second Interim Order, neither the Carve-Out, nor the proceeds of any Revolving Loans or DIP

Collateral shall be used to pay any Allowed Professional Fees or any other fees or expenses

incurred by any Professional in connection with any of the following: (a) an assertion or joinder

in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other

contested matter seeking any order, judgment, determination or similar relief: (i) challenging the

legality, validity, priority, perfection, or enforceability of the Obligations (whether Pre-Petition

Obligations or Post-Petition Obligations) or the Secured Parties' liens on and security interests in

the Collateral, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the

Obligations (whether Pre-Petition Obligations or Post-Petition Obligations) or the Secured

Parties' liens on and security interests in the pre-petition Collateral or the DIP Collateral, or (iii)

preventing, hindering or delaying the Secured Parties' assertion or enforcement of any lien,

claim, right or security interest or realization upon any in accordance with the terms and

conditions of this Second Interim Order, (b) a request to use Cash Collateral (as such term is

defined in Section 363 of the Bankruptcy Code) without the prior written consent of the Secured

Parties, except to the extent expressly permitted herein, (c) a request for authorization to obtain

Debtor-in-Possession financing or other financial accommodations pursuant to Section 364(c) or

(d) of the Bankruptcy Code, other than from the DIP Lender, without the prior written consent of

the DIP Lender, (d) the commencement or prosecution of any action or proceeding of any

claims, causes of action or defenses against the Secured Parties, or any of them, or any of their

respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns,

including, without limitation, any attempt to recover or avoid any claim or interest from the

Secured Parties, or any of them, under Chapter 5 of the Bankruptcy Code; provided, however,

28

that, subject to the Carve Out Cap, an amount not to exceed $25,000 in the aggregate of the indebtedness incurred pursuant to the DIP Facility may be used to pay Allowed Professional Fees of the Committee to investigate (but not prosecute) claims against and objections with respect to the Pre-Petition Obligations and pre-petition liens and security interests of the Pre-Petition Secured Parties (including, without limitation, issues regarding validity, perfection, priority, or enforceability of the secured claims of the Pre-Petition Secured Parties).

2.5    Carve Out Reserve.  At the DIP Lender's sole discretion, the DIP Lender may at any time establish (and adjust) a reserve against the amount of Revolving Loans or other credit accommodations that would otherwise be made available to the Debtor pursuant to the lending formulae contained in the DIP Credit Agreement in respect of the Carve-Out.  Nothing contained herein shall limit, modify or restrict in any way the DIP Lender's rights to establish (and adjust) any other reserves in accordance with the DIP Financing Documents.

2.6    Carve-Out Reserve Account.

2.6.1    The Debtor shall maintain a segregated account for the payment of Allowed Professional Fees (the "**Carve-Out Reserve Account**") which account shall be funded by or on behalf of the Debtor in accordance with the Budget on a weekly basis until the occurrence of an Event of Default provided there is availability under the DIP Credit Agreement.  After an Event of Default, the Carve-Out Reserve Account may continue to be funded at the DIP Lender's option, up to the Carve-Out Cap.  From funds in the Carve-Out Reserve Account, the Debtor shall pay the Professionals the Allowed Professional Fees in connection with the Carve-Out compensation and reimbursement of expenses that accrue following the Petition Date in compliance with and subject to the Carve-Out provisions of Section 2.3 as the same may be due and payable; provided, however, that to the extent that

140690.01019/101527344v.3

Allowed Professional Fees that have accrued from the Petition Date through and including an Event of Default are less than the amounts funded into the Carve Out Reserve Account, the excess amounts in the Carve Out Reserve Account shall be remitted to the DIP Lender to apply to reduce the Pre-Petition Obligations and/or the Post-Petition Obligations at the DIP Lender's sole discretion. Funds held in the Carve Out Reserve Account shall be applied to the Allowed Professional Fees that have been incurred following the Petition Date in the manner set forth in this Second Interim Order in accordance with the procedures established in the Case with the excess, if any, to be remitted to the DIP Lender as set forth in the preceding sentence. Provided that the amounts the DIP Lender is obligated to allocate to Professionals as required in Section 2.3 has been funded, all obligations of the DIP Lender and the Pre-Petition Lender with respect to the Carve-Out shall be terminated.

> 2.6.2    The Carve-Out Cap shall be reduced on a dollar-for-dollar basis on a weekly basis by the amounts actually funded into the Carve-Out Reserve Account or based on the amounts paid to the Professionals. The Post-Default Carve-Out Amount shall be reduced on a dollar-for-dollar basis by the amounts actually paid to Debtor's Professionals in respect of fees accruing after delivery of the Carve-Out Trigger Notice. Payment of any amounts on account of the Carve-Out, whether by or on behalf of the DIP Lender, shall not and shall not be deemed to reduce the Obligations, and shall not and shall not be deemed to subordinate any of the DIP Lender's liens and security interests in the DIP Collateral or their DIP Superpriority Claim to any junior pre- or post-petition lien, interest or claim in favor of any other party. The DIP Lender shall not, under any circumstance, be responsible for the direct payment or reimbursement of any fees or disbursements of any Professionals incurred in connection with the Case under any chapter of the Bankruptcy Code, and nothing in

30

Section 2.3, 2.4, 2.5 or 2.6 of this Second Interim Order shall be construed to obligate the DIP

Lender in any way, to pay compensation to or to reimburse expenses of any Professional, or to

ensure that the Debtor has  sufficient funds to pay such compensation or reimbursement.

Section 3.       <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions

of this Second Interim Order, pursuant to sections 363(c)(2) of the Bankruptcy Code, the Debtor

is authorized to use Cash Collateral in accordance with the DIP Financing Documents.  Absent

entry of the Final Order by the Court, the Debtor shall no longer be authorized to use Cash

Collateral at the expiration of the Interim Period.  Nothing in this Second Interim Order shall be

deemed to authorize the use, sale, lease, encumbrance, or disposition of any assets of the Debtor

or its Estate outside the ordinary course of business, or any Debtor's use of any Cash Collateral

or other proceeds resulting therefrom, except as provided for herein.

3.1      <u>Pre-Petition Lender's Adequate Protection</u>.   As adequate protection for the

interests of the Pre-Petition Lender, for the benefit of the Pre-Petition Secured Parties, on

account of the Adequate Protection Obligations in respect of the Pre-Petition Secured Parties, the

Pre-Petition Lender is being provided with adequate protection (collectively, the "**First Lien**

**Adequate Protection**").

3.1.1      <u>First Lien Adequate Protection Liens</u>.  The Pre-Petition Lender, for

the benefit of itself and the other Pre-Petition Secured Parties, is hereby granted valid and

perfected replacement and additional security interests in, and liens (the "**First Lien Adequate**

**Protection Liens**") on the DIP Collateral to the extent of the Adequate Protection Obligations,

which shall be junior solely to the DIP Liens, the Permitted Liens and the Carve Out.

a.       The First Lien Adequate Protection Liens shall be deemed to be

valid, binding, enforceable and fully perfected as of the Petition Date and, subject to Section 5.1,

not subject to subordination or avoidance, for all purposes in the Case and subject only to the

DIP Liens, the Permitted Liens and the Carve Out.

        b.      Except for the DIP Liens, the Permitted Liens and the Carve Out,

the First Lien Adequate Protection Liens shall not be made subject to or pari passu with any lien

or security interest by any court order heretofore or hereafter entered in the Case (unless with the

consent of the Pre-Petition Lender).   The First Lien Adequate Protection Liens shall not be

subject to sections 506(c) (upon entry of the Final Order), 510, 549, or 550 of the Bankruptcy

Code.  No lien or interest avoided and preserved for the benefit of any estate pursuant to section

551 of the Bankruptcy Code shall be made pari passu with or senior to the First Lien Adequate

Protection Liens.

        3.2      First Lien Adequate Protection Claims.  As further adequate protection, the Pre-

Petition Lender, for the benefit of itself and the other Pre-Petition Secured Parties, is hereby

granted an allowed administrative claim (the "**First Lien Adequate Protection Claim**") against

the Debtor's Estate under sections 503 and  507(b) of the Bankruptcy Code to the extent that the

First Lien Adequate Protection Liens do not adequately protect the diminution in the value of the

liens and security interests of the Pre-Petition Secured Parties in the Pre-Petition Collateral,

which First Lien Adequate Protection Claim shall be subject and subordinate only to the DIP

Superpriority Claim and the Carve Out and shall have priority over all other administrative

expense claims and unsecured claims against the Debtor or its Estate, which are now existing, of

any kind or nature whatsoever, including, without limitation, administrative expenses of the

kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364, 365, 503(a),

503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726 (to the extent

permitted by law), 1113 and 1114 of the Bankruptcy Code.

3.2.1    <u>Interest</u>.  As further adequate protection, the Pre-Petition Lender, for the benefit of itself and the other Pre-Petition Secured Parties, shall be entitled to interest on account of the outstanding Pre-Petition Obligation, which shall be accrued and payable and paid in accordance with the Pre-Petition Financing Documents.

3.2.2    <u>Additional Adequate Protection</u>.  As further adequate protection, and without limiting any rights of the Pre-Petition Lender, for the benefit of itself and the other Pre-Petition Secured Parties, under section 506(b) of the Bankruptcy Code which are hereby preserved, and in consideration of, and as a requirement for, the Adequate Protection Obligations, the Debtor shall pay or reimburse the Pre-Petition Lender for any and all of its accrued and payable reasonable fees, costs, expenses and charges payable under the Pre-Petition Financing Documents, including, without limitation, the fees and expenses of the Pre-Petition Lender as provided in sections 2.2, 4.2, 4.4, 4.9 and 6.3 of the Pre-Petition Credit Agreement, whether accrued pre-petition or post-petition, all without further notice, motion or application to, order of, or hearing before, this Court; provided that DIP Lender shall be permitted to add such amounts to the Obligations.  Payment of these amounts shall be as provided for by the terms of the DIP Financing Documents.

3.3    <u>Subordinated Creditor</u>.  The Subordinated Creditor is hereby granted valid and perfected security interests in, and liens on (collectively, the "**<u>Subordinated Adequate Protection Liens</u>**"): (a) all accounts receivable and inventory, now existing or hereinafter acquired, and all proceeds thereof, junior in all respects to the Carve-Out and the Secured Parties' rights or interests in the DIP Collateral; and (b) fixtures that may constitute real property, now existing or hereinafter acquired, and all proceeds thereof, junior in all respects to the Carve-Out, the Secured Parties' rights or interests in the DIP Collateral, the Mechanic Lienors' rights in

the Mechanics Lienors Asserted Lien Collateral, and the Permitted Liens (if applicable); *provided* that the extent of the Subordinated Adequate Protection Liens shall be limited to the amount, if any, of the diminution in the value of the Subordinated Creditor's interests, including its interests in the Pre-Petition Subordinated Collateral caused by the priming of the Subordinated Creditor's liens, the use of its Pre-Petition Subordinated Collateral, the use of Cash Collateral or the imposition of the automatic stay; *provided further* that the Subordinated Creditor shall not be entitled to prosecute or otherwise monetize any claim secured by the Subordinated Adequate Protection Liens unless and until (i) all Obligations pursuant to the DIP Financing Documents have been indefeasibly paid in full, (ii) DIP Lender's commitment to make advances thereunder has been terminated, and (iii) the Debtor and its estate have fully and finally released the Secured Parties in accordance with the DIP Financing Documents, or DIP Lender has otherwise consented, in its sole discretion, in writing.  Any claims of the Subordinated Creditor are subordinated to the DIP Superpriority Claim, the First Lien Adequate Protection Claim and the Carve-Out.  The Subordinated Creditor shall not seek any further adequate protection in relation to the financing contemplated by the terms of the DIP Credit Facility that would impact or be adverse to the Pre-Petition Lender or the DIP Lender.

3.4   <u>Mechanics Lienors</u>.   Excepting payments made under the Mechanics Lienor Agreements and the Carve Out, in consideration of the payments provided for in the First Interim Order and herein, the Mechanics Lienor's liens on the Mechanic's Lienor's Asserted Lien Collateral is subject to (i) the DIP Liens on the DIP Collateral; (ii) the Pre-Petition Liens on the Pre-Petition Collateral; (ii) the First Lien Adequate Protection Liens, (iv) Permitted Liens, and (v) the Carve Out, *provided, however,* the aggregate principal amount of all advances constituting Senior Debt (as defined in the Mechanics Lienors Subordination Agreements) shall

34

not at any time exceed $7,100,000 (exclusive of all fees, costs and expenses and Protective Advances (as defined in the DIP Financing Documents)) without Sullivan's prior written consent; *provided further* that the Mechanic Lienors shall not be entitled to prosecute or otherwise monetize any claim secured by the Mechanic Lienors' liens unless and until (i) all Obligations pursuant to the DIP Financing Documents have been indefeasibly paid in full, (ii) DIP Lender's commitment to make advances thereunder has been terminated, and (iii) the Debtor and its estate have fully and finally released the Secured Parties in accordance with the DIP Financing Documents, or DIP Lender has otherwise consented, in its sole discretion, in writing; *provided further*, *however*, that the Mechanics Lienors may take any action permitted under the Mechanics Lienor Agreements; *provided further* that any consent judgment contemplated thereby has to be in form and substance acceptable to the Secured Parties. The Mechanics Lienors shall not be entitled to and waive any further adequate protection that would impact or be adverse to the Pre-Petition Lender or the DIP Lender.

3.5    Excepting payments made under the Mechanics Lienor Agreements and the Carve Out, in the event that any party (including without limitation the Mechanics Leinors) who holds a lien or security interest in any of the Pre-Petition Collateral or the DIP Collateral that is junior and/or subordinate to the liens and claims of the Pre-Petition Lender or DIP Lender in such Pre-Petition Collateral or DIP Collateral, as applicable, receives or is paid proceeds of the Pre-Petition Collateral or DIP Collateral, as applicable, prior to the indefeasible payment and satisfaction in full of all Post-Petition Obligations (and upon entry of the Final Order, any and all Obligations, including, without limitation, all Pre-Petition Obligations and Post-Petition Obligations), such junior or subordinate lienholder shall be deemed to have received, and shall hold, such proceeds in trust for the Pre-Petition Lender or DIP Lender, as applicable, and shall

35

immediately turnover to the Pre-Petition Lender or DIP Lender, as applicable, such proceeds for application to the Post-Petition Obligations (and upon entry of the Final Order, any and all Obligations, including, without limitation, all Pre-Petition Obligations and Post-Petition Obligations) in accordance with the DIP Financing Documents.

Section 4.     Default; Rights and Remedies; Relief from Stay.

4.1     Events of Default.  The occurrence of any Event of Default as defined and under the DIP Credit Agreement shall constitute an "**Event of Default**" under this Second Interim Order.

4.2     [Reserved]

4.3     **Expiration of Commitment/Relief from Stay.  Upon the expiration of the Debtor's authority to borrow and obtain other credit accommodations from the DIP Lender pursuant to the terms of this Second Interim Order (except if such authority shall be extended with the prior written consent of the DIP Lender, which consent shall not be implied or construed from any action, inaction or acquiescence by the DIP Lender) or upon the earlier of the Maturity Date and the Termination Date (each as defined in the DIP Credit Agreement), unless an Event of Default occurs sooner and the automatic stay has been lifted or modified as provided herein, all of the Obligations shall immediately become due and payable and the Secured Parties shall be automatically and completely relieved from the effect of any stay under Section 362 of the Bankruptcy Code, any other restriction on the enforcement of their liens upon and security interests in the DIP Collateral or any other rights granted to the Secured Parties pursuant to the terms and conditions of the DIP Financing Documents or this Second Interim Order, and the DIP Lender, shall be and is hereby authorized, in its sole discretion, to take any and all actions and remedies provided**

140690.01019/101527344v.3

**to it in this Second Interim Order, the DIP Financing Documents or applicable law which
the DIP Lender may deem appropriate and to proceed against and realize upon the DIP
Collateral or any other property of the Debtor's Estate.**

4.4    <u>Landlord Waiver Agreements</u>.  Upon entry of the Final Order unless otherwise
permitted in any landlord waiver, all rights and remedies granted in any landlord waiver
executed and delivered in connection with the Pre-Petition Obligations and Pre-Petition Credit
Agreement, and all rights granted to the Secured Parties therein, including the right to access any
premises leased by Debtor and access the Pre-Petition Collateral, shall be deemed to be
continuing, enforceable and applicable to and binding upon the landlords and other parties to
such waiver agreements with respect to the DIP Collateral and Obligations.

Section 5.      <u>Representations; Covenants; and Waivers</u>.

5.1    **<u>Objections to Pre-Petition Obligations</u>.    The extent, legality, validity,
perfection, enforceability and other matters noted in this Second Interim Order with
respect to the Pre-Petition Financing Documents and Secured Parties' liens in the Pre-
Petition Collateral and in the DIP Collateral as security for the Pre-Petition Obligations
and the Adequate Protection Obligations, are for all purposes subject only to the rights of
any party in interest with requisite standing other than with respect to the Debtor
(including any Chapter 7 trustee appointed during the Challenge Period) (as defined
below)) for a period of the earlier of (i) the day before the date set for the auction in the bid
procedures order; and (ii) 60 days from the date of the formation of the Committee (such
period hereafter referred to as the "<u>Initial Challenge Period</u>"); *provided*, *however*, that to
the extent that this case converts to a case under chapter 7 on or before the 60th day
following Committee formation, then the Initial Challenge Period shall be extended by an**

140690.01019/101527344v.3

additional 60 days from the date of conversion with respect to the chapter 7 trustee (the

"Extended Challenge Period," and together with the Initial Challenge Period, the

"Challenge Period"); *provided, further*, however that the Extended Challenge Period may

be reduced by agreement by and among the Secured Parties, the Debtor and the

Committee, and any such agreement will be reflected in the Final Order: to seek to

(a) challenge in any manner the Pre-Petition Obligations, and/or assert claims or causes of

action of any nature in any way arising out of, relating to, or in connection with, the Pre-

Petition Obligations or the Pre-Petition Financing Documents, or (b) assert or allege any

other matters in any way arising out of, relating to, or in connection with, the Pre-Petition

Obligations or the Pre-Petition Financing Documents, or (c) challenge the extent, legality,

validity, perfection and/or enforceability of any Secured Party's pre-petition liens upon and

security interests in the Pre-Petition Collateral pursuant to the Bankruptcy Code (the

actions described in clause (a), (b) and/or (c) above, collectively referred to herein as an

"Objection").   If an Objection is not timely filed within the Challenge Period (i) the Pre-

Petition Obligations shall be deemed allowed in full and the Secured Parties' security

interests in and liens upon the Pre-Petition Collateral shall be recognized and allowable as

legal, valid, binding, in full force and effect, non avoidable, perfected and senior to all other

liens (subject only to Permitted Liens to the extent such liens are valid, perfected and

unavoidable) upon and claims against the Pre-Petition Collateral with respect to all parties

in this Case and not be subject to any counterclaims, setoff, recoupment, deduction, or

claim of any kind or any defenses, or any further objection or challenge by any party at

any time, and (ii) the Pre-Petition Secured Parties and each their respective agents, officers,

directors, employees, attorneys, professionals, successors, and assigns shall be deemed

released and discharged from all claims and causes of action arising out of or in any way relating to the Pre-Petition Financing Documents entered into with the Debtor prior to the entry of this Second Interim Order and shall not be subject to any further objection or challenge by any party at any time.  Nothing in this Second Interim Order shall be deemed to confer standing to commence any action or proceeding on either the Committee, or any other party-in-interest.  After expiration of the Challenge Period, the release set forth in Section 5.4, with no Objection having been interposed on behalf of the Debtor's Estates, shall be binding on the Debtor's Estates, including any subsequently appointed trustee, case fiduciary or successors and assigns.  To the extent that the Committee with appropriate standing timely files an Objection on behalf of any of the Estates against any Secured Party the releases set forth in Section 5.4 shall not be binding with respect to specific matters asserted in the Objection.

5.2    **Debtor's Waivers.**  At all times during the Case, and whether or not an Event of Default has occurred, unless otherwise consented to by the DIP Lender in writing in advance (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender), the Debtor irrevocably waives any right that it may have to seek authority: (i) to use Cash Collateral of the Secured Parties under Section 363 of the Bankruptcy Code without the written consent of the Secured Parties; (ii) until all Obligations are indefeasibly paid and satisfied in full, to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, other than from the DIP Lender; (iii) upon entry of the Final Order, to challenge the application of any payments authorized by this Second Interim Order as pursuant to Section 506(b) of the Bankruptcy Code, or to assert that the value of the Pre-Petition Collateral is less than

39

the Pre-Petition Obligations; (iv) to propose or support a plan of reorganization that does not provide for the indefeasible payment in full and satisfaction of all Obligations on the effective date of such plan; or (v) to seek relief under the Bankruptcy Code, including without limitation, under Section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of the DIP Lender as provided in this Second Interim Order or the DIP Financing Documents or the DIP Lender's exercise of such rights or remedies.

5.3    **Section 506(c) Claims.**   Effective only upon the entry of a Final Order approving the Motion, no costs or expenses of administration which have or may be incurred in the Case at any time shall be charged against the DIP Lender, its respective claims or the DIP Collateral pursuant to Section 506(c) of the Bankruptcy Code without the prior written consent of the DIP Lender (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender).   Upon entry of a Final Order, the Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under Section 552(b) of the Bankruptcy Code shall not apply to the Secured Parties with respect to proceeds, product, offspring or profits of any of the Pre-Petition Collateral or DIP Collateral.

5.4    **Release.**

5.4.1    In consideration of and as a condition to the DIP Lender making Revolving Loans and providing other credit and financial accommodations to the Debtor pursuant to the provisions of this Second Interim Order and the DIP Financing Documents, the Debtor, on behalf of itself and its Estate, and other legal representatives

40

(collectively, the "Releasors"), subject to Section 5.1, hereby absolutely releases, forever discharges and acquits each Pre-Petition Secured Party and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (the Pre-Petition Lender and all such other parties being hereinafter referred to collectively as "Releasees") of and from any and all claims, demands, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all other claims, counterclaims, defenses rights of set-off, demands and liabilities whatsoever (individually, a "Pre-Petition Released Claim" and collectively, the "Pre-Petition Released Claims") of every kind, name, nature and description, known or unknown, suspected or unsuspected, both at law and in equity, which, including, without limitation, any so-called "lender liability" claims or defenses, that any Releasor may now or hereafter own, hold, have or claim to have against Releasees, or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the date of this Second Interim Order, in respect to the Debtor, as Borrower (and notwithstanding any action taken  or omitted to be taken by Debtor in such capacity) under the Pre-Petition Financing Documents, the Pre-Petition Obligations, the Pre-Petition Financing Documents and any Revolving Loans or other financial accommodations made by the Pre-Petition Secured Parties to the Debtor pursuant to (and as defined in) the Pre-Petition Financing Documents; provided that such release shall not be effective with respect to the Debtor until entry of the Final Order, and with respect to the Debtor's Estate, until the expiration of the Challenge Period.  In addition, upon the indefeasible payment in full of all Obligations owed to the DIP Lender by the Debtor and termination of

the rights and obligations arising under this Second Interim Order and the DIP Financing Documents (which payment and termination shall be on terms and conditions acceptable to the DIP Lender), the DIP Lender shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to the DIP Financing Documents, the First Interim Order or this Second Interim Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated), on terms and conditions acceptable to the DIP Lender.

5.4.2    Upon the entry of this Second Interim Order, each Releasor hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released and discharged by each Releasor pursuant to <u>Section 5.4.1</u> above.   If any Releasor violates the forgoing covenant, the Debtor agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

5.4.3    In no circumstance will any of the Releasees be liable for lost profits or other special, punitive, or consequential damages.

Section 6.    <u>Other Rights and Obligations</u>.

6.1    <u>No Modification or Stay of this Second Interim Order</u>.   Based upon the record presented to the Court by the Debtor, notwithstanding (i) any stay, modification, amendment, supplement, vacating, revocation or reversal of this Second Interim Order, the DIP Financing Documents or any term hereunder or thereunder, (ii) the failure to obtain a Final Order pursuant

to Bankruptcy Rule 400l(c)(2), or (iii) the dismissal or conversion of the Case, the DIP Lender

shall be entitled to all of the rights, remedies, privileges, and benefits in favor of the DIP Lender

pursuant to Section 364(e) of the Bankruptcy Code and the Second Interim Order and DIP

Financing Documents.

6.2     Power to Waive Rights; Duties to Third Parties.  The Secured Parties shall have

the right to waive any of the terms, rights and remedies provided or acknowledged in this Second

Interim Order in respect of the Secured Parties (the "**Lender Rights**"), and shall have no

obligation or duty to any other party with respect to the exercise or enforcement, or failure to

exercise or enforce, any Lender Right(s).   Any waiver by any Secured Party of any Lender

Rights shall not be or constitute a continuing waiver.   Any delay in or failure to exercise or

enforce any Lender Right shall neither constitute a waiver of such Lender Right, nor cause or

enable any other party to rely upon or in any way seek to assert as a defense to any obligation

owed by the Debtor to any Secured Party.

6.3     Disposition of Collateral.  Other than allowable under the terms of the Budget and

this Second Interim Order, the Debtor shall not sell, transfer, lease, encumber or otherwise

dispose of any portion of the DIP Collateral without an order of this Court and the consent of the

DIP Lender, except for sales of the Debtor's Inventory in the ordinary course of its business or as

otherwise permitted in the DIP Credit Agreement. The proceeds of the sale of any DIP Collateral

shall be remitted to the DIP Lender for application to the Obligations.

6.4     Inventory.  The Debtor shall not, without the prior written consent of the DIP

Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by

the DIP Lender), (a) enter into any agreement to return any inventory to any of their creditors for

application against any pre-petition indebtedness under any applicable provision of Section 546

of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant to Section 553(b)(l) of the Bankruptcy Code or otherwise**.**

6.5    <u>Reservation of Rights</u>.    The terms, conditions and provisions of this Second Interim Order are in addition to and without prejudice to the rights of the Secured Parties to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Financing Documents, the Pre-Petition Financing Documents (other than the setting of reserves which is governed by the DIP Facility and other rights modified by the terms of the DIP Facility) or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the DIP Collateral or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estates.

6.6    <u>Modification of the Automatic Stay</u>.    The automatic stay under Section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Second Interim Order and the DIP Financing Documents, including without limitation the application of collections, authorization to make payments, granting of liens and perfection of liens.

6.7    <u>Binding Effect</u>.

6.7.1    The provisions of this Second Interim Order, the DIP Financing Documents, the Obligations, the DIP Superpriority Claim, First Lien Adequate Protection Liens, First Lien Adequate Protection Claims and any and all rights, remedies, privileges and

44

benefits in favor of the DIP Lender and the Pre-Petition Secured Parties provided or acknowledged in this Second Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Second Interim Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall survive entry of any such other order, including without limitation any order which may be entered confirming any plan of reorganization, converting the Case to any other chapter under the Bankruptcy Code, or dismissing the Case.

6.7.2      Any order dismissing the Case under Section 1112 or otherwise shall be deemed to provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (a) the DIP Lender's and the Pre-Petition Secured Parties' liens on and security interests in the DIP Collateral shall continue in full force and effect notwithstanding such dismissal until the Obligations are indefeasibly paid and satisfied in full, and (b) this Court shall retain jurisdiction, to the extent permissible under applicable law, notwithstanding such dismissal, for the purposes of enforcing the DIP Superpriority Claim and DIP Liens and First Lien Adequate Protection Liens and First Lien Adequate Protection Claims of the DIP Lender in the DIP Collateral.

6.7.3      In the event this Court modifies any of the provisions of this Second Interim Order or the DIP Financing Documents following a Final Hearing; (a) the Final Order shall provide such modifications shall not affect the rights or priorities of any portion of the Obligations which arises or is incurred or is advanced prior to such modifications; and (b) this Second Interim Order shall remain in full force and effect except as specifically amended or modified at such Final Hearing.

6.7.4        This Second Interim Order shall be binding upon the Debtor, its Estate, all parties in interest in the Case and their respective successors and assigns, including any trustee or other fiduciary appointed in the Case or any subsequently converted bankruptcy case(s) of the Debtor and shall inure to the benefit of the Secured Parties, the Debtor and its successors and assigns, subject to the rights of any Chapter 11 or Chapter 7 trustee pursuant to Section 5.1 above (collectively, the "**Successor Case**").

6.8    Marshalling.    In no event shall the Secured Parties be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral.

6.9    Credit Bidding Rights.    The Pre-Petition Lender and the DIP Lender shall have the right to credit bid the Pre-Petition Obligations and the Post-Petition Obligations, respectively, in connection with the sale of the assets.

6.10    Proofs of Claim.    Upon entry of the Final Order, notwithstanding the entry of an order establishing a bar date in the Case, the Pre-Petition Secured Parties shall not be required to file proofs of claim in the Case with respect to any of the Pre-Petition Obligations or any other claims or liens granted hereunder or created hereby.    The Pre-Petition Lender, for the benefit of itself and the other Pre-Petition Secured Parties, is hereby authorized and entitled, in its sole and absolute discretion, but in no event is required, to file (and amend and/or supplement, as it sees fit) aggregate proofs of claim in the Case on behalf of all of the Pre-Petition Secured Parties in respect of the Pre-Petition Obligations.    Any proof of claim so filed shall be deemed to be in addition and not in lieu of any other proof of claim that may be filed by any of the Pre-Petition Secured Parties.    In the discretion of the Court, any order entered by the Bankruptcy Court in relation to the establishment of a bar date in the Case will so provide.

6.11   Waiver of Bankruptcy Rule 4001(a)(3), 6003(b), 6004(a) and 6004(h).   The 21 day provision of Bankruptcy Rule 6003(b), the notice requirements of Bankruptcy Rule 6004(a) and the 14 day stay of 4001(a)(3) and 6004(h) are hereby waived.

6.12   Order Controls.   Unless this Second Interim Order specifically provides otherwise, in the event of a conflict between (a) the terms and provisions of the DIP Financing Documents and/or the Pre-Petition Financing Documents or (b) the terms and provisions of this Second Interim Order, then in each case the terms and provisions of this Second Interim Order shall govern.

6.13   Objections Overruled.   All objections to the entry of this Second Interim Order are, to the extent not withdrawn, hereby overruled.

6.14   No Third Party Rights.   Except as explicitly provided for herein, this Second Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

6.15   Terms of the DIP Financing Documents.   Notwithstanding any provision of this Second Interim Order to the contrary, the term of the financing arrangements among the Debtor and the DIP Lender authorized by this Second Interim Order may be terminated pursuant to the terms of the DIP Financing Documents.

Section 7.   Final Hearing and Response Dates.

The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for October 21, 2015 at 1:30 p.m. (ET) before this Court.  The Debtor shall promptly mail copies of this Second Interim Order to the Noticed Parties, and to any other party that has filed a request for notices with this Court and to any Committee or Committee counsel, if same shall have filed a request for notice.  Any party in interest objecting to the relief sought at the Final Hearing shall

serve and file written objections, which objections shall be served upon (a) counsel for the

Debtor, Bernstein Shur, 100 Middle Street, P.O. Box 9729, Portland, Maine 04101, Attn: Robert

Keach, Esq. and D. Sam Anderson, Esq. (b) counsel for the Pre-Petition Lender and DIP Lender,

Blank Rome LLP, 1201 Market Street, Suite 800, Wilmington, Delaware 19801, Attn: Regina

Stango Kelbon, Esq., Fax: (302) 425-6424; (c) counsel to any Committee; (d) counsel to

Subordinated Creditor; (e) counsel to the Mechanics Lienors; and (f) the U.S. Trustee; and shall

be filed with the Clerk of the United States Bankruptcy Court for the District of Maine, in each

case, to allow actual receipt of the foregoing no later than October 14, 2015 by 4:00 p.m.

prevailing Eastern time.

Dated:  _____
October 9, 2015
Portland, Maine

/s/ Peter G. Cary
_____
**HONORABLE PETER CARY
CHIEF JUDGE FOR THE UNITED STATES
BANKRUPTCY COURT FOR THE
DISTRICT OF MAINE**

140690.01019/101527344v.3

**EXHIBIT 1**

**BUDGET**

**Lincoln Paper and Tissue**
**Post Filing Weekly Cash Analysis**                2
**From Week Starting  9/28/2015 through 11/29/2015**
**REVISED**

| Week========>>>> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 9/28/2015 | 10/5/2015 | 10/12/2015 | 10/19/2015 | 10/26/2015 | 11/2/2015 | 11/9/2015 | 11/16/2015 | 11/23/2015 | Total |
| **Receipts** | | | | | | | | | | |
| Pre Petition Collections | 764,155 | 955,194 | 955,194 | 955,194 | 191,039 | - | - | - | - | 3,820,777 |
| Discounts | (14,328) | (14,328) | (14,328) | (14,328) | - | - | - | - | - | (57,312) |
| Post Petition Collections | - | - | - | 706,188 | 1,157,457 | 1,341,522 | 1,559,703 | 1,175,684 | 917,369 | 6,857,922 |
| Discounts | - | - | - | (7,273) | (14,708) | (13,355) | (13,199) | (8,379) | (3,463) | (60,376) |
| **Net Receipts** | 749,827 | 940,866 | 940,866 | 1,639,781 | 1,333,788 | 1,328,167 | 1,546,504 | 1,167,305 | 913,906 | 10,561,011 |
| **Disbursements** | | | | | | | | | | |
| **Payroll & Related** | | | | | | | | | | |
| ADP w/fees | - | 362,200 | - | 357,200 | - | 338,343 | - | 313,200 | - | 1,370,943 |
| Fidelity | - | 30,200 | - | 29,783 | - | 28,211 | - | 26,114 | - | 114,308 |
| Weekly Medical, etc. | 60,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 45,000 | 420,000 |
| **Total PR and Related** | 60,000 | 437,400 | 45,000 | 431,983 | 45,000 | 411,554 | 45,000 | 384,314 | 45,000 | 1,905,251 |
| **Raw Material, Energy, Freight** | | | | | | | | | | |
| Bleached Hardwood Kraft | 420,420 | 600,600 | 450,450 | 525,525 | 241,355 | 193,994 | 193,994 | 193,994 | 83,140 | 2,903,472 |
| Bleached Softwood Kraft | 68,544 | 97,920 | 73,440 | 85,680 | 53,280 | 47,880 | 47,880 | 47,880 | 20,520 | 543,024 |
| Chemicals & Packaging | 80,319 | 85,297 | 100,399 | 122,344 | 106,489 | 78,244 | 67,271 | 56,299 | 20,862 | 717,524 |
| Electricity - distribution & transmission | 28,812 | 36,015 | 36,015 | 36,015 | 17,115 | 13,965 | 13,965 | 13,965 | 13,965 | 209,832 |
| Electricity - supply | 34,245 | 42,806 | 42,806 | 42,806 | 20,342 | 16,598 | 16,598 | 16,598 | 16,598 | 249,400 |
| Natural Gas (supply & distribution) | 97,155 | - | 32,385 | - | 44,859 | - | 14,953 | - | 14,244 | 203,596 |
| Waste Oil or #6 Oil | 64,228 | 79,835 | 81,635 | 83,435 | 49,130 | 44,913 | 46,713 | 48,513 | 50,313 | 548,713 |
| Mill Paid Freight & Distribution | 31,702 | 39,627 | 39,627 | 39,627 | 16,947 | 13,167 | 13,167 | 13,167 | 13,167 | 220,198 |
| **Total Raw Material, Energy, Freight** | 825,424 | 982,100 | 856,757 | 935,432 | 549,518 | 408,761 | 414,541 | 390,416 | 232,810 | 5,595,759 |
| **Operating Expenditures** | | | | | | | | | | |
| Parts, Supplies, & Contractors | 80,000 | 80,000 | 80,000 | 80,000 | 38,017 | 31,020 | 31,020 | 31,020 | 13,294 | 464,373 |
| Insurance (pay per schedule - assume 10 | 88,079 | - | - | - | 88,079 | - | - | - | - | 176,159 |
| Property Taxes | - | - | 50,355 | - | - | - | - | 50,355 | - | 100,709 |
| Property Taxes - refund/TIF | - | - | - | (28,978) | - | - | - | - | (28,978) | (57,956) |
| Other | 30,000 | 30,000 | 30,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 240,000 |
| **Total Operating Expenditures** | 198,079 | 110,000 | 160,355 | 76,022 | 151,097 | 56,020 | 56,020 | 106,375 | 9,316 | 923,285 |
| **Total Operating Disbursements** | 1,083,504 | 1,529,500 | 1,062,112 | 1,443,437 | 745,615 | 876,335 | 515,562 | 881,105 | 287,126 | 8,424,295 |
| Net Operating CF in Week | (333,676) | (588,634) | (121,245) | 196,344 | 588,173 | 451,833 | 1,030,942 | 286,199 | 626,779 | 2,136,716 |
| **Professional and Related Fees** | | | | | | | | | | |
| BSSN - Counsel | | | | 100,000 | | | 120,000 | | | 220,000 |
| Spinglass | | - | - | 35,000 | | - | 40,000 | - | | 75,000 |
| Sales Agent / Banker | | - | - | 25,000 | | 25,000 | 25,000 | | | 75,000 |
| Mechanic Lien Subordination | 182,798 | 182,798 | | | | | | | | 365,595 |
| Utilities Adequate Assurance Deposit | - | | - | 70,104 | | - | | - | | 70,104 |
| DIP Fees | | | | | | | | | 125,000 | 125,000 |
| DIP Interest Payments | | | | - | 45,248 | | - | | 37,954 | 83,202 |
| PrePetition Fees | | | | | | | | | 302,500 | 302,500 |
| Siena Counsel | | | | 125,000 | | | 125,000 | | | 250,000 |
| US Trustee | | - | | | | 13,000 | | | - | 13,000 |
| Committee Fees & Expenses | | | | | | | 75,000 | | - | 75,000 |
| **Total Professional and BK Related in Week** | 182,798 | 182,798 | - | 355,104 | 45,248 | 38,000 | 385,000 | - | 465,454 | 1,654,401 |
| **Miscellaneous Expenses** | | | | | | | | | | - |
| **Total Disbursements in Week** | 1,266,301 | 1,712,297 | 1,062,112 | 1,798,542 | 790,863 | 914,335 | 900,562 | 881,105 | 752,580 | 10,078,697 |
| **Change In Cash during Week** | **(516,474)** | **(771,431)** | **(121,245)** | **(158,760)** | **542,926** | **413,833** | **645,942** | **286,199** | **161,325** | **482,315** |
| Cummulative Change in Cash | (516,474) | (1,287,905) | (1,409,150) | (1,567,910) | (1,024,985) | (611,152) | 34,790 | 320,989 | 482,315 | |
| Cash Beginning | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Receipts - Total | 749,827 | 940,866 | 940,866 | 1,639,781 | 1,333,788 | 1,328,167 | 1,546,504 | 1,167,305 | 913,906 | 10,561,011 |
| Receipts Applied to PP Loan | (749,827) | (940,866) | (940,866) | (1,602,831) | | | | | | (4,234,391) |
| Receipts Applied to DIP Loan | | | | (36,950) | (1,333,788) | (1,328,167) | (1,546,504) | (1,167,305) | (913,906) | (6,326,620) |
| Advances of DIP Loan | 1,266,301 | 1,712,297 | 1,062,112 | 1,798,542 | 790,863 | 914,335 | 900,562 | 881,105 | 752,580 | 10,078,697 |
| Disbursements | (1,266,301) | (1,712,297) | (1,062,112) | (1,798,542) | (790,863) | (914,335) | (900,562) | (881,105) | (752,580) | (10,078,697) |
| Cash At End | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |

[Date]11:34 AM

**Lincoln Paper and Tissue**
**DIP Loan and Collateral**
**From Week Starting  9/28/2015 through 11/29/2015**

| Week=========>>>> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 9/28/2015 | 10/5/2015 | 10/12/2015 | 10/19/2015 | 10/26/2015 | 11/2/2015 | 11/9/2015 | 11/16/2015 | 11/23/2015 | Total |
| **PRE PETITION SIENA BALANCE** | 4,234,391 | 3,484,564 | 2,543,697 | 1,602,831 | - | - | - | - | - | - |
| Collections applied to balance | (749,827) | (940,866) | (940,866) | (1,602,831) | - | - | - | - | - | - |
| Ending PP Loan Balance | 3,484,564 | 2,543,697 | 1,602,831 | - | - | - | - | - | - | |
| | | | | | | | | | | |
| **ANALYSIS OF DIP LOAN** | | | | | | | | | | |
| Beginning Balance | - | 1,266,301 | 2,978,598 | 4,040,710 | 5,802,301 | 5,259,376 | 4,845,543 | 4,199,601 | 3,913,402 | 3,752,077 |
| Advances/Disbursements | 1,266,301 | 1,712,297 | 1,062,112 | 1,798,542 | 790,863 | 914,335 | 900,562 | 881,105 | 752,580 | 10,078,697 |
| Repayments/Collections | - | - | - | (36,950) | (1,333,788) | (1,328,167) | (1,546,504) | (1,167,305) | (913,906) | (6,326,620) |
| Ending Balance | 1,266,301 | 2,978,598 | 4,040,710 | 5,802,301 | 5,259,376 | 4,845,543 | 4,199,601 | 3,913,402 | 3,752,077 | 3,752,077 |
| | | | | | | | | | | |
| **TOTAL SIENA EXPOSURE** | 4,750,865 | 5,522,296 | 5,643,541 | 5,802,301 | 5,259,376 | 4,845,543 | 4,199,601 | 3,913,402 | 3,752,077 | 3,752,077 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **ANALYSIS OF ACCOUNTS RECEIVABLE** | | | | | | | | | | |
| Beginning Balance | 3,820,777 | 4,065,461 | 4,331,417 | 4,769,333 | 4,739,051 | 4,371,060 | 3,919,848 | 3,240,090 | 2,623,007 | 3,820,777 |
| Invoiced | 1,008,840 | 1,221,150 | 1,393,110 | 1,631,100 | 980,505 | 890,310 | 879,945 | 558,600 | 230,850 | 8,794,410 |
| Discounts | | | | | | | | | | |
| Less Collections w/discount effect | (764,155) | (955,194) | (955,194) | (1,661,382) | (1,348,496) | (1,341,522) | (1,559,703) | (1,175,684) | (917,369) | (10,678,699) |
| Ending AR | 4,065,461 | 4,331,417 | 4,769,333 | 4,739,051 | 4,371,060 | 3,919,848 | 3,240,090 | 2,623,007 | 1,936,488 | 1,936,488 |
| **ANALYSIS OF INVENTORY** | | | | | | | | | | |
| Estimated Ending Inventory | 1,734,835 | 1,734,835 | 1,604,015 | 1,276,965 | 1,037,480 | 748,410 | 449,845 | 449,845 | 449,845 | 449,845 |
| | | | | | - | | | | | |
| **REFUNDABLE DEPOSITS** | - | - | - | 70,104 | 70,104 | 70,104 | 70,104 | 70,104 | 70,104 | 70,104 |
| | | | | | | | | | | |
| **ENDING CASH** | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| | | | | | | | | | | |
| **TOTAL AR, INV, CASH, DEPOSIT COLLATERAL** | 5,805,296 | 6,071,252 | 6,378,348 | 6,091,120 | 5,483,644 | 4,743,362 | 3,765,039 | 3,147,956 | 2,461,437 | 2,461,437 |
| | | | | | | | | | | |
| Borrowing Base (start of period) | | | | | | | | | | |
| AR | 3,820,777 | 4,065,461 | 4,331,417 | 4,769,333 | 4,739,051 | 4,371,060 | 3,919,848 | 3,240,090 | 2,623,007 | |
| Availability (@85%) | 3,247,660 | 3,455,642 | 3,681,705 | 4,053,933 | 4,028,193 | 3,715,401 | 3,331,871 | 2,754,077 | 2,229,556 | |
| Inventory | 1,734,835 | 1,734,835 | 1,604,015 | 1,276,965 | 1,037,480 | 748,410 | 449,845 | 449,845 | 449,845 | |
| Availability (@60%) | 1,040,901 | 1,040,901 | 962,409 | 766,179 | 622,488 | 449,046 | 269,907 | 269,907 | 269,907 | |
| Equipment (Availability) | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | |
| Total Availability | 6,788,561 | 6,996,543 | 7,144,114 | 7,320,112 | 7,150,681 | 6,664,447 | 6,101,778 | 5,523,984 | 4,999,463 | |
| | | | | | | | | | | |
| Excess Availability | 2,037,697 | 1,474,247 | 1,500,573 | 1,517,811 | 1,891,305 | 1,818,904 | 1,902,177 | 1,610,581 | 1,247,386 | |

[Date]11:34 AM

**EXHIBIT 2**

**DIP CREDIT AGREEMENT**

**EXECUTION VERSION**

**DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT**

**Dated as of September 30, 2015**

**between**

**SIENA LENDING GROUP LLC,**

**as Lender,**

**LINCOLN PAPER AND TISSUE, LLC,**

**as Borrower,**

**and**

**LPT HOLDING, LLC,**

**as Guarantor**

## TABLE OF CONTENTS

**Page**

1. LOANS ...............................................................................................................1

    1.1    Revolving Loans ..................................................................................1
    1.2    Reserves re Revolving Loans ...............................................................2
    1.3    Protective Advances ............................................................................2
    1.4    Notice of Borrowing; Manner of Revolving Loan Borrowing ............2
    1.5    [Reserved] ...........................................................................................2
    1.6    Conditions of Making the Loans .........................................................2
    1.7    Repayments..........................................................................................6
    1.8    Voluntary Termination of Loan Facilities ..........................................6
    1.9    Obligations Unconditional ..................................................................7
    1.10   Reversal of Payments..........................................................................7
    1.11   Acknowledgement ...............................................................................8
    1.12   Release .................................................................................................8
    1.13   Adoption and Ratification ...................................................................9

2. INTEREST AND FEES; LOAN ACCOUNT ..................................................9

    2.1    Interest .................................................................................................9
    2.2    Fees .....................................................................................................9
    2.3    Computation of Interest and Fees .......................................................9
    2.4    Loan Account; Monthly Accountings..................................................9
    2.5    Further Obligations; Maximum Lawful Rate .....................................10
    2.6    Treatment of Revolving Loans Made Against Eligible Equipment ....10

3. SECURITY INTEREST GRANT / POSSESSORY COLLATERAL / FURTHER
ASSURANCES.................................................................................................11

    3.1    Grant of Security Interest...................................................................11
    3.2    Possessory Collateral .........................................................................11
    3.3    Further Assurances .............................................................................12
    3.4    UCC Financing Statements.................................................................12
    3.5    Superpriority Claims, Collateral Security, Etc ..................................12

4. CERTAIN PROVISIONS REGARDING ACCOUNTS, INVENTORY,
COLLECTIONS, APPLICATIONS OF PAYMENTS, INSPECTION RIGHTS, AND
APPRAISALS...................................................................................................17

    4.1    Lock Boxes and Blocked Accounts ...................................................17
    4.2    Application of Payments.....................................................................17
    4.3    Notification; Verification....................................................................18
    4.4    Power of Attorney...............................................................................18
    4.5    Disputes .............................................................................................19
    4.6    Invoices ..............................................................................................20
    4.7    Inventory............................................................................................20
    4.8    Access to Collateral, Books and Records ..........................................20

140690.01019/101148069v.1

4.9      Appraisals ...........................................................................................20

5.      REPRESENTATIONS, WARRANTIES AND COVENANTS.............................21

5.1      Existence and Authority.........................................................................21
5.2      Names; Trade Names and Styles ...........................................................21
5.3      Title to Collateral; Third Party Locations; Permitted Liens ..................21
5.4      Accounts and Chattel Paper ..................................................................22
5.5      Electronic Chattel Paper .......................................................................22
5.6      Capitalization; Investment Property .....................................................22
5.7      Commercial Tort Claims........................................................................24
5.8      Jurisdiction of Organization; Location of Collateral ............................24
5.9      Financial Statements and Reports; Budget; Solvency ..........................24
5.10     Tax Returns and Payments; Pension Contributions..............................25
5.11     Compliance with Laws; Intellectual Property; Licenses ......................26
5.12     Litigation ..............................................................................................27
5.13     Use of Proceeds....................................................................................27
5.14     Insurance ..............................................................................................27
5.15     Financial, Collateral and Other Reporting / Notices ...........................28
5.16     Litigation Cooperation .........................................................................31
5.17     Maintenance of Collateral, Etc ............................................................31
5.18     Reserved................................................................................................31
5.19     No Default .............................................................................................31
5.20     [Reserved] .............................................................................................31
5.21     Full Disclosure ......................................................................................31
5.22     Sensitive Payments ...............................................................................31
5.23     Parent ...................................................................................................32
5.24     Financial Advisor..................................................................................32
5.25     Negative Covenants...............................................................................32
5.26     [Reserved].............................................................................................33
5.27     Carve-Out Reserve Account ..................................................................34
5.28     Bankruptcy Matters...............................................................................34

6.      RELEASE, LIMITATION OF LIABILITY AND INDEMNITY ......................34

6.1      Release ..................................................................................................34
6.2      Limitation of Liability ...........................................................................35
6.3      Indemnity/Currency Indemnity..............................................................35

7.      EVENTS OF DEFAULT AND REMEDIES .......................................................36

7.1      Events of Default ..................................................................................36
7.2      Remedies with Respect to Lending Commitments/Acceleration/Etc....41
7.3      Remedies with Respect to Collateral ....................................................42

8.      LOAN GUARANTY ............................................................................................46

8.1      Guaranty................................................................................................46
8.2      Guaranty of Payment ............................................................................47
8.3      No Discharge or Diminishment of Loan Guaranty................................47

140690.01019/101148069v.1

8.4     Defenses Waived ................................................................47
8.5     Rights of Subrogation ..........................................................48
8.6     Reinstatement; Stay of Acceleration ........................................48
8.7     Information ......................................................................48
8.8     Termination ......................................................................48
8.9     Maximum Liability ..............................................................49
8.10    Contribution ....................................................................49
8.11    Liability Cumulative ............................................................49

9.      PAYMENTS FREE OF TAXES; OBLIGATION TO WITHHOLD; PAYMENTS ON
        ACCOUNT OF TAXES ..............................................................50

10.     GENERAL PROVISIONS ........................................................51

        10.1    Notices ..................................................................51
        10.2    Severability ............................................................53
        10.3    Integration ............................................................54
        10.4    Waivers ................................................................54
        10.5    Amendment ............................................................54
        10.6    Time of Essence ......................................................54
        10.7    Expenses, Fee and Costs Reimbursement............................54
        10.8    Benefit of Agreement; Assignability ................................55
        10.9    Recordation of Assignment..........................................56
        10.10   Participations ........................................................56
        10.11   Headings; Construction..............................................57
        10.12   USA PATRIOT Act Notification......................................57
        10.13   Counterparts; Fax/Email Signatures ................................57
        10.14   GOVERNING LAW ....................................................57
        10.15   WAIVER OF JURY TRIAL; CONSENT TO SERVICE OF PROCESS.............58
        10.16   Publication ............................................................58
        10.17   Confidentiality ........................................................58

Disclosure Schedule
Schedule A      Description of Certain Terms
Schedule B      Definitions
Schedule C      Fees
Schedule D      Reporting
Exhibit A       Form of Notice of Borrowing
Exhibit B       Closing Checklist
Exhibit C       Client User Form
Exhibit D       Authorized Accounts Form
Exhibit E       Form of Account Debtor Notification
Exhibit F       Form of Compliance Certificate
Exhibit G       Budget

140690.01019/101148069v.1

**Debtor-in-Possession Loan and Security Agreement**

Pursuant to Section 364(c) and (d) of the Bankruptcy code, this Debtor-in-Possession Loan and Security Agreement (as it may be amended, restated or otherwise modified from time to time, this "***Agreement***") is entered into on September 30, 2015 among (1) SIENA LENDING GROUP LLC ("***Lender***"), (2) LINCOLN PAPER AND TISSUE, LLC, a Delaware limited liability company, as a debtor and debtor-in-possession ("***Borrower***"), and (3) LPT HOLDING, LLC, a Delaware limited liability company ("***Parent***" and together with Borrower, the "***Debtors***" and each a "***Debtor***"), as a Guarantor (as defined herein).  The Schedules and Exhibits to this Agreement are an integral part of this Agreement and are incorporated herein by reference.  Terms used, but not defined elsewhere, in this Agreement are defined in Schedule B.

## RECITALS

A.      Borrower filed a voluntary petition for relief on September 28, 2015 (the "***Petition Date***") under Chapter 11 of the Bankruptcy Code, resulting in Bankruptcy Case No. 15-10715 (the "***Case***") before the United States Bankruptcy Court for the District of Maine (together with any other court having jurisdiction over the Case, the "***Bankruptcy Court***").  Borrower remains in possession of its assets and is operating its business as a debtor-in-possession under Chapter 11 of the Bankruptcy Code.

B.      Lender has provided Debtors with a credit facility pursuant to that certain Loan and Security Agreement dated as of the Pre-Petition Closing Date (as has been amended or modified, the "***Pre-Petition Credit Agreement***") originally entered into by and among Borrower, Parent and Lender.

C.      Debtors have requested that during the Case, Lender continue to make loans, advances and extensions of credit in an aggregate amount up to $6,600,000 on a senior secured, superpriority basis, pursuant to, inter alia, Section 364(c) and (d) of the Bankruptcy Code.

D.      Lenders is willing to provide loans and advances to Borrower and guaranteed by Parent on a senior secured, superpriority basis on the terms and subject to the conditions of this Agreement, so long as such post-petition credit obligations are (i) secured by Liens on all of the assets, property and interests, real and personal, tangible and intangible, of the Debtors, whether now owned or hereafter acquired, which liens are superior to all other liens (other than Permitted Priority Liens and the Carve-Out) pursuant to Sections 364(c) and (d) of the Bankruptcy Code (other than the Carve-Out); and (ii) given priority over any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation, Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(b), 506(c) (upon entry of the Final Order), 507, 546(c), 726 and 1114 of the Bankruptcy Code as provided in the Interim Order.

IN CONSIDERATION of the foregoing Recitals, which are incorporated into the operative provisions of this Agreement by this reference, the mutual covenants and undertakings herein contained, Borrower (acting for itself and as a debtor-in-possession in the Case), Parent and Lender hereby agree as follows:

**1.      LOANS.**

**1.1      Revolving Loans.**  Subject to the terms and conditions contained in this Agreement, including Sections 1.3 and 1.6, Lender will, from time to time prior to the Maturity Date, at Borrower's request, make revolving loans to Borrower ("***Revolving Loans***"); *provided*, that after giving effect to each such Revolving Loan, (A) the outstanding balance of all Revolving Loans will not exceed the lesser of (x) the Maximum Revolving Facility Amount less the amount of then outstanding Pre-Petition Obligations

and (y) the Borrowing Base less the amount of then outstanding Pre-Petition Obligations, and (B) none of the other Loan Limits for Revolving Loans will be exceeded.  All Revolving Loans shall be made in and repayable in Dollars.

      **1.2      Reserves re Revolving Loans.**  Lender may, with or without notice to Borrower, from time to time establish and revise reserves against the Borrowing Base and/or the Maximum Revolving Facility Amount in such amounts and of such types as Lender deems appropriate in its commercially reasonable discretion to address facts and circumstances not known to Lender on September 23, 2015 ("**Reserves**").  Without limiting the foregoing but without duplication, references to Reserves shall include the Dilution Reserve, the Carve Out Reserve Amount and the Trustee Fee Reserve.  In no event shall the establishment of a Reserve in respect of a particular actual or contingent liability obligate Lender to make advances to pay such liability or otherwise obligate Lender with respect thereto.

      **1.3      Protective Advances.**  Any contrary provision of this Agreement or any other Loan Document notwithstanding, at any time (A) after the occurrence and during the continuance of a Default or an Event of Default, or (B) that any of the other applicable conditions precedent set forth in Section 1.6 or otherwise are not satisfied, Lender hereby is authorized by Borrower, from time to time, in Lender's sole discretion, to make Revolving Loans to, or for the benefit of, Borrower, that Lender in its sole discretion deems necessary or desirable (1) to preserve or protect the Collateral, or any portion thereof, or (2) to enhance the likelihood of repayment of the Obligations (the Revolving Loans described in this Section 1.3 shall be referred to as "**Protective Advances**").  Any contrary provision of this Agreement or any other Loan Document notwithstanding, Lender may direct the proceeds of any Protective Advance to Borrower or to such other Person as Lender determines in its sole discretion.  All Protective Advances shall be payable immediately upon demand.

      **1.4      Notice of Borrowing; Manner of Revolving Loan Borrowing.**  Borrower shall request each Revolving Loan by submitting such request via Passport 6.0 (or, if requested by Lender, by delivering, in writing or via an Approved Electronic Communication, a Notice of Borrowing substantially in the form of Exhibit A hereto) (each such request a "**Notice of Borrowing**").  Subject to the terms and conditions of this Agreement, including Sections 1.1 and 1.6, Lender shall, except as provided in Section 1.3, deliver the amount of the Revolving Loan requested in the Notice of Borrowing for credit to any account of Borrower at a bank in the United States of America as Borrower may specify (**provided** that such account must be one identified on Section 3 of the Disclosure Schedule and approved by Lender as an account to be used for funding of loan proceeds) by wire transfer of immediately available funds (i) on the same day if the Notice of Borrowing is received by Lender on or before 11:00 a.m. Eastern Time on a Business Day, or (ii) on the immediately following Business Day if the Notice of Borrowing is received by Lender after 11:00 a.m. Eastern Time on a Business Day, or is received by Lender on any day that is not a Business Day.  Lender shall charge to the Revolving Loan Lender's usual and customary fees for the wire transfer of each Loan.

      **1.5      [Reserved].**

      **1.6      Conditions of Making the Loans.**  Lender's obligation to make any Loan under this Agreement is subject to the following conditions precedent (as well as any other conditions set forth in this Agreement or any other Loan Document), all of which must be satisfied in a manner acceptable to Lender (and as applicable, pursuant to documentation which in each case is in form and substance acceptable to Lender) as of each day that such Loan is made:

            (a)      **Loans Made on the Closing Date:**  With respect to Loans made on the Closing Date,

**Debtor-in-Possession Loan and Security Agreement**

---

(1)      each applicable Loan Party Obligor shall have duly executed and/or delivered, or, as applicable, shall have caused such other applicable Persons to have duly executed and or delivered, to Lender such agreements, instruments, documents, proxies and certificates as Lender may require, and including such other agreements, instruments, documents and/or certificates listed on the closing checklist attached hereto as Exhibit B;

(2)      Borrower shall have paid to Lender all fees due on the date hereof, and shall have paid or reimbursed Lender for all of Lender's costs, charges and expenses incurred through the Closing Date (and in connection herewith, Borrower hereby irrevocably authorizes Lender to charge such fees, costs, charges and expenses as Revolving Loans);

(3)      The Case shall have been commenced in the Bankruptcy Court and all of the first day orders entered at the time of commencement of the Case shall be satisfactory, in form and substance, to Lender in its reasonable discretion and no trustee or examiner shall have been appointed with respect to Borrower, or any property of or any estate of Borrower;

(4)      Lender shall have received satisfactory evidence of the entry of the Interim Order, in form and substance satisfactory to Lender in its reasonable discretion, on the Petition Date, which Interim Order (i) shall have been entered upon an application or motion of Borrower satisfactory, in form and substance, to Lender in its reasonable discretion and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Lender; and (ii) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed; and, if the Interim Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Interim Order, nor the making of the Loans, or the performance by Loan Party Obligors of any of the Obligations shall be the subject of a presently effective stay. Loan Party Obligors and Lender shall be entitled to rely in good faith upon the Interim Order notwithstanding any such objection, appeal or motion for reconsideration.  Lender may, however, in its sole discretion, defer any obligations to make Loans until such time as no such objection, appeal or motion for reconsideration is pending and the period for lodging any such objection, appeal or motion for reconsideration has expired;

(5)      [Reserved];

(6)      Lender shall have received satisfactory evidence of the entry of a cash management order adopting and implementing cash management arrangements in effect pursuant to the Pre-

Petition Financing Documents and otherwise acceptable to Lender in its reasonable discretion (the "***Cash Management Order***");

(7)     Lender shall have received and approved the Budget for the Initial Period, including all updates and supplements thereto, and such Budget shall be in form and substance satisfactory to Lender and shall have no material changes from the budget delivered to Lender prior to the Petition Date;

(8)     Loan Party Obligors shall have obtained, as of the Petition Date, a binding commitment from a "stalking horse" buyer reasonably acceptable to Lender to purchase the assets of Borrower in the Bankruptcy Case for a purchase price reasonably acceptable to Lender (Lender agrees that the purchase price for the equipment specified in the offer received from the Reich Brothers dated September 25, 2015 is reasonably acceptable);

(9)     Each of the Pre-Petition Financing Documents shall be in full force and effect except as expressly modified or limited by the Interim Order;

(10)     Lender shall have confirmed, in a manner satisfactory to Lender, that SSG Capital Advisors is continuing to serve as investment banker to Debtors on terms and conditions satisfactory to Lender;

(11)     Lender shall have received subordination agreements and consents executed by the Mechanics Lien Holders in form and substance satisfactory to Lender, including, without limitation, consent of the existing Mechanics Lien Holders to be primed pursuant to the terms of this Agreement and the Interim Order immediately upon entry of the Interim Order; and

(12)     Lender shall have confirmed, in a manner satisfactory to Lender, that Borrower and Parent have retained Spinglass Management Group as a financial advisor, with the authority to report directly to Lender, on terms and conditions satisfactory to Lender.

(b)     **All Loans:**  With respect to Loans made on the Closing Date and/or at any time thereafter, in addition to the conditions specified in clause (a) above as applicable:

(1)     Borrower shall have provided to Lender such information as Lender may require in order to determine the Borrowing Base (including the items set forth in Section 5.15(a)) and in clause (a) of Schedule D, as of such borrowing or issue date, after giving effect to such Loans;

(2)      Borrower shall deliver a certification to Lender that all the conditions set forth in this Section 1.6(b) are true and correct with respect to such loans;

(3)      each applicable Loan Party Obligor shall have duly executed and/or delivered, or, as applicable, shall have caused such other applicable Person to have duly executed and/or delivered, each of the reports required to be delivered pursuant to clause (m) of Schedule D to this Agreement;

(4)      each of the representations and warranties set forth in this Agreement and in the other Loan Documents shall be true and correct in all respects as of the date such Loan is made (or to the extent any representations or warranties are expressly made solely as of an earlier date, such representations and warranties shall be true and correct as of such earlier date), both before and after giving effect thereto;

(5)      in connection with each request of a Loan pursuant to Section 1.1 hereof, Borrower shall deliver to Lender a written notice identifying the line-items on the applicable Budget that Borrower intends to pay with the proceeds of such Loan and such proceeds shall be used to pay such line-item within five (5) Business Days of such request;

(6)      the Interim Order or the Final Order, as applicable, shall be in full force and effect and shall not be the subject of any appeal, stay, order or reversal or modification;

(7)      Within twenty-one (21) days of the Petition Date, the Bankruptcy Court shall have entered the Final Order which Final Order (i) shall have been entered upon an application or motion of Borrower reasonably satisfactory in form and substance to Lender and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by Lender; and (ii) shall be in full force and effect and shall not have been amended, modified or stayed, or reversed; and, if the Final Order is the subject of a pending objection, appeal or motion for reconsideration in any respect, neither the Final Order, nor the making of the Loans, or the performance by Loan Party Obligors of any of the Obligations shall be the subject of a presently effective stay.  Loan Party Obligors and Lender shall be entitled to rely in good faith upon the Final Order notwithstanding any such objection, appeal or motion for reconsideration.  Lender may, however, in its sole discretion, defer any obligations of Lender to make Loans or to issue until such time as no such objection, appeal or motion for reconsideration is pending and the period for lodging any such objection, appeal or motion for reconsideration has expired; and

(8)      no Default or Event of Default shall be in existence, both before and after giving effect thereto.

**1.7     Repayments.**

(a)      **Revolving Loans.**  If at any time for any reason whatsoever (including without limitation as a result of currency fluctuations)  (i) the sum of the outstanding balance of all Revolving Loans exceeds the lesser of (x) the Maximum Revolving Facility Amount less the amount of the then outstanding Pre-Petition Obligations and (y) the Borrowing Base less the amount of the then outstanding Pre-Petition Obligations, or (ii) any of the Loan Limits for Revolving Loans are exceeded, then in each case, Borrower will immediately pay to Lender such amounts as shall cause Borrower to eliminate such excess.

(b)      **Maturity Date Payments / Cash Collateral.**  All remaining outstanding monetary Obligations (including without limitation, (i) all accrued and unpaid fees described on Schedule C and (ii) all Pre-Petition Obligations (including, without limitation, the Annual Fee, the Collateral Monitoring Fee, and the Early Termination Fee (in the amount of 3% of the Maximum Facility Amount) each as defined in and existing under the Pre-Petition Credit Agreement)) shall be payable in full on the Maturity Date or, if earlier, the earlier of the date of any acceleration pursuant to Section 7.2, and the Termination Date.

(c)      **Currency Due.** If, notwithstanding the terms of this Agreement or any other Loan Document, Lender receives any payment from or on behalf of Borrower or any other Person in a currency other than the Currency Due, Lender may convert the payment (including the monetary proceeds of realization upon any Collateral and any funds then held in a cash collateral account) into the Currency Due at the exchange rate selected by Lender in the manner contemplated by Section 6.3(b) and Borrower shall reimburse Lender on demand for all reasonable costs they incur with respect thereto.  To the extent permitted by law, the obligation shall be satisfied only to the extent of the amount actually received by Lender upon such conversion.

(d)      **Termination of Loan Facilities.**  The security interests, Liens and rights granted to Lender hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that no Obligations may be outstanding, until all Obligations (including, without limitation, the Annual Fee, the Collateral Monitoring Fee, and the Early Termination Fee (in the amount of 3% of the Maximum Facility Amount) each as defined in and existing under the Pre-Petition Credit Agreement) have been indefeasibly paid in full in cash and Loan Party Obligors have provided to Lender a full release from all claims of Loan Party Obligors and their estates for any matters arising out of, relating to or in connection, with this Agreement, the Pre-Petition Financing Documents and the Loan Documents as required pursuant to Section 1.12(a), or providing Lender with an indemnification satisfactory to Lender with respect thereto.

**1.8    Voluntary Termination of Loan Facilities.**  Borrower may, on at least thirty days prior written notice received by Lender, permanently terminate the Loan facilities by repaying all of the outstanding Obligations, including all principal, interest and fees with respect to the Revolving Loans (including, without limitation, the Annual Fee, the Collateral Monitoring Fee, and the Early Termination Fee (in the amount of 3% of the Maximum Facility Amount) each as defined in and existing under the Pre-Petition Credit Agreement).  From and after such date of termination, Lender shall have no obligation whatsoever to extend any additional Loans.

-6-

Debtor-in-Possession Loan and Security Agreement

**1.9    Obligations Unconditional.**

(a)    The payment and performance of all Obligations shall constitute the absolute and unconditional obligations of each Loan Party Obligor, and shall be independent of any defense or rights of set-off, recoupment or counterclaim which any Loan Party Obligor or any other Person might otherwise have against Lender or any other Person. All payments required (other than by Lender) by this Agreement and/or the other Loan Documents shall be made in Dollars (unless payment in a different currency is expressly provided otherwise in the applicable Loan Document) and paid free of any deductions or withholdings for any taxes or other amounts and without abatement, diminution or set-off. If any Loan Party Obligor is required by applicable law to make such a deduction or withholding from a payment under this Agreement or under any other Loan Document, such Loan Party Obligor shall pay to Lender such additional amount as is necessary to ensure that, after the making of such deduction or withholding, Lender receives (free from any liability in respect of any such deduction or withholding) a net sum equal to the sum which it would have received and so retained had no such deduction or withholding been made or required to be made. Each Loan Party Obligor shall (i) pay the full amount of any deduction or withholding, which it is required to make by law, to the relevant authority within the payment period set by applicable law, and (ii) promptly after any such payment, deliver to Lender an original (or certified copy) official receipt issued by the relevant authority in respect of the amount withheld or deducted or, if the relevant authority does not issue such official receipts, such other evidence of payment of the amount withheld or deducted as is reasonably acceptable to Lender.

(b)    If, at any time and from time to time after the Closing Date (or at any time before or after the Closing Date with respect to (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, regulations, guidelines or directives thereunder or issued in connection therewith, or (y) all requests, rules, regulations, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case for purposes of this clause (y) pursuant to Basel III, regardless of the date enacted, adopted or issued), (i) any change in any existing law, regulation, treaty or directive or in the interpretation or application thereof, (ii) any new law, regulation, treaty or directive enacted or application thereof, or (iii) compliance by Lender with any request or directive (whether or not having the force of law) from any Governmental Authority, central bank or comparable agency (A) subjects Lender to any tax, levy, impost, deduction, assessment, charge or withholding of any kind whatsoever with respect to any Loan Document, or changes the basis of taxation of payments to Lender of any amount payable thereunder (except for net income taxes, or franchise taxes imposed in lieu of net income taxes, imposed generally by federal, state, local or other taxing authorities with respect to interest or fees payable hereunder or under any other Loan Document or changes in the rate of tax on the overall net income of Lender or its members), or (B) imposes on Lender any other condition or increased cost in connection with the transactions contemplated thereby or participations therein, and the result of any of the foregoing is to increase the cost to Lender of making or continuing any Loan or to reduce any amount receivable hereunder or under any other Loan Documents, then, in any such case, Borrower shall promptly pay to Lender, when notified to do so by Lender, any additional amounts necessary to compensate Lender, on an after-tax basis, for such additional cost or reduced amount as determined by Lender. Each such notice of additional amounts payable pursuant to this Section 1.9(b) submitted by Lender to Borrower shall, absent manifest error, be final, conclusive and binding for all purposes.

(c)    This Section 1.9 shall remain operative even after the Termination Date and shall survive the payment in full of all of the Loans.

**1.10    Reversal of Payments.** To the extent that any payment or payments made to or received by Lender pursuant to this Agreement, the Pre-Petition Financing Documents or any other Loan

-7-

Document are subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid to any trustee, receiver or other Person under any state, federal or other bankruptcy or other such applicable law, then, to the extent thereof, such amounts (and all Liens, rights and remedies therefore) shall be revived as Obligations (secured by all such Liens) and continue in full force and effect under this Agreement and under the other Loan Documents as if such payment or payments had not been received by Lender.  This Section 1.10 shall remain operative even after the Termination Date and shall survive the payment in full of all of the Loans.

### 1.11   Acknowledgement.

(a)    Borrower and Parent each hereby acknowledge, confirm and agree, that as of September 28, 2015, Borrower and Parent are indebted to Lender, without defense, setoff, claim or counterclaim, in the aggregate principal amount of $4,234,391.16 outstanding under the Pre-Petition Credit Agreement, plus all expenses set forth in Section 10.7 of the Pre-Petition Credit Agreement incurred to date in connection with the Pre-Petition Credit Agreement and the Pre-Petition Financing Documents and the Annual Fee, the Collateral Monitoring Fee, and the Early Termination Fee (in the amount of 3% of the Maximum Facility Amount) each as defined in and existing under the Pre-Petition Credit Agreement.

(b)    Borrower and Parent each hereby acknowledge, confirm and agree that Lender has and shall continue to have valid, enforceable and perfected first priority and senior security interest and Liens upon all Pre-Petition Collateral heretofore granted to Lender pursuant to the Pre-Petition Financing Documents as in effect immediately prior to the Petition Date to secure all of the Pre-Petition Obligations arising under the Pre-Petition Credit Agreement, as well as valid and enforceable first priority and senior security interests in and Liens upon all Collateral granted to Lender, in accordance with the Interim Order and the Final Order, upon the entry of, and under, the Interim Order or the Final Order, and under this Agreement.

### 1.12   Release.

(a)    In consideration of and as a condition to Lender making Loans and providing other credit and financial accommodations to Loan Party Obligors pursuant to the provisions of this Agreement, the Interim Order and the Final Order, each of Borrower and Parent, on behalf of itself, its estate, its successors and assigns, and other legal representatives  (collectively, the "***Releasors***"), hereby absolutely releases, forever discharges and acquits Pre-Petition Lender and any and all Participants and their respective successors and assigns, and their present and former shareholders, Affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Pre-Petition Lender and all such other parties being hereinafter referred to collectively as "***Releasees***") of and from any and all claims, demands, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages,  and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "***Pre-Petition Released Claim***" and collectively, the "***Pre-Petition Released Claims***") of every kind, name, nature and description, known or unknown, suspected or unsuspected, both at law and in equity, including, without limitation, any so-called "lender liability" claims or defenses, that any Releasor may now or hereafter own, hold, have or claim to have against Releasees, or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the date of this Agreement, pertaining to, arising out of, relating to, or in connection with the Pre-Petition Obligations, the Pre-Petition Financing Documents and any Loans or other financial accommodations made by Lender to Borrower and/or Parent pursuant to the Pre-Petition Financing Documents and the actions or inactions of the Releasees in connection therewith.  In addition, upon the indefeasible payment in full of all

-8-

Obligations owed to Lender by Loan Party Obligors and termination of the rights and obligations arising under this Agreement, the Loan Documents and the Interim Order or Final Order, as the case may be (which payment and termination shall be on terms and conditions acceptable to Lender), Lender shall be released from any and all obligations, liabilities, actions, duties, responsibilities and causes of action arising or occurring in connection with or related to this Agreement, the Loan Documents and Interim Order or the Final Order, as applicable (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated), on terms and conditions acceptable to Lender.

(b)      Upon the entry of the Interim Order, each Loan Party Obligor, on behalf of itself and the Releasors, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Releasor pursuant to this Section 1.12. If any Releasor violates the foregoing covenant, Borrower agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

**1.13    Adoption and Ratification.**    Except as expressly modified pursuant to the terms hereof, each Loan Party Obligor hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Pre-Petition Financing Documents to which it is a party and (b) agrees to pay all Pre-Petition Obligations in accordance with the terms of the Pre-Petition Financing Documents and in accordance with the Interim Order and Final Order. All of the Pre-Petition Financing Documents are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Loan Party Obligors, in the case of Borrower in its capacity as a debtor and debtor-in-possession, and considered as agreements among Loan Party Obligors, on the one hand, and Lender, on the other hand.

## 2.      INTEREST AND FEES; LOAN ACCOUNT.

**2.1    Interest.**    All Loans and other monetary Obligations shall bear interest at the interest rate(s) set forth in Section 3 of Schedule A, and accrued interest shall be payable (i) on the first day of each month in arrears, (ii) upon a prepayment of such Loan in accordance with Section 1.8, and (iii) on the Maturity Date; *provided*, that after the occurrence and during the continuation of an Event of Default, all Loans and other monetary Obligations shall bear interest at a rate per annum equal to three percentage points (3.00%) in excess of the rate otherwise applicable thereto (the "***Default Rate***"), and all such interest shall be payable on demand. Changes in the interest rate shall be effective as of the date of any change in the Base Rate**.**

**2.2    Fees.**    Borrower shall pay Lender the fees set forth on Schedule C hereto on the dates set forth therein, which fees are in addition to all fees and other sums payable by Borrower or any other Person to Lender under this Agreement or under any other Loan Document, and, in each case are not refundable once paid.

**2.3    Computation of Interest and Fees.**    All interest and fees shall be calculated daily on the outstanding monetary Obligations based on the actual number of days elapsed in a year of 360 days.

**2.4    Loan Account; Monthly Accountings.**    Lender shall maintain a loan account for Borrower reflecting all outstanding Loans, along with interest accrued thereon and such other items reflected therein (the "***Loan Account***"), and shall provide Borrower with a monthly accounting reflecting the activity in the Loan Account, viewable by Borrower on Passport 6.0. Each accounting shall be deemed correct, accurate and binding on Borrower and an account stated (except for reverses and

reapplications of payments made and corrections of errors discovered by Lender), unless Borrower notifies Lender in writing to the contrary within thirty days after such account is rendered, describing the nature of any alleged errors or omissions. However, Lender's failure to maintain the Loan Account or to provide any such accounting shall not affect the legality or binding nature of any of the Obligations. Interest, fees and other monetary Obligations due and owing under this Agreement may, in Lender's discretion, be charged to the Loan Account, and will thereafter be deemed to be Revolving Loans and will bear interest at the same rate as other Revolving Loans.

2.5   **Further Obligations; Maximum Lawful Rate**.   With respect to all monetary Obligations for which the interest rate is not otherwise specified herein (whether such Obligations arise hereunder or under any other Loan Document, or otherwise), such Obligations shall bear interest at the rate(s) in effect from time to time with respect to the Revolving Loans and shall be payable upon demand by Lender. In no event shall the interest charged with respect to any Loan or any other Obligation exceed the maximum amount permitted under applicable law. Notwithstanding anything to the contrary herein or elsewhere, if at any time the rate of interest payable or other amounts hereunder or under any other Loan Document (the "***Stated Rate***") would exceed the highest rate of interest or other amount permitted under any applicable law to be charged (the "***Maximum Lawful Rate***"), then for so long as the Maximum Lawful Rate would be so exceeded, the rate of interest and other amounts payable shall be equal to the Maximum Lawful Rate; ***provided***, that if at any time thereafter the Stated Rate is less than the Maximum Lawful Rate, Borrower shall, to the extent permitted by applicable law, continue to pay interest and such other amounts at the Maximum Lawful Rate until such time as the total interest and other such amounts received is equal to the total interest and other such amounts which would have been received had the Stated Rate been (but for the operation of this provision) the interest rate payable or such other amounts payable. Thereafter, the interest rate and such other amounts payable shall be the Stated Rate unless and until the Stated Rate again would exceed the Maximum Lawful Rate, in which event this provision shall again apply. In no event shall the total interest or other such amounts received by Lender exceed the amount which it could lawfully have received had the interest and other such amounts been calculated for the full term hereof at the Maximum Lawful Rate. If, notwithstanding the prior sentence, Lender has received interest or other such amounts hereunder in excess of the Maximum Lawful Rate, such excess amount shall be applied to the reduction of the principal balance of the Loans or to other Obligations (other than interest) payable hereunder, and if no such principal or other Obligations are then outstanding, such excess or part thereof remaining shall be paid to Borrower. In computing interest payable with reference to the Maximum Lawful Rate applicable to any Lender, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made.

2.6   **Treatment of Revolving Loans Made Against Eligible Equipment.**   Notwithstanding anything in this Agreement to the contrary and for avoidance of doubt, the first Revolving Loans made hereunder shall be considered made against the availability generated pursuant to clause (iii) of the Borrowing Base, and such Revolving Loans shall be considered the last Revolving Loans repaid from any proceeds received from Borrower by Lender as repayment of the Revolving Loans. Revolving Loans made in excess of the availability generated pursuant to clause (iii) of the Borrowing Base shall be considered made against clauses (i) and (ii) of the Borrowing Base and shall be considered the first Revolving Loans repaid from any proceeds received from Borrower by Lender as repayment of the Revolving Loans.

140690.01019/101148069v.1

Debtor-in-Possession Loan and Security Agreement

3.    **SECURITY INTEREST GRANT / POSSESSORY COLLATERAL / FURTHER ASSURANCES.**

      **3.1    Grant of Security Interest.**  To secure the full payment and performance of any and all Post-Petition Obligations (and, upon entry of the Final Order, any and all of the Obligations, including, without limitation, all Pre-Petition Obligations and Post-Petition Obligations), each Loan Party Obligor hereby assigns to Lender and grants to Lender, effective as of the Petition Date, a valid and perfected first priority (subject only to Permitted Priority Liens and the Carve-Out) continuing security interest in all pre-petition and post-petition property of each Loan Party Obligor, whether existing on the Petition Date or thereafter acquired, whether tangible or intangible, real or personal, now or hereafter owned, existing, acquired or arising and wherever now or hereafter located, and whether or not eligible for lending purposes, including:  (i) all Accounts (whether or not Eligible Accounts) and all Goods whose sale, lease or other disposition by any Loan Party Obligor has given rise to Accounts and have been returned to, or repossessed or stopped in transit by, any Loan Party Obligor; (ii) all Chattel Paper (including Electronic Chattel Paper), Instruments, Documents, and General Intangibles (including all patents, patent applications, trademarks, trademark applications, trade names, trade secrets, goodwill, copyrights, copyright applications, registrations, licenses, software, franchises, customer lists, tax refund claims, claims against carriers and shippers, guarantee claims, contracts rights, payment intangibles, security interests, security deposits and rights to indemnification); (iii) all Inventory (whether or not Eligible Inventory); (iv) all Goods (other than Inventory), including Equipment, Farm Products, Health-Care-Insurance Receivables, vehicles, and Fixtures; (v) all Investment Property, including, without limitation, all rights, privileges, authority, and powers of each Loan Party Obligor as an owner or as a holder of Pledged Equity, including, without limitation, all economic rights, all control rights, authority and powers, and all status rights of each Loan Party Obligor as a member, equity holder or shareholder, as applicable, of each Issuer; (vi) all Deposit Accounts, bank accounts (including, without limitation, the Carve-Out Reserve Accounts and all funds on deposit therein), deposits and cash; (vii) all Letter-of-Credit Rights; (viii) all Commercial Tort Claims listed in Section 2 of the Disclosure Schedule and all other Commercial Tort Claims of Loan Party Obligors now existing or hereafter arising; (ix) all real property and all rents, issues, products and proceeds thereof; (x) all Supporting Obligations; (xi) any other property of any Loan Party Obligors now or hereafter in the possession, custody or control of Lender or any agent or any parent, Affiliate or Subsidiary of Lender or any Participant with Lender in the Loans, for any purpose (whether for safekeeping, deposit, collection, custody, pledge, transmission or otherwise), (xii) any and all property and assets described in the Interim Order and the Final Order and (xiii) all additions and accessions to, substitutions for, and replacements, products and Proceeds of the foregoing property, including proceeds of all insurance policies insuring the foregoing property, and all of each Loan Party Obligor's books and records relating to any of the foregoing and to any Loan Party Obligor's business.  As consideration to Pre-Petition Lender for its agreement to the terms hereof and as replacement collateral for the Pre-Petition Collateral used, consumed or sold by the Loan Party Obligors in the Case, the Collateral shall secure the Pre-Petition Obligations.  Notwithstanding anything to the contrary contained in this Agreement, the parties agree and acknowledge that the Collateral shall not include the proceeds of any Avoidance Actions.

      **3.2    Possessory Collateral.**  Promptly, but in any event no later than five Business Days after any Loan Party Obligor's receipt of any portion of the Collateral evidenced by an agreement, Instrument or Document, including any Tangible Chattel Paper and any Investment Property consisting of certificated securities, such Loan Party Obligor shall deliver the original thereof to Lender together with an appropriate endorsement or other specific evidence of assignment thereof to Lender (in form and substance acceptable to Lender).  If an endorsement or assignment of any such items shall not be made for any reason, Lender is hereby irrevocably authorized, as attorney and agent-in-fact (coupled with an interest) for each Loan Party Obligor, to endorse or assign the same on such Loan Party Obligor's behalf.

-11-

**3.3    Further Assurances**.  Each Loan Party Obligor shall, without any further order of the Bankruptcy Court, at its own cost and expense, promptly and duly take, execute, acknowledge and deliver (and/or cause such other applicable Person to take, execute, acknowledge and deliver) all such further acts, documents, agreements and instruments as may from time to time be necessary or desirable or as Lender may from time to time require in order to (a) carry out the intent and purposes of the Loan Documents and the transactions contemplated thereby, (b) establish, create, preserve, protect and perfect a first priority lien (subject only to Permitted Liens) in favor of Lender in all real and personal property (wherever located) from time to time owned by the Loan Party Obligors and in all capital stock and other equity from time to time issued by the Loan Party Obligors (other than Parent), (c) cause Parent and each Subsidiary of Borrower to guarantee all of the Obligations, all pursuant to documentation that is in form and substance reasonably satisfactory to Lender, and (d) facilitate the collection of the Collateral. Without limiting the foregoing, each Loan Party Obligor shall, at its own cost and expense, promptly and duly take, execute, acknowledge and deliver (and/or cause such other applicable Person to take, execute, acknowledge and deliver) to Lender all promissory notes, security agreements, agreements with landlords, mortgagees and processors and other bailees, subordination and intercreditor agreements and other agreements, instruments and documents, in each case in form and substance acceptable to Lender, as Lender may request from time to time to perfect, protect, and maintain Lender's security interests in the Collateral, including the required priority thereof, and to fully carry out the transactions contemplated by the Loan Documents.

**3.4    UCC Financing Statements.**  Each Loan Party Obligor authorizes Lender to file, transmit, or communicate, as applicable, from time to time, without any further order of the Bankruptcy Court, Uniform Commercial Code financing statements, along with amendments and modifications thereto, in all filing offices selected by Lender, listing such Loan Party Obligor as the debtor and Lender as the secured party, and describing the collateral covered thereby in such manner as Lender may elect, including using descriptions such as "all personal property of debtor" or "all assets of debtor" or words of similar effect, in each case without such Loan Party Obligor's signature.  Each Loan Party Obligor also hereby ratifies its authorization for Lender to have filed in any filing office any financing statements filed prior to the date hereof.

**3.5    Superpriority Claims, Collateral Security, Etc.**

(a)      Loan Party Obligors hereby represent, warrant and covenant that, upon the entry by the Bankruptcy Court of the Interim Order and/or the Final Order, as applicable:

(1)      for all Post-Petition Obligations (and upon entry of the Final Order, for all Obligations, including without limitation, all Pre-Petition Obligations and the Post-Petition Obligations) now existing or hereafter arising and for diminution in value of any Pre-Petition Collateral used by Debtors pursuant to the Interim Order, this Agreement or otherwise, Lender is granted an allowed Superpriority Claim, subject as to priority only to the Carve-Out;

(2)      As consideration to Pre-Petition Lender for its agreement to the terms hereof and as adequate protection for the Pre-Petition Collateral used, consumed or sold by the Loan Party Obligors in the Case, for all Pre-Petition Obligations, Pre-Petition Lender is granted an allowed Superpriority Claim,

subject as to priority only to the Carve-Out and the Post-Petition Obligations;

(3)     to secure the prompt payment and performance of any and all Post-Petition Obligations (and upon entry of the Final Order, any and all Obligations, including without limitation, all Pre-Petition Obligations and the Post-Petition Obligations) of Debtors to Lender of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, Lender shall have and is hereby granted, effective as of the Petition Date, valid and perfected first priority (subject only to Permitted Priority Liens and the Carve-Out), security interests and liens in and upon all pre- and post- petition property of Debtors and in the case of Borrower, its estates, whether existing on the Petition Date or thereafter acquired, including without limitation, (i) pursuant to Section 364(c)(2), property that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (collectively, the "*Unencumbered Property*"), (ii) pursuant to Section 364(c) and (d) of the Bankruptcy Code, all of the Pre-Petition Collateral, and (iii) pursuant to Section 364(c) and (d) of the Bankruptcy Code, all of the Collateral (as defined in this Agreement) other than any Avoidance Actions. Such security interests and liens shall be senior in all respects to interests of other parties arising out of security interests or liens, if any, in such assets and property existing immediately prior to the Petition Date.  The Liens securing the Obligations shall not be subject to Section 551 of the Bankruptcy Code;

(4)     Neither the incurrence of the Obligations, the granting of Liens on the Collateral under this Agreement or the transfer of any interest in property was incurred, granted or transferred, as applicable, with any intent to hinder, delay or defraud any of its respective creditors; and

(5)     The Interim Order and/or the Final Order, as applicable, has been entered by the Bankruptcy Court and is in full force and effect, and has not been amended or modified except to the extent consented to by Lender, or stayed, or reversed.

(b)     Loan Party Obligors hereby represent, warrant and covenant that, upon the entry by the Bankruptcy Court of the Interim Order and/or the Final Order, as applicable, all of the Obligations:

(1)     shall at all times constitute a Superpriority Claim, subject, as to priority, only to the Carve Out; and

(2)     pursuant to Section 364(c) and Section 364(d) of the Bankruptcy Code, this Agreement and the Loan Documents, shall at all times be secured by a first priority perfected Lien, subject as to priority, only to Permitted Priority Liens and the Carve Out, in all assets and property, whether now owned or hereafter acquired, of Debtors and in the case of Borrower, its

-13-

estates (other than any Avoidance Actions), such Liens shall be senior to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Bankruptcy Court or otherwise, including without limitation, liens or interests granted in favor of third parties in conjunction with Section 363, 364 or any other Section of the Bankruptcy Code or other applicable law. Such security interests and liens shall be senior in all respects to interests of other parties arising out of security interests or liens, if any, in such assets and property existing immediately prior to the Petition Date. The Liens securing the Obligations shall not be subject to Section 551 of the Bankruptcy Code.

(c)     The agreement of Lender to provide post-petition financing to Loan Party Obligors will not prohibit Lender from moving in the Bankruptcy Court for other and further relief which Lender believes in good faith to be reasonably and immediately necessary to protect its rights with respect to the Collateral (including a request for Loan Party Obligors to abandon any part of the Collateral) or otherwise.

(d)     The Liens securing the Obligations shall be deemed valid and perfected and duly recorded by entry of the Interim Order. Lender shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien granted by or pursuant to the Interim Order, the Final Order, this Agreement or any Loan Document.

(e)     The Lien granted by or pursuant to the Interim Order, the Final Order, this Agreement and any Loan Document are independently granted and the administrative priority granted by the Interim Order and the Final Order shall control. The Interim Order, the Final Order, this Agreement and the Loan Documents supplement each other and the grants, priorities, rights and remedies hereunder and thereunder are cumulative.

(f)     Each Loan Party Obligor agrees that (i) the Obligations shall not be discharged by the entry of an order confirming a Reorganization Plan (and Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge), (ii) the Superpriority Claim granted to Lender pursuant to the Interim Order and the Final Order and the Liens granted to Lender pursuant to the Interim Order, the Final Order, this Agreement and the Loan Documents, shall not be affected in any manner by the entry of an order confirming a Reorganization Plan, (iii) no Loan Party Obligor shall propose or support any Reorganization Plan that is not conditioned upon termination of Lender's commitment to make Loans hereunder and indefeasible payment in full in cash of all Obligations and the release of Lender in full from all claims of Loan Party Obligors and their estates, in each case, on or before the effective date of such Reorganization Plan, and (iv) no Reorganization Plan shall be confirmed if it does not satisfy the foregoing requirements.

(g)     The Liens, priority, administrative priorities and other rights and remedies granted to the Lender pursuant to the Interim Order, the Final Order, this Agreement and the Loan Documents (specifically including the existence, perfection and priority of the Liens provided herein and therein, and the superpriority administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by Loan Party Obligors (pursuant to Section 364 of the Bankruptcy Code or otherwise), or

-14-

by any dismissal or conversion of the Case, or by any other act or omission whatever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(1)      except for the Carve-Out, no costs or expenses of administration which have been or may be incurred in the Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, including claims and charges under Section 506(c) of the Bankruptcy Code, are or will be prior to or on a parity with any claim of the Lender against Loan Party Obligors in respect of any Obligation;

(2)      the Liens securing the Obligations shall constitute valid and perfected Liens and, subject only to Permitted Priority Liens and the Carve-Out, shall be prior to all other Liens, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever;

(3)      the Liens securing the Obligations shall continue to be valid and perfected without the necessity that Lender file financing statements, mortgages or otherwise perfecting its Lien under applicable non-bankruptcy law; and

(4)      the Liens securing the Obligations shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that the Obligations  may from time to time be temporarily in a zero or credit position, until all of the Obligations have been paid in full in cash, Lender's commitment to make Loans has been terminated and Lender has received a full release from Loan Party Obligors from all claims of Loan Party Obligors and their estates for any matters arising out of, relating to or in connection, with the this Agreement, the Loan Documents and the Pre-Petition Financing Documents or Loan Party Obligors have furnished Lender with an indemnification satisfactory to Lender with respect thereto.

(h)      Loan Party Obligors and the Lender know and understand that there are rights and remedies provided under the Bankruptcy Code, the Federal Rules of Civil Procedure, and the Bankruptcy Rules, pursuant to which parties otherwise bound by a previously entered order can attempt to obtain relief from such an order by alleging circumstances that may warrant a change or modification in the order, or circumstances such as fraud, mistake, inadvertence, excusable neglect, newly discovered evidence, or similar matters that may justify vacating the order entirely, or otherwise changing or modifying it (collectively, "***Changed Circumstances***").   Rights and remedies based on Changed Circumstances include, but are not limited to, modification of a plan of reorganization after confirmation of the plan and before its substantial consummation, pursuant to Section 1127(b) of the Bankruptcy Code, relief from a final order or judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and Bankruptcy Rule 9024, and the commencement and prosecution of a serial Chapter 11 case by a debtor which is in default of obligations under a stipulation or plan of reorganization confirmed in an earlier case.  With full knowledge and understanding of what are, or may be, its present or future rights and remedies based on allegations of Changed Circumstances, each Loan Party Obligor (i) expressly disavows that there are any matters which constitute any kind of Changed Circumstances as of the date of entry of the Interim Order and (ii) expressly disavows that it is aware of any matters whatsoever that it is assuming, contemplating, or expecting in proceeding with the Final Order and the transactions contemplated by this Agreement and having the Final Order entered that would serve as a basis to allege

such Changed Circumstances.  Each Loan Party Obligor understands and agrees that the Lender is not willing to bear any of the risks involved in Loan Party Obligors' business enterprises and Lender is not willing to modify any of the rights if such risks cause actual or alleged Changed Circumstances; and each Loan Party Obligor expressly assumes all risks of any and all such matters, and the consequences that Lender will enforce its legal, equitable, and contractual rights if Lender is not paid and dealt with strictly in accordance with the terms and conditions of the Interim Order, the Final Order, this Agreement and the Loan Documents.  Without limiting the foregoing in any way, Loan Party Obligors' use of any cash collateral that is included in the Collateral will be governed exclusively by the terms and conditions of this Agreement, the Interim Order and the Final Order, and, until the Termination Date, no Loan Party Obligor will seek authority from the Bankruptcy Court to otherwise use any cash collateral that is included in the Collateral for any purpose whatsoever without Lender's consent.

(i)        If any Loan Party Obligor asserts that it has any adverse claims against Lender with respect to this Agreement and the transactions contemplated hereby, each Loan Party Obligor agrees that its sole and exclusive remedy for any and all such adverse claims will be an action for monetary damages (a "***Damage Lawsuit***").  Any such Damage Lawsuit, regardless of the procedural form in which it is alleged (e.g., by complaint, counterclaim, cross-claim, third-party claim, or otherwise) will be severed from any enforcement by Lender of its legal, equitable, and contractual rights (including collection of the Obligations and foreclosure or other enforcement against the Collateral) pursuant to the Loan Documents, and the Damage Lawsuit (including any and all adverse claims alleged against the Lender) cannot be asserted by any Loan Party Obligor as a defense, setoff, recoupment, or grounds for delay, stay, or injunction against any enforcement by Lender of its legal, equitable, and contractual rights under the Interim Order, the Final Order, this Agreement, the Loan Documents, and otherwise.

(j)        No Person will be permitted to use Lender's Collateral for purposes of seeking to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out.  The prohibition on surcharging or priming of the Liens of Lender on the Collateral will survive the termination of this Agreement and the dismissal of the Case, such that no Person will be permitted to obtain a Lien or rights (through any means, at law or in equity) which in any case is equal or senior to the Liens of Lender on the Collateral prior to indefeasible payment in full of the Obligations.  Upon the termination of this Agreement and the dismissal of the Case, the Bankruptcy Court will retain jurisdiction over the Collateral for the limited purpose of enforcing this Section 3.5.

(k)        Lender shall not be subject to any equitable remedy of marshalling.

(l)        The motions to approve the Interim Order and all other first day motions have been served on (i) Borrower and Lender; (ii) the United States Trustee for the District of Maine; (iii) the holders of the twenty (20) largest unsecured claims against the Borrower's estate; (iv) FAME; (v) all parties known to Borrower who hold any liens or security interest in Borrower's assets who have filed UCC-1 financing statements against Borrower, or who, to Borrower's knowledge, have asserted any liens on any of Borrower's assets, including Sullivan and Merritt Constructors, Inc., a Maine corporation and Fastco Corporation, a Maine corporation; (vi) all landlords and warehouseman of Borrower; (vii) Parent; (xiii) the Internal Revenue Service and all taxing authorities in the State of Maine; (ix) the Pension Benefit Guaranty Company; (x) the United Steelworkers Union; (xi) the Environmental Protection Agency; (xii) all creditors known to Borrower to be holding a judgment and (xiii) certain other parties identified in the certificates of service filed with the Bankruptcy Court.

Debtor-in-Possession Loan and Security Agreement

4.    **CERTAIN PROVISIONS REGARDING ACCOUNTS, INVENTORY, COLLECTIONS, APPLICATIONS OF PAYMENTS, INSPECTION RIGHTS, AND APPRAISALS.**

4.1    **Lock Boxes and Blocked Accounts.**  Each Loan Party Obligor hereby represents and warrants that all Deposit Accounts and all other depositary and other accounts maintained by each Loan Party Obligor as of the Closing Date are described in Section 3 of the Disclosure Schedule, which description includes for each such account the name of the Loan Party Obligor maintaining such account, the name, of the financial institution at which such account is maintained, the account number, and the purpose of such account.  After the Closing Date, no Loan Party Obligor shall open any new Deposit Accounts or any other depositary or other accounts without the prior written consent of Lender and without updating Section 3 of the Disclosure Schedule to reflect such Deposit Accounts or other accounts, as applicable.  No Deposit Accounts or other accounts of any Loan Party Obligor shall at any time constitute a Restricted Account other than accounts expressly indicated on Section 3 of the Disclosure Schedule as being a Restricted Account (and each Loan Party Obligor hereby represents and warrants that each such account shall at all times meet the requirements set forth in the definition of Restricted Account to qualify as a Restricted Account).   Each Loan Party Obligor will, at its expense, maintain the cash management system procedures in effect on the Petition Date for the collection of checks, wire transfers and all other proceeds of all of such Loan Party Obligor's Accounts and other Collateral ("*Collections*"), which shall include (i) directing all Account Debtors to send all Account proceeds directly to a post office box designated by Lender either in the name of such Loan Party Obligor (but as to which Lender has exclusive access) or, at Lender's option, in the name of Lender (a "*Lock Box*"), and/or (ii) depositing all Collections received by such Loan Party Obligor into one or more bank accounts maintained in the name of such Loan Party Obligor (but as to which Lender has exclusive access) or, at Lender's option, in the name of Lender (each, a "*Blocked Account*"), under an arrangement acceptable to Lender with a depository bank acceptable to Lender, pursuant to which all funds deposited into each Blocked Account are to be transferred to Lender in such manner, and with such frequency, as provided in the Cash Management Order, and/or (iii) a combination of the foregoing; provided, however, that notwithstanding the foregoing, Loan Party Obligors may establish new cash management procedures satisfactory to Lender in its sole discretion.  Each Loan Party Obligor agrees to execute, and to cause its depository banks and other account holders to execute, such Lock Box and Blocked Account control agreements and other documentation as Lender shall require from time to time in connection with the foregoing, all in form and substance acceptable to Lender, and in any event such arrangements and documents must be in place on the date hereof with respect to accounts in existence on the date hereof, or prior to any such account being opened with respect to any such account opened after the date hereof, in each case excluding Restricted Accounts.  Prior to the Closing Date, Borrower shall deliver to Lender a complete and executed Authorized Accounts form regarding Borrower's operating account(s) into which the proceeds of Loans are to be paid in the form of Exhibit D annexed hereto.

4.2    **Application of Payments.**  All amounts paid to or received by Lender in respect of the monetary Obligations, from whatever source (whether from Borrower or any other Loan Party Obligor pursuant to such other Loan Party Obligor's guaranty of the Obligations, any realization upon any Collateral, or otherwise) shall be applied by Lender to the Obligations in such order as Lender may elect, and absent such election shall be applied as follows:

(i) **FIRST**, to the Pre-Petition Obligations (expressly excluding the Annual Fee, the Collateral Monitoring Fee, and the Early Termination Fee (in the amount of 3% of the Maximum Facility Amount) each as defined in and existing under the Pre-Petition Credit Agreement other than to the extent paid upon the earlier of the Termination Date or the Maturity Date) in such order as Lender may elect;

-17-

**Debtor-in-Possession Loan and Security Agreement**

(ii) **SECOND**, to reimburse Lender for all out-of-pocket costs and expenses, and all indemnified losses, incurred by Lender which are reimbursable to Lender in accordance with this Agreement and/or any of the other Loan Documents,

(iii) **THIRD**, to any accrued but unpaid interest on any Protective Advances,

(iv) **FOURTH**, to the outstanding principal of any Protective Advances,

(v) **FIFTH**, to any accrued but unpaid fees owing to Lender under this Agreement and/or any other Loan Documents;

(vi) **SIXTH**, to any unpaid accrued interest on the Obligations,

(vii) **SEVENTH**, to the outstanding principal of the Revolving Loans, and

(viii) **EIGHTH,** to the payment of any other outstanding Obligations (expressly including the Annual Fee, the Collateral Monitoring Fee, and the Early Termination Fee (in the amount of 3% of the Maximum Facility Amount) each as defined in and existing under the Pre-Petition Credit Agreement to the extent paid prior to the earlier of the Termination Date or the Maturity Date); and after payment in full in cash of all of the outstanding monetary Obligations, any further amounts paid to or received by Lender in respect of the Obligations (so long as no monetary Obligations are outstanding) shall be paid over to Borrower or such other Person(s) as may be legally entitled thereto.

For purposes of determining the Borrowing Base, such amounts will be credited to the Loan Account and the Collateral balances to which they relate upon Lender's receipt of an advice from Lender's Bank (set forth in Section 5 of Schedule A) that such items have been credited to Lender's account at Lender's Bank (or upon Lender's deposit thereof at Lender's Bank in the case of payments received by Lender in kind), in each case subject to final payment and collection.  However, for purposes of computing interest on the Obligations, such items shall be deemed applied by Lender two (2) Business Days after Lender's receipt of advice of deposit thereof at Lender's Bank.

4.3    **Notification; Verification.**   Lender or its designee may, from time to time, whether or not a Default or Event of Default has occurred:  (i) verify directly with the Account Debtors of the Loan Party Obligors (or by any manner and through any medium Lender considers advisable) the validity, amount and other matters relating to the Accounts and Chattel Paper of the Loan Party Obligors, by means of mail, telephone or otherwise, either in the name of the applicable Loan Party Obligor or Lender or such other name as Lender may choose; (ii) notify Account Debtors of the Loan Party Obligors that Lender has a security interest in the Accounts of the Loan Party Obligors and direct such Account Debtors to make payment thereof directly to Lender; each such notification to be sent on the letterhead of such Loan Party Obligor and substantially in the form of Exhibit E annexed hereto; and (iii) demand, collect or enforce payment of any Accounts and Chattel Paper (but without any duty to do so).  Each Loan Party Obligor hereby authorizes Account Debtors to make payments directly to Lender and to rely on notice from Lender without further inquiry. Lender may on behalf of each Loan Party Obligor endorse all items of payment received by Lender that are payable to such Loan Party Obligor for the purposes described above.

4.4    **Power of Attorney.**   Each Loan Party Obligor hereby grants to Lender an irrevocable power of attorney, coupled with an interest, authorizing and permitting Lender (acting through any of its officers, employees, attorneys or agents), at Lender's option, but without obligation, with or without notice to such Loan Party Obligor, and at such Loan Party Obligor's expense, to do any or all of the following, in such Loan Party Obligor's name or otherwise:

-18-

(a)    (i) execute on behalf of such Loan Party Obligor any documents that Lender may, in its sole discretion, deem advisable in order to perfect, protect and maintain Lender's security interests, and priority thereof, in the Collateral and/or to fully consummate all the transactions contemplated by this Agreement and the other Loan Documents (including such financing statements and continuation financing statements, and amendments or other modifications thereto, as Lender shall deem necessary or appropriate); (ii) endorse such Loan Party Obligor's name on all checks and other forms of remittances received by Lender; (iii) pay any sums required on account of such Loan Party Obligor's taxes or to secure the release of any Liens therefor; (iv) pay any amounts necessary to obtain, or maintain in effect, any of the insurance described in Section 5.14; (v) receive and otherwise take control in any manner of any cash or non-cash items of payment or Proceeds of Collateral; (vi) receive, open and dispose of all mail addressed to such Loan Party Obligor at any post office box/lockbox maintained by Lender for such Loan Party Obligor or at any other business premises of Lender and (vii) endorse or assign to Lender on such Loan Party Obligor's behalf any portion of Collateral evidenced by an agreement, Instrument or Document if an endorsement or assignment of any such items is not made by such Loan Party Obligor pursuant to Section 3.2; and

(b)    After the occurrence and during the continuance of an Event of Default; (i) execute on behalf of such Loan Party Obligor any document exercising, transferring or assigning any option to purchase, sell or otherwise dispose of or lease (as lessor or lessee) any real or personal property which is part of the Collateral or in which Lender has an interest; (ii) execute on behalf of such Loan Party Obligor any invoices relating to any Accounts, any draft against any Account Debtor, any proof of claim in bankruptcy, any notice of Lien or claim, and any assignment or satisfaction of mechanic's, materialman's or other Lien; (iii) except as otherwise provided in Section 4.3(i) hereof, execute on behalf of such Loan Party Obligor any notice to any Account Debtor; (iv) pay, contest or settle any Lien, charge, encumbrance, security interest and adverse claim in or to any of the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; (v) grant extensions of time to pay, compromise claims relating to, and settle Accounts, Chattel Paper and General Intangibles for less than face value and execute all releases and other documents in connection therewith; (vi) settle and adjust, and give releases of, any insurance claim that relates to any of the Collateral and obtain payment therefor; (xii) instruct any third party having custody or control of any Collateral or books or records belonging to, or relating to, Loan Party Obligor to give Lender the same rights of access and other rights with respect thereto as Lender has under this Agreement or any other Loan Document; (viii) change the address for delivery of Loan Party Obligor's mail; (ix) vote any right or interest with respect to any Investment Property; and (x) instruct any Account Debtor to make all payments due to Loan Party Obligor directly to Lender.

Any and all sums paid, and any and all costs, expenses, liabilities, obligations and reasonable attorneys' fees incurred, by Lender with respect to the foregoing shall be added to and become part of the Obligations, shall be payable on demand, and shall bear interest at a rate equal to the highest interest rate applicable to any of the Obligations.  Each Loan Party Obligor agrees that Lender's rights under the foregoing power of attorney and/or any of Lender's other rights under this Agreement or the other Loan Documents shall not be construed to indicate that Lender is in control of the business, management or properties of such Loan Party Obligor.

**4.5    Disputes.**  Each Loan Party Obligor shall promptly notify Lender of all disputes or claims relating to its Accounts and Chattel Paper.  Each Loan Party Obligor agrees that it will not, without Lender's prior written consent, compromise or settle any of its Accounts or Chattel Paper for less than the full amount thereof, grant any extension of time for payment of any of its Accounts or Chattel Paper, release (in whole or in part) any Account Debtor or other person liable for the payment of any of its Accounts or Chattel Paper or grant any credits, discounts, allowances, deductions, return

authorizations or the like with respect to any of its Accounts or Chattel Paper; except (unless otherwise directed by Lender during the existence of a Default or an Event of Default) such Loan Party Obligor may take any of such actions in the ordinary course of its business consistent with past practices, ***provided*** that Borrower promptly reports the same to Lender.

**4.6    Invoices.**  At Lender's request, each Loan Party Obligor will cause all invoices and statements which it sends to Account Debtors or other third parties to be marked, in a manner satisfactory to Lender, to reflect Lender's security interest therein and payment instructions.

**4.7    Inventory.**

(a)    **Returns.**  No Loan Party Obligor will accept returns of any Inventory from any Account Debtor except in the ordinary course of its business.  In the event the value of returned Inventory in any one calendar month exceeds $100,000 (collectively for all Loan Party Obligors), Borrower will immediately notify Lender (which notice shall specify the value of all such returned Inventory, the reasons for such returns, and the locations and the condition of such returned Inventory).

(b)    **Third Party Locations.**  No Loan Party Obligor will, without Lender's prior written consent, at any time, store any Inventory with any warehouseman or other third party other than as set forth in Section 1(d) of the Disclosure Schedule.

(c)    **Sale on Return, etc.**  No Loan Party Obligor will, without Lender's prior written consent, at any time, sell any Inventory on a sale-or-return, guaranteed sale, consignment, or other contingent basis.

(d)    **Fair Labor Standards Act.**  Each Loan Party Obligor represents and warrants, and covenants that at all times, that all of the Inventory of each Loan Party Obligor has been, at all times will be, produced only in accordance with the Fair Labor Standards Act of 1938 and all rules, regulations and orders promulgated thereunder.

**4.8    Access to Collateral, Books and Records.**  At reasonable times, Lender and/or its representatives or agents shall have the right to inspect the Collateral, and the right to examine and copy each Loan Party Obligor's books and records.  Each Loan Party Obligor agrees to give Lender access to any or all of such Loan Party Obligor's, and each of its Subsidiaries', premises to enable Lender to conduct such inspections and examinations.  Such inspections and examinations shall be at Borrower's expense and the charge therefor shall be $1,100 per person per day (or such higher amount as shall represent Lender's then current standard charge), plus out-of-pocket expenses so long as not duplicative of any inspections and examinations under the Pre-Petition Credit Agreement.  Lender may, at Borrower's expense, use each Loan Party Obligor's personnel, computer and other equipment, programs, printed output and computer readable media, supplies and premises for the collection, sale or other disposition of Collateral to the extent Lender, in its sole discretion, deems appropriate.  Each Loan Party Obligor hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Lender, at Borrower's expense, all financial information, books and records, work papers, management reports and other information in their possession regarding the Loan Party Obligors.

**4.9    Appraisals**.  Each Loan Party Obligor will permit Lender and each of its representatives or agents to conduct appraisals and valuations of the Collateral at such times and intervals as Lender may designate.  Such appraisals and valuations shall be at Borrower's expense.

**5.      REPRESENTATIONS, WARRANTIES AND COVENANTS.**

To induce Lender to enter into this Agreement, each Loan Party Obligor represents, warrants and covenants as follows (it being understood and agreed that (a) each such representation and warranty (i) will be made as of the date hereof and be deemed remade as of each date on which any Loan is made (except to the extent any such representation or warranty expressly relates only to any earlier and/or specified date, in which case such representation or warranty will be made as of such earlier and/or specified date), and (ii) shall not be affected by any knowledge of, or any investigation by, Lender, and (b) each such covenant shall continuously apply with respect to all times commencing on the date hereof and continuing until the Termination Date):

**5.1      Existence and Authority.**  Each Loan Party Obligor is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization (which jurisdiction is identified in Section 1(a) of the Disclosure Schedule) and is qualified to do business in each jurisdiction in which the operation of its business requires that it be qualified (which each such jurisdiction is identified in Section 1(a) of the Disclosure Schedule). Each Loan Party Obligor has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, and, subject to the entry by the Bankruptcy Court of the Interim Order, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby. Subject to the entry by the Bankruptcy Court of the Interim Order, the execution, delivery and performance by each Loan Party Obligor of this Agreement and all of the other Loan Documents to which such Loan Party Obligor is a party have been duly and validly authorized, do not violate such Loan Party Obligor's Organic Documents, or any law or any agreement or instrument or any court order which is binding upon any Loan Party Obligor or its property, do not constitute grounds for acceleration of any Indebtedness or obligation under any agreement or instrument which is binding upon any Loan Party Obligor or its property, and do not require the consent of any Person.  Subject to the entry by the Bankruptcy Court of the Interim Order, no Loan Party Obligor is required to obtain any government approval, consent, or authorization from, or to file any declaration or statement with, any Governmental Authority in connection with or as a condition to the execution, delivery or performance of any of the Loan Documents.  This Agreement and each of the other Loan Documents have been duly executed and delivered by, and, subject to entry by the Bankruptcy Court of the Interim Order, are enforceable against each of the Loan Party Obligors who have signed them, in accordance with their respective terms. Section 1(f) of the Disclosure Schedule sets forth the ownership of Borrower and its Subsidiaries, and as of the Closing Date, the Parent.

**5.2      Names; Trade Names and Styles.**  The name of each Loan Party Obligor set forth on Section 1(b) of the Disclosure Schedule is its correct and complete legal name as of the date hereof, and no Loan Party Obligor has used any other name at any time in the past five years, or at any time will use any other name, in any tax filing made in any jurisdiction.  Listed in Section 1(b) of the Disclosure Schedule are all prior names used by each Loan Party Obligor at any time in the past five years and all of the present and prior trade names used by any Loan Party Obligor at any time in the past five years. Borrower shall give Lender at least thirty days' prior written notice (and will deliver an updated Section 1(b) of the Disclosure Schedule to reflect the same) before it or any other Loan Party Obligor changes its legal name or does business under any other name.

**5.3      Title to Collateral; Third Party Locations; Permitted Liens.**  Each Loan Party Obligor has, and at all times will continue to have, good and marketable title to all of the Collateral.  The Collateral now is, and at all times will remain, free and clear of any and all Liens, except for Permitted Liens.  Lender now has, and will at all times continue to have, a first-priority perfected and enforceable security interest in all of the Collateral, subject only to the Permitted Liens, and each Loan Party Obligor

will at all times defend Lender and the Collateral against all claims of others.  Except for leases or subleases as to which Borrower has delivered to Lender a landlord's waiver in form and substance satisfactory to Lender, no Loan Party Obligor is or will be a lessee or sublessee under any real property lease or sublease.   Except for warehouses as to which Borrower has delivered to Lender a warehouseman's waiver in form and substance satisfactory to Lender, no Loan Party Obligor is or will at any time be a bailor of any Goods at any warehouse or otherwise.  Prior to causing or permitting any Collateral to at any time be located upon premises in which any third party (including any landlord, warehouseman, or otherwise) has an interest, Borrower shall notify Lender and the applicable Loan Party Obligor shall cause each such third party to execute and deliver to Lender, in form and substance acceptable to Lender, such waivers, collateral access agreements, and subordinations as Lender shall specify, so as to, among other things, ensure that Lender's rights in the Collateral are, and will at all times continue to be, superior to the rights of any such third party and that Lender has access to such Collateral. Each applicable Loan Party Obligor will keep at all times in full force and effect, and will comply at all times with all the terms of, any lease of real property where any of the Collateral now or in the future may be located.  Notwithstanding the foregoing, Sullivan and Merritt Constructors, Inc. has claimed a first priority mechanic's lien encumbering the Collateral and has agreed to subordinate its lien to Lender pursuant to the terms and conditions of (a) that certain Settlement Agreement dated as of September 28, 2015 between Lender and Sullivan and Merritt Contractors, Inc. and (b) that certain Subordination Agreement dated as of September 28, 2015 between Lender and Sullivan and Merritt Contractors, Inc.

5.4    **Accounts and Chattel Paper.**  As of each date reported by Borrower, all Accounts which Borrower has then reported to Lender as then being Eligible Accounts comply in all respects with the criteria for eligibility set forth in the definition of Eligible Accounts.  All such Accounts and Chattel Paper are genuine and in all respects what they purport to be, arise out of a completed, bona fide and unconditional and non-contingent sale and delivery of goods or rendition of services by Borrower in the ordinary course of its business and in accordance with the terms and conditions of all purchase orders, contracts or other documents relating thereto, each Account Debtor thereunder had the capacity to contract at the time any contract or other document giving rise to such Accounts and Chattel Paper were executed, and the transactions giving rise to such Accounts and Chattel Paper comply with all applicable laws and governmental rules and regulations.

5.5    **Electronic Chattel Paper.**  To the extent that any Loan Party Obligor obtains or maintains any Electronic Chattel Paper, such Loan Party Obligor shall at all times create, store and assign the record or records comprising the Electronic Chattel Paper in such a manner that (i) a single authoritative copy of the record or records exists which is unique, identifiable and except as otherwise provided below, unalterable, (ii) the authoritative copy identifies Lender as the assignee of the record or records, (iii) the authoritative copy is communicated to and maintained by Lender or its designated custodian, (iv) copies or revisions that add or change an identified assignee of the authoritative copy can only be made with the participation of Lender, (v) each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy and (vi) any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.

5.6    **Capitalization; Investment Property.**

(a)    No Loan Party Obligor, directly or indirectly, owns, or shall at any time own, any capital stock or other equity interests of any other Person except as set forth in Sections 1(f) and 1(g) of the Disclosure Schedule, which such Sections of the Disclosure Schedule list all Investment Property owned by each Loan Party Obligor.

(b)   None of the Pledged Equity has been issued or otherwise transferred in violation of the Securities Act, or other applicable laws of any jurisdiction to which such issuance or transfer may be subject.

(c)   The Pledged Equity, if any, pledged by each Loan Party Obligor hereunder constitute all of the issued and outstanding equity interests of each Issuer owned by such Loan Party Obligor.

(d)   All of the Pledged Equity has been duly and validly issued and is fully paid and non-assessable, and the holders thereof are not entitled to any preemptive, first refusal, or other similar rights.  There are no outstanding options, warrants or similar agreements, documents, or instruments with respect to any of the Pledged Equity.

(e)   Each Loan Party Obligor has caused each Issuer to amend or to otherwise modify its Organic Documents, books, records, and related agreements, documents, and instruments, as applicable, to reflect the rights and interests of Lender hereunder, and to the extent required to enable and empower Lender to exercise and enforce its rights and remedies hereunder in respect of the Pledged Equity and other Investment Property.

(f)   Each Loan Party Obligor will take any and all actions required or requested by Lender, from time to time, to (i) cause Lender to obtain exclusive control of any Investment Property in a manner acceptable to Lender and (ii) obtain from any Issuers and such other Persons as Lender shall specify, for the benefit of Lender, written confirmation of Lender's exclusive control over such Investment Property and take such other actions as Lender may request to perfect Lender's security interest in any Investment Property.  For purposes of this Section 5.6, Lender shall have exclusive control of Investment Property if (A) pursuant to Section 3.2, such Investment Property consists of certificated securities and the applicable Loan Party Obligor delivers such certificated securities to Lender (with all appropriate endorsements); (B) such Investment Property consists of uncertificated securities and either (x) the applicable Loan Party Obligor delivers such uncertificated securities to Lender or (y) the Issuer thereof agrees, pursuant to documentation in form and substance satisfactory to Lender, that it will comply with instructions originated by Lender without further consent by the applicable Loan Party Obligor, and (C) such Investment Property consists of security entitlements and either (x) Lender becomes the entitlement holder thereof or (y) the appropriate securities intermediary agrees, pursuant to documentation in form and substance satisfactory to Lender, that it will comply with entitlement orders originated by Lender without further consent by the applicable Loan Party Obligor.  Each Loan Party Obligor that is a limited liability company or a partnership hereby represents and warrants that it has not, and at no time will, elect pursuant to the provisions of Section 8-103 of the UCC to provide that its equity interests are securities governed by Article 8 of the UCC.

(g)   No Loan Party Obligor owns, or has any present intention of acquiring, any "margin security" or any "margin stock" within the meaning of Regulations T, U or X of the Board of Governors of the Federal Reserve System (herein called "margin security" and "margin stock").  None of the proceeds of the Loans will be used, directly or indirectly, for the purpose of purchasing or carrying, or for the purpose of reducing or retiring any Indebtedness which was originally incurred to purchase or carry, any margin security or margin stock or for any other purpose which might constitute the transactions contemplated hereby a "purpose credit" within the meaning of said Regulations T, U or X, or cause this Agreement to violate any other regulation of the Board of Governors of the Federal Reserve System or the Exchange Act, or any rules or regulations promulgated under such statutes.

(h)   No Loan Party Obligor shall vote to enable, or take any other action to cause or to permit, any Issuer to issue any equity interests of any nature, or to issue any other securities or interests

-23-

Debtor-in-Possession Loan and Security Agreement

convertible into or granting the right to purchase or exchange for any equity interests of any nature of any Issuer.

(i) No Loan Party Obligor shall take, or fail to take, any action that would in any manner impair the value or the enforceability of Lender's Lien on any of the Investment Property, or any of Lender's rights or remedies under this Agreement or any other Loan Document with respect to any of the Investment Property.

(j) In the case of any Loan Party Obligor which is an Issuer, such Issuer agrees that the terms of Section 7.3(g)(iii) of this Agreement shall apply to such Loan Party Obligor with respect to all actions that may be required of it pursuant to such Section 7.3(g)(iii) regarding the Investment Property issued by it.

**5.7     Commercial Tort Claims.**  No Loan Party Obligor has any Commercial Tort Claims pending other than those listed in Section 2 of the Disclosure Schedule, and each Loan Party Obligor shall promptly (but in any case no later than five Business Days thereafter) notify Lender in writing upon incurring or otherwise obtaining a Commercial Tort Claim after the date hereof against any third party. Such notice shall constitute such Loan Party Obligor's authorization to amend such Section 2 to add such Commercial Tort Claim and shall automatically be deemed to amend such Section 2 to include such Commercial Tort Claim.

**5.8     Jurisdiction of Organization; Location of Collateral.**  Sections 1(c) and 1(d) of the Disclosure Schedule set forth (i) each place of business of each Loan Party Obligor (including its chief executive office), (ii) all locations where all Inventory, Equipment, and other Collateral owned by each Loan Party Obligor is kept, and (iii) whether each such Collateral location and/or place of business (including each Loan Party Obligor's chief executive office) is owned by a Loan Party Obligor or leased (and if leased, specifies the complete name and notice address of each lessor). No Collateral is located outside the United States or in the possession of any lessor, bailee, warehouseman or consignee, except as expressly indicated in Sections 1(c) and 1(d) of the Disclosure Schedule. Each Loan Party Obligor will give Lender at least thirty days' prior written notice before changing its jurisdiction of organization, opening any additional place of business, changing its chief executive office or the location of its books and records, or moving any of the Collateral to a location other than one of the locations set forth in Sections 1(c) and 1(d) of the Disclosure Schedule, and will execute and deliver all financing statements, landlord waivers, collateral access agreements, mortgages, and all other agreements, instruments and documents which Lender shall require in connection therewith prior to making such change, all in form and substance satisfactory to Lender. Without the prior written consent of Lender, no Loan Party Obligor will at any time (x) change its jurisdiction of organization or (y) allow any Collateral to be located outside of the continental United States of America.

**5.9     Financial Statements and Reports; Budget; Solvency.**

(a)     All financial statements delivered to Lender by or on behalf of any Loan Party Obligor have been, and at all times will be, prepared in conformity with GAAP and completely and fairly reflect the financial condition of each Loan Party Obligor covered thereby, at the times and for the periods therein stated.

(b)     The Budget was prepared in good faith by the Chief Financial Officer of Borrower and based upon assumptions which provide a reasonable basis for the projections contained therein and reflect Borrower's reasonable judgment based on present circumstances of the most likely set of conditions and course of action for the projected period.

-24-

**5.10**     **Tax Returns and Payments; Pension Contributions.**

(a)     Each Loan Party Obligor has timely filed all tax returns and reports required by applicable law, has timely paid all applicable Taxes, assessments, deposits and contributions owing to such Loan Party Obligor and will, subject to any prohibition under the Bankruptcy Code with respect to pre-petition claims, but otherwise in accordance with applicable law, timely pay all such items in the future as they became due and payable.  Each Loan Party Obligor may, however, defer payment of any contested taxes; *provided*, that such Loan Party Obligor (i) in good faith contests its obligation to pay such Taxes by appropriate proceedings promptly and diligently instituted and conducted; (ii) notifies Lender in writing of the commencement of, and any material development in, the proceedings; (iii) posts bonds or takes any other steps required to keep the contested taxes from becoming a Lien upon any of the Collateral and (iv) maintains adequate reserves therefor in conformity with GAAP.  No Loan Party Obligor is aware of any claims or adjustments proposed for any prior tax years that could result in additional taxes becoming due and payable by any Loan Party Obligor.

(b)     Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other applicable laws.  Each Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter or opinion letter from the Internal Revenue Service to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the Internal Revenue Service to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the Internal Revenue Service.  To the best knowledge of each Loan Party Obligor, nothing has occurred that would prevent or cause the loss of such tax-qualified status.  There are no pending or, to the best knowledge of any Loan Party Obligor, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to result in liabilities individually or in the aggregate in excess of $10,000 on any Loan Party Obligor.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in liabilities individually or in the aggregate on any Loan Party Obligor in excess of $10,000.

(c)     No ERISA Event has occurred, and except for the filing of the Case and actions that may be taken by a Loan Party Obligor thereunder, no Loan Party Obligor is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan, in each case that could reasonably be expected to result in liabilities individually or in the aggregate in excess of $10,000. Each Loan Party Obligor and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Pension Plan, and no waiver of the minimum funding standards under the Pension Funding Rules has been applied for or obtained, in each case except as could not reasonably be expected to result in liabilities individually or in the aggregate to the Loan Party Obligors in excess of $10,000.  As of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 60% or higher and no Loan Party Obligor knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of the most recent valuation date.  No Loan Party Obligor nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid, except as could not reasonably be expected to result in liabilities individually or in the aggregate to the Loan Party Obligors in excess of $10,000.   No Loan Party Obligor nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA except as could not reasonably be expected to result in liabilities individually or in the aggregate to the Loan Party Obligors in excess of $10,000.  No Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could

-25-

reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan except as could not reasonably be expected to result in liabilities individually or in the aggregate to the Loan Party Obligors in excess of $10,000.

**5.11    Compliance with Laws; Intellectual Property; Licenses.**

(a)    Each Loan Party Obligor has complied, and will continue at all times to comply, in all material respects with all provisions of all applicable laws and regulations, including those relating to the ownership of real or personal property, the conduct and licensing of each Loan Party Obligor's business, the payment and withholding of Taxes, ERISA and other employee matters, and safety and environmental matters.

(b)    No Loan Party Obligor has received written notice of default or violation, nor is any Loan Party Obligor in default or violation, with respect to any judgment, order, writ, injunction, decree, demand or assessment issued by any court or any federal, state, local, municipal or other Governmental Authority relating to any aspect of any Loan Party Obligor's business, affairs, properties or assets.  No Loan Party Obligor has received written notice of or been charged with, or is, to the knowledge of any Loan Party Obligor, under investigation with respect to, any violation in any material respect of any provision of any applicable law.

(c)    No Loan Party Obligor owns any Intellectual Property, except as set forth in Section 4 of the Disclosure Schedule.  Except as set forth in Section 4 of the Disclosure Schedule, none of the Intellectual Property owned by any Loan Party Obligor is the subject of any licensing or franchise agreement pursuant to which such Loan Party Obligor is the licensor or franchisor.  Each Loan Party Obligor shall promptly (but in any event within thirty (30) days thereafter) notify Lender in writing of any additional Intellectual Property rights acquired or arising after the Closing Date and shall submit to Lender a supplement to Section 4 of the Disclosure Schedule to reflect such additional rights (*provided* that such Loan Party Obligor's failure to do so shall not impair Lender's security interest therein).  Each Loan Party Obligor shall execute a separate security agreement granting Lender a security interest in such Intellectual Property (whether owned on the Closing Date or thereafter), in form and substance acceptable to Lender and suitable for registering such security interest in such Intellectual Property with the United States Patent and Trademark Office and/or United States Copyright Office, as applicable (*provided* that such Loan Party Obligor's failure to do so shall not impair Lender's security interest therein).  Each Loan Party Obligor owns or has, and will at all times continue to own or have, the valid right to use all material patents, trademarks, copyrights, software, computer programs, equipment designs, network designs, equipment configurations, technology and other Intellectual Property used, marketed and sold in such Loan Party Obligor's business, and each Loan Party Obligor is in compliance, and will continue at all times to comply, in all material respects with all licenses, user agreements and other such agreements regarding the use of Intellectual Property.  No Loan Party Obligor has any knowledge that, or has received any notice claiming that, any of such Intellectual Property infringes upon or violates the rights of any other Person.

(d)    Each Loan Party Obligor has and will continue at all times to have, all federal, state, local and other licenses and permits required to be maintained in connection with such Loan Party Obligor's business operations, and all such licenses and permits are valid and in full force and effect.  Each Loan Party Obligor has, and will continue at all times to have, complied with the requirements of such licenses and permits in all material respects, and has received no written notice of any pending or threatened proceedings for the suspension, termination, revocation or limitation thereof.  No Loan Party Obligor is aware of any facts or conditions that could reasonably be expected to cause or permit any of such licenses or permits to be voided, revoked or withdrawn.

**5.12     Litigation.**  Section 1(e) of the Disclosure Schedule discloses all claims, proceedings, litigation or investigations pending or (to the best of each Loan Party Obligor's knowledge) threatened against any Loan Party Obligor as of the Closing Date.  Except as set forth in Section 1(e) of the Disclosure Schedules, there is no claim, suit, litigation, proceeding or investigation pending or (to the best of each Loan Party Obligor's knowledge) threatened by or against or affecting any Loan Party Obligor in any court or before any Governmental Authority (or any basis therefor known to any Loan Party Obligor) which may result, either separately or in the aggregate, in liability in excess of $6,600,000 for the Loan Party Obligors, in any Material Adverse Effect, or in any material impairment in the ability of any Loan Party Obligor to carry on its business in substantially the same manner as it is now being conducted.

**5.13     Use of Proceeds.**  All proceeds of all Loans shall be used by Borrower solely (i) to refinance, in whole or in part at Lender's option, the Pre-Petition Obligations (including, but not limited to, the Annual Fee, the Collateral Monitoring Fee, and the Early Termination Fee (in the amount of 3% of the Maximum Facility Amount) each as defined in and existing under the Pre-Petition Credit Agreement; it being agreed and acknowledged by the parties that such Early Termination Fee shall be deemed fully earned and non-refundable prior to the Filing Date and shall be indefeasibly paid in full in cash on the earlier of the Maturity Date and the Termination Date) and interest, fees and expenses accruing in respect thereof, (ii) purchase inventory, machinery and equipment integral to Borrower's day-to-day operations strictly in accordance with the Budget, (iii) to pay the current interest and fees, costs, and expenses incurred in connection with this Agreement, the other Loan Documents, and the transactions contemplated hereby and thereby, (iv) for Borrower's working capital purposes strictly in accordance with the Budget, (v) to fund the Carve-Out strictly in accordance with the Budget, (vi) to pay for Allowed Professional Fees and Statutory Fees allocated to the Borrower during the Case strictly in accordance with the Budget and (vii) for such other purposes as specifically permitted pursuant to the terms of this Agreement, the Interim Order or the Final Order, including as permitted pursuant to Section 5.28(b) of this Agreement.  All proceeds of all Loans will be used solely for lawful business purposes.

**5.14     Insurance.**

(a)     Each Loan Party Obligor will at all times carry property, liability and other insurance, with insurers acceptable to Lender, in such form and amounts, and with such deductibles and other provisions, as Lender shall require, and Borrower will provide Lender with evidence satisfactory to Lender that such insurance is, at all times, in full force and effect.  A true and complete listing of such insurance as of the Closing Date, including issuers, coverages and deductibles, is set forth in Section 5 of the Disclosure Schedule.  Each property insurance policy shall name Lender as loss payee and shall contain a lender's loss payable endorsement in form acceptable to Lender, each liability insurance policy shall name Lender as an additional insured, and each business interruption insurance policy shall be collaterally assigned to Lender, all in form and substance satisfactory to Lender.  All policies of insurance shall provide that they may not be cancelled or changed without at least thirty days' prior written notice to Lender, and shall otherwise be in form and substance satisfactory to Lender.  Borrower shall advise Lender promptly of any policy cancellation, non-renewal, reduction, or material amendment with respect to any insurance policies maintained by any Loan Party Obligor or any receipt by any Loan Party Obligor of any notice from any insurance carrier regarding any intended or threatened cancellation, non-renewal, reduction or material amendment of any of such policies, and Borrower shall promptly deliver to Lender copies of all notices and related documentation received by any Loan Party Obligor in connection with the same.

(b)     Borrower shall deliver to Lender no later than fifteen (15) days prior to the expiration of any then current insurance policies, insurance certificates evidencing renewal of all such insurance policies required by this Section 5.14.  Borrower shall deliver to Lender, upon Lender's request,

-27-

certificates evidencing such insurance coverage in such form as Lender shall specify.  If any Loan Party Obligor fails to provide Lender with a certificate of insurance or other evidence of the continuing insurance coverage required by this Agreement within three (3) days of Lender's written request, Lender may purchase insurance required by this Agreement at Borrower's expense.  This insurance may, but need not, protect any Loan Party Obligor's interests.

**5.15    Financial, Collateral and Other Reporting / Notices.**  Each Loan Party Obligor has kept and will at all times keep adequate records and books of account with respect to its business activities and the Collateral in which proper entries are made in accordance with GAAP reflecting all its financial transactions.  Each Loan Party Obligor will cause to be prepared and furnished to Lender, in each case in a form and in such detail as is acceptable to Lender the following items (the items to be provided under this Section 5.15 shall be delivered to Lender by posting on Passport 6.0 (or, if requested by Lender, by another form of Approved Electronic Communication or in writing)):

(a)    **Borrowing Base / Collateral Reports / Insurance Certificates / Disclosure Schedules / Other Items.** The items described on Schedule D hereto by the respective dates set forth therein;

(b)    **[Reserved].**

(c)    **Interim Financial Statements.**  Not later than thirty (30) days after the end of each month hereafter, including the last month of each Fiscal Year, unaudited interim financial statements of each Loan Party Obligor as of the end of such month and of the portion of such Fiscal Year then elapsed, including balance sheet, income statement, statement of cash flow, and results of their respective operations during such month and the then-elapsed portion of the Fiscal Year, together with comparative figures for the same periods in the immediately preceding Fiscal Year and the corresponding figures from the budget for the Fiscal Year covered by such financial statements, in each case on a consolidated and consolidating basis, certified by the principal financial officer of Borrower as prepared in accordance with GAAP and fairly presenting the consolidated financial position and results of operations (including management discussion and analysis of such results) of each Loan Party Obligor for such month and period subject only to changes from ordinary course year-end audit adjustments and except that such statements need not contain footnotes.  Concurrently with the delivery of such financial statements, Borrower shall deliver to Lender a Compliance Certificate, indicating whether (i) Borrower is in compliance with each of the covenants specified in Section 5.25, and setting forth a detailed calculation of such covenants, and (ii) any Default or Event of Default is then in existence;

(d)    **[Reserved].**

(e)    **Shareholder Reports, Etc.**  Promptly after the sending or filing thereof, as the case may be, copies of any proxy statements, financial statements or reports which each Loan Party Obligor has made available to its shareholders and copies of any regular, periodic and special reports or registration statements which any Loan Party Obligor files with the Securities and Exchange Commission or any Governmental Authority which may be substituted therefor, or any national securities exchange;

(f)    **ERISA Reports.**  (i) Copies of any annual report to be filed pursuant to the requirements of ERISA in connection with each plan subject thereto promptly upon request by Lender and in addition, each Loan Party Obligor shall promptly notify Lender upon having knowledge of any ERISA Event and (ii) simultaneously with the date that any Loan Party Obligor files a notice of intent to terminate any Pension Plan or Multiemployer Plan, if such termination would require material additional

contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA, copies of each such notice; and

        (g)    **Tax Returns.**  Each federal and state income tax return filed by any Loan Party Obligor or Other Obligor promptly (but in no event later than ten days following the filing of such return), together with such supporting documentation as is supplied to the applicable tax authority with such return and proof of payment of any amounts owing with respect to such return.

        (h)    **Notification of Certain Changes**.  Borrower will promptly (and in no case later than the earlier of (i) three Business Days after the occurrence of any of the following and (ii) such other date that such information is required to be delivered pursuant to this Agreement or any other Loan Document) notify Lender in writing of: (i) the occurrence of any Default or Event of Default, (ii) the occurrence of any event that has had, or may have, a Material Adverse Effect, (iii) any change in any Loan Party Obligor's officers or directors, (iv) any investigation, action, suit, proceeding or claim (or any material development with respect to any existing investigation, action, suit, proceeding or claim) relating to any Loan Party Obligor, any officer or director of a Loan Party Obligor, the Collateral or which may result in an adverse impact upon any Loan Party Obligor's business, assets or financial condition, (v) any material loss or damage to the Collateral, (vi) any event or the existence of any circumstance that has resulted in, or could reasonably be expected to result in, any material adverse change in the business or financial affairs of any Loan Party Obligor, any Default, or any Event of Default, or which would make any representation or warranty previously made by any Loan Party Obligor to Lender untrue in any material respect or constitute a material breach if such representation or warranty was then being made, (vii) any actual or alleged breaches of any Material Contract or termination or threat to terminate any Material Contract or any material amendment to or modification of a Material Contract, or the execution of any new Material Contract by any Loan Party Obligor, (viii) any change in any Loan Party Obligor's certified accountant, (ix) Borrower's receipt or knowledge of any finding, ruling, decision or determination, whether partial or complete, with respect to the FERC Litigation (and Borrower shall deliver to Lender copies of all material documents received in connection with the same), and (x) Borrower's receipt or knowledge of any material pleading, filing or other document in connection with the FERC Litigation (and Borrower shall deliver to Lender copies of all material documents received in connection with the same).  In the event of each such notice under this Section 5.15(h), Borrower shall give notice to Lender of the action or actions that each Loan Party Obligor has taken, is taking, or proposes to take with respect to the event or events giving rise to such notice obligation.

        (i)    **Bankruptcy Schedules**.  Borrower shall:

        (1)    File with the Bankruptcy Court and deliver to Lender, within twenty (20) days after the Petition Date, all schedules and statement of financial affairs required to be filed with the Bankruptcy Court under the Federal Rules of Bankruptcy Procedure with respect to Borrower and the other debtors in the Case; and

        (2)    Serve (a) Lender; (b) the United States Trustee for the District of Maine; (c) the holders of the twenty (20) largest unsecured claims against the Borrower's estate; (d) FAME; (e) all parties known to Borrower who hold any liens or security interest in Borrower's assets who have filed UCC-1 financing statements against Borrower, or who, to Borrower's knowledge, have asserted any liens on any of Borrower's assets, including

Sullivan and Merritt Constructors, Inc., a Maine corporation and Fastco Corporation, a Maine corporation; (f) all landlords and warehouseman of Borrower; (g) Parent; (h) the Internal Revenue Service and all taxing authorities in the State of Maine; (i) the Pension Benefit Guaranty Company; (j) the United Steelworkers Union; (k) the Environmental Protection Agency; (l) all creditors known to Borrower to be holding a judgment and (m) certain other parties identified in the certificates of service filed with the Bankruptcy Court a copy of all first day motions, the Interim Order and the Final Order as approved by the Bankruptcy Court in accordance with the Federal Rules of Bankruptcy Procedure.

(j)     **Budget**.  Loan Party Obligors shall:

(1)     Furnish Lender, not later than 5:00 p.m. (Eastern time) on the Wednesday of each week commencing with the Petition Date and promptly upon request, an updated Budget for the period commencing on such date through the sixtieth day following the Petition Date (or such longer period requested by Lender to the extent Lender has, in its sole discretion agreed to extend the Maturity Date), each to be accompanied by a certificate signed by an Authorized Officer of Borrower to the effect that such Budget has been prepared on the basis of sound financial planning practice consistent with past budgets and financial statements, that such officer has no reason to question the reasonableness of any material assumptions on which such projections were prepared and the Budget has been thoroughly reviewed by the Debtors, their management and the advisors.

(2)     Not later than 5:00 p.m. (Eastern time) on the Wednesday of each week commencing with the Petition Date, in connection with the delivery of the Budget required in Section 5.15(j)(1), furnish to Lender, in form and substance satisfactory to Lender, a report (the "***Budget Compliance Report***") that sets forth, on both a week by week basis and a cumulative, weekly roll-forward basis through the end of the immediately preceding week, a comparison of the actual cash disbursements to the projected cash disbursements, the actual cash receipts to the projected cash receipts, the actual loan balance to the projected loan balance and the actual Excess Availability of Borrower to the projected Excess Availability of Borrower, each as set forth in the Budget for such period, together with a certification from the Loan Party Obligors' Chief Financial Officer (in his capacity as an officer, not individually) that no Material Budget Deviation has occurred, together with the calculations evidencing that no Material Budget Deviation has occurred in form and substance satisfactory to Lender.

(k)     **Other Bankruptcy Documents**.  Deliver to Lender: (a) contemporaneous with the filing thereof, copies of all pleadings, motions, applications, financial information and other papers

-30-

and documents filed by the Debtors in the Case, with copies of such papers and documents also provided to or served on Lender's counsel; (b) contemporaneously with delivery thereof to the Creditors' Committee or any other official or unofficial creditors' committee in the Case, copies of all material written reports and all term sheets for a Reorganization Plan or any sale under Section 363 of the Bankruptcy Code given by the Debtors to the Creditors' Committee or any other official or unofficial creditors' committee in the Case, with copies of such reports and term sheets also provided to or served on Lender's counsel; and (c) projections, operating plans and other financial information and information, reports or statements regarding the Debtors, their business and the Collateral as Lender may from time to time reasonably request.

(l)    **Other Information**.  Promptly upon request, such other data and information (financial and otherwise) as Lender, from time to time, may reasonably request, bearing upon or related to the Collateral or each Loan Party Obligor's and each Other Obligor's business or financial condition or results of operations.

5.16    **Litigation Cooperation.**  Should any third-party suit, regulatory action, or any other judicial, administrative, or similar proceeding be instituted by or against Lender with respect to any Collateral or in any manner relating to any Loan Party Obligor, this Agreement, any other Loan Document or the transactions contemplated hereby, each Loan Party Obligor shall, without expense to Lender, make available each Loan Party Obligor, such Loan Party Obligor's officers, employees and agents, and any Loan Party Obligor's books and records, without charge, to the extent that Lender may deem them reasonably necessary in order to prosecute or defend any such suit or proceeding.

5.17    **Maintenance of Collateral, Etc.**  Each Loan Party Obligor will (a) maintain all of the Collateral that is in good working condition, in good working condition, ordinary wear and tear excepted and (b) use commercially reasonable efforts to prevent a material diminution of the value of Collateral that is not in good working condition, and no Loan Party Obligor will use the Collateral for any unlawful purpose.

5.18    **Reserved.**

5.19    **No Default.**  No Default or Event of Default under this Agreement or any Loan Documents (specifically excluding the Pre-Petition Financing Documents) has occurred and is continuing and no Loan Party Obligor is in default in the payment or performance of any of its post-petition contractual obligations required to be performed by an order of the Bankruptcy Court of the Bankruptcy Code.

5.20    **[Reserved].**  [Reserved].

5.21    **Full Disclosure.**  No report, notice, certificate, information or other statement  delivered or made (including, in electronic form) by or on behalf of any Loan Party Obligor, any Other Obligor or any of their respective Affiliates to Lender in connection with this Agreement or any other Loan Document contains or will at any time contain any untrue statement of a material fact, or omits or will at any time omit to state any material fact necessary to make any statements contained herein or therein not misleading.  Except for matters of a general economic or political nature which do not affect any Loan Party Obligor or any Other Obligor uniquely, there is no fact presently known to any Loan Party Obligor which has not been disclosed to Lender, which has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.22    **Sensitive Payments**. No Loan Party Obligor (a) has  made or will at any time make any contributions, payments or gifts to or for the private use of any governmental official, employee or agent

-31-

where either the payment or the purpose of such contribution, payment or gift is illegal under the applicable laws of the United States or the jurisdiction in which made or any other applicable jurisdiction, (b) has established or maintained or will at any time establish or maintain any unrecorded fund or asset for any purpose or made any false or artificial entries on its books, (c) has made or will at any time make any payments to any Person with the intention that any part of such payment was to be used for any purpose other than that described in the documents supporting the payment, or (d) has engaged in or will at any time engage in any "trading with the enemy" or other transactions violating any rules or regulations of the Office of Foreign Assets Control or any similar applicable laws, rules or regulations.

5.23     **Parent.**  Parent does not and shall not at any time (i) engage in any business activities other than serving as a passive holding company for Borrower, (ii) have any material assets other than the outstanding shares of equity interests issued by Borrower, (iii) have any Subsidiaries other than Borrower, or (iv) have any material liabilities other than the Obligations.

5.24     **Financial Advisor**.  Retain Spinglass Management Group (or such other Person acceptable to Lender) as the financial advisor of Borrower and Parent at all times with direct reporting to Lender on terms and provisions satisfactory to Lender.

5.25     **Negative Covenants.**  No Loan Party Obligor shall, and no Loan Party Obligor shall permit any other Loan Party Obligor to, without Lender's prior written consent or pursuant to a Reorganization Plan that satisfies the requirements of Section 7.1(cc) hereof:

(a)     merge or consolidate with another Person, form any new Subsidiary or acquire any interest in any Person;

(b)     acquire any assets except in the ordinary course of business and as otherwise expressly permitted by this Agreement;

(c)     enter into any transaction outside the ordinary course of business that is not expressly permitted by this Agreement;

(d)     sell, transfer, return, or dispose of any Collateral or other assets, except that each Loan Party Obligor may (i) sell finished goods Inventory in the ordinary course of its business, and (ii) enter into an Approved Sale to the extent the proceeds are applied to the Obligations or otherwise consented to by Lender and (iii) any other sales or dispositions expressly permitted by the Interim Order or Final Order;

(e)     make any loans to, or investments in, any Affiliate or other Person in the form of money or other assets**;** *provided* that Parent may make investments in Borrower;

(f)     incur any Indebtedness other than the Obligations and Permitted Indebtedness;

(g)     create, incur, assume or suffer to exist any Lien or other encumbrance of any nature whatsoever, other than in favor of Lender to secure the Obligations, on any of its assets whether now or hereafter owned, other than Permitted Liens;

(h)     guaranty or otherwise become liable with respect to the obligations (other than the Obligations) of another party or entity;

(i)      pay or declare any dividends or other distributions on any Loan Party Obligor's stock or other equity interest (except for dividends payable solely in capital stock or other equity interests of such Loan Party Obligor and dividends and distributions to Borrower);

(j)      redeem, retire, purchase or otherwise acquire, directly or indirectly, any of Loan Party Obligor's capital stock or other equity interests;

(k)      make any change in any Loan Party Obligor's capital structure;

(l)      dissolve or elect to dissolve;

(m)      engage, directly or indirectly, in a business other than the business which is being conducted on the date hereof, wind up its business operations or cease substantially all, or any material portion, of its normal business operations, or suffer any material disruption, interruption or discontinuance of a material portion of its normal business operations;

(n)      pay any principal or other amount on any Indebtedness that is contractually subordinated to Lender in violation of the applicable subordination or intercreditor agreement;

(o)      directly or indirectly pay, prepay, repurchase, redeem, retire or otherwise acquire, or make any payment on account of any principal of, interest on or premium payable in connection with the repayment or redemption of any pre-petition Indebtedness except for the Pre-Petition Obligations in accordance with the Interim Order or Final Order;

(p)      enter into any transaction with an Affiliate other than on arms-length terms disclosed to, and approved by, Lender in writing;

(q)      change its jurisdiction of organization or enter into any transaction which has the effect of changing its jurisdiction of organization except as provided for in Section 5.8;

(r)      agree, consent, permit or otherwise undertake to amend or otherwise modify any of the terms or provisions of any Loan Party Obligor's Organic Documents, except for such amendments or other modifications required by applicable law or that are not adverse to Lender, and then, only to the extent such amendments or other modifications are fully disclosed in writing to Lender no less than five Business Days prior to being effectuated;

(s)      enter into or assume any agreement prohibiting the creation or assumption of any Lien to secure the Obligations upon its properties or assets, whether now owned or hereafter acquired;

(t)      create or otherwise cause or suffer to exist or become effective any encumbrance or restriction (other than any Loan Documents) of any kind on the ability of any such Person to pay or make any dividends or distributions to Borrower, to pay any of the Obligations, to make loans or advances or to transfer any of its property or assets to Borrower; or

(u)      agree, consent, permit or otherwise undertake to amend or otherwise modify any of the terms or provisions of any FAME Loan Document without the prior written consent of Lender.

**5.26**      **[Reserved]**..

5.27    **Carve-Out Reserve Account**.  Borrower shall, upon request by Lender, at all times maintain the Carve-Out Reserve Account and fund the escrowed amounts for the Allowed Professional Fees as contemplated in accordance with the Budget, the Interim Order and, upon entry of the Final Order, the Final Order, and this Agreement and any interim order entered by the Bankruptcy Court.

5.28    **Bankruptcy Matters**.  Loan Party Obligors shall not:

(a)    Directly or indirectly, seek, consent to or suffer to exist: (i) any modification, stay, vacation or amendment to the Interim Order or the Final Order, unless the Lender has consented to such modification, stay, vacation or amendment in writing; (ii) entry of any order in the Case that is not, in form and substance, satisfactory to Lender in its reasonable discretion; (iii) a priority claim for any administrative expense or unsecured claim (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code) equal or superior to the Superpriority Claim of Lender in respect of the Obligations, except for the Carve-Out; or (iv) any Lien on any Collateral, having a priority equal or superior to the Lien in favor of the Lender in respect of the Obligations (subject only to Permitted Priority Liens and the Carve-Out).

(b)    Prior to the Termination Date, pay any administrative expense claims not provided for in the Budget; provided however that Borrower may pay administrative expense claims with respect to (i) subject to the Carve-Out Cap (as defined in the Interim Order and Final Order, as applicable), Ineligible Professional Expenses in an amount not to exceed $25,000 in the aggregate to pay Allowed Professional Fees of the Creditors' Committee to investigate (but not prosecute) claims against and objections with respect to the Pre-Petition Obligations and pre-petition Liens and security interests of Pre-Petition Lender (including, without limitation, issues regarding validity, perfection, priority, or enforceability of the secured claims of Pre-Petition Lender), (ii) the Carve-Out, subject to the Carve-Out Cap (as defined in the Interim Order and Final Order, as applicable), (iii) Obligations due and payable hereunder and (iv) Allowed Professional Fees and Statutory Fees as set forth in the Budget allocated to Borrower during the Case.

(c)    Make any material expenditure except of the type and for the purposes provided for in the Budget.

(d)    Amend, modify or supplement the Bidding Procedures or any agreement providing for an Approved Sale without the prior written consent of Lender.

# 6.    RELEASE, LIMITATION OF LIABILITY AND INDEMNITY.

6.1    **Release.**

(a)    Borrower and each Loan Party Obligor on behalf of itself, its estate and its successors, assigns, heirs, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges Lender and any and all Participants and their respective successors and assigns, and their present and former shareholders, Affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (Lender and all such other parties being hereinafter referred to collectively as "***Released Parties***") of and from any and all liability, including  all actual or potential claims, demands or causes of action of any kind, nature or description whatsoever, whether arising in law or equity or under contract or tort or under any state or federal law or otherwise which Borrower or any Loan Party Obligor or any of their successors, assigns, or

-34-

other legal representatives has had, now has or has made claim to have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever, pertaining to the transactions contemplated by this Agreement and the other Loan Documents, whether based on errors of judgment or mistake of law or fact, from and after the Petition Date, whether such claims, demands and causes of action are matured or known or unknown. Notwithstanding any provision in this Agreement to the contrary, this Section 6.1 shall remain operative even after the Termination Date and shall survive the payment in full of all of the Loans. Such release is made on the date hereof and remade upon each request for a Loan by Borrower.

(b)        Upon the entry of the Interim Order and of the Final Order, each Loan Party Obligor, on behalf of itself and the Releasors, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Released Party that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Released Party on the basis of any claim released, remised and discharged pursuant to this Section 6.1. If any Releasor violates the foregoing covenant, Borrower agrees to pay, in addition to such other damages as any Released Party may sustain as a result of such violation, all attorneys' fees and costs incurred by any Released Party as a result of such violation.

**6.2        Limitation of Liability.**   In no circumstance will any of the Releasees or Released Parties be liable for lost profits or other special, punitive, or consequential damages. Notwithstanding any provision in this Agreement to the contrary, this Section 6.2 shall remain operative even after the Termination Date and shall survive the payment in full of all of the Loans.

**6.3        Indemnity/Currency Indemnity.**

(a)        Each Loan Party Obligor hereby agrees to indemnify the Released Parties and the Releasees and hold them harmless from and against any and all claims, debts, liabilities, demands, obligations, actions, causes of action, penalties, costs and expenses (including attorneys' fees), of every nature, character and description, of or brought by any Person, which the Released Parties or the Releasees may sustain or incur based upon or arising out of any of the transactions contemplated by this Agreement or any other Loan Documents or any of the Obligations, including any Collateral relating thereto, or any other matter, cause or thing whatsoever occurred, done, omitted or suffered to be done by Lender relating to any Loan Party Obligor or the Obligations (except any such amounts sustained or incurred solely as the result of the gross negligence or willful misconduct of such Released Parties or such Releasees, as applicable, as finally determined by a court of competent jurisdiction). Notwithstanding any provision in this Agreement to the contrary, this Section 6.3 shall remain operative even after the Termination Date and shall survive the payment in full of all of the Loans.

(b)        If, for the purposes of obtaining or enforcing judgment in any court in any jurisdiction with respect to this Agreement or any Loan Document, it becomes necessary to convert into the currency of such jurisdiction (the "***Judgment Currency***") any amount due under this Agreement or under any Loan Document in any currency other than the Judgment Currency (the "***Currency Due***") (or for the purposes of Section 1.7(c)), then, to the extent permitted by law, conversion shall be made at the exchange rate reasonably selected by Lender on the Business Day before the day on which judgment is given (or for the purposes of Section 1.7(c), on the Business Day on which the payment was received by the Lender). In the event that there is a change in such exchange rate between the Business Day before the day on which the judgment is given and the date of receipt by the Lender of the amount due, each Loan Party Obligor shall to the extent permitted by law, on the date of receipt by the Lender, pay such additional amounts, if any, or be entitled to receive reimbursement of such amount, if any as may be necessary to ensure that the amount received by Lender on such date is the amount in the Judgment Currency which (when converted at such exchange rate on the date of receipt by Lender in accordance

**Debtor-in-Possession Loan and Security Agreement**

with normal banking procedures in the relevant jurisdiction) is the amount then due under this Agreement or such Loan Document in the Currency Due.  If the amount of the Currency Due (including any Currency Due for purposes of Section 1.7(c)) which the Lender is so able to purchase is less than the amount of the Currency Due (including any Currency Due for purposes of Section 1.7(c)) originally due to it, each Loan Party Obligor shall to the extent permitted by law jointly and severally indemnify and save Lender harmless from and against loss or damage arising as a result of such deficiency.

7.    **EVENTS OF DEFAULT AND REMEDIES.**

7.1    **Events of Default.**  The occurrence of any of the following events shall constitute an "*Event of Default*":

(a)    if any warranty, representation, statement, report or certificate made or delivered to Lender by or on behalf of any Loan Party Obligor or any Other Obligor is untrue or misleading in any material respect when made;

(b)    if any Loan Party Obligor or any Other Obligor fails to pay to Lender, (i) when due, any principal or interest payment required under this Agreement or any other Loan Document, or (ii) within three (3) Business Days when due, any other monetary Obligation;

(c)    (1)    if any Loan Party Obligor or any Other Obligor defaults in the due observance or performance of any covenant, condition or agreement contained in Section 3.2, 3.5, 4.1, 4.6, 4.7, 4.8, 4.9, 5.2 (limited to the last sentence of Section 5.2), 5.3, 5.13, 5.14, 5.15, 5.24, 5.25, 5.27 or 5.28; or

(2) if any Loan Party Obligor or any Other Obligor defaults in the due observance or performance of any covenant, condition or agreement contained in any provision of this Agreement or any other Loan Document and not addressed in clauses Sections 7.1(a), (b) or (c)(1), and the continuance of such default unremedied for a period of ten (10) Business Days; <u>provided</u> that such ten (10) Business Day grace period shall not be available for any default that is not reasonably capable of being cured within such period or for any intentional default;

(d)    if one or more judgments aggregating in excess of $25,000 is entered by a court against any Loan Party Obligor or any Other Obligor and such judgment shall remain undischarged for a period of thirty (30) consecutive days after entry unless a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, shall be in effect;

(e)    any default with respect to any Indebtedness (other than the Obligations) of any Loan Party Obligor or any Other Obligor if (i) such default shall consist of the failure to pay such Indebtedness when due, whether by acceleration or otherwise and such default shall failed to be cured within any applicable cure period, or (ii) the effect of such default is to permit the holder, with or without notice or lapse of time or both, to accelerate the maturity of any such Indebtedness or to cause such Indebtedness to become due prior to the stated maturity thereof (without regard to the existence of any subordination or intercreditor agreements);

(f)    the dissolution, death, termination of existence or business failure or suspension or cessation of business as usual (other than arising in connection with or during the administration of the Case in a manner consistent with the Budget) of any Loan Party Obligor or any Other Obligor (or of any general partner of any Loan Party Obligor or any Other Obligor if it is a partnership);

(g)    Reserved;

-36-

(h)       the occurrence of a strike or walkout or union organization of any of Borrower's employees;

(i)       the actual or attempted revocation or termination of, or limitation or denial of liability under, any guaranty of any of the Obligations, or any security document securing any of the Obligations, by any Loan Party Obligor or Other Obligor;

(j)       if any Loan Party Obligor or Other Obligor makes any payment on account of any Indebtedness or obligation which has been contractually subordinated to the Obligations other than payments which are not prohibited by the applicable subordination provisions pertaining thereto, or if any Person who has subordinated such Indebtedness or obligations attempts to limit or terminate any applicable subordination provisions pertaining thereto;

(k)       if there is any actual or threatened indictment of any Loan Party Obligor, any Loan Party Obligor's officers, any Other Obligor or any Other Obligor's officers under any criminal statute or commencement or threatened commencement of criminal or civil proceedings against any such Person;

(l)       if, except in connection with an Approved Sale: (i) collectively, John Wissmann, the Wissmann Family Trust, Keith Van Scotter, the Keith Van Scotter Trust, Rod Fisher and Stan Okoro cease to, directly or indirectly, own and control at least 51% of the outstanding equity interests of Parent on a fully diluted basis, (ii) collectively, John Wissman, Keith Van Scotter, Rod Fisher and Stan Okoro cease to possess the right to elect (through contract, ownership of voting securities or otherwise) at all times a majority of the board of directors (or similar governing body) of Parent and to direct the management policies and decisions of Parent, (iii) Parent shall cease to directly own and control 100% of each class of the outstanding equity interests of Borrower, or (iv) Borrower shall cease to, directly or indirectly, own and control 100% of each class of the outstanding equity interests of each other Loan Party Obligor;

(m)       if (i) Keith Van Scotter ceases to be employed as, and actively perform the duties of, the chief executive officer and President of Borrower, or (ii) John Wissmann ceases to be employed as, and actively perform the duties of, the chief financial officer of Borrower, in each case unless a successor is appointed within sixty days after the termination of such individual's employment, and such successor is reasonably satisfactory to Lender;

(n)       [Reserved];

(o)       if any Lien purported to be created by any Loan Document shall cease to be a valid perfected first priority Lien (subject only to any priority accorded by law to Permitted Priority Liens and the Carve-Out) on any portion of the Collateral, or any Loan Party Obligor or any Other Obligor shall assert in writing that any Lien purported to be created by any Loan Document is not a valid perfected first priority lien (subject only to any priority accorded by law to Permitted Priority Liens and the Carve-Out) on the assets or properties purported to be covered thereby;

(p)       if any of the Loan Documents shall cease to be in full force and effect (other than as a result of the discharge thereof in accordance with the terms thereof or by written agreement of all parties thereto);

(q)       if Lender determines in good faith that the Collateral is insufficient to fully secure the Obligations or that the prospect of payment of performance of the Obligations is impaired;

-37-

(r)     if (A) the outstanding balance of all Revolving Loans exceeds, at any time, the lesser of (x) the Maximum Revolving Facility Amount less the amount of the then outstanding Pre-Petition Obligations and (y) the Borrowing Base less the amount the then outstanding Pre-Petition Obligations, or (B) any of the Loan Limits for Revolving Loans are, at any time, exceeded;

(s)     (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which, other than arising out of the Case or any action taken by a Loan Party thereunder, has resulted or could reasonably be expected to result in liability of any Loan Party Obligor or any Subsidiary under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $10,000, (ii) the Pension Benefit Guaranty Corporation files a notice of a Lien against any assets of any Loan Party Obligor, (iii) the existence of any Lien under Section 430(k) or Section 6321 of the Code or Section 303(k) or Section 4068 of ERISA on any assets of a Loan Party Obligor, or (iv) a Loan Party Obligor or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $10,000;

(t)     the Bankruptcy Court shall enter any order (i) revoking, reversing, staying, vacating, rescinding, modifying, supplementing or amending the Interim Order, the Final Order, the Cash Management Order, the Bidding Procedures Order, the Sale Order, any "first day" orders, this Agreement, the Pre-Petition Financing Documents or any other Loan Document or (ii) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the priority of Lender in respect of the Obligations, except for the Carve-Out, or there shall arise any such Superpriority Claim, or (iii) to grant or permit the grant of a Lien on the Collateral superior to, or pari passu with, the Liens of Lender on the Pre-Petition Collateral or the Collateral (other than Permitted Priority Liens and the Carve-Out);

(u)     the Bankruptcy Court shall enter any order (i) appointing a Chapter 11 trustee under Section 1104 of the Bankruptcy Code in the Case, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in the Case, (iii) appointing a fiduciary or representative of the estate with decision-making or other management authority over some or all of any Loan Party Obligor's senior management, (iv) substantively consolidating the estate of any Loan Party Obligor with the estate of any other Person (other than a Loan Party Obligor with another Loan Party Obligor), (v) dismissing the Case or converting the Case to a Chapter 7 case; or (vi) without the prior written Consent of Lender that approves a sale of any Loan Party Obligor's assets which order does not provide for payment of good funds at closing that would, upon consummation of such sale, be sufficient to indefeasibly pay and satisfy all Obligations and which shall otherwise be satisfactory to Lender, and in connection with such sale order, Lender and Pre-Petition Lender shall not have received a release of Lender and Pre-Petition Lender, respectively, in full from all claims of Loan Party Obligors and their estates on or before the entry of such sale order;

(v)     this Agreement, any of the Loan Documents, the Interim Order or the Final Order for any reason ceases to be in full force and effect or is declared to be null and void by a court of competent jurisdiction, or any of the Loan Party Obligors or any other Person shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Loan Party Obligor or such Person) any other Person's motion (a "Third Party Motion") to, disallow in whole or in part Lender's or Pre-Petition Lender's claim in respect of the Obligations or to challenge the validity and enforceability of the Liens in favor of Lender or Pre-Petition Lender and with respect to any such Third Party Motion, an order is granted by a court of competent jurisdiction granting such Third Party Motion; provided,

-38-

however that the filing of any such Third Party Motion shall be immediately deemed to be a Default hereunder and unless such motion shall be withdrawn or denied pursuant to a final, non-appealable order of a court of competent jurisdiction, from and after the date of the filing of such Third Party Motion, Lender shall have no obligation to lend to or extend credit to Borrower under this Agreement and/or any other Loan Document;

(w)      any Loan Party Obligor files a motion with the Bankruptcy Court or supports a motion filed with the Bankruptcy Court which fails to provide that Lender has the right to credit bid for any assets of Loan Party Obligors in connection with any sale pursuant to Section 363(k) of the Bankruptcy Code;

(x)      the Bankruptcy Court shall enter any order granting relief from the automatic stay to any creditor holding or asserting a Lien, reclamation claim or other rights on the assets of any Loan Party Obligor;

(y)      any application for any of the orders described in clauses (t), (u) or (w) above shall be made by a Person other than a Loan Party Obligor, and such application is not being diligently contested by any Loan Party Obligor in good faith;

(z)      except as permitted by the Interim Order or the Final Order and set forth in the Budget or as otherwise agreed to by Lender in writing, any Loan Party Obligor shall make any Pre-Petition Payment (including, without limitation, related to any reclamation claims) following the Closing Date;

(aa)      any Loan Party Obligor shall be unable to pay its post-petition debts as they mature, shall fail to comply with any order of the Bankruptcy Court in any material respect, or shall fail to make, as and when such payments become due or otherwise;

(bb)      any Loan Party Obligor shall file a motion in the Case (i) to use cash collateral of Lender under Section 363 of the Bankruptcy Code without Lender's prior written consent except to the extent expressly permitted in the Interim Order or Final Order, (ii) to sell a material portion of the assets of any Loan Party Obligor without Lender's prior written consent, (iii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, or to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code, (iv) to obtain additional loans or other financial accommodations under Sections 364(c) or (d) of the Bankruptcy Code not otherwise permitted under this Agreement, or (v) to take any other action or actions adverse to Lender or Pre-Petition Lender or their rights and remedies hereunder or under any of the Loan Documents or Lender's or Pre-Petition Lender's interest in any of the Collateral;

(cc)      (i) a Reorganization Plan is filed in the Case which does not contain provisions for termination of Lender's commitment to make Loans hereunder and indefeasible payment in full in cash of all Obligations on or before the effective date of such Reorganization Plan, for the release of the Lender and Pre-Petition Lender in full from all claims of Loan Party Obligors and their estates on or before the effective date of such Reorganization Plan, and the continuation of the Liens and security interests granted to Lender until the effective date of such Reorganization Plan, or (ii) an order shall be entered by the Bankruptcy Court confirming a Reorganization Plan in the Case which does not contain provisions for termination of Lender's commitment to make Loans hereunder and indefeasible payment in full in cash of all Obligations and the release of the Lender and Pre-Petition Lender in full from all claims of Loan Party Obligors and their estates on or before, and the continuation of the Liens and security interests granted to Lender until, the effective date of such Reorganization Plan upon entry thereof;

(dd)   the expiration of the "exclusive period" and any extensions thereto of the Loan Party Obligors under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization;

(ee)   any Loan Party Obligor engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the credit facility provided hereunder or under the Pre-Petition Financing Documents or the liens on or security interest in the assets of the Loan Party Obligors securing the Obligations (including without limitation, the Pre-Petition Obligations); (ii) any Loan Party Obligor engages in or supports any investigation or asserts any claims or causes of action (or directly or indirectly support assertion of the same) against Lender or Pre-Petition Lender; *provided*, *however*, that it shall not constitute an Event of Default if any Loan Party Obligor provides information with respect to the Pre-Petition Financing Documents to a party in interest or is compelled to provide information by an Order of the Bankruptcy Court and provides prior written notice to Lender of any intention or requirement to do so; or (iii) any Loan Party Obligor files a motion or petitions the Bankruptcy Court to obtain additional financing that is pari passu or senior to the Obligations;

(ff)   any Person shall obtain a judgment under Section 506(a) Bankruptcy Code or similar determination with respect to the Pre-Petition Obligations that is unacceptable to Lender;

(gg)   the termination or rejection of any material contract of any Loan Party Obligor which could reasonably be expected to result in a Material Adverse Effect;

(hh)   a breach or default occurs under any agreement providing for an Approved Sale or such agreement is terminated for any reason, in each case, except as consented to by Lender;

(ii)   Loan Party Obligors shall fail to, (x) within seven (7) days of the Petition Date, deliver to Lender a signed purchase agreement from a "stalking horse" bidder reasonably satisfactory to Lender (it being acknowledged that Reich Brothers is acceptable to Lenders) in form and substance satisfactory to Lender and (y) within fifteen (15) days of the Petition Date, file a motion under Section 363 of the Bankruptcy Code for an order seeking authority for an Approved Sale, subject to the receipt of "higher and better" bids, together with bidding procedures (the "***Bidding Procedures***") in form and substance reasonably acceptable to Lender, including providing Lender with the right, in its sole discretion, to credit bid all or any portion of the Obligations with respect to any sale of any of the assets of Loan Party Obligors;

(jj)   Loan Party Obligors fail to, within thirty (30) days of the Petition Date, obtain an order of the Bankruptcy Court approving the Bidding Procedures in form and substance reasonably satisfactory to Lender (the "***Bidding Procedures Order***"), such Bidding Procedures Order to be in form and substance acceptable to Lender;

(kk)   Loan Party Obligors fail to, within forty-five (45) days of the Petition Date, enter into a purchase agreement for an Approved Sale with a buyer reasonably satisfactory to Lender;

(ll)   Loan Party Obligors fail to, within forty five (45) days of the Petition Date, obtain a court order for the Approved Sale (the "***Sale Order***") to the successful bidder, such Sale Order to be in form and substance satisfactory to Lender;

(mm)   the Approved Sale is not consummated on or before fifteen days after entry of the Sale Order;

(nn)    the Final Order is not entered within twenty one (21) days after the Petition Date or, if the Interim Order expires or terminates prior to such date, the Final Order is not entered on the date of expiration or termination of the Interim Order;

(oo)    a breach of the terms or provisions of the Interim Order or Final Order;

(pp)    if (the occurrence of any of the following, a "***Material Budget Deviation***"):

(1)    actual aggregate operating cash receipts for the period commencing as of the Petition Date through the date of delivery of the most recent Budget, as set forth in the most recent Budget (acceptable to Lender), are less than ninety percent (90%) of the projected aggregate operating cash receipts for such period of determination, as set forth in the most recent Budget (acceptable to Lender);

(2)    actual aggregate cash disbursements for the period commencing as of the Petition Date through the date of delivery of the most recent Budget, as set forth in the most recent Budget (acceptable to Lender), are more than one hundred and ten percent (110%) of the projected aggregate cash disbursements for such period of determination, as set forth in the most recent Budget (acceptable to Lender);

(3)    actual aggregate operating sales revenue for the period commencing as of the Petition Date through the date of delivery of the most recent Budget, as set forth in the most recent Budget (acceptable to Lender), are less than ninety percent (90%) of the projected aggregate sales revenue for such period of determination, as set forth in the most recent Budget (acceptable to Lender).

For the avoidance of doubt, if a budgeted item is not paid during the week in which it is budgeted but is subsequently paid, such deviation from the weekly Budgets will be acceptable so long as the delayed payment is consistent with the Budget on a cumulative basis.

(qq)    (i) an "Event of Default" (as defined in the FAME Loan Agreement), other than as a result of the filing of the Case, has occurred under the FAME Loan Documents, which "Event of Default" shall not have been cured or waived within any applicable grace period other than as a result of the filing of the Case; (ii) termination or breach of the Intercreditor Agreement by Borrower, (iii) the attempt by Borrower to terminate or challenge in writing the validity of its obligations under the Intercreditor Agreement or (iv) the Intercreditor Agreement ceases to be enforceable; or

(rr)    any finding, ruling, order, decision or determination, whether partial or complete, with respect to the FERC Litigation pursuant to which Borrower or any other Loan Party Obligor shall be held liable for the payment of any amounts, which in the aggregate, exceed $250,000.

**7.2    Remedies with Respect to Lending Commitments/Acceleration/Etc.**    Upon the occurrence of an Event of Default and at any time thereafter and without the necessity of seeking relief from the automatic stay or any further order of the Bankruptcy Court, Lender may, in Lender's sole discretion (i) terminate all or any portion of its obligations to lend to or extend credit to Borrower under

-41-

**Debtor-in-Possession Loan and Security Agreement**

this Agreement and/or any other Loan Document, without prior notice to any Loan Party Obligor, (ii) terminate the Borrower's right, if any exists, to use Cash Collateral (as defined in the Interim Order or Final Order, as applicable) by written notice thereof upon counsel for the Debtors, counsel for the Creditors' Committee and the Office of the United States Trustee, without further application or order of the Bankruptcy Court, (iii) demand payment in full of all or any portion of the Obligations (including all Pre-Petition Obligations and whether or not payable on demand prior to such Event of Default) and/or (iv) take any and all other and further actions and avail itself of any and all rights and remedies available to Lender under this Agreement, any other Loan Document, the Pre-Petition Financing Documents, under law and/or in equity.

**7.3    Remedies with Respect to Collateral.**  Without limiting any rights or remedies Lender may have pursuant to this Agreement, the other Loan Documents, the Interim Order, the Final Order (upon entry thereof), under applicable law or otherwise, upon the occurrence and during the continuation of an Event of Default, and at any time thereafter and without further notice, application or order of the Bankruptcy Court (except as expressly set forth in the Interim Order or, upon entry of the Final Order, the Final Order):

(a)    **Any and All Remedies**.  Lender may take any and all actions and avail itself of any and all rights and remedies available to Lender under this Agreement, any other Loan Document, the Pre-Petition Financing Documents, the Interim Order, and upon entry of the Final Order, the Final Order, under law or in equity, and the rights and remedies herein and therein provided shall be cumulative and not exclusive of any rights or remedies provided by applicable law or otherwise.

(b)    **Collections; Modifications of Terms.**  Lender may but shall be under no obligation to (i) notify all appropriate parties that the Collateral, or any part thereof, has been assigned to Lender; (ii) demand, sue for, collect and give receipts for and take all necessary or desirable steps to collect any Collateral or Proceeds in its or any Loan Party Obligor's name, and apply any such collections against the Obligations as Lender may elect; (iii) take control of any Collateral and any cash and non-cash Proceeds of any Collateral; (iv) enforce, compromise, extend, renew settle or discharge any rights or benefits of each Loan Party Obligor with respect to or in and to any Collateral, or deal with the Collateral as Lender may deem advisable; and (v) make any compromises, exchanges, substitutions or surrenders of Collateral Lender deems necessary or proper in its reasonable discretion, including extending the time of payment, permitting payment in installments, or otherwise modifying the terms or rights relating to any of the Collateral, all of which may be effected without notice to, consent of, or any other action of any Loan Party Obligor and without otherwise discharging or affecting the Obligations, the Collateral or the security interests granted to Lender under this Agreement or any other Loan Document.

(c)    **Insurance.**  Lender may file proofs of loss and claim with respect to any of the Collateral with the appropriate insurer, and may endorse in its own and each Loan Party Obligor's name any checks or drafts constituting Proceeds of insurance. Any Proceeds of insurance received by Lender may be applied by Lender against payment of all or any portion of the Obligations as Lender may elect in its reasonable discretion.

(d)    **Possession and Assembly of Collateral.**  Lender may take possession of the Collateral and/or without removal render each Loan Party Obligor's Equipment unusable. Upon Lender's request, each Loan Party Obligor shall assemble the Collateral and make it available to Lender at a place or places to be designated by Lender.

(e)    **Set-off.**  Lender may and without any notice to, consent of or any other action by any Loan Party Obligor (such notice, consent or other action being expressly waived), set-off or apply

-42-

(i) any and all deposits (general or special, time or demand, provisional or final) at any time held by or for the account of Lender or any Affiliate of Lender, and/or (ii) any Indebtedness at any time owing by Lender or any Affiliate of Lender or any Participant in the Loans to or for the credit or the account of any Loan Party Obligor, to the repayment of the Obligations irrespective of whether any demand for payment of the Obligations has been made.

(f)      **Disposition of Collateral.**

(i)      *Sale, Lease, etc. of Collateral.*  Lender may, without demand, advertising or notice, all of which each Loan Party Obligor hereby waives (except as the same may be required by the UCC or other applicable law and is not waivable under the UCC or such other applicable law), at any time or times in one or more public or private sales or other dispositions, for cash, on credit or otherwise, at such prices and upon such terms as determined by Lender (***provided*** such price and terms are commercially reasonable within the meaning of the UCC to the extent such sale or other disposition is subject to the UCC requirements that such sale or other disposition must be commercially reasonable) (A) sell, lease, license or otherwise dispose of any and all Collateral, and/or (B) deliver and grant options to a third party to purchase, lease, license or otherwise dispose of any and all Collateral. Lender may sell, lease, license or otherwise dispose of any Collateral in its then-present condition or following any preparation or processing deemed necessary by Lender in its reasonable discretion; ***provided, however***, that prior to exercising any foreclosure on any of the Collateral or otherwise to exercise remedies against the Collateral, Lender shall provide five (5) Business Days' written notice to counsel for Debtors, counsel for the Creditors Committee (if appointed) and the Office of the U.S. Trustee (such notice shall not relieve any Loan Party Obligor of any obligation hereunder); ***provided further that*** the only issue that may be raised by any such party in opposition to the actions proposed or available to Lender shall be whether an Event of Default has actually occurred and is existing. Lender may be the purchaser at any such public or private sale or other disposition of Collateral, and in such case Lender may make payment of all or any portion of the purchase price therefor by the application of all or any portion of the Obligations due to Lender to the purchase price payable in connection with such sale or disposition. Lender may, if it deems it reasonable, postpone or adjourn any sale or other disposition of any Collateral from time to time by an announcement at the time and place of the sale or disposition to be so postponed or adjourned without being required to give a new notice of sale or disposition; ***provided***, however, that Lender shall provide the applicable Loan Party Obligor with written notice of the time and place of such postponed or adjourned sale or disposition. Each Loan Party Obligor hereby acknowledges and agrees that Lender's compliance with any requirements of applicable law in connection with a sale, lease, license or other disposition of Collateral will not be considered to adversely affect the commercial reasonableness of any sale, lease, license or other disposition of such Collateral.

(ii)      *Deficiency.*  Each Loan Party Obligor shall remain liable for all amounts of the Obligations remaining unpaid as a result of any deficiency of the Proceeds of the sale, lease, license or other disposition of Collateral after such Proceeds are applied to the Obligations as provided in this Agreement.

(iii)      *Warranties; Sales on Credit.*  Lender may sell, lease, license or otherwise dispose of the Collateral without giving any warranties and may specifically disclaim any and all warranties, including but not limited to warranties of title, possession, merchantability and fitness.  Each Loan Party Obligor hereby acknowledges and agrees that Lender's disclaimer of any and all warranties in connection with a sale, lease, license or other disposition of Collateral will not be considered to adversely affect the commercial reasonableness of any such disposition of the Collateral. If Lender sells, leases, licenses or otherwise disposes of any of the Collateral on credit, Borrower will be credited only with payments actually made in cash by the recipient of such Collateral and received by Lender and applied to

-43-

the Obligations. If any Person fails to pay for Collateral acquired pursuant this Section 7.3(f) on credit, Lender may re-offer the Collateral for sale, lease, license or other disposition.

(g)   **Investment Property; Voting and Other Rights; Irrevocable Proxy.**

(i)   All rights of each Loan Party Obligor to exercise any of the voting and other consensual rights which it would otherwise be entitled to exercise in accordance with the terms hereof with respect to any Investment Property, and to receive any dividends, payments, and other distributions which it would otherwise be authorized to receive and retain in accordance with the terms hereof with respect to any Investment Property, shall immediately, at the election of Lender (without requiring any notice) cease, and all such rights shall thereupon become vested solely in Lender, and Lender (personally or through an agent) shall thereupon be solely authorized and empowered, without notice, to (a) transfer and register in its name, or in the name of its nominee, the whole or any part of the Investment Property, it being acknowledged by each Loan Party Obligor that any such transfer and registration may be effected by Lender through its irrevocable appointment as attorney-in-fact pursuant to Section 7.3(g)(ii) and Section 4.4 of this Agreement, (b) exchange certificates and/or instruments representing or evidencing Investment Property for certificates and/or instruments of smaller or larger denominations, (c) exercise the voting and all other rights as a holder with respect to all or any portion of the Investment Property (including, without limitation, all economic rights, all control rights, authority and powers, and all status rights of each Loan Party Obligor as a member or as a shareholder (as applicable) of the Issuer), (d) collect and receive all dividends and other payments and distributions made thereon, (e) notify the parties obligated on any Investment Property to make payment to Lender of any amounts due or to become due thereunder, (f) endorse instruments in the name of each Loan Party Obligor to allow collection of any Investment Property, (g) enforce collection of any of the Investment Property by suit or otherwise, and surrender, release, or exchange all or any part thereof, or compromise or renew for any period (whether or not longer than the original period) any liabilities of any nature of any Person with respect thereto, (h) consummate any sales of Investment Property or exercise any other rights as set forth in Section 7.3(f) hereof, (i) otherwise act with respect to the Investment Property as though Lender was the outright owner thereof, and (j) exercise any other rights or remedies Lender may have under the UCC, other applicable law, or otherwise.

(ii)   EACH LOAN PARTY OBLIGOR HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS LENDER AS ITS PROXY AND ATTORNEY-IN-FACT FOR SUCH LOAN PARTY OBLIGOR WITH RESPECT TO ALL OF EACH SUCH LOAN PARTY OBLIGOR'S INVESTMENT PROPERTY WITH THE RIGHT, DURING THE CONTINUANCE OF AN EVENT OF DEFAULT, WITHOUT NOTICE, TO TAKE ANY OF THE FOLLOWING ACTIONS: (A) TRANSFER AND REGISTER IN LENDER'S NAME, OR IN THE NAME OF ITS NOMINEE, THE WHOLE OR ANY PART OF THE INVESTMENT PROPERTY, (B) VOTE THE PLEDGED EQUITY, WITH FULL POWER OF SUBSTITUTION TO DO SO, (C) RECEIVE AND COLLECT ANY DIVIDEND OR ANY OTHER PAYMENT OR DISTRIBUTION IN RESPECT OF, OR IN EXCHANGE FOR, THE INVESTMENT PROPERTY OR ANY PORTION THEREOF, TO GIVE FULL DISCHARGE FOR THE SAME AND TO INDORSE ANY INSTRUMENT MADE PAYABLE TO ANY LOAN PARTY OBLIGOR FOR THE SAME, (D) EXERCISE ALL OTHER RIGHTS, POWERS, PRIVILEGES, AND REMEDIES (INCLUDING ALL ECONOMIC RIGHTS, ALL CONTROL RIGHTS, AUTHORITY AND POWERS, AND ALL STATUS RIGHTS OF EACH LOAN PARTY OBLIGOR AS A MEMBER OR AS A SHAREHOLDER (AS APPLICABLE) OF THE ISSUER) TO WHICH A HOLDER OF THE PLEDGED COLLATERAL WOULD BE ENTITLED (INCLUDING, WITH RESPECT TO THE PLEDGED EQUITY, GIVING OR WITHHOLDING WRITTEN CONSENTS OF MEMBERS OR SHAREHOLDERS, CALLING SPECIAL MEETINGS OF MEMBERS OR SHAREHOLDERS, AND VOTING AT SUCH MEETINGS), AND (E) TAKE ANY

-44-

ACTION AND TO EXECUTE ANY INSTRUMENT WHICH LENDER MAY DEEM NECESSARY OR ADVISABLE TO ACCOMPLISH THE PURPOSES OF THIS AGREEMENT.  THE APPOINTMENT OF LENDER AS PROXY AND ATTORNEY-IN-FACT IS COUPLED WITH AN INTEREST AND SHALL BE VALID AND IRREVOCABLE UNTIL (W) ALL OF THE OBLIGATIONS HAVE BEEN INDEFEASIBLY PAID IN FULL IN CASH IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, (X) LENDER HAS NO FURTHER OBLIGATIONS UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, (Y) LENDER HAS RECEIVED A FULL RELEASE FROM LOAN PARTY OBLIGORS FROM ALL CLAIMS OF LOAN PARTY OBLIGORS AND THEIR ESTATES FOR ANY MATTERS ARISING OUT OF, RELATING TO OR IN CONNECTION WITH, THE PRE-PETITION FINANCING DOCUMENTS, THIS AGREEMENT AND THE LOAN DOCUMENTS AND (Z) THE COMMITMENTS UNDER THIS AGREEMENT HAVE EXPIRED OR HAVE BEEN TERMINATED (IT BEING UNDERSTOOD AND AGREED THAT SUCH OBLIGATIONS WILL BE AUTOMATICALLY REINSTATED IF AT ANY TIME PAYMENT, IN WHOLE OR IN PART, OF ANY OF THE OBLIGATIONS IS RESCINDED OR MUST OTHERWISE BE RESTORED OR RETURNED BY LENDER FOR ANY REASON WHATSOEVER, INCLUDING, WITHOUT LIMITATION, AS A PREFERENCE, FRAUDULENT CONVEYANCE, OR OTHERWISE UNDER ANY BANKRUPTCY, INSOLVENCY, OR SIMILAR LAW, ALL AS THOUGH SUCH PAYMENT HAD NOT BEEN MADE; IT BEING FURTHER UNDERSTOOD THAT IN THE EVENT PAYMENT OF ALL OR ANY PART OF THE OBLIGATIONS IS RESCINDED OR MUST BE RESTORED OR RETURNED, ALL REASONABLE OUT-OF-POCKET COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ALL REASONABLE ATTORNEYS' FEES AND DISBURSEMENTS) INCURRED BY LENDER IN DEFENDING AND ENFORCING SUCH REINSTATEMENT SHALL HEREBY BE DEEMED TO BE INCLUDED AS A PART OF THE OBLIGATIONS).  SUCH APPOINTMENT OF LENDER AS PROXY AND AS ATTORNEY-IN-FACT SHALL BE VALID AND IRREVOCABLE AS PROVIDED HEREIN NOTWITHSTANDING ANY LIMITATIONS TO THE CONTRARY SET FORTH IN ANY ORGANIC DOCUMENTS OF ANY LOAN PARTY OBLIGOR, ANY ISSUER, OR OTHERWISE.

(iii)     In order to further effect the foregoing transfer of rights in favor of Lender, during the continuance of an Event of Default, each Loan Party Obligor hereby authorizes and instructs each Issuer of Investment Property pledged by such Loan Party Obligor to comply with any instruction received by such Issuer from Lender without any other or further instruction from such Loan Party Obligor, and each Loan Party Obligor acknowledges and agrees that each Issuer shall be fully protected in so complying, and to pay any dividends, distributions, or other payments with respect to any of the Investment Property directly to Lender.

(iv)     Upon exercise of the proxy set forth herein, all prior proxies given by any Loan Party Obligor with respect to any of the Pledged Equity or other Investment Property, as applicable (other than to Lender), are hereby revoked, and no subsequent proxies (other than to Lender) will be given with respect to any of the Pledged Equity or any of the other Investment Property, as applicable, unless Lender otherwise subsequently agrees in writing.  Lender, as proxy, will be empowered and may exercise the irrevocable proxy to vote the Pledged Equity and/or the other Investment Property at any and all times during the existence of an Event of Default, including, without limitation, at any meeting of shareholders or members, as the case may be, however called, and at any adjournment thereof, or in any action by written consent, and may waive any notice otherwise required in connection therewith. To the fullest extent permitted by applicable law, Lender shall have no agency, fiduciary, or other implied duties to any Loan Party Obligor, any Issuer, any Loan Party Obligor, or any other Person when acting in its capacity as such proxy or attorney-in-fact.  Each Loan Party Obligor hereby waives and releases any

claims that it may otherwise have against Lender with respect to any breach, or alleged breach, of any such agency, fiduciary, or other duty.

(v)    Any transfer to Lender or its nominee, or registration in the name of Lender or its nominee, of the whole or any part of the Investment Property shall be made solely for purposes of effectuating voting or other consensual rights with respect to the Investment Property in accordance with the terms of this Agreement and is not intended to effectuate any transfer of ownership of any of the Investment Property. Notwithstanding the delivery by Lender of any instruction to any Issuer or any exercise by Lender of an irrevocable proxy or otherwise, Lender shall not be deemed the owner of, or assume any obligations or any liabilities whatsoever of the owner or holder of, any Investment Property unless and until Lender expressly accepts such obligations in a duly authorized and executed writing and agrees in writing to become bound by the applicable Organic Documents or otherwise becomes the owner thereof under applicable law (including through a sale as described in Section 7.3(f) hereof). The execution and delivery of this Agreement shall not subject Lender to, or transfer or pass to Lender, or in any way affect or modify, the liability of any Loan Party Obligor under the Organic Documents of any Issuer or any related agreements, documents, or instruments or otherwise. In no event shall the execution and delivery of this Agreement by Lender, or the exercise by Lender of any rights hereunder or assigned hereby, constitute an assumption of any liability or obligation whatsoever of any Loan Party Obligor to, under, or in connection with any of the Organic Documents of any Issuer or any related agreements, documents, or instruments or otherwise.

(h)    **Election of Remedies.**  Lender shall have the right in Lender's sole discretion to determine which rights, security, Liens and/or remedies Lender may at any time pursue, foreclose upon, relinquish, subordinate, modify or take any other action with respect to, without in any way impairing, modifying or affecting any of Lender's other rights, security, Liens or remedies with respect to such Property, or any of Lender's rights or remedies under this Agreement or any other Loan Document.

(i)    **Lender's Obligations.**  Each Loan Party Obligor agrees that Lender shall not have any obligation to preserve rights to any Collateral against prior parties or to marshal any Collateral of any kind for the benefit of any other creditor of any Loan Party Obligor or any other Person. Lender shall not be responsible to any Loan Party Obligor or any other Person for loss or damage resulting from Lender's failure to enforce its Liens or collect any Collateral or Proceeds or any monies due or to become due under the Obligations or any other liability or obligation of any Loan Party Obligor to Lender.

(j)    **Waiver of Rights by Loan Party Obligors.**  Except as otherwise expressly provided for in this Agreement or by non-waivable applicable law, each Loan Party Obligor waives: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which any Loan Party Obligor may in any way be liable, and hereby ratifies and confirms whatever Lender may do in this regard, (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, the Collateral or any bond or security which might be required by any court prior to allowing Lender to exercise any of its remedies and (c) the benefit of all valuation, appraisal, marshalling and exemption laws.

# 8.    LOAN GUARANTY.

**8.1    Guaranty.**  Each Loan Party Obligor hereby agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to Lender, the prompt payment when due, whether at

-46-

stated maturity, upon acceleration or otherwise, and at all times thereafter, all of the Obligations and all costs and expenses, including all court costs and attorneys' and paralegals' fees (including allocated costs of in-house counsel and paralegals) and expenses paid or incurred by Lender in endeavoring to collect all or any part of the Obligations from, or in prosecuting any action against, Borrower, any Loan Party Obligor or any Other Obligor of all or any part of the Obligations (and such costs and expenses paid or incurred shall be deemed to be included in the Obligations). Each Loan Party Obligor further agrees that the Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any branch or Affiliate of Lender that extended any portion of the Obligations.

**8.2   Guaranty of Payment.**   This Loan Guaranty is a guaranty of payment and not of collection. Each Loan Party Obligor waives any right to require Lender to sue or otherwise take action against Borrower, any other Loan Party Obligor, any Other Obligor, or any other Person obligated for all or any part of the Obligations, or otherwise to enforce its payment against any Collateral securing all or any part of the Obligations.

**8.3   No Discharge or Diminishment of Loan Guaranty.**

(a)   Except as otherwise expressly provided for herein, the obligations of each Loan Party Obligor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of all of the Obligations), including:  (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of Borrower or any Obligor; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting Borrower or any Obligor, or their assets or any resulting release or discharge of any obligation of Borrower or any Obligor; or (iv) the existence of any claim, setoff or other rights which any Loan Party Obligor may have at any time against Borrower, any Obligor, Lender, or any other Person, whether in connection herewith or in any unrelated transactions.

(b)   The obligations of each Loan Party Obligor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by Borrower or any Obligor, of the Obligations or any part thereof.

(c)   Further, the obligations of any Loan Party Obligor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for all or any part of the Obligations or all or any part of any obligations of any Obligor; (iv) any action or failure to act by Lender with respect to any Collateral; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Party Obligor or that would otherwise operate as a discharge of any Loan Party Obligor as a matter of law or equity (other than the indefeasible payment in full in cash of all of the Obligations).

**8.4   Defenses Waived.**   To the fullest extent permitted by applicable law, each Loan Party Obligor hereby waives any defense based on or arising out of any defense of any Loan Party Obligor or

-47-

the unenforceability of all or any part of the Obligations from any cause, or the cessation from any cause of the liability of any Loan Party Obligor, other than the indefeasible payment in full in cash of all of the Obligations. Without limiting the generality of the foregoing, each Loan Party Obligor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against Borrower, any Obligor, or any other Person.  Each Loan Party Obligor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder.  Lender may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any Collateral, compromise or adjust any part of the Obligations, make any other accommodation with Borrower or any Obligor or exercise any other right or remedy available to it against Borrower or any Obligor, without affecting or impairing in any way the liability of any Loan Party Obligor under this Loan Guaranty except to the extent the Obligations have been fully and indefeasibly paid in cash.  To the fullest extent permitted by applicable law, each Loan Party Obligor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Party Obligor against Borrower or any Obligor or any security.

**8.5    Rights of Subrogation.**  No Loan Party Obligor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against Borrower or any Obligor, or any Collateral, until the Termination Date.

**8.6    Reinstatement; Stay of Acceleration.**  If at any time any payment of any portion of the Obligations (including Pre-Petition Obligations) is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of Borrower or any other Person, or otherwise, each Loan Party Obligor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not Lender is in possession of this Loan Guaranty. If acceleration of the time for payment of any of the Obligations is stayed upon the insolvency, bankruptcy or reorganization of Borrower, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Obligations shall nonetheless be payable by the Loan Party Obligors forthwith on demand by Lender.  This Section 8.6 shall remain operative even after the Termination Date and shall survive the payment in full of all of the Loans.

**8.7    Information.**  Each Loan Party Obligor assumes all responsibility for being and keeping itself informed of Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Obligations and the nature, scope and extent of the risks that each Loan Party Obligor assumes and incurs under this Loan Guaranty, and agrees that Lender shall not have any duty to advise any Loan Party Obligor of information known to it regarding those circumstances or risks.

**8.8    Termination.**  To the maximum extent permitted by law, each Loan Party Obligor hereby waives any right to revoke this Loan Guaranty as to future Obligations.  If such a revocation is effective notwithstanding the foregoing waiver, each Loan Party Obligor acknowledges and agrees that (a) no such revocation shall be effective until written notice thereof has been received by Lender, (b) no such revocation shall apply to any Obligations in existence on the date of receipt by Lender of such written notice (including any subsequent continuation, extension, or renewal thereof, or change in the interest rate, payment terms, or other terms and conditions thereof), (c) no such revocation shall apply to any Obligations made or created after such date to the extent made or created pursuant to a legally binding commitment of Lender, (d) no payment by Borrower, any other Loan Party Obligor, or from any other source, prior to the date of Lender's receipt of written notice of such revocation shall reduce the maximum obligation of any Loan Party Obligor hereunder, and (e) any payment, by Borrower or from

any source other than a Loan Party Obligor which has made such a revocation, made subsequent to the date of such revocation, shall first be applied to that portion of the Obligations as to which the revocation is effective and which are not, therefore, guarantied hereunder, and to the extent so applied shall not reduce the maximum obligation of any Loan Party Obligor hereunder.

8.9    **Maximum Liability.**  The provisions of this Loan Guaranty are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Loan Party Obligor under this Loan Guaranty would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Loan Party Obligor's liability under this Loan Guaranty, then, notwithstanding any other provision of this Loan Guaranty to the contrary, the amount of such liability shall, without any further action by the Loan Party Obligors or Lender, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Loan Party Obligor's "*Maximum Liability*").  This Section with respect to the Maximum Liability of each Loan Party Obligor is intended solely to preserve the rights of Lender to the maximum extent not subject to avoidance under applicable law, and no Loan Party Obligor nor any other Person shall have any right or claim under this Section with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Loan Party Obligor hereunder shall not be rendered voidable under applicable law. Each Loan Party Obligor agrees that the Obligations may at any time and from time to time exceed the Maximum Liability of each Loan Party Obligor without impairing this Loan Guaranty or affecting the rights and remedies of Lender hereunder, ***provided*** that, nothing in this sentence shall be construed to increase any Loan Party Obligor's obligations hereunder beyond its Maximum Liability.

8.10    **Contribution.**  In the event any Loan Party Obligor shall make any payment or payments under this Loan Guaranty or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Loan Guaranty (such Loan Party Obligor a "***Paying Guarantor***"), each other Loan Party Obligor (each a "***Non-Paying Guarantor***") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Applicable Percentage" of such payment or payments made, or losses suffered, by such Paying Guarantor.  For purposes of this Section 8.10, each Non-Paying Guarantor's "Applicable Percentage" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from Borrower after the date hereof (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Loan Party Obligors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Loan Party Obligor, the aggregate amount of all monies received by such Loan Party Obligors from any other Loan Party Obligor after the date hereof (whether by loan, capital infusion or by other means). Nothing in this provision shall affect any Loan Party Obligor's several liability for the entire amount of the Obligations (up to such Loan Party Obligor's Maximum Liability).  Each of the Loan Party Obligors covenants and agrees that its right to receive any contribution under this Loan Guaranty from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of all of the Obligations.  This provision is for the benefit of Lender and the Loan Party Obligors and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

8.11    **Liability Cumulative.**  The liability of each Loan Party Obligor under this Section 8 is in addition to and shall be cumulative with all liabilities of each Loan Party Obligor to Lender under this

140690.01019/101148069v.1

Agreement and the other Loan Documents to which such Loan Party Obligor is a party or in respect of any obligations or liabilities of the other Loan Party Obligors, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

## 9. PAYMENTS FREE OF TAXES; OBLIGATION TO WITHHOLD; PAYMENTS ON ACCOUNT OF TAXES.

(a)     Any and all payments by or on account of any obligation of the Loan Party Obligors hereunder or under any other Loan Document shall to the extent permitted by applicable laws be made free and clear of and without reduction or withholding for any Taxes.  If, however, applicable laws require the Loan Party Obligors to withhold or deduct any Tax, such Tax shall be withheld or deducted in accordance with such laws as the case may be, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(b)     If any Loan Party Obligor shall be required by applicable law to withhold or deduct any Taxes from any payment, then (A) such Loan Party Obligor shall withhold or make such deductions as are required based upon the information and documentation it has received pursuant to subsection (e) below, (B) such Loan Party Obligor shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the applicable law, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Loan Party Obligors shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section) the Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.  Upon request by Lender or other Recipient,  Borrower shall deliver to Lender or such other Recipient, as the case may be, the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment of Indemnified Taxes, a copy of any return required by applicable law to report such payment or other evidence of such payment reasonably satisfactory to Lender or such other Recipient, as the case may be.

(c)     Without limiting the provisions of subsections (a) and (b) above, the Loan Party Obligors shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(d)     Without limiting the provisions of subsections (a) through (c)  above, each Loan Party Obligor shall, and does hereby, on a joint and several basis indemnify Lender and each other Recipient (and their respective directors, officers, employees, affiliates and agents) and shall make payment in respect thereof within 10 days after demand therefor, for the full amount of any Indemnified Taxes and Other Taxes (including Indemnified Taxes and Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid or incurred by Lender or any other Recipient on account of, or in connection with any Loan Document or a breach by a Loan Party Obligor thereof, and any penalties, interest and related expenses and losses arising therefrom or with respect thereto (including the fees, charges and disbursements of any counsel or other tax advisor for Lender or any other Recipient (or their respective directors, officers, employees, affiliates, and agents)), whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of any such payment or liability delivered to Borrower shall be conclusive absent manifest error.  Notwithstanding any provision in this Agreement to the contrary, this Section 9 shall remain operative even after the Termination Date and shall survive the payment in full of all of the Loans.

(e)    Lender shall deliver to Borrower and each Participant shall deliver to the applicable Lender granting the participation, at the time or times prescribed by applicable laws, such properly completed and executed documentation prescribed by applicable laws or by the taxing authorities of any jurisdiction and such other reasonably requested information as will permit Borrower or Lender granting a participation, as the case may be, to determine (A) whether or not payments made hereunder or under any other Loan Document are subject to Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's or Participant's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of all payments to be made to such Recipient by the Loan Party Obligors pursuant to this Agreement or otherwise to establish such Recipient's status for withholding tax purposes in the applicable jurisdiction; ***provided*** each Recipient shall only be required to deliver such documentation as it may legally provide.

Without limiting the generality of the foregoing, if a Borrower is resident for tax purposes in the United States:

(i)    any Lender (or Participant) that is a "United States person" within the meaning of Section 7701(a)(30) of the Code shall deliver to Borrower (or Lender granting a participation as applicable) an executed original of Internal Revenue Service Form W-9 or such other documentation or information prescribed by applicable law or reasonably requested by Borrower (or Lender granting a participation) as will enable Borrower (or Lender granting a participation) as the case may be, to determine whether or not such Lender (or Participant) is subject to backup withholding or information reporting requirements under the Code;

(ii)    any Lender (or Participant) that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code (a "***Non-U.S. Recipient***") shall deliver to Borrower (and Lender granting a participation in case the Non-U.S. Recipient is a Participant) and Lender on or prior to the date on which such Non-U.S. Person becomes a party to this Agreement or a Participant (and from time to time thereafter upon the reasonable request of Borrower or Lender granting the participation but only if such Non-U.S. Recipient is legally entitled to do so), whichever of the following is applicable: (I) executed originals of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party; (II) executed originals of Internal Revenue Service Form W-8ECI; (III) executed originals of Internal Revenue Service Form W-8IMY and all required supporting documentation; (IV) each Non-U.S. Recipient claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, shall provide (x) a certificate to the effect that such Non-U.S. Recipient is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) executed originals of  Internal Revenue Service Form W-8BEN; and/or (V) executed originals of any other form prescribed by applicable law (including FATCA) as a basis for claiming exemption from or a reduction in United States Federal withholding tax together with such supplementary documentation as may be prescribed by applicable law to permit Borrower or any Lender granting a participation, to determine the withholding or deduction required to be made.  Each Non-U.S. Recipient shall promptly notify Borrower (or any Lender granting a participation if the Non-U.S. Recipient is a Participant) of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

## 10.    GENERAL PROVISIONS.

### 10.1    Notices.

(a)    Notice by Approved Electronic Communications.

Lender and each of its Affiliates is authorized to transmit, post or otherwise make or communicate, in its sole discretion (but shall not be required to do so), by Approved Electronic Communications in connection with this Agreement or any other Loan Document and the transactions contemplated therein.  Lender is hereby authorized to establish procedures to provide access to and to make available or deliver, or to accept, notices, documents and similar items by posting to Passport 6.0.  All uses of Passport 6.0 and other Approved Electronic Communications shall be governed by and subject to, in addition to the terms of this Agreement, the separate terms, conditions and privacy policy posted or referenced in such system (or such terms, conditions and privacy policy as may be updated from time to time, including on such system) and any related contractual obligations executed by Lender and Loan Party Obligors in connection with the use of such system.  Each of the Loan Party Obligors and Lender hereby acknowledges and agrees that the use of Passport 6.0 and other Approved Electronic Communications is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing Lender and each of its Affiliates to transmit Approved Electronic Communications.  Passport 6.0 and all Approved Electronic Communications shall be provided "as is" and "as available".  None of Lender or any of its Affiliates or related persons warrants the accuracy, adequacy or completeness of Passport 6.0 or any other electronic platform or electronic transmission and disclaims all liability for errors or omissions therein.  No warranty of any kind is made by Lender or any of its Affiliates or related persons in connection with Passport 6.0 or any other electronic platform or electronic transmission, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects.  Each of Borrower and each other Loan Party Obligor executing this Agreement agrees that Lender has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with Passport 6.0, any Approved Electronic Communication or otherwise required for Passport 6.0 or any Approved Electronic Communication.

Prior to the Closing Date, Borrower shall deliver to Lender a complete and executed Client User Form regarding Borrower's use of Passport 6.0 in the form of Exhibit C annexed hereto.

No Approved Electronic Communications shall be denied legal effect merely because it is made electronically.  Approved Electronic Communications that are not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such Approved Electronic Communication, an E-Signature, upon which Lender and the Loan Party Obligors may rely and assume the authenticity thereof.  Each Approved Electronic Communication containing a signature, a reproduction of a signature or an E-Signature shall, for all intents and purposes, have the same effect and weight as a signed paper original.  Each E-Signature shall be deemed sufficient to satisfy any requirement for a "signature" and each Approved Electronic Communication shall be deemed sufficient to satisfy any requirement for a "writing", in each case including pursuant to this Agreement, any other Loan Document, the Uniform Commercial Code, the Federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural law governing such subject matter.  Each party or beneficiary hereto agrees not to contest the validity or enforceability of an Approved Electronic Communication or E-Signature under the provisions of any applicable law requiring certain documents to be in writing or signed; ***provided***, that nothing herein shall limit such party's or beneficiary's right to contest whether an Approved Electronic Communication or E-Signature has been altered after transmission.

(b)      All Other Notices.

All notices, requests, demands and other communications under or in respect of this Agreement or any transactions hereunder, other than those approved for or required to be delivered

by Approved Electronic Communications (including via Passport 6.0 or otherwise pursuant to Section 10.1(a)), shall be in writing and shall be personally delivered or mailed (by prepaid registered or certified mail, return receipt requested), sent by prepaid recognized overnight courier service, or by email to the applicable party at its address or email address indicated below,

If to Lender:

Siena Lending Group LLC
9 West Broad Street, 5th
Stamford, Connecticut 06902
Attention: Steve Sanicola
Email: ssanicola@sienalending.com

with a copy to:

Blank Rome LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Attention: Lawrence F. Flick II, Esq.
Email: Flick@blankrome.com

If to Borrower or any other Loan Party Obligor:

Lincoln Paper and Tissue, LLC
50 Katahdin Avenue
Lincoln, ME 04457
Attention: Keith Van Scotter, President and CEO
Email: kvanscotter@lpt.com

with a copy to:

Bernstein Shur
100 Middle Street, P.O. Box 9729
Portland, Maine 04101
Attention : John L. Carpenter, Esq.
Email: jcarpenter@bernsteinshur.com

or, as to each party, at such other address as shall be designated by such party in a written notice to the other party delivered as aforesaid. All such notices, requests, demands and other communications shall be deemed given (a) when personally delivered, (b) three (3) Business Days after being deposited in the mails with postage prepaid (by registered or certified mail, return receipt requested), (c) one (1) Business Day after being delivered to the overnight courier service, if prepaid and sent overnight delivery, addressed as aforesaid and with all charges prepaid or billed to the account of the sender, or (d) when sent by email transmission to an email address designated by such addressee and the sender receives a confirmation of transmission.

**10.2    Severability.** If any provision of this Agreement or any other Loan Document is held invalid or unenforceable, either in its entirety or by virtue of its scope or application to given circumstances, such provision shall thereupon be deemed modified only to the extent necessary to render same valid, or not applicable to given circumstances, or excised from this Agreement or such other Loan

Document, as the situation may require, and this Agreement and the other Loan Documents shall be construed and enforced as if such provision had been included herein as so modified in scope or application, or had not been included herein or therein, as the case may be.

**10.3    Integration.**  This Agreement and the other Loan Documents represent the final, entire and complete agreement between each Loan Party Obligor party hereto and thereto and Lender and supersede all prior and contemporaneous negotiations, oral representations and agreements, all of which are merged and integrated into this Agreement.   THERE ARE NO ORAL UNDERSTANDINGS, REPRESENTATIONS OR AGREEMENTS BETWEEN THE PARTIES THAT ARE NOT SET FORTH IN THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.

**10.4    Waivers.**  The failure of Lender at any time or times to require any Loan Party Obligor to strictly comply with any of the provisions of this Agreement or any other Loan Documents shall not waive or diminish any right of Lender later to demand and receive strict compliance therewith.   Any waiver of any default shall not waive or affect any other default, whether prior or subsequent, and whether or not similar.   None of the provisions of this Agreement or any other Loan Document shall be deemed to have been waived by any act or knowledge of Lender or its agents or employees, but only by a specific written waiver signed by an authorized officer of Lender and delivered to Borrower.   Once an Event of Default shall have occurred, it shall be deemed to continue to exist and not be cured or waived unless specifically waived in writing by an authorized officer of Lender and delivered to Borrower.   Each Loan Party Obligor waives demand, protest, notice of protest and notice of default or dishonor, notice of payment and nonpayment, release, compromise, settlement, extension or renewal of any commercial paper, Instrument, Account, General Intangible, Document, Chattel Paper, Investment Property or guaranty at any time held by Lender on which such Loan Party Obligor is or may in any way be liable, and notice of any action taken by Lender, unless expressly required by this Agreement, and notice of acceptance hereof.

**10.5    Amendment.**  This Agreement may not be amended or modified except in a writing executed by Borrower, the Loan Party Obligors party hereto (to the extent such amendment is directly adverse to such Loan Party Obligor), and Lender.  For the avoidance of doubt, the parties hereto shall be permitted to amend this Agreement and the Loan Documents without further approval or order of the Bankruptcy Court so long as such amendment is not material (for purposes hereof, a "material" amendment shall mean, any amendment that operates to increase the interest rate other than as currently provided in this Agreement, increase the Maximum Revolving Facility Amount, add specific new Events of Default or enlarge the nature and extent of default remedies available to the Lender following an Event of Default) and is undertaken in good faith by the parties hereto.

**10.6    Time of Essence.**  Time is of the essence in the performance by each Loan Party Obligor of each and every obligation under this Agreement and the other Loan Documents.

**10.7    Expenses, Fee and Costs Reimbursement.**  Borrower hereby agrees to promptly pay: (i) all out of pocket costs and expenses of Lender (including the out of pocket fees, costs and expenses of legal counsel to, and appraisers, accountants, consultants and other professionals and advisors retained by or on behalf of, Lender) payable to unrelated third parties in connection with: (A) all loan proposals and commitments pertaining to the transactions contemplated hereby (whether or not such transactions are consummated), (B) the examination, review, due diligence investigation, documentation, negotiation, and closing of the transactions contemplated by the Loan Documents (whether or not such transactions are consummated), (C) the creation, perfection and maintenance of Liens pursuant to the Loan Documents, (D) the performance by Lender of its rights and remedies under the Loan Documents, (E) the administration of the Loans (including usual and customary fees for wire transfers and other transfers or

payments received by Lender on account of any of the Obligations) and Loan Documents, (F) any amendments, modifications, consents and waivers to and/or under any and all Loan Documents (whether or not such amendments, modifications, consents or waivers are consummated), (G) any periodic public record searches conducted by or at the request of Lender (including, title investigations and public records searches), pending litigation and tax lien searches and searches of applicable corporate, limited liability company, partnership and related records concerning the continued existence, organization and good standing of certain Persons), (H) protecting, storing, insuring, handling, maintaining, auditing, examining, valuing or selling any Collateral, (I) any litigation, dispute, suit or proceeding relating to any Loan Document, (J) in connection with the Case, including, without limitation, (x) costs and expenses incurred in connection with review of pleadings and other filings made with the Bankruptcy Court, (y) attendance at all hearings in respect of the Case, and (z) defending and prosecuting any actions or proceedings arising out of or relating to the Obligations (including, without limitation, the Pre-Petition Obligations), the Liens securing the Obligations (including, without limitation, the Pre-Petition Obligations) or any transactions related to or arising in connection with the Pre-Petition Financing Documents, the Loan Documents, the Interim Order or the Final Order, and (K) any workout, collection, enforcement proceedings under any and all of the Loan Documents (it being agreed that such costs and expenses may include the costs and expenses of workout consultants, investment bankers, financial consultants, appraisers, valuation firms and other professionals and advisors retained by or on behalf of Lender), and (ii) without limitation of the preceding clause (i), all out of pocket costs and expenses of Lender payable to unrelated third parties in connection with Lender's reservation of funds in anticipation of the funding of the initial Loans to be made hereunder.  Any fees, costs and expenses owing by Borrower or other Loan Party Obligor hereunder shall be due and payable upon demand therefor and may be charged as a Revolving Loan and added to the Loan Account of Borrower; provided however that only the foregoing fees, costs and expenses included in the initial Budget (and any subsequently delivered Budgets) shall be due and payable on demand and charged as a Revolving Loan and added to the Loan Account of Borrower, and any such fees, costs and expenses in excess of those set forth in the initial Budget (or any subsequently delivered Budget) shall be due and payable on the earlier of the Maturity Date and the Termination Date.  For the avoidance of doubt, any estimates of the forgoing fees, costs and expenses set forth in the Budget shall not limit, in any manner, Borrower's obligations under this Section 10.7.  Borrower agrees that in the event that any actions or proceedings are in effect or are threatened by, or Lender reasonably believes any actions or proceedings may be brought by the Creditors' Committee or any other party in interest attacking the legality, validity, enforceability of the Pre-Petition Obligations, the Liens arising under the Pre-Petition Credit Agreement or any other matters relating to the Pre-Petition Financing Documents at the time of the consummation of any sale of the assets of Loan Party Obligors or at the time that Loan Party Obligors propose to pay and satisfy the Obligations in full, Lender may hold a reserve following the date of payment in full of the Obligations as cash collateral for the expenses expected to be incurred in connection with such actions or proceedings until the earlier of (I) Lender's receipt of a general release satisfactory in form and substance to Lender, and (II) the entry of a final non-appealable order determining the outcome of such litigation.

**10.8    Benefit of Agreement; Assignability.**    The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, beneficiaries and representatives of Borrower, each other Loan Party Obligor party hereto and Lender; **_provided_**, that neither Borrower nor any other Loan Party Obligor may assign or transfer any of its rights under this Agreement without the prior written consent of Lender, and any prohibited assignment shall be void.  No consent by Lender to any assignment shall release any Loan Party Obligor from its liability for any of the Obligations.  Lender shall have the right to assign all or any of its rights and obligations under the Loan Documents to one or more other Persons, and each Loan Party Obligor agrees to execute all agreements, instruments and documents requested by Lender in connection with each such assignments.  Notwithstanding any provision of this Agreement or any other Loan Document to the contrary, Lender

-55-

may at any time pledge or grant a security interest in all or any portion of its rights under this Agreement and the other Loan Documents to secure obligations of Lender, including any pledge or grant to secure obligations to a Federal Reserve Bank.

**10.9     Recordation of Assignment.**  In respect of any assignment of all or any portion of any Lender's interest in this Agreement and/or any other Loan Documents at any time and from time to time, the following provisions shall be applicable:

(a)     Borrower, or any agent appointed by Borrower, shall maintain a register (the "***Register***") in which there shall be recorded the name and address of each Person holding any Loans or any commitment to lend hereunder, and the principal amount and stated interest payable to such Person hereunder or committed by such Person under such Person's lending commitment.  Borrower hereby irrevocably appoints Lender (and/or any subsequent Lender appointed by Lender then maintaining the Register) as Borrower's non-fiduciary agent for the purpose of maintaining the Register.

(b)     In connection with any negotiation, transfer or assignment as aforesaid, the transferor/assignor shall deliver to Lender then maintaining the Register an assignment and assumption agreement executed by the transferor/assignor and the transferee/assignee, setting forth the specifics of the subject transaction, including but not limited to the amount and nature of Obligations and/or lending commitments being transferred or assigned (and being assumed, as applicable), and the proposed effective date of such transfer or assignment and the related assumption (if applicable).

(c)     Subject to receipt of any required tax forms reasonably required by Lender, such Person shall record the subject transfer, assignment and assumption in the Register.  Anything contained in this Agreement or other Loan Document to the contrary notwithstanding, no negotiation, transfer or assignment shall be effective until it is recorded in the Register pursuant to this Section 10.9(c).  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error; and Borrower and each Lender shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement and the other Loan Documents.  The Register shall be available for inspection by Borrower and each Lender at any reasonable time and from time to time upon reasonable prior notice.

**10.10     Participations.**  Anything in this Agreement or any other Loan Document to the contrary notwithstanding, Lender may, at any time and from time to time, without in any manner affecting or impairing the validity of any Obligations, sell to one or more Persons participating interests in its Loans, commitments and/or other interests hereunder and/or under any other Loan Document (any such Person, a "***Participant***").  In the event of a sale by Lender of a participating interest to a Participant, (a) such Lender's obligations hereunder and under the other Loan Documents shall remain unchanged for all purposes, (b) Borrower and Lender shall continue to deal solely and directly with each other in connection with Lender's rights and obligations hereunder and under the other Loan Documents and (c) all amounts payable by Borrower shall be determined as if Lender had not sold such participation and shall be paid directly to Lender, ***provided, however***, a Participant shall be entitled to the benefits of Section 9 as if it were a Lender if Borrower is notified of the Participation and the Participant complies with Section 9(e).  Borrower agrees that if amounts outstanding under this Agreement or any other Loan Document are due and payable (as a result of acceleration or otherwise), each Participant shall be deemed to have the right of set-off in respect of its participating interest in amounts owing under this Agreement and the other Loan Documents to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement; ***provided*** that such right of set-off shall not be exercised without the prior written consent of Lender and shall be subject to the obligation of each Participant to share with Lender its share thereof.  Borrower also agrees that each Participant shall be entitled to the

-56-

benefits of Section 10.9 as if it were Lender.  Notwithstanding the granting of any such participating interests: (i) Borrower shall look solely to Lender for all purposes of this Agreement, the Loan Documents and the transactions contemplated hereby, (ii) Borrower shall at all times have the right to rely upon any amendments, waivers or consents signed by Lender as being binding upon all of the Participants, and (iii) all communications in respect of this Agreement and such transactions shall remain solely between Borrower and Lender (exclusive of Participants) hereunder.   Lender granting a participation hereunder shall maintain, as a non-fiduciary agent of Borrower, a register as to the participations granted and transferred under this Section containing the same information specified in Section 10.9 on the Register as if each Participant were a Lender to the extent required to cause the Loans to be in registered form for the purposes of Sections 163(F), 165(J), 871, 881, and 4701 of the Code.

10.11   **Headings; Construction.**   Section and subsection headings are used in this Agreement only for convenience and do not affect the meanings of the provisions that they precede.

10.12   **USA PATRIOT Act Notification**.   Lender hereby notifies the Loan Party Obligors that pursuant to the requirements of the USA PATRIOT Act, it may be required to obtain, verify and record certain information and documentation that identifies such Person, which information may include the name and address of each such Person and such other information that will allow Lender to identify such Persons in accordance with the USA PATRIOT Act.

10.13   **Counterparts; Fax/Email Signatures**.   This Agreement may be executed in any number of counterparts, all of which shall constitute one and the same agreement.   This Agreement may be executed by signatures delivered by facsimile or electronic mail, each of which shall be fully binding on the signing party.

10.14   **GOVERNING LAW.**

(a)   THIS AGREEMENT, ALONG WITH ALL OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED OTHERWISE IN SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED THEREIN WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATION LAW) EXCEPT TO THE EXTENT THAT THE APPLICATION OF THE BANKRUPTCY CODE IS MANDATORY.  FURTHER, THE LAW OF THE STATE OF NEW YORK SHALL APPLY TO ALL DISPUTES OR CONTROVERSIES ARISING OUT OF OR CONNECTED TO OR WITH THIS AGREEMENT AND ALL SUCH OTHER LOAN DOCUMENTS WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES (EXCEPT SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATION LAW). EXCEPT TO THE EXTENT THAT THE APPLICATION OF THE BANKRUPTCY CODE IS MANDATORY.

(b)   IF (I) THE CASE IS DISMISSED, (II) THE BANKRUPTCY COURT ABSTAINS FROM HEARING ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO) OR (III) THE BANKRUPTCY COURT REFUSES TO EXERCISE JURISDICTION OVER ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS

140690.01019/101148069v.1

OR THE TRANSACTIONS RELATED HERETO OR THERETO), THEN ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM, RELATED TO OR IN CONNECTION WITH THIS AGREEMENT, THE LOAN DOCUMENTS OR THE COLLATERAL SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE BOROUGH OF MANHATTAN, COUNTY OF NEW YORK, STATE OF NEW YORK.  EACH OF THE LOAN PARTY OBLIGORS AND LENDER HEREBY CONSENT AND SUBMIT TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE. EACH OF THE DEBTORS AND LENDER AGREE THAT SAID FORUM AND VENUE SELECTION IS MANDATORY, AND HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST ANY SUCH PERSON IN ACCORDANCE WITH THIS SECTION.

**10.15  WAIVER OF JURY TRIAL; CONSENT TO SERVICE OF PROCESS.** BORROWER AND EACH OTHER LOAN PARTY OBLIGOR HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR UNDER ANY AMENDMENT, WAIVER, AMENDMENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE OTHER TRANSACTION DOCUMENTS, AND AGREES THAT ANY SUCH ACTION, PROCEEDING OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  BORROWER EACH OTHER LOAN PARTY OBLIGOR HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON BORROWER OR ANY OTHER LOAN PARTY OBLIGOR AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY CERTIFIED MAIL (RETURN RECEIPT REQUESTED) DIRECTED TO THE BORROWER'S NOTICE ADDRESS (ON BEHALF OF THE BORROWER OR SUCH LOAN PARTY OBLIGOR) SET FORTH IN SECTION 10.1 HEREOF AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO DEPOSITED IN THE MAIL, OR, AT THE LENDER'S OPTION, BY SERVICE UPON BORROWER OR ANY OTHER LOAN PARTY OBLIGOR IN ANY OTHER MANNER PROVIDED UNDER THE RULES OF ANY SUCH COURTS.

**10.16    Publication.**  Borrower and each other Loan Party Obligor consents to the publication by Lender of a tombstone, press releases or similar advertising material relating to the financing transactions contemplated by this Agreement, and Lender reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

**10.17    Confidentiality.**  Lender agrees to use commercially reasonable efforts not to disclose Confidential Information to any Person without the prior consent of Borrower; provided, however, that nothing herein contained shall limit any disclosure of the tax structure of the transactions contemplated hereby, or the disclosure of any information (a) to the extent required by applicable law, statute, rule, regulation or judicial process or in connection with the exercise of any right or remedy under any Loan Document, or as may be required in connection with the examination, audit or similar investigation of the Lender or any of its Affiliates, (b) to examiners, auditors, accountants or any regulatory authority, (c) to the officers, partners, managers, directors, employees, agents and advisors (including independent auditors, lawyers and counsel) of the Lender or any of its Affiliates, (d) in connection with any litigation or dispute which relates to this Agreement or any other Loan Document to which the Lender is a party or is otherwise subject, (e) to a subsidiary or Affiliate of the Lender, (f) to any assignee or participant (or prospective assignee or participant) which agrees to be bound by this Section 10.17 and (g) to any lender

-58-

**Debtor-in-Possession Loan and Security Agreement**

or other funding source of the Lender (each reference to Lender in the foregoing clauses shall be deemed to include (i) the actual and prospective assignees and participants referred to in clause (f) and the lenders and other funding sources referred to in clause (g), as applicable for the purposes of this Section 10.17), and further provided, that in no event shall the Lender be obligated or required to return any materials furnished by or on behalf of the Borrower or any other Loan Party Obligor or Obligor.  The obligations of the Lender under this Section 10.17 shall supersede and replace the obligations of the Lender under any confidentiality letter or provision in respect of this financing or any other financing previously signed and delivered by the Lender to the Borrower or any of its Affiliates.

[signature page follows]

140690.01019/101148069v.1

**Debtor-in-Possession Loan and Security Agreement**

IN WITNESS WHEREOF, Borrower, each other Loan Party Obligor party hereto, and Lender have signed this Agreement as of the date first set forth above.

**Borrower:**                                      **Lender:**

**LINCOLN PAPER AND TISSUE, LLC**                  **SIENA LENDING GROUP LLC**

By: _____                          By: _____
   Name:  John Wissmann                                Name:
   Its:    CFO                                         Its:

                                                    By: _____
                                                       Name:
                                                       Its:

**Guarantor:**

**LPT HOLDING, LLC**

By: _____
   Name:  John Wissmann
   Its:    CFO

Debtor-in-Possession Loan and Security Agreement

---

IN WITNESS WHEREOF, Borrower, each other Loan Party Obligor party hereto, and Lender have signed this Agreement as of the date first set forth above.

**Borrower:**                          **Lender:**

**LINCOLN PAPER AND TISSUE, LLC**      **SIENA LENDING GROUP LLC**

By: _____            By: _____
    Name:                              Name: STEVEN SANICOLA
    Its:                               Its: Director

                                     By: _____
                                       Name: Francisco Machado
                                       Its: V.P.

**Guarantor:**

**LPT HOLDING, LLC**

By: _____
    Name:
    Its:

**Disclosure Schedule**

1.  Loan Party Obligor Information:

    (a)  Jurisdictions of Formation; Foreign Business Qualifications:

| LOAN PARTY OBLIGOR | JURISDICTION OF FORMATION | FOREIGN BUSINESS QUALIFICATIONS |
|---|---|---|
| LPT Holding, LLC | Delaware | Maine |
| Lincoln Paper and Tissue, LLC | Delaware | Maine |

    (b)  Names:

| LOAN PARTY OBLIGOR LEGAL NAME | PRIOR LEGAL NAMES | EXISTING TRADE NAMES | PRIOR TRADE NAMES |
|---|---|---|---|
| LPT Holding, LLC | Delaware | LPT Holding, LLC | N/A |
| Lincoln Paper and Tissue, LLC | Delaware | Lincoln Paper and Tissue, LLC | N/A |

    (c)  Collateral Locations:

| LOAN PARTY OBLIGOR | COLLATERAL DESCRIPTION | COLLATERAL LOCATION OR PLACE OF BUSINESS (INCLUDING CHIEF EXECUTIVE OFFICE) | OWNER/LESSOR (IF LEASED) |
|---|---|---|---|
| Lincoln Paper and Tissue, LLC | Equipment, parts and raw materials | Currie Casino 146 Main St. Lincoln, ME | Webber Oil Company |
| Lincoln Paper and Tissue, LLC | Spare parts | 148 Main St. Lincoln, ME | Johnson Company |
| Lincoln Paper and Tissue, LLC | Finished goods | Sibley Warehouse 489 Odin Road Bangor, ME | Sibley Transportation, Inc. |
| Lincoln Paper and Tissue, LLC | Finished goods and raw materials | 242 Miller St., Bangor, ME | Galt Block Warehouse Company, Inc. |
| Lincoln Paper and Tissue, LLC | Finished goods, equipment, parts and raw materials | 50 Katahdin Avenue, Lincoln, Maine | Lincoln Paper and Tissue, LLC |

140690.01019/101148069v.1

(d)   Collateral in Possession of Lessor, Bailee, Consignee, or Warehouseman:

| LOAN PARTY OBLIGOR | ADDRESS | LESSOR/BAILEE/CONSIGNEE/ WAREHOUSEMAN |
|---|---|---|
| See (c) above | | |

140690.01019/101148069v.1

(e)      Litigation:

**XNG.** The Company has an agreement with Xpress Natural Gas (Xpress) for the delivery of natural gas by truck. There is a dispute between the parties regarding the Company's purchase requirement and related payments made for the period ended February 28, 2014. Xpress claims the Company owes it an additional amount and the Company believes Xpress owes it a refund of amounts previously paid. The dispute is going to arbitration and the likelihood of loss cannot be determined at this time.  Prior to filing for arbitration, Xpress claimed it was owed $710,000 for 2013 and 2014.  Lincoln has told Xpress at that time that it did not believe the amount could exceed $309,000, and Xpress (orally) has acknowledged that it had made a calculation error and that Lincoln's estimate likely is more accurate.  There have not been any formal damage demands made in the arbitration.

**FERC**. In a letter dated November 3, 2009, the Federal Energy Regulatory Commission (FERC) accused the Company of violating certain FERC regulations related to ISO New England, Inc.'s (ISO-NE) Day-Ahead Load Response Program (DALRP) during 2007 and 2008... On July 17, 2012, FERC issued an Order to Show Cause and Notice of Proposed Penalty, alleging that the Company violated FERC's anti-manipulation rule and Section 222 of the Federal Power Act. FERC's proposed penalty totals $4,779,000 ($4,400,000 civil penalty and disgorgement of $379,000). On December 2, 2013, the FERC filed an action in the U.S. District Court for the District of Massachusetts seeking enforcement of its assessment against the Company. Management and the Company's legal counsel intend to vigorously defend against the claims and believe they have an adequate defense. Given the status of this matter, the Company's legal counsel have further stated they are unable to opine on any potential outcome at this time. Given this uncertainty, the Company cannot reasonably estimate the manner and timing of resolution of the matter, the likelihood of loss, or an estimate of a range of possible losses that could result in the event of a settlement or an adverse verdict if the case goes to trial.

**SULLIVAN AND MERRITT CONSTRUCTORS, INC**.   Sullivan and Merritt filed a complaint against Lincoln Paper and Tissue on August 26, 2015 demanding payment of $1,120,318.47 and alleging that such amount is secured by a mechanic's lien.

**FASTCO CORPORATION**.  Fastco and Merritt filed a complaint against Lincoln Paper and Tissue on August 3, 2015 demanding payment of $336,999.13 and alleging that such amount is secured by a mechanic's lien.

(f)    Capitalization of Loan Party
Obligors:

| Loan Party Obligor | Equity-holder | Equity Description | Percentage of Outstanding Equity Issued by Loan Party Obligor | Certificate (Indicate No.) |
|---|---|---|---|---|
| Lincoln Paper and Tissue | LPT Holding, LLC | LLC Interest | 100% | #1 |
| LPT Holding, LLC | various | LLC Interest | 100% | N/A |

(g)    Other Investment Property:

| Loan Party Obligor | Investment Property Description |
|---|---|
| None | |

2.    Commercial Tort Claims                See 1(e), above

3.    Deposit Accounts / Other accounts:

| Loan Party Obligor | Name of Financial Institution | Account Number (* indicates account is approved for funding of loan proceeds) | Purpose of Account | Is the Account a "Restricted Account" as defined in Schedule B (Yes or No?) |
|---|---|---|---|---|
| LPT Holding | JPM Chase | 887097632 | disbursement | No |
| Lincoln Paper and Tissue | JPM Chase | 3073180985 | LC Block Acct | No |
| Lincoln Paper and Tissue | JPM Chase | 163388710 | Medical D'bursement | Yes |
| Lincoln Paper and Tissue | JPM Chase | 163388720 | Medical Flex Spending | Yes |
| Lincoln Paper and Tissue | JPM Chase | 886120997 | Payroll Account | Yes |
| Lincoln Paper and Tissue | JPM Chase | 886121003 | lockbox | No |

Disclosure Schedule Page 4

| Lincoln Paper and Tissue | JPM Chase | 886120989* | Operating | No |
|---|---|---|---|---|

4. Intellectual Property:

    (a) Patents and Patent Licenses

| Loan Party Obligor | Patent Registration Number | Registration Date | Patent Application Number | Application Date |
|---|---|---|---|---|
| N/A | | | | |

    (b) Trademarks and Trademark Licenses

| Loan Party Obligor | Trademark Title | Trademark Application Number | Trademark Registration Number | Date of Application | Date of Registration |
|---|---|---|---|---|---|
| Lincoln Paper and Tissue | HI-PLY | 75006323 | 2096470 | 10-16-1995 | 9-16-1997 |
| N/A | N/A | N/A | N/A | N/A | N/A |

    (c) Copyrights and Copyright Licenses

| Loan Party Obligor | Copyright Title | Copyright Registration Date | Copyright Registration Number | Copyright Application Number |
|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A |

5. Insurance:                                                Provided to Lender prior to the Closing Date

140690.01019/101148069v.1

6. Permitted Indebtedness:

>FAME Permitted Indebtedness in the original
>principal amount of approximately $970,000

>LC Agreement with JPM Chase Bank (blocked
>collateral account) – to be refinanced by
>Lender post loan closing

>Caterpillar Financial Services Corporation –
>equipment leases

>NMHG Financial Services – equipment leases

>US Bank – equipment leases

7. Permitted Liens:

>FAME – all assets lien on all of Borrower's personal property, subject to the Intercreditor Agreement

>LC Agreement with JPM Chase Bank (blocked collateral account)

>Caterpillar Financial Services Corporation – equipment leases / precautionary UCC filing

>NMHG Financial Services – equipment leases / precautionary UCC filing

>US Bank – equipment leases

140690.01019/101148069v.1

## Schedule A

### Description of Certain Terms

1.   Loan Limits for Revolving Loans:

(a)   Maximum Revolving Facility Amount:   From the Petition Date through and including entry of the Final Order, $4,500,000, and upon entry of the Final Order, the Maximum Revolving Facility Amount shall be increased to $6,600,000, in each case minus Reserves against the Maximum Revolving Facility Amount.

(b)   Advance Rates:

(i)   Accounts Advance Rate:   85%; ***provided***, that if Dilution exceeds 3%, Lender may, at its option (A) reduce such advance rate by the number of full or partial percentage points comprising such excess or (B) establish a Reserve on account of such excess (the "***Dilution Reserve***").

(ii)   Inventory Advance Rate:   60% of the value of Eligible Inventory valued at the lower of cost or market.

(iii)   Equipment Advance Rate:   100% of the liquidation value of the Eligible Equipment.

(c)   Inventory Sublimit   The lesser of (A) 100% of the amount set forth in clause (i) of the definition of Borrowing Base, less any Reserves established against Accounts or (B) $1,500,000

(d)   Sublimit for Revolving Loans made to Borrower against Eligible Inventory consisting of raw materials   $250,000 at any time outstanding

(e)   Sublimit for Revolving Loans made to Borrower against Eligible Inventory consisting of finished goods that are located in trailers on the Borrower's premises   $250,000 at any time outstanding

(f)   Sublimit for Revolving Loans made to Borrower against Eligible Equipment   $2,500,000

A-1

2.  Reserved;

3.  Interest Rates:

    (a)  Revolving Loans made pursuant to
        clauses (i) or (ii) of the Borrowing Base:    6.00% per annum in excess of the Base Rate

    (b)  Revolving Loans made pursuant to
        clauses (i) or (ii) of the Borrowing Base:    7.50% per annum in excess of the Base Rate

4.  Maximum Days re Eligible Accounts:

    (a)  Maximum days after original *invoice
        date* for Eligible Accounts:    Ninety (90) days

    (b)  Maximum days after original *invoice
        due date* for Eligible Accounts:    Sixty (60) days

5.  Lender's Bank:    Wells Fargo Bank, National Association and its
    affiliates
    (which bank may be changed from time to time by
    notice from Lender to Borrower)

    Wiring Instructions:

    Siena Funding Depository Account
    Account # 4986311751
    ABA Routing # 121000248
    Reference: Lincoln Paper and Tissue

6.  Maturity Date:    The earliest to occur of (a) the sixtieth day
    following the Petition Date (subject to Section
    1.7(b)), (b) the effective date or substantial
    consummation of a Reorganization Plan that has
    been confirmed by an order of the Bankruptcy
    Court, (c) the closing of an Approved Sale, (d) the
    date of the conversion of the Case to a case under
    Chapter 7 of the Bankruptcy Code, (e) the date of
    the dismissal of the Case, and (f) the date that is
    twenty one (21) days after the entry of the Interim
    Order (or any earlier date that the Interim Order
    expires or terminates by its terms) if the Final Order
    has not been entered or has not become effective as
    of such date

140690.01019/101148069v.1

**Schedule B**

**Definitions**

Unless otherwise defined herein, the following terms are used herein as defined in the UCC: Accounts, Account Debtor, Certificated Security, Chattel Paper, Commercial Tort Claims, Deposit Accounts, Documents, Electronic Chattel Paper, Equipment, Farm Products, Fixtures, General Intangibles, Goods, Health-Care-Insurance Receivables, Instruments, Inventory, Letter-of-Credit Rights, Proceeds, Supporting Obligations and Tangible Chattel Paper.

As used in this Agreement, the following terms have the following meanings:

"**Accounts Advance Rate**" means the percentage set forth in Section 1(b)(i) of Schedule A.

"**Advance Rates**" means, collectively, the Accounts Advance Rate and the Inventory Advance Rate.

"**Affiliate**" means, with respect to any Person, any other Person in control of, controlled by, or under common control with the first Person, and any other Person who has a substantial interest, direct or indirect, in the first Person or any of its Affiliates, including, any officer or director of the first Person or any of its Affiliates; *provided*, however, that neither Lender nor any of its Affiliates shall be deemed an "Affiliate" of Borrower for any purposes of this Agreement. For the purpose of this definition, a "substantial interest" shall mean the direct or indirect legal or beneficial ownership of more than ten (10%) percent of any class of equity or similar interest.

"**Agreement**" and "**this Agreement**" has the meaning set forth in the heading to this Agreement.

"**Allowed Professional Fees**" has the meaning given to the term "Allowed Professional Fees" in the Final Order, or, prior to the entry of the Final Order, the Interim Order, less the amount of any retainers, if any, then held by such persons.

"**Approved Electronic Communication**" means each notice, demand, communication, information, document and other material transmitted, posted or otherwise made or communicated by e-mail, facsimile, Passport 6.0, or any other equivalent electronic service, whether owned, operated or hosted by Lender, any of its Affiliates or any other Person, that any party is obligated to, or otherwise chooses to, provide to Lender pursuant to this Agreement or any other Loan Document, including any financial statement, financial and other report, notice, request, certificate and other information or material; *provided* that Approved Electronic Communications shall not include any notice, demand, communication, information, document or other material that Lender specifically instructs a Person to deliver in physical form.

"**Approved Sale**" means a sale of all or substantially all of the Loan Party Obligors' or any Loan Party Obligor's assets or business pursuant to Section 363 of the Bankruptcy Code which is approved in writing by Lender and pays all Obligations in full in cash.

"**Authorized Officer**" means the chief executive officer, chief financial officer or treasurer of Borrower and each other Person designated from time to time by any of the foregoing officers

140690.01019/101148069v.1

of Borrower in a notice to Lender, which designation shall continue in force and effect until terminated in a notice to Lender from any of the foregoing officers of Borrower.

"***Avoidance Actions***" means all claims and causes of action of Borrower or its estate under Chapter 5 of the Bankruptcy Code and all proceeds thereof and property received thereby whether by judgment, settlement, or otherwise, whether pursuant to federal law or applicable state law.

"***Bankruptcy Code***" means the United States Bankruptcy Code (11 U.S.C. § 101 et seq.), as the same may be amended, modified or supplemented from time to time, and any successor statute thereto.

"***Bankruptcy Court***" has the meaning set forth in the recitals hereto.

"***Base Rate***" means, for any day, the greatest of (i) the per annum rate of interest which is identified as the "Prime Rate" and normally published in the Money Rates section of The Wall Street Journal (or, if such rate ceases to be so published, as quoted from such other generally available and recognizable source as Lender may select) ("the ***Published Prime Rate***"), (ii) the sum of the Federal Funds Rate plus 0.5% and (iii) 3.25%. Any change in the Base Rate due to a change in such Published Prime Rate or the Federal Funds Rate shall be effective on the effective date of such change in such Published Prime Rate or the Federal Funds Rate.

"***Bidding Procedures***" has the meaning set forth in Section 7.1(ii) hereof.

"***Bidding Procedures Order***" has the meaning set forth in Section 7.1(jj) hereof.

"***Blocked Account***" has the meaning set forth in Section 4.1.

"***Borrower***" has the meaning set forth in the heading to this Agreement.

"***Borrowing Base***" means, as of any date of determination, the Dollar Equivalent Amount as of such date of determination of (i) the aggregate amount of Eligible Accounts multiplied by the Accounts Advance Rate; plus (ii) the lower of cost or market value of Eligible Inventory multiplied by the applicable Inventory Advance Rate(s), plus (iii) the aggregate amount of Eligible Equipment multiplied by the Equipment Advance Rate (in each case, subject to the sublimits set forth on **Schedule A**; *minus* (iv) the Carve-Out Reserve Amount, *minus* (v) the Trustee Fee Reserve, *minus* (vi) all other Reserves which Lender has established pursuant to Section 1.2 (including those to be established in connection with any requested Revolving Loan).

"***Budget***" means a budget prepared by Borrower in good faith based upon assumptions which Borrower believes to be reasonable and delivered to Lender on or before the Closing Date and attached hereto as Exhibit G, setting forth Borrower's cash flow forecast in reasonable detail satisfactory to Lender including receipts, disbursements and such line item detail as satisfactory to Lender, as well as projected borrowings and availability hereunder for the period commencing the Petition Date through and including the date that is sixty days after the Petition Date (the "***Initial Period***"), and to the extent Lender consents to the extension of the Initial Period in its sole discretion, for each period subsequent to the Initial Period as Lender may request, means a budget prepared by Borrower in good faith based upon assumptions which Borrower believes to be reasonable setting forth Borrower's cash flow forecast in reasonable detail satisfactory to Lender including receipts, disbursements and such line item detail as satisfactory to Lender, as well as projected borrowings and availability for the period requested by Lender.

B-2

"*Budget Compliance Report*" has the meaning set forth in Section 5.15(j)(2).

"*Business Day*" means a day other than a Saturday or Sunday or any other day on which Lender or banks in New York are authorized to close.

"*Capital Expenditures*" means all expenditures which, in accordance with GAAP, would be required to be capitalized and shown on the consolidated balance sheet of Borrower, but excluding expenditures made in connection with the acquisition, replacement, substitution or restoration of assets to the extent financed (a) from insurance proceeds (or other similar recoveries) paid on account of the loss of or damage to the assets being replaced or restored or (b) with cash awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced.

"*Capitalized Lease*" means any lease which is or should be capitalized on the balance sheet of the lessee thereunder in accordance with GAAP.

"*Carve-Out*" has the meaning given to the term "Carve-Out" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"*Carve-Out Reserve Account*" means an escrow account maintained by Borrower with JPMorgan Chase or as otherwise consent by Siena, which shall be used solely to escrow funds for the Allowed Professional Fees, which funds shall be funded by Borrower only in accordance with the Budget.

"*Carve-Out Reserve Amount*" means $0 so long as all amounts required to be funded to the Carve-Out Reserve Account in accordance with the Budget are funded to the Carve-Out Reserve Account and otherwise, an amount determined by Lender as the amount necessary to fund into the Carve-Out Reserve Account in accordance with the Budget.

"*Case*" has the meaning set forth in the recitals hereto.

"*Cash Collateral Order*" means any order(s) of the Bankruptcy Court authorizing the use of cash collateral in the Case.

"*Cash Management Order*" has the meaning set forth in Section 1.6(a)(9) hereof.

"*Changed Circumstances*" has the meaning set forth in Section 3.5(h) hereof.

"*Closing Date*" means the date the Interim Order is approved by the Bankruptcy Court.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Collateral*" means all property and interests in property in or upon which a security interest, mortgage, pledge or other Lien is granted pursuant to this Agreement or the other Loan Documents, including all of the property of each Loan Party Obligor described in Section 3.1.

"*Collections*" has the meaning set forth in Section 4.1.

"*Compliance Certificate*" means a compliance certificate substantially in the form of Exhibit F hereto to be signed by the Chief Financial Officer or President of Borrower.

140690.01019/101148069v.1

"***Confidential Information***" means confidential information that any Loan Party Obligor furnishes to the Lender pursuant to any Loan Document concerning any Loan Party Obligor's business, but does not include any such information once such information has become, or if such information is, generally available to the public or available to the Lender (or other applicable Person) from a source other than the Loan Party Obligors which is not, to the Lender's knowledge, bound by any confidentiality agreement in respect thereof.

"***Creditors' Committee***" means the official unsecured creditors' committee appointed in the Case.

"***Debtors***" has the meaning set forth in the recitals hereto.

"***Default***" means any event which with notice or passage of time, or both, would constitute an Event of Default.

"***Default Rate***" has the meaning set forth in Section 2.1.

"***Dilution***" means, as of any date of determination, a percentage, based upon the experience of the immediately prior 3 months, that is the result of dividing the Dollar Equivalent Amount of (a) bad debt write-downs, discounts, advertising allowances, credits, or other dilutive items, each made after invoicing and billing to the Account Debtor with respect to Borrower's Accounts during such period, by (b) Borrower's billings with respect to Accounts during such period.

"***Dilution Reserve***" has the meaning set forth in Section 1(b)(i) of Schedule A.

"***Dollar Equivalent Amount***" means, at any time, (a) as to any amount denominated in Dollars, the amount hereof at such time, and (b) as to any amount denominated in a currency other than Dollars, the equivalent amount in Dollars as determined by Lender at such time that such amount could be converted into Dollars by Lender according to prevailing exchange rates selected by Lender.

"***Dollars***" or "***$***" means United States Dollars, lawful currency for the payment of public and private debts.

"***E-Signature***" means the process of attaching to or logically associating with an Approved Electronic Communication an electronic symbol, encryption, digital signature or process (including the name or an abbreviation of the name of the party transmitting the Approved Electronic Communication) with the intent to sign, authenticate or accept such Approved Electronic Communication.

"***Eligible Account***" means, at any time of determination, an Account owned by Borrower which satisfies the general criteria set forth below and which is otherwise acceptable to Lender in its sole discretion (***provided***, that Lender may, in its sole discretion, change the general criteria for acceptability of Eligible Accounts and shall notify Borrower of such change promptly thereafter). An Account shall be deemed to meet the current general criteria if:

(i)     neither the Account Debtor nor any of its Affiliates is an Affiliate, creditor or supplier of any Loan Party Obligor;

(ii)     it does not remain unpaid more than the earlier to occur of (A) the number of days after the original invoice date set forth in Section 4(a) of Schedule A or (B) the number of days after the original invoice due date set forth in Section 4(b) of Schedule A;

B-4

(iii)    the Account Debtor or its Affiliates are not past due (or past any of applicable dates referenced in clause (ii) above) on other Accounts owing to Borrower comprising more than 25% of all of the Accounts owing to Borrower by such Account Debtor or its Affiliates;

(iv)    all Accounts owing by the Account Debtor or its Affiliates do not represent more than 25% of all otherwise Eligible Accounts (*provided*, that Accounts which are deemed to be ineligible solely by reason of this clause (iv) shall be considered Eligible Accounts to the extent of the amount thereof which does not exceed 25% of all otherwise Eligible Accounts);

(v)    no covenant, representation or warranty contained in this Agreement or any other Loan Document with respect to such Account (including any of the representations set forth in Section 5.4) has been breached;

(vi)    the Account is not subject to any contra relationship, counterclaim, dispute or set-off;

(vii)    the Account Debtor's chief executive office or principal place of business is located in the United States or Canada;

(viii)    the Account is payable solely in Dollars;

(ix)    it is absolutely owing to Borrower and does not arise from a sale on a bill-and-hold, guarantied sale, sale-or-return, sale-on-approval, consignment, retainage or any other repurchase or return basis or consist of progress billings;

(x)    Lender shall have verified the Account in a manner satisfactory to Lender;

(xi)    the Account Debtor is not the United States of America or any state or political subdivision (or any department, agency or instrumentality thereof), unless Borrower has complied with the Assignment of Claims Act of 1940 (31 U.S.C. §203 et seq.) or other applicable similar state or local law in a manner satisfactory to Lender;

(xii)    it is at all times subject to Lender's duly perfected, first priority security interest and to no other Lien that is not a Permitted Lien, and the goods giving rise to such Account (A) were not, at the time of sale, subject to any Lien except Permitted Liens and (B) have been sold by Borrower to the Account Debtor in the ordinary course of Borrower's business and delivered to and accepted by the Account Debtor, or the services giving rise to such Account have been performed by Borrower and accepted by the Account Debtor in the ordinary course of Borrower's business;

(xiii)    the Account is not evidenced by Chattel Paper or an Instrument of any kind (unless delivered to Lender in accordance with Section 3.2 of this Agreement) and has not been reduced to judgment;

(xiv)    the Account Debtor's total indebtedness to Borrower does not exceed the amount of any credit limit established by Borrower or Lender and the Account Debtor is otherwise deemed to be creditworthy by Lender (*provided*, that Accounts which are deemed to be ineligible solely by reason of this clause (xiii) shall be considered Eligible Accounts to the extent the amount of such Accounts does not exceed the lower of such credit limits);

B-5

(xv)    there are no facts or circumstances existing, or which could reasonably be anticipated to occur, which might result in any adverse change in the Account Debtor's financial condition or impair or delay the collectability of all or any portion of such Account;

(xvi)    Lender has been furnished with all documents and other information pertaining to such Account which Lender has requested, or which Borrower is obligated to deliver to Lender, pursuant to this Agreement;

(xvii)    Borrower has not made an agreement with the Account Debtor to extend the time of payment thereof beyond the time periods set forth in clause (ii) above;

(xviii)    Borrower has not posted a surety or other bond in respect of the contract under which such Account arose; and

(xix)    the Account Debtor is not subject to any proceeding seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar applicable law.

"*__Eligible Equipment__*" means, as determined solely as of the Closing Date, Equipment owned by Borrower which satisfies the general criteria set forth below and which is otherwise acceptable to Lender, in its sole discretion, (*provided*, that Lender may, in its sole discretion, change the general criteria for acceptability of Eligible Equipment and shall notify Borrower of such change promptly thereafter).  Equipment shall be deemed to meet the current general criteria if:

(i)    it is in good condition and is in marketable condition and is adequately maintained;

(ii)    it is not obsolete, damaged, defective, out of service, contaminated, unmerchantable, returned, discontinued or repossessed;

(iii)    it is currently used in the business of Borrower;

(iv)    it is not in the possession of a processor, consignee or bailee, or located on premises leased or subleased to Borrower, or on premises subject to a mortgage in favor of a Person other than Lender, unless such processor, consignee, bailee or mortgagee or the lessor or sublessor of such premises, as the case may be, has executed and delivered all documentation which Lender shall require to evidence the subordination or other limitation or extinguishment of such Person's rights with respect to such Inventory and Lender's right to gain access thereto;

(v)    it meets all standards imposed by any Governmental Authority;

(vi)    it conforms in all respects to any covenants, warranties and representations set forth in this Agreement and each other Loan Document;

(vii)    it is at all times subject to Lender's duly perfected, first priority security interest and no other Lien except a Permitted Lien;

(viii)    Lender is in receipt of an appraisal of such Equipment in form and substance satisfactory to Lender; and

(ix)    it is situated at a Collateral Location listed in Section 1(c) of the Disclosure Schedule or other location of which Lender has been notified as required by Section 5.8, in each case

B-6

which location must be in the continental United States; and it is not subject to (A) any due and unpaid taxes owing and (B) any mechanics liens or other similar liens arising under applicable law.

"*Eligible Equipment Availability Amount*" has the meaning set forth in the defined term Borrowing Base.

"*Eligible Inventory*" means, at any time of determination, Inventory (other than packaging materials and supplies) owned by Borrower which satisfies the general criteria set forth below and which is otherwise acceptable to Lender in its sole discretion (*provided*, that Lender may, in its sole discretion, change the general criteria for acceptability of Eligible Inventory and shall notify Borrower of such change promptly thereafter).  Inventory shall be deemed to meet the current general criteria if:

(i)      it consists of (a) raw materials comprised of bailed, virgin hardwood pulp that has not been opened or unpacked or (b) finished goods comprised of tissue products that have been manufactured pursuant to a firm purchase order, but in no event shall it consist of work in progress;

(ii)      it is in good, new and saleable condition;

(iii)      it is not slow-moving, obsolete, damaged, contaminated, unmerchantable, returned, rejected, discontinued, repossessed, fabricated or supplies and packaging;

(iv)      it is not in the possession of a processor, consignee or bailee, or located on premises leased or subleased to Borrower, or on premises subject to a mortgage in favor of a Person other than Lender, unless such processor, consignee, bailee or mortgagee or the lessor or sublessor of such premises, as the case may be, has executed and delivered all documentation which Lender shall require to evidence the subordination or other limitation or extinguishment of such Person's rights with respect to such Inventory and Lender's right to gain access thereto (*provided*, at the election of Lender in its sole discretion, this clause (iv) may be waived with respect to Inventory located on a premises for which Lender has established a rent or other similar Reserve satisfactory to Lender in its sole discretion);

(v)      it does not consist of fabricated parts, consigned items, supplies or packaging;

(vi)      it meets all standards imposed by any Governmental Authority;

(vii)      it conforms in all respects to any covenants, warranties and representations set forth in this Agreement and each other Loan Document;

(viii)      it is at all times subject to Lender's duly perfected, first priority security interest and no other Lien except a Permitted Lien;

(ix)      it is not purchased or manufactured pursuant to a license agreement that is not assignable to each of Lender and its transferees; and

(x)      it is situated at a Collateral location listed in Section 1(c) of the Disclosure Schedule or other location of which Lender has been notified as required by Section 5.8 (and it is not in-transit), in each case which location must be in the continental United States.

"*ERISA*" means the Employee Retirement Income Security Act of 1974 and all rules, regulations and orders promulgated thereunder.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) under common control with a Loan Party Obligor within the meaning of section 414(b) or (c) of the Code (and sections 414(m) and (o) of the Code for purposes of provisions relating to section 412 of the Code and section 302 of ERISA).

"*ERISA Event*" means (a) a Reportable Event with respect to a Pension Plan; (b) the withdrawal of any Loan Party Obligor or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by a Loan Party Obligor or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA; (e) the institution by the PBGC of proceedings to terminate a Pension Plan; (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (g) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Loan Party Obligor or any ERISA Affiliate.

"*Event of Default*" has the meaning set forth in Section 7.1.

"*Excess Availability*" means the amount, as determined by Lender, calculated at any date, equal to the difference of (A) the lesser of (x) the Maximum Revolving Facility minus Reserves against the Maximum Revolving Facility Amount, and (y) the Borrowing Base minus Reserves against the Borrowing Base, minus (B) the sum of the outstanding balance of all Revolving Loans and the outstanding Pre-Petition Obligations; *provided* that if any of the Loan Limits for Revolving Loans is exceeded as of the date of calculation, then Excess Availability shall be zero.

"*Excluded Taxes*" means any of the following Taxes imposed on or with respect to a Recipient  or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof); (b) in the case of a Non-U.S. Recipient (as defined in Section 9(e)), U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Non-U.S. Recipient with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which Non-U.S. Recipient becomes a party to this Agreement or acquires a participation, except in each case to the extent that, pursuant to Section 9 amounts with respect to such Taxes were payable either to such Non-U.S. Recipient assignor (or Lender granting such participation) immediately before such assignment or grant of participation; (c) United States federal withholding Taxes that would not have been imposed but for such Recipient's failure to comply with Section 9(e) (except where the failure to comply with Section 9(e) was the result of a change in law, ruling, regulation, treaty, directive, or interpretation thereof by a Governmental Authority after the date the Recipient became a party to this Agreement or a Participant) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

 "*FAME*" means the Finance Authority of Maine, a body corporate and politic and a public instrumentality of the State of Maine.

"***FAME Parent Guaranty***" means the Economic Recovery Loan Program Corporate Guaranty dated as of December 9, 2014 made by Parent, as guarantor in favor of FAME, as lender in respect of the FAME Permitted Indebtedness.

"***FAME Loan Agreement***" means the Economic Recovery Loan Program Loan Agreement dated as of December 9, 2014 by and between FAME, as lender and the Borrower, as borrower.

"***FAME Loan Documents***" means, collectively, (i) the FAME Loan Agreement, (ii) the FAME Term Note, (iii) FAME Parent Guaranty, (iv) the Fame Security Agreement and (v) all other instruments, agreements and documents executed in connection therewith.

"***FAME Permitted Indebtedness***" means the Indebtedness evidenced by the FAME Term Note in an aggregate principal amount outstanding at any time not to exceed $970,000.

"***FAME Permitted Liens***" means, collectively all Liens in favor of FAME securing the FAME Permitted Indebtedness.

"***FAME Security Agreement***" means the Economic Recovery Loan Program Security Agreement dated as of December 9, 2014 by and between FAME, as lender and the Borrower, as borrower.

"***FAME Term Note***" means that certain term Promissory Note dated as of December 9, 2014, from Borrower in favor of FAME in the original principal amount of $970,000.

"***FATCA***" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof.

"***FERC Litigation***" means <u>Federal Energy Regulatory Commission v. Lincoln Paper and Tissue, LLC</u>, Case No. 1:13-CV-13056 in the United States District Court, District of Massachusetts, as more fully described in Section 1(e) of the Disclosure Schedule.

"***Final Order***" means a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the Loan Documents under Sections 364(c) and (d) of the Bankruptcy Code on a final basis and entered at or after a final hearing, in form and substance satisfactory to Lender. The Final Order shall, among other things, have:

(a)   authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the principal amount of $8,000,000 as provided for herein;

(b)   granted the claim and Lien status and Liens described in Section 3.5, and prohibited the granting of additional Liens on the assets of Loan Party Obligors except for any Liens specifically provided for in such order, which all such Liens shall be Permitted Liens;

(c)   provided that such Liens are automatically perfected as of the Petition Date by the entry of the Final Order and also granted to Lender relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable Lender, if Lender elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by Lender to perfect, protect and insure the priority of its Liens upon the Collateral as a matter of non-bankruptcy law;

(d)       provided that no Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out;

(e)       prohibited the use of any cash collateral by any Loan Party Obligor;

(f)       provided Lender with relief from the automatic stay in a manner consistent with the terms of Section 7.2; and

(g)       authorized payment in full of all Pre-Petition Obligations, including without limitation the Annual Fee, the Collateral Monitoring Fee, and the Early Termination Fee (in the amount of 3% of the Maximum Facility Amount), each as defined in and existing under the Pre-Petition Credit Agreement.

"*Fiscal Year*" means the fiscal year of Borrower which ends on December 31 of each year.

"*GAAP*" means generally accepted accounting principles set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the United States accounting profession), which are applicable to the circumstances as of the date of determination, in any case consistently applied.

"*Governmental Authority*" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"*Guaranty*", "*Guaranteed*" or to "*Guarantee*", as applied to any Indebtedness, liability or other obligation, means (i) a guaranty, directly or indirectly, in any manner, including by way of endorsement (other than endorsements of negotiable instruments for collection in the ordinary course of business), of any part or all of such Indebtedness, liability or obligation, and (ii) an agreement, contingent or otherwise, and whether or not constituting a guaranty, assuring, or intended to assure, the payment or performance (or payment of damages in the event of non-performance) of any part or all of such Indebtedness, liability or obligation by any means (including, the purchase of securities or obligations, the purchase or sale of property or services, or the supplying of funds).

"*Indebtedness*" means (without duplication), with respect to any Person, (i) all obligations or liabilities, contingent or otherwise, for borrowed money, (ii) all obligations represented by promissory notes, bonds, debentures or the like, or on which interest charges are customarily paid, (iii) all liabilities secured by any Lien on property owned or acquired, whether or not such liability shall have been assumed, (iv) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (v) all obligations of such Person issued or assumed as the deferred purchase price of property or services (excluding trade payables which are not ninety days past the invoice date incurred in the ordinary course of business, but including the maximum potential amount payable under any earn-out or similar obligations), (vi) all Capitalized Leases of such Person, (vii) all obligations (contingent or otherwise) of such Person as an account party or applicant in respect of letters of credit and/or bankers' acceptances, or in respect

B-10

of financial or other hedging obligations, (viii) all equity interests issued by such Person subject to repurchase or redemption at any time on or prior to the final scheduled Maturity Date, other than voluntary repurchases or redemptions that are at the sole option of such Person, (ix) all principal outstanding under any synthetic lease, off-balance sheet loan or similar financing product, and (x) all Guarantees, endorsements (other than for collection in the ordinary course of business) and other contingent obligations in respect of the obligations of others.

"*Indemnified Taxes*" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party Obligor under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"*Ineligible Professional Expenses*" shall mean fees or expenses incurred by any Person, including the Creditors' Committee, in connection with any of the following: (a) an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief:  (i) challenging the legality, validity, priority, perfection, or enforceability of the Obligations (including, without limitation, the Pre-Petition Obligations) or Lender's Liens on and security interests in the Collateral, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Obligations (including, without limitation, the Pre-Petition Obligations) or Lender's Liens on and security interests in the Collateral (as defined herein and/or in the Pre-Petition Credit Agreement), or (iii) preventing, hindering or delaying Lender's assertion or enforcement of any Lien, claim, right or security interest or realization upon any in accordance with the terms and conditions of the Interim Order or Final Order, (b) a request to use the cash collateral (as such term is defined in Section 363 of the Bankruptcy Code) without the prior written consent of Lender, except to the extent expressly permitted in the Interim Order or, upon entry of the Final Order, the Final Order, (c) a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, other than from Lender, without the prior written consent of Lender, (d) the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against Lender or any of its officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from Lender or Pre-Petition Lender under Chapter 5 of the Bankruptcy Code, or (e) any act which has or could have the effect of materially and adversely modifying or compromising the rights and remedies of Lender or Pre-Petition Lender, or which is contrary, in a manner that is material and adverse to Lender or Pre-Petition Lender, to any term or condition set forth in or acknowledged by this Agreement, the Loan Documents or the Interim Order and which results in the occurrence of an Event of Default under this Agreement, the Interim Order or the Final Order.

"*Initial Period*" has the meaning set forth in the definition of "Budget" herein.

"*Intellectual Property*" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, patents, patent licenses, trademarks and trademark licenses, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"*Intercreditor Agreement*" shall mean that certain Intercreditor Agreement dated as of the Pre-Petition Closing Date among Lender, Borrower and FAME.

"*Interim Order*" means a final order of the Bankruptcy Court in the Case authorizing and approving this Agreement and the Loan Documents, for an interim period, under Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a hearing, in form and substance satisfactory to Lender.  The Interim Order shall, among other things, have:

B-11

(a)     authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount up to $4,500,000 on an interim basis and in an amount not less than $6,600,000 as provided for herein on a final basis;

(b)     granted the claim and Lien status and Liens described in Section 3.5, and prohibited the granting of additional Liens on the assets of Loan Party Obligors except for any Liens specifically provided for in such order, which all such Liens shall be Permitted Liens;

(c)     provided that such Liens are automatically perfected as of the Petition Date by the entry of the Interim Order and also granted to Lender relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable Lender, if Lender elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by Lender to perfect, protect and insure the priority of its Liens upon the Collateral as a matter of non-bankruptcy law;

(d)     upon entry of the Final Order, provided that no Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve Out; and

(e)     prohibited the use of any cash collateral by any Loan Party Obligor; and

(f)     provided Lender with relief from the automatic stay in a manner consistent with the terms of Section 7.2

"*Inventory Advance Rate*" means the percentage(s) set forth in Section 1(b)(ii) of Schedule A.

"*Investment Property*" means the collective reference to (a) all "investment property" as such term is defined in Section 9-102 of the UCC, (b) all "financial assets" as such term is defined in Section 8-102(a)(9) of the UCC, and (c) whether or not constituting "investment property" as so defined, all Pledged Equity.

"*Issuers*" means the collective reference to each issuer of Investment Property.

"*Judgment Currency*" has the meaning set forth in Section 6.3(b).

"*Lender*" has the meaning set forth in the heading to this Agreement.

"*Lien*" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement in the nature of a security interest of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"*Loan Account*" has the meaning set forth in Section 2.4.

"*Loan Documents*" means, collectively, this Agreement and all notes, guaranties, security agreements, mortgages, certificates, landlord's agreements, Lock Box and Blocked Account agreements, the Interim Order, the Final Order, the Cash Management Order, the Mortgage, the Intercreditor Agreement, the Validity Guaranties and all other agreements, documents and

B-12

instruments now or hereafter executed or delivered by Borrower, any Loan Party Obligor, or any Other Obligor in connection with, or to evidence the transactions contemplated by, this Agreement.

"*Loan Guaranty*" means Section 8 of this Agreement.

"*Loan Limits*" means, collectively, the Loan Limits for Revolving Loans set forth in Section 1 of Schedule A and all other limits on the amount of Loans set forth in this Agreement.

"*Loan Party Obligor*" means, individually, Borrower or any Obligor that is a Loan Party Obligor; and "*Loan Party Obligors*" means, collectively, Borrower and each Loan Party Obligor.

"*Loans*" means, collectively, the Revolving Loans.

"*Lock Box*" has the meaning set forth in Section 4.1.

"*Material Adverse Effect*" means any event, act, omission, condition or circumstance which, which individually or in the aggregate, has or could reasonably be expected to have a material adverse effect on (i) the business, operations, prospects, properties, assets or condition, financial or otherwise, of any Loan Party Obligor or any Other Obligor, as applicable, excepting, however as may have occurred as a result of the filing of the Case and any reduction of the operation of the business of any Loan Party Obligor in a manner consistent with the Budget, (ii) the ability of any Loan Party Obligor or any Other Obligor, as applicable, to perform any of its obligations under any of the Loan Documents, or (iii) the validity or enforceability of, or Lender's rights and remedies under, any of the Loan Documents.

"*Material Budget Deviation*" has the meaning set forth in Section 7.1(pp).

"*Material Contract*" has the meaning set forth in Section 5.18.

"*Maturity Date*" means the date set forth in Section 6 of Schedule A, as such date may be accelerated in accordance with the terms of this Agreement.

"*Maximum Lawful Rate*" has the meaning set forth in Section 2.5.

"*Maximum Liability*" has the meaning set forth in Section 8.9.

"*Maximum Revolving Facility Amount*" means the amount set forth in Section 1(a) of Schedule A.

"*Mechanics Lien Holders*" means the Mechanic Lienors as defined in the Interim Order and/or Final Order, as applicable.

"*Mortgage*" means the Open-End Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated as of the Pre-Petition Closing Date on the Borrower's real property located at 50 Katahdin Avenue, Lincoln, Maine securing the Obligations.

"*Multiemployer Plan*" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which a Loan Party Obligor or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

B-13

"*Non-Paying Guarantor*" has the meaning set forth in Section 8.10.

"*Non-U.S. Recipient*" has the meaning set forth in Section 9(e)(ii).

"*Notice of Borrowing*" has the meaning set forth in Section 1.4.

"*Obligations*" means (i) all Pre-Petition Obligations, including, without limitation, all indemnification obligations of Loan Party Obligors (or any of them) to Lender arising under the Pre-Petition Financing Documents, including, without limitation, the obligations under Sections 1.7(c), 1.9, 6.3, 9 and 10.7 of the Pre-Petition Credit Agreement, and (ii) all present and future Loans, advances, debts, liabilities, fees, expenses, obligations, guaranties, covenants, duties and indebtedness at any time owing by Borrower or any Loan Party Obligor to Lender, whether evidenced by this Agreement, any other Loan Document, the Pre-Petition Financing Documents or otherwise (including, without limitation, under the Interim Order or the Final Order) whether arising from an extension of credit, guaranty, indemnification or otherwise, whether direct or indirect (including those acquired by assignment and any participation by Lender in Borrower's indebtedness owing to others), whether absolute or contingent, whether due or to become due, and whether arising before or after the conversion of the Case to a chapter 7 case under the Bankruptcy Code or any similar statute.

"*Obligor*" means any guarantor, endorser, acceptor, surety or other Person liable on, or with respect to, any of the Obligations or who is the owner of any property which is security for any of the Obligations, other than Borrower.

"*Organic Documents*" means, with respect to any Person, the certificate of incorporation, articles of incorporation, certificate of formation, certificate of limited partnership, by-laws, operating agreement, limited liability company agreement, limited partnership agreement or other similar governance document of such Person.

"*Other Obligor*" means any Obligor other than any Loan Party Obligor.

"*Other Taxes*" means all present or future stamp, court or documentary, property, excise, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"*Parent*" means LPT Holding, LLC, a Delaware limited liability company.

"*Participant*" has the meaning set forth in Section 10.10.

"*Passport 6.0*" means the electronic and/or internet-based system approved by Lender for the purpose of making notices, requests, deliveries, communications, and for the other purposes contemplated in this Agreement or otherwise approved by Lender, whether such system is owned, operated or hosted by Lender, any of its Affiliates or any other Person.

"*Paying Guarantor*" has the meaning set forth in Section 8.10.

"*PBGC*" means the Pension Benefit Guaranty Corporation.

"*Pension Act*" means the Pension Protection Act of 2006.

"*Pension Funding Rules*" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and

Multiemployer Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA, and any sections of the Code or ERISA related thereto that are enacted after the date of this Agreement.

"***Pension Plan***" means any employee pension benefit plan (including a Multiple Employer Plan or a Multiemployer Plan) that is maintained or is contributed to by a Loan Party Obligor and any ERISA Affiliate and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"***Permitted Indebtedness***" means:  (a) the Obligations (including, without limitation, the Pre-Petition Obligations);  (b) the Indebtedness existing on the Petition Date described in Section 6 of the Disclosure Schedule; (c) capitalized leases and purchase money Indebtedness existing on the Petition Date secured by Permitted Liens in an aggregate amount not exceeding $100,000 at any time outstanding; (d) Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business and (e) the FAME Permitted Indebtedness.

"***Permitted Liens***" means (a) purchase money security interests in specific items of Equipment existing on the Petition Date and securing Permitted Indebtedness described under clause (c) of the definition of Permitted Indebtedness; (b) liens for taxes, fees, assessments, or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings (which proceedings have the effect of preventing the enforcement of such lien) for which adequate reserves in accordance with GAAP are being maintained, ***provided*** the same have no priority over any of Lender's security interests; (c) liens of materialmen, mechanics, carriers, or other similar liens arising in the ordinary course of business and securing obligations which are not delinquent or are being contested in good faith by appropriate proceedings (which proceedings have the effect of preventing the enforcement of such lien) for which adequate reserves in accordance with GAAP are being maintained; (d) liens which constitute banker's liens, rights of set-off, or similar rights as to deposit accounts or other funds maintained with a bank or other financial institution (but only to the extent such banker's liens, rights of set-off or other rights are in respect of customary service charges relative to such deposit accounts and other funds, and not in respect of any loans or other extensions of credit by such bank or other financial institution to any Loan Party Obligor), (e) cash deposits or pledges of an aggregate amount not to exceed $10,000 to secure the payment of worker's compensation, unemployment insurance, or other social security benefits or obligations, public or statutory obligations, surety or appeal bonds, bid or performance bonds, or other obligations of a like nature incurred in the ordinary course of business; and (f) the FAME Permitted Liens to secure the FAME Permitted Indebtedness.

"***Permitted Priority Liens***" shall mean the "Permitted Liens" as defined in the Interim Order and/or Final Order, as applicable.

"***Person***" means any individual, sole proprietorship, partnership, joint venture, limited liability company, trust, unincorporated organization, association, corporation, government or any agency or political division thereof, or any other entity or the Creditors' Committee.

"***Petition Date***" has the meaning set forth in the recitals hereto.

"***Plan***" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of any Loan Party Obligor or any such plan to which any Loan Party Obligor (or with respect to any plan subject to Section 412 of the Code

B-15

or Section 302 or Title IV of ERISA, any ERISA Affiliate) is required to contribute on behalf of any of its employees.

"*Pledged Equity*" means the equity interests listed on Sections 1(f) and 1(g) of the Disclosure Schedule, together with any other equity interests, certificates, options, or rights or instruments of any nature whatsoever in respect of the equity interests of any Person that may be issued or granted to, or held by, any Loan Party Obligor while this Agreement is in effect, and including, without limitation, to the extent attributable to, or otherwise related to, such pledged equity interests, all of such Loan Party Obligor's (i) interests in the profits and losses of each Issuer, (ii) rights and interests to receive distributions of each Issuer's assets and properties, and (iii) rights and interests, if any, to participate in the management or each Issuer related to such pledged equity interests.

"*Post-Petition Obligations*" means all Obligations other than Pre-Petition Obligations.

"*Pre-Petition Closing Date*" means December 11, 2014.

"*Pre-Petition Collateral*" means all Collateral (as defined in the Pre-Petition Credit Agreement) in existence as of the Petition Date.

"*Pre-Petition Credit Agreement*" has the meaning set forth in the recitals hereto.

"*Pre-Petition Financing Documents*" means the Pre-Petition Credit Agreement, the Loan Documents (as defined in the Pre-Petition Credit Agreement) and each document, agreement and instrument (and all schedules and exhibits thereto) executed in connection therewith, in each case, as in effect immediately prior to the Petition Date.

"*Pre-Petition Lender*" means Lender (as defined in the Pre-Petition Credit Agreement).

"*Pre-Petition Obligations*" means all "Obligations" as defined under the Pre-Petition Credit Agreement.

"*Pre-Petition Payment*" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of the Pre-Petition Obligations, any other pre-petition Indebtedness or trade payables or other pre-petition claims against Borrower or any other Obligor.

"*Pre-Petition Released Claim*" has the meaning set forth in Section 1.12(a).

"*Protective Advances*" has the meaning set forth in Section 1.3.

"*Recipient*" means any Lender, Participant, or any other recipient of any payment to be made by or on account of any Obligation of any Loan Party Obligor under this Agreement or any other Loan Document, as applicable.

"*Register*" has the meaning set forth in Section 10.9(a).

"*Released Parties*" has the meaning set forth in Section 6.1(a).

"*Releasees*" has the meaning set forth in Section 1.12(a).

"*Releasors*" has the meaning set forth in Section 1.12(a).

"*Reorganization Plan*" means a plan or plans of reorganization in the Case.

"*Reportable Event*" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"*Reserves*" has the meaning set forth in Section 1.2.

"*Restricted Accounts*" means Deposit Accounts (a) established and used (and at all times will be used) solely for the purpose of paying current payroll obligations of Loan Party Obligors (and which do not (and will not at any time) contain any deposits other than those necessary to fund current payroll), in each case in the ordinary course of business, or (b) maintained (and at all times will be maintained) solely in connection with an employee benefit plan, but solely to the extent that all funds on deposit therein are solely held for the benefit of, and owned by, employees (and will continue to be so held and owned) pursuant to such plan.

"*Revolving Loans*" has the meaning set forth in Section 1.1(a).

"*Sale Order*" has the meaning set forth in Section 7.1(ll).

"*Securities Act*" means the Securities of Act of 1933, as amended.

"*Stated Rate*" has the meaning set forth in Section 2.5.

"*Statutory Fees*" has the meaning given to the term "Statutory Fees" in the Final Order, or, prior to the entry of the Final Order, the Interim Order.

"*Subsidiary*" means any corporation or other entity of which a Person owns, directly or indirectly, through one or more intermediaries, more than 50% of the capital stock or other equity interest at the time of determination.  Unless the context indicates otherwise, references to a Subsidiary shall be deemed to refer to a Subsidiary of Borrower.

"*Superpriority Claim*" means an allowed claim against any Loan Party Obligor or such Loan Party Obligor's estate in the Case which is an administrative expense claim having priority pursuant to Section 364(c)(1) of the Bankruptcy Code over (a) any and all allowed administrative expenses or priority claims and (b) all unsecured claims now existing or hereafter arising, including any administrative expenses of the kind specified in the Bankruptcy Code, including without limitation Sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503, 506(c) (upon entry of the Final Order), 507, 546, 726, 1113 or 1114 of the Bankruptcy Code.

"*Taxes*" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Termination Date*" means the date on which all of the Obligations have been indefeasibly paid in full in cash and all of Lender's lending commitments under this Agreement and under each of the other Loan Documents have been terminated.

"*Trustee Fee Reserve*" means, at any given time, an amount equal to the fees due or which may become due, to a chapter 7 or chapter 11 trustee in the Bankruptcy Case in the event a trustee is appointed or for any other reason.

B-17

"*UCC*" means, at any given time, the Uniform Commercial Code as adopted and in effect at such time in the State of New York or such other applicable jurisdiction.

"*Validity Guaranties*" means, collectively (a) the Validity Guaranty dated as of the Pre-Petition Closing Date executed by John Wissman in favor of Lender, and (b) the Validity Guaranty dated as of the Pre-Petition Closing Date executed by Keith Van Scotter in favor of Lender.

Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder (including determinations made pursuant to the exhibits hereto) shall be made, and all financial statements required to be delivered hereunder shall be prepared on a consolidated basis in accordance with GAAP consistently applied.  If at any time any change in GAAP would affect the computation of any financial ratio or financial requirement set forth in any Loan Document, and either Borrower or Lender shall so request, Lender and Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; *provided* that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) Borrower shall provide to Lender financial statements and other documents required under this Agreement and the other Loan Documents which include a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Statement of Financial Accounting Standards 159 (Codification of Accounting Standards 825-10) to value any Indebtedness or other liabilities of any Loan Party Obligor at "fair value", as defined therein.

Notwithstanding anything to the contrary contained in the paragraph above or the definitions of Capital Expenditures or Capitalized Leases, in the event of a change in GAAP after the Closing Date requiring all leases to be capitalized, only those leases (assuming for purposes of this paragraph that they were in existence on the Closing Date) that would constitute Capitalized Leases on the Closing Date shall be considered Capitalized Leases (and all other such leases shall constitute operating leases) and all calculations and deliverables under this Agreement or the other Loan Documents shall be made in accordance therewith (other than the financial statements delivered pursuant to this Agreement; *provided* that all such financial statements delivered to Lender in accordance with the terms of this Agreement after the date of such change in GAAP shall contain a schedule showing the adjustments necessary to reconcile such financial statements with GAAP as in effect immediately prior to such change).

References in this Agreement to "Articles", "Sections", "Annexes", "Exhibits" or "Schedules" shall be to Articles, Sections, Annexes, Exhibits or Schedules of or to this Agreement unless otherwise specifically provided.  Any term defined herein may be used in the singular or plural.  "Include", "includes" and "including" shall be deemed to be followed by "without limitation".  "Or" shall be construed to mean "and/or".  Except as otherwise specified or limited herein, references to any Person include the successors and assigns of such Person.  References "from" or "through" any date mean, unless otherwise specified, "from and including" or "through and including", respectively.  Unless otherwise specified herein, the settlement of all payments and fundings hereunder between or among the parties hereto shall be made in lawful money of the United States and in immediately available funds.  Time is of the essence for each performance obligation of the Loan Party Obligors under this Agreement and each Loan Document.  All amounts used for purposes of financial calculations required to be made herein shall be without duplication.  References to any statute or act shall include all related current regulations and all amendments and any successor statutes, acts and regulations.  References to any agreement, instrument or document (i) shall include all schedules,

exhibits, annexes and other attachments thereto and (ii) shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein or in any other Loan Document).   The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.   Unless otherwise specified herein Dollar ($) baskets set forth in the representations and warranty, covenants and event of default provisions of this Agreement (and other similar baskets) are calculated as of each date of measurement by the Dollar Equivalent Amount thereof as of such date of measurement.

B-19

## Schedule C

### Fees

(a)    **Closing Fee.** A fee equal to $125,000 (the "***Closing Fee***"), which Closing Fee shall be deemed to be fully earned and non-refundable upon entry of the Interim Order and shall be payable in full on the earlier of the Maturity Date and the Termination Date.

(b)    **[Reserved].**

(c)    **Collateral Monitoring Fee.** A fee equal to $4,000 per month (the "***Collateral Monitoring Fee***"). The first Collateral Monitoring Fee shall be deemed to be fully earned and non-refundable upon entry of the Interim Order and each monthly Collateral Monitoring Fee thereafter shall be deemed to be fully earned and non-refundable upon the first day of each calendar month. All accrued Collateral Monitoring Fees shall be payable in full on the earlier of the Maturity Date and the Termination Date.

(d)    **Unused Line Fee.** An unused line fee (the "***Unused Line Fee***") equal to 0.75% per annum of the amount by which (i) the Maximum Revolving Facility Amount, calculated without giving effect to any Reserves, if any, applied to the Maximum Revolving Facility Amount, exceeds (ii) the average daily outstanding principal balance of the Revolving Loans during the immediately preceding month (or part thereof), which each such fee shall be deemed to be fully earned, nonrefundable and payable, in arrears, on the first day of each month until the Termination Date.

(e)    **[Reserved].**

(f)    **[Reserved].**

(g)    **[Reserved].**

(h)    **Late Document Fee.** A fee equal to $150 per document per calendar day for each document, instrument or report identified on Schedule D and required to be delivered to Lender pursuant to this Agreement that is overdue. Notwithstanding the payment of any such fee, any Event of Default resulting from such late delivery shall not be cured by such payment of any such fee. Each such fee shall be deemed to be fully earned and payable upon demand by Lender.

(i)    **Passport 6.0 Fee.** A fee equal to $200 per month for access to and use of Passport 6.0, which each such shall be deemed to be fully earned and payable upon entry of the Interim Order and on the first day of each month thereafter until the Termination Date.

140690.01019/101148069v.1

**Schedule D**

Provide Lender with each of the documents set forth below at the following times in form satisfactory to Lender:

| | |
|---|---|
| Weekly (no later than the 2nd Business Day of each week), but in any event no later than the date of each Loan made or more frequently if Lender requests | (a)      a detailed aging, by total, of Borrower's Accounts, together with an Account roll-forward with supporting details supplied from sales journals, collection journals, credit memos, collections, accounts receivable aging reports, credit registers and any other records, with respect to Borrower's Accounts (delivered electronically in an acceptable format). |
| Weekly (no later than the 2nd Business Day of each week) or more frequently if Lender requests | (b)      notice of all claims, offsets, or disputes asserted by Account Debtors with respect to Borrower's Accounts, <br><br> (c)      copies of invoices together with corresponding shipping and delivery documents, and credit memos together with corresponding supporting documentation, with respect to invoices and credit memos in excess of an amount determined in the sole discretion of Lender, from time to time, <br><br> (d)      a detailed Inventory perpetual report with respect to Borrower's Inventory together with a reconciliation to Borrower's general ledger accounts, including a listing by category and location of Inventory (delivered electronically in an acceptable format), <br><br> (e)      a detailed calculation of Inventory of Borrower that is not eligible for the Borrowing Base (delivered electronically in an acceptable format), and <br><br> (f)      an update, in form and substance satisfactory to Lender, from SSG Capital Advisors, as to the status of potential bidders to purchase the Loan Party Obligors' assets as a going concern. |
| Monthly (no later than the 10th day of each month) | (g)      a detailed aging, by total, of Borrower's Accounts, together with reconciliation and support documentation for any reconciling items noted (delivered electronically in an acceptable format), <br><br> (h)      a summary aging, by vendor, of each Loan Party Obligor's accounts payable and any book overdraft  and an aging, by vendor, of any held checks (delivered electronically in an acceptable format), and <br><br> (i)      a monthly Account roll-forward with respect to Borrower's Accounts, in a format acceptable to Lender in its discretion, tied to the beginning and ending Account balances of Borrower's general ledger (delivered electronically in an acceptable format). |

D-1

| | |
|---|---|
| Monthly (no later than the 20th day of each month) | (j)      a reconciliation of Accounts, trade accounts payable, and Inventory of Borrower's general ledger accounts to its monthly financial statements including any book reserves related to each category, and<br><br>(k)      a monthly sales backlog report. |
| Quarterly | (l)      a report regarding each Loan Party Obligor's accrued, but unpaid, ad valorem taxes. |
| Contemporaneously with each Revolving Loans | (m)      reports reasonably requested by Lender, including, without limitation, sales journal, credit memos and collections, cash disbursements, accounts receivable and accounts payable reports. |
| Promptly upon (but in no event later than two Business Days after) delivery or receipt, as applicable, thereof | (n)      copies of any and all written notices (including notices of default or acceleration), reports and other deliveries received by or on behalf of any Loan Party Obligor from or sent by or on behalf of any Loan Party Obligor to, any holder, agent or trustee with respect to any or all of the FAME Permitted Indebtedness, the Mechanic Lien Holders or any other Indebtedness (in such holder's, agent's or trustee's capacity as such). |

D-2

E-1

**Exhibit A**

**FORM OF NOTICE OF BORROWING**

**[Letterhead of Borrower]**

Siena Lending Group LLC
9 W. Broad Street, 5th Floor
Stamford, Connecticut 06902
Attention: Steve Sanicola

Dear Mr. Sanicola

Please refer to the Debtor-in-Possession Loan and Security Agreement dated as of September 30, 2015 (as amended, restated or otherwise modified from time to time, the "***Loan Agreement***") among the undersigned, as Borrower, the Loan Party Obligors (as defined therein) party thereto, and Siena Lending Group LLC, as Lender. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Loan Agreement. This notice is given pursuant to Section 1.4 of the Loan Agreement and constitutes a representation by Borrower that the conditions specified in Section 1.6 of the Loan Agreement have been satisfied. Without limiting the foregoing, (i) each of the representations and warranties set forth in the Loan Agreement and in the other Loan Documents is true and correct in all respects as of the date hereof (or to the extent any representations or warranties are expressly made solely as of an earlier date, such representations and warranties shall be true and correct as of such earlier date), both before and after giving effect to the Loans requested hereby, (ii) no Default or Event of Default is in existence, both before and after giving effect to the Loans requested hereby, and (iii) the borrowing being requested hereunder shall be used in accordance with the Budget, subject to the variances permitted under Section 7.1(pp) of the Loan Agreement within five (5) Business Days of the funding of such borrowing request.

Borrower hereby requests a borrowing under the Loan Agreement as follows:

The aggregate amount of the proposed borrowing is $[_____]. The requested borrowing date for the proposed borrowing (which is a Business Day) is [_____], [_____].

Borrower has caused this Notice of Borrowing to be executed and delivered by its officer thereunto duly authorized on [_____].

LINCOLN PAPER AND TISSUE, LLC

By:_____
Title: _____

Ex. A-1

**Exhibit B**

**CLOSING CHECKLIST**

**1.**    This Agreement
**2.**    Subordination Agreement between Lender and Sullivan & Merritt Constructors, Inc.
**3.**    Subordination Agreement between Fastco Fabrication, Inc. d/b/a Fastco Corporation.

140690.01019/101148069v.1

**Exhibit C**

**CLIENT USER FORM**

**Siena Lending Group LLC**
**Passport 6.0 – Client User Form**

**Borrower Name**:   Lincoln Paper and Tissue, LLC

**Borrower Number**: _____

**Loan and Security Agreement Date**:  September 30, 2015

I, being an authorized signer of the above borrower (the "***Borrower***"), refer to the above Debtor-in-Possession Loan and Security Agreement (as amended, restated or otherwise modified from time to time, the "***Loan Agreement***") between the Borrower and Siena Lending Group LLC.  This is the Client User Form, used to determined client access to Passport 6.0.  Terms defined in the Loan Agreement have the same meaning when used in this Client User Form.

Being duly authorized by the Borrower, I confirm that the following people have been authorized by the Borrower to have access to Passport 6.0:

| First Name | Last Name | Email Address | Phone Number |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

_____         _____

Authorized Signer                                    Authorized Signer


Name:                                                Name:
Title:                                               Title:

Ex. C-1

**Exhibit D**

**AUTHORIZED ACCOUNTS FORM**

**Siena Lending Group LLC**
**Authorized Accounts Form**

**Borrower Name**:   Lincoln Paper and Tissue, LLC

**Borrower Number**:   _____

**Loan and Security Agreement Date**:  September 30, 2015

I, being an authorized signer of the above borrower (the "***Borrower***"), refer to the above Debtor-in-Possession Loan and Security Agreement (as amended, restated or otherwise modified from time to time, the "***Loan Agreement***") between the Borrower and Siena Lending Group LLC ("***Lender***").  This is the Authorized Accounts Form, referring to authorized operating bank accounts of the Borrower.  Terms defined in the Loan Agreement have the same meaning when used in this Authorized Accounts Form.

Being duly authorized by the Borrower, I confirm that the following operating bank accounts of the Borrower are the accounts into which the proceeds of any Loan may be paid:

| Bank | Routing Number | Account number | Account name |
|------|---------------|----------------|--------------|
|      |               |                |              |
|      |               |                |              |
|      |               |                |              |
|      |               |                |              |
|      |               |                |              |
|      |               |                |              |
|      |               |                |              |
|      |               |                |              |

_____               _____

Authorized Signer                                            Authorized Signer


Name:                                                           Name:
Title:                                                          Title:

Ex. D-1

**Exhibit E**

**FORM OF ACCOUNT DEBTOR NOTIFICATION**

**[Date]**

**VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

**[Account Debtor]**
**[Address]**

Re:     **Loan Transaction with Siena Lending Group LLC**

Ladies and Gentlemen:

       Please be advised that we have entered into certain financing arrangements (along with any other financing agreements that we may enter into with Lender in the future, the "Financing Arrangements") with Siena Lending Group LLC ("Lender"), pursuant to which we have granted to Lender a security interest in, among other things, any and all Accounts and Chattel Paper (as those terms are defined in the Uniform Commercial Code) owing by you to us, whether now existing or hereafter arising.

       You are authorized and directed to respond to any inquiries that Lender may direct to you from time to time pertaining to the validity, amount, and other matters relating to such Accounts and Chattel Paper. In the event that Lender requests that payment for any Accounts and/or Chattel Paper be made directly to Lender, you are hereby authorized and directed to comply with such instructions, without further authorization or instruction from us.

       This authorization and directive shall be continuing and irrevocable until all of the Financing Agreements have been terminated and all obligations owing thereunder by us have indefeasibly been paid in full in cash.

Very truly yours,

**LINCOLN PAPER AND TISSUE, LLC**

By: _____
Name:
Its:

cc:    SIENA LENDING GROUP LLC
       9 W. Broad Street, 5th Floor
       Stamford, Connecticut 06902
       Attention: Steven Sanicola

140690.01019/101148069v.1

**Exhibit F**

**FORM OF COMPLIANCE CERTIFICATE**

[letterhead of Borrower]

To:   Siena Lending Group LLC
      9 W. Broad Street, 5th Floor
      Stamford, Connecticut 06902
      Attention:  Steven Sanicola

Re:  Compliance Certificate dated _____

Ladies and Gentlemen:

Reference is made to that certain Debtor-in-Possession Loan and Security Agreement dated as of September 30, 2015 (as amended, restated or otherwise modified from time to time, the "Loan Agreement") by and among Siena Lending Group LLC ("Lender"), Lincoln Paper and Tissue, LLC, a Delaware limited liability company ("Borrower") and each of the Loan Party Obligors (as defined therein) party thereto.  Capitalized terms used in this Compliance Certificate have the meanings set forth in the Loan Agreement unless specifically defined herein.

Pursuant to Section 5.15 of the Loan Agreement, the undersigned Chief Financial Officer of Borrower hereby certifies (solely in his capacity as an officer or Borrower and not in his individual capacity) that:

1.      The financial statements of Borrower for the ___ -month period ending _____ attached hereto have been prepared in accordance with GAAP, and fairly present the financial condition of Borrower for the periods and as of the dates specified therein.

2.      As of the date hereof, there does not exist any Default or Event of Default.

     IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned this _____ day of _____, _____.

                              **LINCOLN PAPER AND TISSUE, LLC**

                              By: _____
                              Name:
                              Title:  Chief Financial Officer

Ex. F-1